# EXHIBIT C

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI DADE-COUNTY, FLORIDA

**CASE NO. 2022-022900-CA-01**

**MICHAEL NORRIS,** et al.

*Plaintiffs,*

*v.*

**COMPLEX BUSINESS
LITIGATION DIVISION**

**THOMAS BRADY,** et al.

**JURY DEMAND**

*Defendants.*

_____/

**PLAINTIFF VIJETH SHETTY'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON WHETHER THE YBA HE PURCHASED WAS A "SECURITY"**

Plaintiff, Vijeth Shetty, moves for partial summary judgment on the specific issue of

whether the Yield-Bearing Account ("YBA") *he purchased* from West Realm Shires Services Inc.

d/b/a FTX US ("FTX US") was a security.[1]

**INTRODUCTION**

Plaintiff Shetty asks the Court to grant summary judgment at this stage on one very targeted

and specific issue: whether the YBA he purchased from FTX is a security. Based upon this Court's

prior experience in securities litigation, that specific and narrow question can and should be

decided (under any conclusion) quickly for all of the parties, so that this case, as well as all

cryptocurrency litigation across the globe, can be advanced and the victims (and alleged co-

---

[1] This Court already set the Initial Case Management Conference for March 7th at 11:30am. This Motion is being filed now, so that it will be fully briefed by the CMC (under the civil rules of procedure of this Court). Undersigned Counsel are also counsel in a proposed federal class action case brought on behalf of US and non-US victims. Counsel for Defendant Brady executed and returned a Waiver of Service on January 17th. Counsel for Defendants O'Leary and Ortiz each requested and were provided with Notices of Commencement of Action and Requests to Waive Service of Process on January 4th and 11th, respectively.

*Michael Norris, et al. v. David Ortiz, et al., Case No. 2022-022900-CA-01*
*Plaintiff Vijeth Shetty's Motion for Partial Summary Judgment*

conspirators) have a more clear and expedited path. The answer to this narrow and specific question will greatly advance litigation across the country all relating to the FTX Disaster, help move the parties towards determining who may be liable for promoting these YBAs, and may also help advance and/or resolve, all of the other massive litigation pending against other cryptocurrency platforms (such as Voyager) that offered similar YBAs.

This important question was already ***practically*** answered in the affirmative through various regulatory statements, guidance, and actions issued by the Securities and Exchange Commission and other regulatory entities. For example, the SEC and state securities regulators have targeted cryptocurrency brokers and exchanges just like FTX for offering almost this exact identical type of interest-bearing account, finding that exchanges such as BlockFi,[2] Voyager,[3] Celsius,[4] and Gemini[5] all offered these same accounts as unregistered securities.

As set forth below, the YBA Shetty purchased was a security, under both the *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293 (1946) ("*Howey*") and *Reves v. Ernst & Young*, 494 U.S. 56 (1990) ("*Reves*") tests.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

1.      Before Shetty opened a YBA with FTX, he saw many advertisements and promotions regarding FTX's trading platform, including, for example, advertisements for FTX

---

[2] https://www.sec.gov/litigation/admin/2022/33-11029.pdf (accessed January 20, 2023).

[3] https://www.nj.gov/oag/newsreleases22/Voyager%20Summary%20Order.pdf (accessed January 20, 2023); *see also* https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/ (accessed January 20, 2023).

[4] https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwjvjNvg27j7AhWfRTABHfwzDe4QFnoECAsQAQ&url=https%3A%2F%2Fwww.nj.gov%2Foag%2Fnewsreleases21%2FCelsius-Order-9.17.21.pdf&usg=AOvVaw0Zd94fuhFSsOoGKM-vQ3YI (accessed January 20, 2023).

[5] https://www.sec.gov/litigation/complaints/2023/comp-pr2023-7.pdf (accessed January 20, 2023).

*Michael Norris, et al. v. David Ortiz, et al., Case No. 2022-022900-CA-01*
*Plaintiff Vijeth Shetty's Motion for Partial Summary Judgment*

made not only by FTX but also by Thomas Brady and Kevin O'Leary. *See* Declaration of Vijeth Shetty dated January 20, 2023 ("Shetty Decl."), attached as **Exhibit A**, ¶ 3.

2.      One such advertisement was a promotional video broadcast online by FTX that touted earning up to 8% "yield" on any fiat or crypto held in a YBA. Shetty Decl., ¶ 3. FTX represented that customers are eligible to earn the "yield," which is rewarded hourly simply by passively keeping the funds in the YBA. *Id.*

3.      In part because he was interested in passively generating "yield" on both fiat and crypto holdings, Shetty then downloaded the FTX App and signed up for a YBA on September 13, 2021. Shetty Decl., ¶ 4.

4.      After Shetty opened his YBA and logged in, he found that the earn capability in his YBA was automatically enabled, and did not need to take any action to "opt in." Shetty Decl., ¶ 5.

5.      Shetty initially deposited $500 USD and began automatically earning "yield" on that fiat currency. Shetty Decl., ¶ 6. While the FTX app includes a button to toggle off the earn function on assets held in the YBA, at no time did Shetty click that button to turn off the earn capability, which was automatically enabled when he opened his YBA. *Id.*

6.      Ultimately, Shetty deposited $5,500 in USD, which he converted to SOL (the cryptocurrency, Solana), and deposited an additional $20,000.00 USD in the YBA, which he kept in the YBA because FTX was offering 8% APY up to a certain limit. Shetty Decl., ¶¶ 7–8.

7.      By the time FTX froze all accounts and declared bankruptcy, Shetty had deposited a total of $25,500.00 USD into his YBA. Shetty Decl., ¶ 8.

8.      On November 10, 2022, Shetty attempted to initiate an ACH transfer of $20,463.50 USD to take it off the platform. Shetty Decl., ¶ 9.

*Michael Norris, et al. v. David Ortiz, et al., Case No. 2022-022900-CA-01*
*Plaintiff Vijeth Shetty's Motion for Partial Summary Judgment*

9.      On November 15, 2022, when Shetty did not receive the funds back to his bank account, he contacted Circle Internet Financial to ascertain the status of the transfer. Shetty Decl., ¶ 10.

10.      Shetty was informed that because FTX "is the primary Circle Account holder and holds the transacting business relationship, too," that Circle was "unable to assist [him] directly on this issue" and advised him to "work directly with the FTX support team for this request." Shetty Decl., ¶¶ 10–12.

11.      The ACH transaction never processed, and to date Shetty has not received a return of the $25,500.00 he invested into the YBA. Shetty Decl., ¶¶ 9–13.

12.      The YBA was a yield-bearing account that FTX customers, including Shetty, were offered through both the FTX and FTX.us platforms. *See* Expert Report of Paul Sibenik, Lead Case Manager at CipherBlade, dated January 20, 2023 ("Sibenik Rpt."), attached as **Exhibit B** ¶ 39; *see also id.*, Appendix C. The FTX website describes it as follows:

> *"You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."*

Sibenik Rpt., ¶ 39; *see also id.*, Appendix C.

13.      The yield that customers like Shetty were offered is also outlined on the Earn page – 8% APY (Annual percentage yield) for total collective deposits under $10,000 USD equivalent, and 5% APY for collective deposits above $10,000 USD. Sibenik Rpt., ¶ 41; *see also id.*, Appendix C. All assets held in the account, whether crypto or fiat, earned the same rate of interest. *Id.*

14.      The FTX website does not describe how, exactly, FTX will generate the applicable yield, and does not indicate what risk factors may be apparent that could result in the inability to pay such yield. Sibenik Rpt., ¶ 43; *see also id.*, Appendix C.

*Michael Norris, et al. v. David Ortiz, et al., Case No. 2022-022900-CA-01*
*Plaintiff Vijeth Shetty's Motion for Partial Summary Judgment*

15.     The website does suggest term 'staking' however as a means of generating yield, indicating that "*By opting in and participating in staking your supported assets in your FTX accoun*t," giving the vague impression all customer assets would be used for 'staking.' Sibenik Rpt., ¶¶ 44–45; *see also id.*, Appendix C.

16.     The word 'staking' in the context of cryptocurrency is understood to have a technical meaning. Sibenik Rpt., ¶ 46. 'Staking' is associated with a consensus mechanism known as 'Proof of Stake'(PoS) and relatedly, 'Delegated Proof of Stake,'(dPoS) which *some* cryptocurrencies utilize, but many don't (such as Bitcoin for example, which uses 'Proof of Work' as a consensus mechanism). *Id.*

17.     FTX is not itself a cryptocurrency operating on a PoS model; FTX was an exchange. Sibenik Rpt., ¶ 48. One cannot 'stake' assets on an exchange. *Id.* One can lend them to an exchange though, and theoretically, that exchange could then stake select cryptocurrency assets on behalf of the user (for cryptocurrencies that have Proof of Stake). *Id.*

18.     FTX, however, often did not 'stake' customer assets, and indeed in many cases *could not* stake customer assets since not all cryptocurrencies utilize Proof of Stake. Sibenik Rpt., ¶ 49. Yet the FTX website and advertisements clearly suggest that 'all assets' in the account are subject to applicable yield, including fiat assets (such as USD), which are technically impossible to stake as the US dollar is obviously not a cryptocurrency at all. Shetty Decl., ¶ 3; Sibenik Decl., ¶¶ 49–50.

19.     Rather than 'staking,' it appears that a primary thing FTX was doing was lending customer assets out, even from applicable customers that weren't part of the 'Earn' program, most notably to Alameda. Sibenik Decl., ¶ 51 (citing Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings in *In re: FTX Trading Ltd., et al.*, No. 22-11068 (JTD), ECF

No.    24    (Bankr.    Del.    Nov.    17,    2022),    available    at    https://pacer-documents.s3.amazonaws.com/33/188450/042020648197.pdf ).

20.    According to FTX's website regarding their Earn program, FTX admit that the Earn "Services are provided by FTX for its customers," that FTX "transmits value from your [YBA]" and those "assets will be used to generate a fixed yield for the user." Sibenik Decl., ¶ 52; *see also id.,* Appendix C.

21.    FTX indicated in the Terms of Service dated May 20, 2020, which according to the Wayback Machine was the version published on FTX's website as in force by October 6, 2021, after Shetty opened his YBA, "Your balances in your [YBA] are not segregated and cryptocurrency or cash are held in shared addresses or accounts, as applicable." Sibenik Decl., ¶ 57;    *see    also    id.,*    Appendix    B    (accessible    at http://web.archive.org/web/20221018024940/https://help.ftx.us/hc/en-us/articles/9081464675735-FTX-Earn).

22.    In other words, Shetty's assets are not technically 'in' his own YBA at all. Sibenik Decl., ¶ 17. At a technical level, an exchange account cannot hold or store cryptocurrency. *Id.* The account stores a record of a liability or an IOU of the exchange to their customer. *Id.* When a user purchases cryptocurrency on an exchange, they are not technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. *Id.* Because this concept of buying and storage can be difficult to understand, it is somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it is not technically true. *Id.*

*Michael Norris, et al. v. David Ortiz, et al., Case No. 2022-022900-CA-01*
*Plaintiff Vijeth Shetty's Motion for Partial Summary Judgment*

23.     The FTX Terms of Service also state "You acknowledge that your [YBA] is not subject to protections or insurance provided by the Federal Deposit Insurance Corporation or the Securities Investor Protection Corporation." Sibenik Decl., ¶ 58; *see also id.,* Appendix B.

24.     On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, which is reproduced in the complaint in this action in full, *see* Compl., ¶ 56, Rotunda concludes:

> Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas.

25.     Moreover, the SEC and state securities regulators have targeted cryptocurrency brokers and exchanges just like FTX for offering almost this exact same type of interest-bearing

*Michael Norris, et al. v. David Ortiz, et al., Case No. 2022-022900-CA-01*
*Plaintiff Vijeth Shetty's Motion for Partial Summary Judgment*

account, finding that exchanges such as BlockFi,[6] Voyager,[7] Celsius,[8] and Gemini[9] all offered these same types of YBAs as unregistered securities.

## ARGUMENT

### I.      LEGAL STANDARD

The summary judgment standard set forth in Florida Rule of Civil Procedure 1.510, as recently amended, applies to this motion. Florida has adopted the Federal summary judgment standard articulated by the U.S. Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), including Federal case law regarding this new standard, meaning the "'summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part' of rules aimed at 'the just, speedy and inexpensive determination of every action.'" *In re Amends, to Fla. Rule of Civ. Proc. 1.510,* 317 So. 3d 72, 75 (Fla, 2021) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).

A party may move for summary judgment on any "claim or defense," or "part of [a] claim or defense." Fla. R. Civ. P. 1.510(a); *Celotex*, 477 U.S. at 323. Once a party makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing there is a genuine issue for trial. *Celotex,*

---

[6] https://www.sec.gov/litigation/admin/2022/33-11029.pdf  (accessed January 20, 2023).

[7] https://www.nj.gov/oag/newsreleases22/Voyager%20Summary%20Order.pdf (accessed January 20,  2023); *see also* https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/ (accessed January 20, 2023).

[8]
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwjvjNvg27j7AhWfRTABHfwzDe4QFnoECAsQAQ&url=https%3A%2F%2Fwww.nj.gov%2Foag%2Fnewsreleases21%2FCelsius-Order-9.17.21.pdf&usg=AOvVaw0Zd94fuhFSsOoGKM-vQ3YI (accessed January 20, 2023).

[9]   https://www.sec.gov/litigation/complaints/2023/comp-pr2023-7.pdf   (accessed   January   20, 2023).

477 U.S. at 324. "[T]he correct test for the existence of a genuine factual dispute is whether 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *In re Amends. to 1.510,* 317 So. 3d at 75 (citation omitted).

Under the new standard, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the [] court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *In re Amends. to 1.510,* 317 So. 3d at 75–76 (citation omitted). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue *of material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id* at 248.

## II.   THE YBA PLAINTIFF SHETTY PURCHASED WAS A SECURITY

### a.   Florida Looks to Federal Law and Agency Interpretation in Interpreting Florida Securities Law

Florida state courts routinely look to interpretations of the federal securities laws for guidance in interpreting Florida's securities laws. *See, e.g., Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1147 (Fla. 3d DCA 2001) ("Florida courts will look to interpretations of the federal securities laws for guidance in interpreting Florida's securities laws."); *Githler v. Grande*, 289 So.2d 533, 537, 539 (Fla. 2d DCA 2019) ("the Florida Securities and Investor Protection Act is patterned after federal securities law; in relying on *Howey* and other cases, Florida courts plainly have looked to federal securities law for guidance in interpreting Florida securities law"); *J.P. Morgan Sec., LLC*

*Michael Norris, et al. v. David Ortiz, et al., Case No. 2022-022900-CA-01*
*Plaintiff Vijeth Shetty's Motion for Partial Summary Judgment*

*v. Geveran Investments Ltd.*, 224 So. 3d 316, 324 (Fla. 5th DCA 2017) (interpreting Section 517.301, Florida Statutes by analyzing federal law on test for materiality developed for Rule 10b-5 claims); *Adams v. State*, 443 So.2d 1003, 1005-6 (Fla. 2d DCA 1983) (looking to federal decisions to construe the *Howey* test); *Yeomans v. State, Dept. of Banking & Finance, Div. of Securities*, 452 So.2d 1011, 1012-3 (Fla. 3d DCA 1984) (agreeing with, adopting and following S.D.N.Y decision which specifically held that certain programs or packages which involve applications for participation in lottery-type drawings for federal oil and gas leases "were not 'securities' under the federal Securities Act which are indistinguishable from ours [Sec. 517.021(15), Fla. Stat. (1981)]").

However, Florida courts are not bound by federal precedent, and must take into consideration the legislative purpose of the FSIPA in construing its laws. The First DCA's decision in *Mehl v. Office of Financial Regulation*, 859 So.2d 1260 (1st DCA 2003) is instructive. There, the First DCA, applying the *Howey* test, determined that a pay telephone sale and lease-back program marketed and sold to investors was an investment contract subject to regulation under the FSIPA. The court analyzed the Eleventh Circuit's decision in *S.E.C. v. ETS Payphones, Inc.*, 300 F.3d 1281 (11th Cir. 2002), which held that a lease-back transaction of ETS pay phones did not constitute a security because the third "profits" prong of *Howey* was lacking. The First DCA noted that *S.E.C. v. ETS* was not binding and applied a more expansive interpretation of the profits prong of *Howey*. It cited to the Florida Supreme Court's decision in *E.F. Hutton & Co. v. Rousseff*, 537 So.2d 978, 979 (Fla. 1989) which held that, "while the various states' securities laws operate in conjunction with federal law, federal laws do not supersede state law," and explained that Florida's interpretation of its securities laws must take into consideration the legislative purpose of the Act, which was designed to protect the public from fraudulent and deceptive practices in the sale and

marketing of securities. The court explained that the Eleventh Circuit's "*S.E.C. v. ETS* opinion is not harmonious with Florida law in that it focused too narrowly on the parties' contractual agreements, without examining all of the factors surrounding the transactions, including particularly the representations made to the purchasers by appellants, as well as the reliance placed by the inexperienced investors on the managerial skills of others." *Id.* at 1264-65. It then concluded that "the third *Howey* element was satisfied pursuant to the broad objectives of Florida law" and that "Florida's interpretation of security takes into consideration the 'legislative purpose of the Florida Securities and Investor Protection Act [, which,] as its title makes clear, [was designed] to protect the public from fraudulent and deceptive practices in the sale and marketing of securities." *Id.* (quoting *Arthur Young & Co. v. Mariner Corp.*, 630 So.2d 1199, 1203 (Fla. 4th DCA 1994).

Therefore, while Florida state courts may look to federal courts and law for guidance in interpretating state securities laws, they also must interpret and apply the *Howey* test consistent with its legislative intent: to protect investors from fraudulent and deceptive practices in the sale and marketing of securities.

Finally, Florida case law is committed to the rule that the administrative construction of a statute by an agency charged with its administration is entitled to great weight. *Mehl*, 859 So. 2d at 1265 (citing *Dep't of Ins. v. Southeast Volusia Hosp. Dist.,* 438 So.2d 815, 820 (Fla. 1983)). Thus, the SEC's and other securities regulators' analyses regarding whether interest-bearing cryptocurrency accounts similar to the YBAs constitute "investment contracts" under the *Howey* test or "notes" under the *Reves* test such that they are securities are entitled to great weight.

**b. The YBA is an Investment Contract under *Howey* and its Progeny**

Under the *Howey* test, a transaction or an investment contract qualifies as a security if it is: (1) an investment of money; (2) in a common enterprise; (3) with a reasonable expectation of

profits to be derived from the entrepreneurial or managerial efforts of others. *Rensel v. Centra Tech, Inc.*, 17-24500-CIV, 2019 WL 6828270, at \*2 (S.D. Fla. Dec. 13, 2019) (citing *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1130 (9th Cir. 1991); *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir. 1989) (*en banc*), *cert. denied*, 494 U.S. 1078 (1990)).

Economic substance, not form, governs whether a given investment is a security. *S.E.C. v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999) (King, J.) (citing *Stowell v. Ted S. Finkel Inv. Servs., Inc.,* 489 F. Supp. 1209, 1224 (S.D. Fla. 1980). ("[T]he securities laws are to be applied in light of the economic realities of a transaction, with the substance of the transaction elevated over the form of the investment. As stated in *Howey* and *Koscot,* the security standard must be a resilient standard, one which is capable of adapting to various and creative schemes devised by promoters who seek to use the money of others.")). A security may include a scheme through which a novel device is widely offered or dealt with under terms or a course of dealing that establishes its character in commerce as an interest or instrument commonly known as a security. *Id.* (citing *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 351, 64 S.Ct. 120, 88 L.Ed. 88 (1943)).

The YBA Plaintiff Shetty purchased meets all elements of the *Howey* test such that the Court should conclude there is no genuine issue of material fact that it is an investment contract, and therefore a security.

### i.  An Investment of Money

The "investment of money" required for an "investment contract" need not be made in cash and refers more generally to "an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses." *Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1348 (S.D. Fla. 2019) (quoting *SEC v. Friendly*, 49 F. Supp. 2d 1363, 1368–69

*Michael Norris, et al. v. David Ortiz, et al., Case No. 2022-022900-CA-01*
*Plaintiff Vijeth Shetty's Motion for Partial Summary Judgment*

(S.D. Fla. 1999)); *see also Uselton v. Comm. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991). Plaintiff's investment of assets, even if such investments were in the form of cryptocurrencies such as Ether and/or Bitcoin, would satisfy the "investment of money" prong for an investment contract.

Here, However, Plaintiff Shetty deposited $25,500 USD into his YBA. SUMF ¶¶ 5–7. Thus, there has been an investment of money.

### ii.  In a Common Enterprise

"[A] common enterprise exists where the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties." *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11ᵗʰ Cir. 1999) (citing *Villeneuve v. Advanced Bus. Concepts Corp*., 698 F.2d 1121, 1124 (11th Cir. 1990)). Similarly, the former Fifth Circuit, noted that "the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoters]." *S.E.C. v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1369 (S.D. Fla. 1999) (quoting *SEC v. Koscot Int'l, Inc.,* 497 F.2d 473, 479 (5th Cir.1974)). "The thrust of the common enterprise element test is that the investors have no desire to perform the chores necessary for a return, and are attracted to the investment solely by the prospects of a return." *Eberhardt v. Waters*, 901 F.2d 1578, 1580–81 (11th Cir. 1990). "[T]he fact that an investor's return is independent of that of other investors in the scheme is not decisive." *Koscot,* 497 F.2d at 479.

Here, there were many promotions and advertisements by FTX that touted earning up to 8% "yield" on *any* fiat or crypto held in a YBA, along with representations that customers are eligible to earn the "yield," on an hourly basis, simply by passively keeping the funds in the YBA. SUMF ¶ 2. FTX also made the same YBAs available to all FTX customers, and all assets held in

the account, whether crypto or fiat, earned the same rate of interest. SUMF ¶¶ 12–13. Plaintiff

Shetty was interested in passively generating "yield" on the holdings in his YBA. SUMF ¶ 3. Once

he logged into his YBA for the first time, the earn capability was automatically enabled, and he

began passively earning yield as soon as he deposited funds. SUMF ¶ 4. FTX admits that these

earn "[s]ervices are provided by FTX for its customers," that FTX "transmits value from your

[YBA]" and those "assets will be used to generate a fixed yield for the user." SUMF ¶ 20. FTX

further makes it clear in their Terms of Service that investor funds are pooled together and used

for these lending and investment activities that would generate the yield, i.e., "Your balances in

your [YBA] are not segregated and cryptocurrency or cash are held in shared addresses or

accounts, as applicable." SUMF ¶ 21. And finally, FTX's collapse and eventual bankruptcy, the

freezing of his account, and acknowledgement by Circle that FTX was the entity in control of the

account where his assets were purportedly kept, not him, all establish the commonality of the

enterprise, that his fortune was tied to the fortunes of both FTX and other YBA investors. SUMF

¶¶ 7–11.

     These facts are also similar to the SEC's prosecution of *BlockFi*, where the SEC found

BlockFi pooled the BIA investors' crypto assets, and used those assets for lending and investment

activity that would generate returns for both BlockFi and BIA investors. Each investor's fortune

was tied to the fortunes of the other investors, and linked to those of the promoter, BlockFi,

meaning both horizontal and vertical commonality existed.

### iii.   Expectation of Profits from the Efforts of Others

     The third prong of the *Howey* test is satisfied when "the efforts made by those other than

the investor are the undeniably significant ones, those essential managerial efforts which affect the

failure or success of the enterprise." *Bamert v. Pulte Home Corp.*, 445 Fed. App'x 256, 262 (11th

Cir. 2011) (quoting *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. 1981) ); *see also*, *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 755 (11th Cir. 2007) ("the focus is on the dependence of the investor on the entrepreneurial or managerial skills of a promoter or other party") (quoting *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982)).

"Although *Howey* stated that the expectation of profits must come solely from the efforts of others, many courts, including the Eleventh Circuit, have rejected a literal or strict interpretation and have instead interpreted 'solely' to mean substantially or primarily. The Supreme Court has removed the emphasis from the word 'solely' and held that the touchstone of the test is an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1348–49 (S.D. Fla. 2019) (citing *Tippens v. Round Island Plantation L.L.C.*, 09-CV-14036, 2009 WL 2365347, at *9 n. 9 (quotations and citations omitted)).

In *Mehl*, the first District Court of Appeal affirmed an order finding that the third *Howey* prong was satisfied and that the investors sufficiently established an expectation of profits from the efforts of others where they "had no interest in operating the pay phones system, but rather were attracted by the represented guarantee of a fixed 14–percent return on their investment, and they were completely dependent on ETS's expertise to achieve such gain." *Mehl*, 859 So. 2d at 1264.

Here, Plaintiff Shetty and other FTX investors who purchased YBAs clearly had an expectation of profit, as they were guaranteed to earn up to 8% "yield" on any fiat or crypto held in a YBA. SUMF ¶ 3. FTX represented that customers are eligible to earn the "yield," which is rewarded hourly simply by passively keeping the funds in the YBA. SUMF ¶ 2. Moreover, Plaintiff Shetty's expectation would be that he would earn these yield profits primarily, if not solely, from

the efforts of FTX in managing the assets he invested into the YBA, and not through his own efforts. SUMF ¶¶ 2–4. while FTX attempts to give the indicia that customers like Shetty maintain full control over their accounts, the assets are not actually "in" his own YBA at all, and are instead pooled with all other FTX customer assets, as explained in the Terms of Service, i.e., "Your balances in your [YBA] are not segregated and cryptocurrency or cash are held in shared addresses or accounts, as applicable." SUMF ¶ 21. The yield was generated entirely through FTX's efforts from either staking assets from the pooled account or otherwise lending assets, most notably to Alameda. SUMF ¶¶ 14–19. Indeed, FTX freely admits that the yield was earned entirely through FTX's efforts, as they admit that the Earn "Services are provided by FTX for its customers," that FTX "transmits value from your [YBA]" and those "assets will be used to generate a fixed yield for the user." SUMF ¶ 20.

### c.   The YBA is a Note under *Reves* and its Progeny

In *Reves,* the Supreme Court set forth the proper approach to ascertaining whether a "note" is a security under the Securities Acts. 494 U.S. 56, 64–65 (1990). The Court adopted the "family resemblance" test, under which

> [a] note is *presumed* to be a "security," and that presumption may be rebutted only by a showing that the note bears a strong resemblance ... to one of the ... categories of instrument [identified by the Second Circuit in the case of *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir. 1976)].

*SEC v. 1 Glob. Capital LLC*, No. 18-CV-61991, 2019 WL 1670799, at *4 (S.D. Fla. Feb. 8, 2019) (citing *Reves*, 494 U.S. at 67) (emphasis supplied). The categories of instruments enumerated by the Second Circuit which are *not* securities include

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in

*Michael Norris, et al. v. David Ortiz, et al., Case No. 2022-022900-CA-01*
*Plaintiff Vijeth Shetty's Motion for Partial Summary Judgment*

the case of the customer of a broker, it is collateralized)[, and] ... notes evidencing loans by commercial banks for current operations.

*Id.* at 65 (quoting *Exch. Nat. Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir. 1976) and *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir. 1984)).

The Supreme Court listed four factors to determine whether an instrument bears a strong resemblance to the instruments on the list: (1) the motivation that would prompt a reasonable seller and buyer to enter into the transaction; (2) the distribution plan of the instrument; (3) the reasonable expectations of the investing public; and (4) the existence of another regulatory scheme that significantly reduces the risk of the instrument. *1 Glob. Capital LLC*, 2019 WL 1670799, at *4 (citing *Reves*, 494 U.S. at 66–67). The Court instructed that if application of *Reves*'s four factors "leads to the conclusion that an instrument is not sufficiently similar to an item on the list," the analyzing court must then decide "whether another category should be added ... by examining the same factors." *Id.* at 67.

The Court in *Reves* conceived of this analysis as comprised of two separate steps, however, "both inquiries involve the application of the same four-factor test, and so the two essentially collapse into a single inquiry." *SEC v. Wallenbrock*, 313 F.3d 532, 537 (9th Cir. 2002); *accord Resolution Tr. Corp. v. Stone*, 998 F.2d 1534,1538–39 (10th Cir. 1993) (treating the two steps as a single inquiry).

      **i.  Motivations that would Prompt a Reasonable Seller and Buyer to Enter Into the YBA Transaction**

"If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.' " *Reves,* 494 U.S. at 66. On the other hand, "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or

consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, ... the note is less sensibly described as a 'security.' " *Id.*

In *1 Global*, the Court found persuasive that "the buyers' primary motivation was likely the 'high single digit' or 'low double digit' rate of return" defendant offered, while the defendant's motivation was so it could "expand its current business activities," over which it had "sole discretion." *1 Glob. Capital LLC*, 2019 WL 1670799, at *6.

Similarly, in *BlockFi*, the SEC determined that BlockFi offered and sold BIAs to obtain crypto assets for the general use of its business including to pay interest to BIA investors, and purchasers bought BIAs to receive interest.

Here, Shetty's primary motivation, like many others who invested in YBAs, was to passively generate up to 8% "yield" on his crypto and fiat holdings, while FTX's primary motivation was to create a pool of funds for the general use of its business, which included generating "yield" to pay YBA investors and to fund its lending and other activities, such as with Alameda. SUMF ¶¶ 3–6, 13–21.

## ii.  Plan of Distribution of the YBAs

The second factor requires that the court determine whether there was "common trading for speculation or investment" on the YBAs. *1 Glob. Capital LLC*, 2019 WL 1670799, at *6 (citing *Reves,* 494 U.S. at 66). The offer and sale of the YBAs to a "broad segment of the public" is sufficient to establish this element. *Id.* (citing *Id.* at 68). "Importantly, an 'evident interest in widening the scope of distribution,' combined with the 'broad availability of the notes' can tip this factor 'strongly in favor' of classifying the note as a security." *Id.* (citing *SEC v. Thompson*, 732 F.3d 1151, 1164 (10th Cir. 2013) (quoting *Wallenbrock,* 313 F.3d at 539)).

Here, the YBAs were unquestionably offered and sold to a broad segment of the public, as they were made available not only nationwide, but internationally, and—in a self-evident interest in widening the scope of distribution—were promoted globally through celebrity endorsements, advertising and internet campaigns. SUMF ¶¶ 1–2, 12, 24.

### iii.   Reasonable Expectations of the Investing Public

Under the third factor, "we examine the reasonable expectations of the investing public," with the court considering "instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *1 Glob. Capital LLC*, 2019 WL 1670799, at *6 (citing *Reves,* 494 U.S. at 66). Where the notes are characterized by the originator as "investments" and there are no "countervailing factors" that would lead a reasonable person to question this characterization, "it would be reasonable for a prospective purchaser to take the [originator] at its word." *Id.*  (citing *id.* at 69).

FTX advertised its YBAs as a "refreshing," way to "earn up to 8% APY on all your fiat and crypto," "simply" by just "keeping your funds in your [YBA]," that yield was "rewarded hourly and you can withdraw at any time," and it was "available in every FTX US and FTX jurisdiction." SUMF ¶ 2. And FTX represented that it was generating the "yield" through "staking," which is a much lower risk profile than, say, billions of dollars in unsecured loans to entities around the world. SUMF ¶¶ 14–24. Based on these characterizations, purchasers would reasonably view these notes as investments. *See Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1336 (S.D. Fla. 2018) ("third factor supports finding that the notes were securities because of advertised 5–8% annual return, paid on a monthly basis, and representations that the offerings were 'low-risk, high-yield investments backed by high interest rate loans made to commercial borrowers.' ");

*Levin*, 2014 WL 11878357, at *10 (third factor supports finding that the notes were securities because they were advertised as a "low risk investment strategy," and investors were promised a high interest rate on their investment.). The third factor also supports a finding that the YBAs are securities.

### iv.  The Presence of an Alternative Regulatory Scheme

Under the final *Reves* factor, the Court considers whether "some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *1 Glob. Capital LLC*, 2019 WL 1670799, at *7 (citing *Reves,* 494 U.S. at 67). If the note "would escape federal regulation entirely if the Acts were held not to apply," the fourth factor supports characterizing the instrument as a security. *See id.* (citing *id.* at 69 (recognizing as adequate risk-reducing factors (1) insurance provided by the Federal Deposit Insurance Corporation, and (2) comprehensive regulation under the Employee Retirement Income Security Act, because both ensure that an instrument would not "escape federal regulation entirely if the Acts were held not to apply")).

This element is easily satisfied, as FTX's terms make clear that the opposite is the case, as "your [YBA] is not subject to protections or insurance provided by the Federal Deposit Insurance Corporation or the Securities Investor Protection Corporation." SUMF ¶ 23.

### CONCLUSION

Plaintiff, Vijeth Shetty, respectfully requests the Court grant this motion for partial summary judgment and enter an order finding as a matter of law that the FTX yield-bearing account he purchased is a security, together with such other and further relief as this Honorable Court deems just, equitable, and proper.

*Michael Norris, et al. v. David Ortiz, et al., Case No. 2022-022900-CA-01*
*Plaintiff Vijeth Shetty's Motion for Partial Summary Judgment*

Dated: January 20, 2023                         Respectfully submitted,

**By: */s/ Adam Moskowitz*       **
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

**By: */s/David Boies***
David Boies
(*Pro Hac Vice* Application Forthcoming)
Alex Boies
(*Pro Hac Vice* Application Forthcoming)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Phone: (914) 749–8200
dboies@bsfllp.com

**By: */s/Stephen Neal Zack***
Stephen Neal Zack
Florida Bar No. 145215
Hon. Ursula Ungaro (Ret.)
Florida Bar No. 200883
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., Suite 2800
Miami, FL 33131
Office: 305-539-8400
szack@bsfllp.com
uungaro@bsfllp.com

Jose M. Ferrer, Esq.
Florida Bar No. 173746
**MARK MIGDAL & HAYDEN**
80 S.W. 8th Street, Suite 1999
Miami, Florida 33130
Telephone: (305) 374-0440
jose@markmigdal.com
eservice@markmigdal.com

*Michael Norris, et al. v. David Ortiz, et al., Case No. 2022-022900-CA-01*
*Plaintiff Vijeth Shetty's Motion for Partial Summary Judgment*

Ricardo M. Martinez-Cid, Esq.
Florida Bar No. 383988
Lea P. Bucciero
Florida Bar No. 84763
Zachary S. Gorwitz
Florida Bar No. 1025415
**PODHURST ORSECK, P.A.**
One S.E. Third Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 358-2800
Fax: (305) 358-2382
Email: rmcid@podhurst.com
Email: lbucciero@podhurst.com
Email: zgorwitz@podhurst.com
Email: rmcteam@podhurst.com

*Co-Counsel for Plaintiffs*

*Michael Norris, et al. v. David Ortiz, et al., Case No. 2022-022900-CA-01*
*Plaintiff Vijeth Shetty's Motion for Partial Summary Judgment*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the forgoing was filed on January 20, 2023, with the Court via the Florida Courts ePortal filing system, which will send notification of such filing to all attorneys of record.

**By: _/s/ Adam Moskowitz_**
Adam M. Moskowitz
Florida Bar No. 984280

# EXHIBIT A

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI DADE-COUNTY, FLORIDA

CASE NO. 2022-022900-CA-01

**MICHAEL NORRIS,** et al.

*Plaintiffs,*

*v.*

**DAVID ORTIZ,** et al.

*Defendants.*

**COMPLEX BUSINESS
LITIGATION DIVISION**

_____/

### DECLARATION OF VIJETH SHETTY IN SUPPORT OF
### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Vijeth Shetty, hereby declare as follows:

1.      I have personal knowledge of the facts stated herein, and if called upon as a witness, I would and could testify competently to the matters set forth herein.

2.      I reside in the State of Massachusetts and am over the age of 18. At the time of the events discussed herein, I resided in the State of Florida.

3.      Before opening an account with FTX, I saw many advertisements and promotions regarding FTX's trading platform, including, for example, advertisements for FTX made not only by FTX but also by Thomas Brady and Kevin O'Leary. One such advertisement was a promotional video broadcast online by FTX that touted earning up to 8% "yield" on any fiat or crypto held in your FTX account. The video can be found at this address, and below are screenshots as well for illustrative purposes (in case the video is subsequently removed and the link does not then work): https://twitter.com/BrettHarrison88/status/1417578618243387392 (accessed January 19, 2023).

1

DocuSign Envelope ID: DEFA50C1-846B-4C09-B4CA-C8C8AE90E646

*CASE NO. 2022-022900-CA-01*



DocuSign Envelope ID: DEFA50C1-846B-4C09-B4CA-C8C8AE90E646
Case 1:23-cv-20439-KMM   Document 1-4   Entered on FLSD Docket 02/03/2023   Page 28 of 92

*CASE NO. 2022-022900-CA-01*



4.     In part because I was interested in passively generating "yield" on both fiat and crypto holdings, I then downloaded the FTX App and signed up for an account on September 13, 2021.

5.     After I opened my account and logged in, I found that my account was automatically enrolled in the Earn program and enabled, and I did not need to take any action to "opt in."

*CASE NO. 2022-022900-CA-01*

6.      As shown in the screenshots of my transaction history in paragraph 8 below, I initially deposited $500 USD and began automatically earning "yield" on that fiat currency. Below is a screenshot dated January 13, 2023, which shows the "total earned" page from the FTX App, showing the amount of "yield" earned through the date FTX froze the account and subsequently declared bankruptcy. The screenshot also includes a depiction of the button to toggle off the earn function on assets held in my FTX account. At no time did I click that button to turn off the earn capability, which was automatically enabled when I opened my account.



7.      Ultimately, I deposited a total of $5,500 in USD, which I converted to SOL (the cryptocurrency, Solana), and deposited an additional total of $20,000.00 USD in the account, which I kept in the account because FTX was offering 8% APY up to a certain limit.

CASE NO. 2022-022900-CA-01

8.      Below are three screenshots, taken on or about November 18, 2022, from my FTX

account on the FTX App, which show the total amount I had deposited and held in my FTX account

as SOL and USD (totaling $25,500.00 USD, not including the "yield" credited to my FTX account)

up until the time FTX froze all accounts and declared bankruptcy. The fourth screenshot confirms

that $5,500 of that amount was converted to SOL:




CASE NO. 2022-022900-CA-01



9.      Although screenshot #3 reflects a "withdraw" on November 10, 2022, that transaction never processed, and I never received a return of those funds.

DocuSign Envelope ID: DEEA50C1-846B-4C09-B4CA-C8C8AE90E646

CASE NO. 2022-022900-CA-01

10.     FTX used Circle Internet Financial to process the ACH transaction I initiated on November 10, 2022. When I did not receive the funds back to my bank account, I contacted Circle Internet Financial on November 15, 2022, explaining that "I was successfully able to execute a withdrawal from my FTX account using Circle Internet Financial on Nov 10th, 2022. FTX went bankrupt on Nov 11, 2022. Would you please be able to provide a status on the ACH transaction?"



CASE NO. 2022-022900-CA-01

11.     Circle Internet Financial informed me later that day that "Unfortunately, we're unable to assist you directly on this issue. The reason is that [FTX | Crypto.com] is the primary Circle Account holder and holds the transacting business relationship too. Given this we recommend you reaching out directly to the [FTX | Crypto.com] support team to request their expert assistance. We will of course assist [FTX | Crypto.com] should they need our support when investigating your issue."

From: Nico (USDC) <support@circleusdc.zendesk.com>
Date: Tue, Nov 15, 2022 at 8:33 PM
To: Vijeth▮▮▮▮▮ <▮▮▮▮▮▮▮▮▮▮▮▮▮>

##- Please type your reply above this line -##

Your request (2641749) has been updated. To continue the conversation, reply to this email.

**Nico** (Circle Account)

Nov 15, 2022, 8:33 PM EST

Hello,

Thanks for reaching out to us here at Circle Customer Care.

Unfortunately, we're unable to assist you directly on this issue. The reason is that [FTX | Crypto.com] is the primary Circle Account holder and holds the transacting business relationship too.

Given this we recommend you reaching out directly to the [FTX | Crypto.com] support team to request their expert assistance. We will of course assist [FTX | Crypto.com] should they need our support when investigating your issue.

We do apologies for any inconvenience this may cause you.

Regards,

Nico - Circle Customer Care

CASE NO. 2022-022900-CA-01

12.     After I informed Circle Internet Financial the support ticket I was speaking with them from was generated through FTX.com and that I had also reached out by email to FTX Legal, Circle Internet Financial responded that "You will need to work directly with the FTX support team for this request. I understand that this may be a source of frustration with everything going on, but unfortunately we are unable to assist directly with this request."

From: Vijeth Shetty <████████████████>
Date: Tue, Nov 15, 2022 at 8:51 PM
To: USDC <support+id2641749@circleusdc.zendesk.com>

Evening Nicole!
The support ticket was raised with FTX.com and I have sent an email to FTX Legal as well.
Was curious why did you mention Crypto.com?
Could i reach out to them instead of FTX, despite having an account at FTX only.
Regards,
Vijeth

----------
From: Nico (USDC) <support@circleusdc.zendesk.com>
Date: Tue, Nov 15, 2022 at 9:06 PM
To: Vijeth ███████ <████████████████>

##- Please type your reply above this line -##

Your request (2641749) has been updated. To continue the conversation, reply to this email.

**Nico** (Circle Account)
Nov 15, 2022, 9:06 PM EST

Hi Vijeth,

The inclusion of Crypto.com was my mistake; the two are not related. You will need to work directly with the FTX support team for this request. I understand that this may be a source of frustration with everything going on, but unfortunately we are unable to assist directly with this request.

Best,

Nico - Circle Customer Care

9

CASE NO. 2022-022900-CA-01

    13.    To date, the withdrawal has not been processed and I have not received back any of the $25,500.00 that I deposited into my FTX account.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate to the best of my knowledge and belief.

Executed ___1/20/2023___.

By: _____

Vijeth Shetty

10

# EXHIBIT B



# CipherBlade

## Blockchain Investigation Agency

# PRELIMINARY EXPERT REPORT

| | |
|---|---|
| **Matter:** | *Michael Norris, et al. v. David Ortiz, et al.*<br>Case No. 2022-022900-CA-01 |
| **Written By:** | Paul Sibenik |
| **Date:** | 01.20.2023 |

# Introduction

1. In accordance with instructions from Moskowitz Law Firm, PLLC, I have been instructed to prepare a preliminary expert report surrounding FTX Exchange. More specifically, I have been asked to provide an assessment of the matter involving Vijeth Shetty, who created an FTX account, deposited money to his FTX account, and invested through his FTX account.

2. This assessment involves the nuances and characteristics of FTX 'Earn' accounts, and FTX Exchange in general. I have furthermore been asked to provide a technical opinion assessing if or how FTX Earn accounts meet the Howey or Reves Tests.

3. I am the Lead Case Manager at CipherBlade, a leading blockchain forensics and cybercrime investigative firm which consults with blockchain projects, numerous police, law enforcement and regulatory agencies around the world, including the US FBI and US Secret Service, cryptocurrency exchanges, and other organizations. Other CipherBlade staff and I have experience in some of the most high-profile cryptocurrency investigations to date in relation to a wide range of niches including but not limited to cases involving hacking, theft, SIM-Swapping, ransomware, different types of frauds and scams (e.g., involving ICOs, NFTs, investment fraud, Ponzi Schemes), 'rugpulls,' embezzlement, as well as civil matters such as divorce cases and bankruptcy cases. I am recognized as one of the few experts in blockchain forensics and cryptocurrency cybercrime investigation. This work regularly requires the analysis of cryptocurrency transactions, wallets and addresses, alongside gathering and analyzing other data sources.

4. I regularly use blockchain forensics software to assist me in blockchain investigations. My usage of blockchain forensics software in this matter, has, thus far been extremely minimal. However, I expect blockchain forensics to play a more important role in this matter as this case develops and disclosures are obtained. For reference, however, I primarily utilize Chainalysis Reactor, which is the leading blockchain forensics software available and is utilized by various law enforcement agencies around the world, including the FBI, USSS, DHS, and DEA in the United States. Chainalysis Reactor helps professionals to better understand the flow of funds on assets on supported blockchains. It helps to aggregate and manage large amounts of transaction data and addresses to make the data more parsable. It helps professionals like me to better understand which addresses are under the control of the same individuals or entities, and for addresses that are under the control of a service or exchange, it is often able to identify the name of that service or exchange. Furthermore, Chainalysis

1

Reactor also provides Open-Source Intelligence (OSINT) on various cryptocurrency addresses, which can help investigators understand what those addresses may be associated with or can provide additional context in situations. I have a Chainalysis Reactor Certification (CRC), which is a certification offered by Chainalysis to certify knowledge and understanding of their Reactor forensics tool. I also have the Chainalysis Investigation Specialist Certification (CISC), an additional certification by Chainalysis designed specifically for the most advanced Reactor users, which dives deep into advanced investigative techniques and obfuscation approaches sometimes used by individuals trying to launder ill-gotten cryptocurrency. I furthermore have the Chainalysis Ethereum Investigations Certification (CEIC), a certification program focused on Ethereum, as well as other EVM (Ethereum virtual machine)-compatible cryptocurrencies.

5. Additionally, a large portion of my work involves consulting with blockchain companies in various capacities pertaining to preventative measures they can or should take to reduce risks and mitigate the amount of cybercrime that their company is exposed to. This involves consulting on security practices, including those pertaining to cryptocurrency storage and management. This also involves consulting on matters of compliance so as to significantly mitigate the likelihood and/or frequency of ill-gotten funds being laundered through their service and reduce the amount of various types of fraud, including investment scams, romance scams, impersonation scams, and money muling.

6. A copy of my CV is attached in Appendix A.

7. I reserve the right to amend the views expressed in this report should or when additional information be uncovered or presented to me.

8. Prior to accepting instructions to act in this matter, I made reasonable inquiries to identify any actual or potential conflicts of interest in connection with the parties concerned. No matters arose.

## A Primer on Cryptocurrency Exchanges

9. Before delving into the issues at hand, I think it's first pertinent to provide some background information on what cryptocurrency exchanges are, what purpose they serve, and how they operate, in relation to the matter at hand.

10. In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry.

2

11. More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

12. The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability or IOU of the exchange to its customer.

13. If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

   a) Trade it for another cryptocurrency
   b) Trade it for fiat currency
   c) Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)
   d) Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

14. The exchange accounts should very much be regarded as being custodial in nature. This means that the customer does not *control* access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. The exchange then debits the user account and sends the assets. Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange.

15. One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so.

16. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature.  This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer.

17. However, it should also be noted that the digital assets aren't technically 'in' the account at all. At a technical level, an exchange account cannot hold or store cryptocurrency. The account stores a record of a liability or an IOU of the exchange to their customer. When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that

3

cryptocurrency. Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true.

18. With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan 'stake,' or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

19. While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented, for reasons I will demonstrate later in this report.

20. The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

21. Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regards to the type of assets that they can investment customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent.

22. Exchanges on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

23. Other than by an exchange's own terms of service, exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance. While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC

insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted.

24. Due to the aforementioned reasons and risks surrounding the lack of regulation, as well various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets.

25. The inherent riskiness associated with storing assets on a cryptocurrency exchange is well-known to the vast majority of well-educated and knowledgeable cryptocurrency users. This is evidenced by the frequent expression 'not your keys, not your coins,' essentially meaning that if you don't *control* the cryptocurrency (which you don't if it's 'in' an exchange account), that cryptocurrency isn't really yours. 'Your' cryptocurrency belongs to the exchange if you elect to store it 'on' the exchange, and if they renege or are unable to fulfill their liability to you, you as the beneficial cryptocurrency owner of the cryptocurrency, have effectively lost your money.

26. This is further referenced by the extensive track record of the many cryptocurrency exchanges that have shut down and ultimately failed,[1] often in spectacular fashion. The most common reasons for an exchange's failure include:

   a) The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency.

   b) The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency.

   c) A hack or theft by an external actor

   d) Embezzlement, or theft by an internal actor, typically founder(s) of the exchange

   e) Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

27. When exchanges do shut down (and this happens relatively frequently) it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back.

---

[1] https://www.cryptowisser.com/exchange-graveyard/

28. Suffice to say cryptocurrency exchanges are generally not a safe place to store assets, even amongst exchanges that don't offer a yield-bearing program. When exchanges have a yield-bearing program, or otherwise elect to leverage or loan our customer assets (with or without customer consent), it significantly increases the risk of the exchange failing and becoming insolvent. Cryptocurrency exchanges can do a variety of things to minimize such risks and improve safety. However, what an exchange says, and what they actually do are two different things entirely. It is common for CEOs and executives of exchanges that have failed or in the process of failing to describe their exchange as 'safe,' 'secure,' 'well-regulated,' 'compliant,' 'transparent,' or in a good financial position even when the exact opposite is true. FTX was not an exception to this trend. One should not assume or believe that an exchange is any of these things just because they make such claims.

29. This is not to suggest that exchanges cannot be a much safer place to store assets. They can be with appropriate regulation and oversight. In fact, it appears that for FTX Japan[2] specifically, those investors will be made whole or almost whole due to sensical regulations that were put in place in light of the lessons learned from the failures of Mt. Gox and Coincheck exchanges in Japan.

## Background Information Surrounding Vijeth Shetty's Use of FTX

30. It is my understanding that Vijeth Shetty 'Shetty' signed up for an FTX US account on 9/13/2021, and did so through the FTX mobile application, and that Shetty resided in Palm Beach Gardens, FL at the time of signup.

31. It is my understanding that Shetty provided his residential address and driver's license as part of the signup process.

32. It is my understanding that Shetty subsequently deposited a total of $25,500 USD into his FTX account over the subsequent months and nothing was successfully withdrawn from the account.

33. It is my understanding that of this amount that was deposited, approximately $5,540 was used to purchase Solana (SOL), a cryptocurrency that Sam Bankman-Fried (also known as 'SBF,' FTX's former CEO), was an investor in and has frequently touted,

---

[2] https://www.coindesk.com/consensus-magazine/2022/12/13/japan-was-the-safest-place-to-be-an-ftx-customer/

suggesting it may become the next Bitcoin.[345] SBF also referred to Solana as 'most underrated' [cryptocurrency] token.[6] Shetty's SOL purchases are shown in the screenshot below:



3 https://www.kitco.com/news/video/show/Market-Analysis/3748/2021-11-25/Could-this-be-the-next-Bitcoin-FTX-founder-Sam-Bankman-Fried-on-massive-adoption#_48_INSTANCE_puYLh9Vd66QY_=https%3A%2F%2Fwww.kitco.com%2Fnews%2Fvideo%2Flatest%3Fshow%3DMarket-Analysis
4 https://www.fxstreet.com/cryptocurrencies/news/ftx-founder-sam-bankman-fried-believes-that-solana-can-be-the-next-bitcoin-202111270618
5 https://www.bloomberg.com/news/articles/2021-09-10/sam-bankman-fried-sees-growing-institutional-interest-in-solana?leadSource=uverify%20wall
6 https://finance.yahoo.com/news/crypto-billionaire-sam-bankman-fried-122322301.html

34. It is my understanding that once Shetty purchased the SOL via the FTX app, he simply held it on his account; he did not trade or sell it.

35. In terms of what Shetty did with the remaining money that he deposited to his FTX US account, it is my understanding he left those remaining USD on his account, and did not use it to buy cryptocurrency. It is my understanding that Shetty's reason for leaving the USD in his FTX account is because it was earning 8% yield, as was the SOL that was in his FTX account.

36. The current 'balances' that Shetty had in his FTX US account at the time it was frozen and FTX declared bankruptcy, inclusive of yield that he received, are 31.2464 SOL and $20,463.50 USD.

37. The 'yield' that Shetty earned, according to the FTX app is $503.5076 USD and 2.2907 SOL.



38. It is my understanding that according to Shetty, his account was automatically set to 'earn yield' once he signed up for the account; the yield-bearing function for him was opt-out rather than opt-in. The above shows a button that Shetty could press to 'stop earning yield on assets.' It is my understanding that Shetty never pressed this button to turn the yield-bearing function off, but he also never turned the yield-bearing functionality on.

## FTX Earn Program

39. The FTX Earn program was a yield-bearing account that FTX customers, including Shetty, were offered through both the FTX and FTX.us platforms.[7] The FTX website describes it as follows:

> *"You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."*

40. Although FTX clearly represented the Earn program to be 'opt-in' rather than 'opt-out' it appears that in many cases, including Shetty's case, customers were auto-enrolled in Earn, making it opt-out. Indications that FTX Earn was opt-out rather than opt-in as FTX had indicated are further substantiated in a declaration from Joseph Rotunda, the Director of Enforcement at the Texas State Security Board. In it, Rotunda describes how he, as a US citizen, went to the FTX website, downloaded the FTX Trading App. He funded his account with $50, and "the default settings were automatically configured to enable earning of yield."[8] He also clearly notes that the earn program he was auto-enrolled in was associated with FTX US, not FTX Trading.

41. The yield that customers like Shetty were offered is also outlined on the Earn page – 8% APY (Annual percentage yield) for total collective deposits up to $10,000 USD equivalent, and 5% APY for collective deposits above $10,000 USD either up to $100,000, or with no limit depending on the source used. There is conflicting information about whether the 5% was available on amounts in excess of $100,000 or not, as shown in the screenshots from FTX's website below).[9] It appears the $100,000

---

[7] https://web.archive.org/web/20221127164753/https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn

[8] https://cases.stretto.com/public/x193/11753/PLEADINGS/1175310142280000000134.pdf

[9] See Appendix C – FTX Earn FAQ; accessible at
http://web.archive.org/web/20221018024940/https://help.ftx.us/hc/en-us/articles/9081464675735-FTX-Earn .

limit may have only been put in place on or around 10/31/2022, just a few days before filing for bankruptcy, and while it clearly applied for the international version of the FTX, it is unclear if it was also applied to the US version.[10]

## How do you calculate APY? Does my balance compound daily?

APY stands for Annual Percentage Yield.  This is the rate you earn on an investment over a year and includes any compounded interest. FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 USD value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

| Assets supported | Amount | Rate |
|---|---|---|
| All crypto and fiat | Up to $10,000 | 8% |
| All crypto and fiat | All funds after $10,000 | 5% |

*Example:*

1. I have $10,000 USD in my account. I will earn 8% APY on my deposit of USD.

2. I have $5,000 USD value each of Bitcoin and Dogecoin in my account, plus $10,000 worth of USD. I will earn 8% APY on the first $10,000 worth of assets deposited regardless of asset, and 5% APY on the next $10,000, for an average APY of 6.5% on my total deposit.

All assets kept in your wallets will earn the same crypto or fiat that is held in the wallet, and will earn at the same rate. In Example 2 above, you will earn 6.5% on both the DOGE and the BTC. There is no way to designate one coin to earn 8% and the rest at 5% - they will all earn at the same average rate based on how many coins you are holding.

---

[10] https://twitter.com/ftx_official/status/1587249585885679616?lang=en

| Assets supported | Amount | Rate |
|---|---|---|
| All crypto and fiat | Up to $10,000 | 8% |
| All crypto and fiat | All funds after $10,000, up to $100,000 | 5% |

*Example:*

A. I have $10,000 USD in my account. I will earn **8% APY** on my deposit of USD.

B. I have $5,000 USD value each of Bitcoin and Dogecoin in my account, plus $10,000 worth of USD. I will earn 8% APY on the first $10,000 worth of assets deposited regardless of asset, and 5% APY on the next $10,000, for an average APY of **6.5%** on my total deposit.

All assets kept in your wallets will earn the same crypto or fiat that is held in the wallet, and will earn at the same rate. In Example B, you will earn 6.5% on both the DOGE and the BTC. **There is no way to designate one coin to earn 8% and the rest at 5% - they will all earn at the same average rate based on how many coins you are holding.**

42. FTX's Earn program is very similar to that of Voyager's earn program, and programs offered by Celsius and Blockfi, all of whom have filed for bankruptcy. The differences between these programs are minimal and involve differences in phrasing 'yield' vs 'interest' vs 'rewards,' the APY offered, the frequency of payout, and the assets that were supported.

43. The FTX website does not describe how, exactly, FTX will generate the applicable yield, and does not indicate what risk factors may be apparent that could result in the inability to pay such yield.

44. The website does suggest term 'staking' however as a means of generating yield when they indicate that:[11]

> "*By opting in and participating in staking your supported assets in your FTX account*"

45. This naturally gives the impression that their assets would be used for 'staking' without being 100% clear about it.

46. The word 'staking' in the context of cryptocurrency is understood to have a technical meaning. 'Staking' is associated with a consensus mechanism known as 'Proof of

---

[11] See Appendix C – FTX Earn FAQ; accessible at
http://web.archive.org/web/20221018024940/https://help.ftx.us/hc/en-us/articles/9081464675735-FTX-Earn

Stake'(PoS) and relatedly, 'Delegated Proof of Stake,'(dPoS) which *some* cryptocurrencies utilize, but many don't (such as Bitcoin for example, which uses 'Proof of Work' as a consensus mechanism).

47. Staking has a similar purpose for cryptocurrencies that utilize PoS and dPoS as what 'miners' are offered from cryptocurrencies that utilize Proof of Work. Individuals involved in staking are responsible for verifying transactions and they used their staked assets (instead of sunk costs associated with expenditure of electricity and equipment) as a way of guaranteeing the transactions they verify and add onto a blockchain are valid. If they try to add an invalid transaction, staked assets are typically burned as punishment, which creates a disincentive to act dishonestly or maliciously. In exchange for staking, users are awarded compensation accordingly in the form of newly issued cryptocurrency.

48. FTX is not itself a cryptocurrency operating on a PoS model; FTX was an exchange. One cannot 'stake' assets on an exchange. One can lend them to an exchange though, and theoretically, that exchange could then stake select cryptocurrency assets on behalf of the user (for cryptocurrencies that have Proof of Stake).

49. While there is disagreement over whether or not 'staking' is itself a security, the issue is that FTX did often not 'stake' customer assets, and indeed in many cases *could not* stake customer assets since not all cryptocurrencies utilize Proof of Stake. Yet the FTX website clearly suggests that 'all assets' in the account are subject to applicable yield, including fiat assets (such as USD), which obviously don't even have a staking mechanism even if FTX wanted to utilize it.

50. In Shetty's case, he only had two assets in his FTX US account; Solana and USD. Solana uses a PoS consensus mechanism, and staking is possible on Solana. US dollars are technically impossible to stake as the US dollar is obviously not a cryptocurrency at all.

51. Rather than 'staking,' it appears that a primary thing FTX was doing was lending customer assets out, even from applicable customers that weren't part of the 'Earn' program, most notably to Alameda.[12] There are allegations that Alameda received loans from FTX interest-free.[13] Sam Bankman-Fried was a primary equity holder of both companies. FTX choosing to lend out assets, whether for free or otherwise, has nothing to do with actual staking of cryptocurrency.

---

[12] https://pacer-documents.s3.amazonaws.com/33/188450/042020648197.pdf

[13] https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html

52. FTX did have a legal disclaimer associated with their Earn program, shown below:[14]

---

**Legal Disclaimers and Terms of Service**

Services are provided by FTX for its customers.

**APY refers to projected yield by staking. This yield is not interest and is not guaranteed, and changes based upon terms of applicable staking programs. FTX transmits value from your account to staking program and ensures that the value is properly transmitted to and from the program. Your customer balance is not a bank account, and is not insured.**

Only customers of FTX may be eligible to participate in the yield program.  If a customer is eligible and opts into the program, then their assets will be used to generate a fixed yield for the user.

While FTX does not anticipate any problems, it does not guarantee the future or present yield payments in the case of malfunction, although it would not intend to claw back previously received yield.  FTX *does* back the principal generating the yield with its own funds and equity.  Nevertheless, users should exercise appropriate caution when deciding whether to enable yield for their accounts.

---

53. FTX again refers to staking numerous times, suggesting this was what they were primarily doing with customer assets, which wasn't true, and indeed wasn't even technically possible for a large portion of the assets that customers deposited.

54. FTX indicated that for customers like Shetty who opt-in to the Earn program, FTX would take their assets to generate a fixed yield for the user; 'staking' was the only mechanism that was mentioned as a way of generating yield.

55. The legal disclaimer grossly misrepresented the level of risk associated with its Earn program. While FTX does indicate that it's 'not a bank account, and is not insured' and that 'users should exercise appropriate caution when deciding whether to enable yield for their accounts,' this hardly seems like a sufficient disclaimer and disclosure that would accurately represent the real level of risk. It certainly does not reveal that funds will be lent to affiliated entities to perform highly questionable and risky trading strategies, the lender will collateralize FTT tokens with FTX for safety.

56. The FTX Earn program was clearly represented as being 'opt-in' and not 'opt-out.' But based on Shetty's declaration and Rotunda's declaration, it's clear that there were a variety of cases where it was not 'opt-in' at all. This would make it such that those users like Shetty that were auto-enrolled (and who did not opt-out) appear to have engaged in an unregistered securities transaction as soon as any money was deposited to their account, whether fiat or cryptocurrency.

---

[14] See Appendix C – FTX Earn FAQ; accessible at
http://web.archive.org/web/20221018024940/https://help.ftx.us/hc/en-us/articles/9081464675735-FTX-Earn

## Howey Test & Reves Test

57. From a securities perspective, the Howey Test defines an investment contract as:

    a.  An investment of money

        i.  Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.

    b.  In a common enterprise

        i.  FTX customer assets are almost always consolidated in wallets operated and controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be moved to other FTX-controlled wallets such as 'cold wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda Research 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

        ii.  The fact that customer deposits were commingled and consolidation into shared wallets controlled by FTX is independently verifiable, but FTX.us also indicated as such in their terms of service on 05.20.2020 when they state, "Your balances in your FTX.US Account are not segregated and cryptocurrency or cash are held in shared addresses or accounts, as applicable."[15] Thus FTX US customers assets have been

---

[15] See Appendix B – FTX.us Terms of Service, section 6; also accessible at
http://web.archive.org/web/20211006144622/https://ftx.us/TermsOfService.pdf

pooled together in a common enterprise, namely FTX US exchange, and in shared wallets controlled by FTX US.

    iii.   Each investor's fortune was tied to one another as customer deposits were used as part of a common enterprise and effort to generate a return, and the ability for customers to get those deposits back was dependent on how successful FTX's efforts to generate yield for their clients collectively were.

c.  With the expectation of profit

    i.   FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[16]

    ii.   The profitability applies to all assets in the FTX account This includes all cryptocurrencies whether or not staking is even possible for such cryptocurrencies, and it also includes US dollars. Thus, a customer can reasonably assume by participating in the Earn program they will acquire more of each asset (both cryptocurrency and fiat currency) that they have in their account, thus generating a profit.

d.  To be derived from the efforts of others

    i.   The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program (which Shetty was already subscribed to upon creating his FTX US account), and that they have deposited assets (of crypto or even fiat) in order to earn the applicable yield, which they clearly indicate is calculated hourly. There is no further work or action needed on the part of the user; FTX takes care of generating the earnings for the customer.

    ii.   The user had no control over the profitability of their investments vis-à-vis 'yield' payouts. They were not given any choice about how or where their assets could be leveraged through the Earn program. Users

---

[16] See Appendix C – FTX Earn FAQ; accessible at
http://web.archive.org/web/20221018024940/https://help.ftx.us/hc/en-us/articles/9081464675735-FTX-Earn

either earned applicable yield (from 8% to 5%) based on the value of all assets in their FTX, or they had the option to disable Earn entirely and they would then not earn any yield at all. The lack of control over yield earnings was also clearly outlined in FTX's Earn Webpage[17] where they illustrate the following example:

> [Example] B: I have $5,000 USD value each of Bitcoin and Dogecoin in my account, plus $10,000 worth of USD. I will earn 8% APY on the first $10,000 worth of assets deposited regardless of asset, and 5% APY on the next $10,000, for an average APY of 6.5% on my total deposit.
>
> All assets kept in your wallets[sic] will earn the same crypto or fiat that is held in the wallet[sic], and will earn at the same rate.
>
> In Example B, you will earn 6.5% on both the DOGE and the BTC. There is no way to designate one coin to earn 8% and the rest at 5% - they will all earn at the same average rate based on how many coins you are holding

iii. The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies. The only strategy that FTX portrayed to investors was 'staking.'

iv. With regards to the yield that FTX was allegedly offering customers, allegedly through staking, the FTX Earn webpage stated "FTX transmits value from your account to staking program and ensures that the value is properly transmitted to and from the program." The act of FTX transmitting 'value' from the account to the staking program, and

---

[17] See Appendix C – FTX Earn FAQ; accessible at
http://web.archive.org/web/20221018024940/https://help.ftx.us/hc/en-us/articles/9081464675735-FTX-Earn

staking assets on behalf of their customer, in this case Shetty, are both actions and efforts that would be performed by the work of others, namely FTX.

58. Under the Reves test, a note is presumed to be a security unless it falls into certain judicially created categories of financial instruments that are not securities, or if the note in question bears a "family resemblance" to notes in those categories based on a four-part test. The Four Reves factors include:

    a. The "motivations that would prompt a reasonable seller and buyer to enter into" the transaction;

        i. The motivation of the buyer (FTX) is to leverage customer (seller) deposits to generate a profit, to which they are willing to pay the customer 'yield' as outlined in return for the customers placing the deposits with them.

        ii. The motivation of the seller is to earn money in the form of yield, which the seller can do passively by simply participating in the Earn program.

    b. The "plan of distribution" of the instrument;

        i. FTX accounts were available to the general public. Accounts for US persons were made publicly available via FTX US specifically. There was a simple, quick and straightforward signup process the involved Shetty providing his address and driver's license.

    c. The "reasonable expectations of the investing public";

        i. FTX and FTX clearly represented that a consistent yield was available; 8% on amounts under $10,000 and 5% on amounts above $10,000. However, FTX did indicate that this yield was "not guaranteed."

        ii. Even if the yield is not guaranteed, a customer could assume that if FTX were 'staking' their assets, some type of earnings would very likely be generated by FTX

    d. The presence of an alternative regulatory regime

        i. There is no alternative regulatory regime. The FTX Terms of Service state "You acknowledge that your FTX.US Account is not subject to

protections or insurance provided by the Federal Deposit Insurance Corporation or the Securities Investor Protection Corporation."[18]

**// ENDS**

Paul Sibenik

Lead Case Manager

CipherBlade

_____

---

[18] See Appendix B – FTX.us Terms of Service, section 6; also accessible at
http://web.archive.org/web/20211006144622/https://ftx.us/TermsOfService.pdf

# APPENDIX A

# Paul Sibenik  |  Curriculum Vitae

Vancouver, British Columbia, Canada | paul@cipherblade.com

## Executive Summary

Paul is extremely passionate about cryptocurrency and blockchain technology and believes that such technology will increasingly be adopted, and money will be just one of applications blockchain technology will be frequently used for. Just as with other currencies (like the USD) and asset classes, he recognizes it presents some unique challenges, such as its pseudonymous and non-custodial nature and that it can sometimes be used for illicit activities and money laundering. However, as a blockchain forensics investigator and expert he helps to offer transparency and accountability, thereby reducing such illicit activities. Despite its challenges, Paul believes the future is bright for cryptocurrency, and frequently educates others about it in his personal life.

## Skills & Expertise

- Blockchain Forensic Analysis & Investigations
- Open-Source Intelligence (OSINT)
- Security Audits
- Tracking of Bitcoin & other Cryptocurrency Assets
- Scam and Fraud Investigations
- Cryptocurrency Token Offerings and Sales (ICOs, IEOs, IDOs)
- Non-fungible tokens (NFTs)
- Compliance and Anti-Money Laundering (AML)

## Experience

**Lead Case Manager** — CipherBlade                                      Sept 2019 — Present

- Blockchain forensics investigator and cryptocurrency cybercrime expert with investigative experience in hundreds of cases
- Experienced working with law firms in a wide range a casework often incorporating the tracking of Bitcoin and other cryptocurrencies and offering expertise-based support
- Investigative experience in a wide range of cases including those involving investment fraud, cryptocurrency theft (e.g. hacking, SIM-Swapping, OTC deals), scams & ponzi schemes, suspect ICOs, embezzlement, extortion (e.g. ransomware, kidnapping), non-disclosed cryptocurrency assets (e.g. divorce), and securities violations

- Expertise utilizing various blockchain forensics tools and software, including Chainalysis' Reactor software
- Generates highly actionable reports for law enforcement "on a silver platter" which include a fusion of off-chain intelligence, OSINT, and blockchain forensics to facilitate easy understanding and leads them to apprehend the person(s) responsible
- Conducts security audits and security-related advisory for cryptocurrency businesses, in addition to 'Proof of Reserves' audits

**Operations Manager** — JarvixX                                    Jan 2019 — Dec 2019

- Community building & management tool for blockchain projects aiming to increase user adoption of their platforms. Fraud detection and analytics for each applicable campaign

**Proprietor** — Cryptforensic Investigators                        Oct 2018 — Sept 2019

- Help to find, track, trace, and in some cases recover cryptocurrency, where individuals haven't truthfully reported cryptocurrency holdings when required to do so by law, primarily focusing on divorce cases

**VP Rewards Management** — AmaZix                                  Oct 2017 — Dec 2018

- Community Building, growth & marketing for a wide range of new cryptocurrency-related projects. Fraud detection and analytics for each applicable campaign

# Education & Certifications

**Chainalysis Investigation Specialist Certification** (CISC)        Feb 2021

**Chainalysis Reactor Certification** (CRC)                          March 2020

**Chainalysis KYT Certification** (CKC)                              June 2022

**Chainalysis Ethereum Investigations Certification** (CEIC)         June 2022

**Certified Bitcoin Professional** (CBP)                             Jan 2023

**Certified Ethereum Professional** (CEP)                            Jan 2023

**York University** — BA, Political Science (Honours), Toronto, ON, Canada    2007 – 2011

# In The News

- "Crypto Scammers Rip Off Billions as Pump-and-Dump Schemes Go Digital" - https://www.bloomberg.com/news/features/2021-07-08/crypto-scams-rug-pulls-bitcoin-hacks-billions-lost-when-shit-coins-go-to-zero?sref=1TG0fQXK, July 7, 2021.

- "He just spent $69 million on a digital piece of art. It's not his first Beeple" - https://www.washingtonpost.com/technology/2021/03/17/nft-beeple-metakovan-christies/, March 18, 2021.

- "Officials weigh regulations to address role of cryptocurrency in ransomware attacks" - https://abcnews4.com/news/nation-world/officials-weigh-regulations-to-address-role-of-cryptocurrency-in-ransomware-attacks, June 8, 2021.

- "Attacking Cryptocurrency Theft: Transaction Databases and Analytics Have Criminals on the Run" - https://www.garp.org/risk-intelligence/technology/cyber-security/a1Z5d000009qxIZEAY, September 14, 2021.

- "New Treasury sanctions take aim at blocking ransomware groups from cashing out" - https://techcrunch.com/2021/09/23/us-treasury-sanctions-suex-ransomware/, September 23, 2021.

- "Divorcing Couples Fight Over the Kids, the House and Now Crypto" - https://www.nytimes.com/2022/02/13/technology/divorce-bitcoin-crypto.html , February 14, 2022.

- "Inheriting Bitcoin is Harder Than It Sounds" - https://www.vox.com/recode/22971265/bitcoin-wills-estate-planning-cryptocurrency-nfts-death, March 11, 2022.

- "Divorcing spouses are hiding millions of dollars of crypto from each other – and NFTs are increasingly involved too" - https://markets.businessinsider.com/news/currencies/divorcing-spouses-hide-millions-dollars-crypto-nfts-from-exes-2022-3 , March 24, 2022

- "How One Man Lost $1 Million to a Crypto 'Super Scam' Called Pig Butchering" - https://www.forbes.com/sites/cyrusfarivar/2022/09/09/pig-butchering-crypto-super-scam/?sh=57e48099ec8e , Sept 9, 2022.

- "Husbands are hiding millions from their wives in divorces using a new tactic: cryptocurrency" - https://inews.co.uk/inews-lifestyle/money/husbands-hiding-millions-cryptocurrency-wives-divorce-proceedings-2000339, November 30, 2022.

## Publications

- "Good or Bad: Sanction on Tornado Cash, Mixers & Illicit Crypto Exchanges" - https://cipherblade.com/blog/good-or-bad-sanctions-on-tornado-cash-mixers-illicit-crypto-exchanges/ , Sept 22, 2022.
- "Comprehensive Guide to Cryptocurrency Scams and Frauds" – Paul Sibenik, https://cipherblade.com/blog/comprehensive-guide-to-cryptocurrency-scams-frauds/, May 13, 2020.
- "The Prevalence of Sha Zhu Pan AKA Pig Butchering Scams" – Paul Sibenik, https://cipherblade.com/blog/the-prevalence-of-sha-zhu-pan-aka-pig-butchering-scams/, May 18, 2022.
- "Compliance and AML Practices: An Open Letter to Cryptocurrency Exchanges and Services" – Paul Sibenik, https://cipherblade.com/blog/compliance-and-aml-practices-an-open-letter-to-cryptocurrency-exchanges/, Sept 28, 2021.
- "Stealing Funds from a Cryptocurrency Hardware Wallet" – Paul Sibenik, https://medium.com/cipherblade/stealing-funds-from-a-cryptocurrency-hardware-wallet-467e07ade8f4 , Dec 5, 2019.
- Centralized vs Decentralized Exchanges, DeFi, Security, & Solvency – Paul Sibenik, https://cipherblade.com/blog/centralized-vs-decentralized-exchanges-defi-security-solvency, Feb 27, 2020.
- "Single Joint Expert: A Model for Dealing with Cryptocurrency in Divorce" - https://cipherblade.com/blog/single-joint-expert-a-model-for-dealing-with-cryptocurrency-in-divorce/ , Oct 7, 2022.
- "Fraudulent Exchanges, ICOs and Exit Scams: Can They Get Away with It?" - Paul Sibenik, https://cipherblade.com/blog/fraudulent-exchanges-icos-exit-scams-can-they-get-away-with-it/, Dec 7, 2019.
- "Balancing Security vs Convenience for Cryptocurrency" – Paul Sibenik, https://cipherblade.com/blog/balancing-security-vs-convenience-for-cryptocurrency/, Jan 8, 2020.
- "Identifying and Discovering Cryptocurrency in a Divorce" – Paul Sibenik, https://cipherblade.com/blog/identifying-and-discovering-cryptocurrency-in-divorce/, Dec 13, 2019.
- "Got Hacked & Had Your Cryptocurrency Stolen? Why It's Your Own Fault" – Paul Sibenik, https://cipherblade.com/blog/got-hacked-had-your-cryptocurrency-stolen-why-its-your-own-fault/, March 5, 2020.
- "How Anonymous are Cryptocurrencies?" – Paul Sibenik, https://cryptforensic.com/2019/01/08/how-anonymous-are-cryptocurrencies/ , Jan 8, 2019.

- "The Rising Issue of Cryptocurrency and Divorce" – Paul Sibenik, https://www.divorcemag.com/articles/cryptocurrency-and-divorce/ , Jan 6, 2019.
- "Is it Necessary to Declare Cryptocurrency During a Divorce", - Paul Sibenik, https://cryptforensic.com/2018/12/09/necessary-to-declare-cryptocurrency-during-divorce/, Dec 9, 2018.
- "Guide to Determining Fair Market Value (FMV) for Cryptocurrency Assets" – Paul Sibenik, https://cryptforensic.com/2019/01/10/guide-to-determining-fair-market-value-fmv-for-cryptocurrency-assets/ , Jan 10, 2019.
- "Cryptocurrency Forensic Accounting: How Crypto Assets Are Tracked" – Paul Sibenik, https://cryptforensic.com/2019/07/04/cryptocurrency-forensic-accounting-how-crypto-assets-are-tracked/ , July 4, 2019.
- "Guide to Estimating Your Spouse's Cryptocurrency Portfolio Value" – Paul Sibenik, https://cryptforensic.com/2019/07/18/guide-to-estimating-cryptocurrency-portfolio-value/ , July 18, 2019.
- "Hiding Cryptocurrency Assets – Just How Easy Is It?" – Paul Sibenik, https://blokt.com/security/hiding-cryptocurrency-assets-just-how-easy-is-it , Feb 23 2019.
- "How Do Governments Look at Facebook's Libra" – Paul Sibenik, https://coincodex.com/article/4027/how-do-governments-look-at-facebooks-libra/ , July 21, 2019.
- "Penalties for Non-Disclosure of Cryptocurrency During Divorce Proceedings" – Paul Sibenik, https://cryptforensic.com/2019/01/16/penalties-for-non-disclosure-of-cryptocurrency-during-divorce/ , Jan 16, 2019.
- "QuadrigaCX: Using Cryptocurrency Forensics to Prove Fraud or an Exit Scam" – Paul Sibenik, https://cryptforensic.com/2019/02/06/quadrigacx-using-cryptocurrency-forensics-to-prove-fraud/ , Feb 6, 2019.
- "Discovering and Seizing Non-Disclosed Cryptocurrency Assets in a Divorce" – Paul Sibenik, https://cryptforensic.com/2019/02/20/seizing-cryptocurrency-assets-in-divorce/ , Feb 20, 2019.
- "Technological Barrier to Entry for Cryptocurrencies" – Paul Sibenik, https://cryptforensic.com/2019/06/27/technological-barrier-entry-cryptocurrency/ , June 27, 2019.
- "What is a Stablecoin and How to Manage It" – Paul Sibenik, https://www.coinspeaker.com/guides/stablecoins-how-manage-operate/ , July 22, 2019.
- "Dividing Cryptocurrency in Divorce" – Paul Sibenik, https://www.womansdivorce.com/cryptocurrency-in-divorce.html, July 29, 2019.
- "Why Cryptocurrency Adoption is Still Hindered by Criminal Activity" –Paul Sibenik, https://cipherblade.com/blog/why-cryptocurrency-adoption-is-still-hindered-by-criminal-activity/, May 29, 2020.

- "Problems Identifying Hidden Cryptocurrency in Divorce" – Paul Sibenik, https://cryptforensic.com/2019/12/31/identifying-hidden-cryptocurrency-divorce/, December 31, 2019.
- "List of Breach Vectors Hackers Exploit to Steal Cryptocurrency" – Paul Sibenik, https://cipherblade.com/blog/list-of-breach-vectors-hackers-exploit-to-steal-cryptocurrency/, June 21, 2020.
- "Shakepay Proof of Reserves and Security Report" – Paul Sibenik, https://cdn.cipherblade.com/wp-content/uploads/2020/08/Shakepay-Proof-of-Reserves-and-Security-Report.pdf, August 24, 2020.
- "Ransomware: Prevention, Investigation, and Bitcoin Funds recovery" – Paul Sibenik, https://cipherblade.com/blog/ransomware-prevention-investigation-bitcoin-funds-recovery/, Sept 17, 2020.
- "The Case For Proactive Solvency and Security Audits" – Paul Sibenik, https://cipherblade.com/blog/the-case-for-proactive-solvency-and-security-audits/, Dec 1, 2020.
- "Tainted Bitcoin Isn't What You Think It is" – Paul Sibenik, https://cipherblade.com/blog/tainted-bitcoin-isnt-what-you-think-it-is/, Jan 6, 2021.
- "Are Non-Fungible Tokens (NFTs) Used for Money Laundering?" – Paul Sibenik, https://cipherblade.com/blog/are-non-fungible-tokens-nfts-used-for-money-laundering/, Nov 30, 2021.

## Selection of Expert Witness Testimony & Expert Reports

| | | |
|---|---|---|
| *Confidential* v. *Confidential* | KBH, Counsel for Defendant | DIFC, Dubai, UAE |
| *Confidential* v. *Confidential* | MacConaghy & Barnier, PLC, Counsel for Plaintiff | United States Bankruptcy Court, Northern District of California, USA |
| *Confidential* v. *Confidential* | Rahman Ravelli Solicitors, Ltd., Counsel for Defendant | High Court of Justice, England |
| *Confidential* v. *Confidential* | Addleshaw Goddard LLP, Counsel for Respondent | Southwark Crown Court, England |
| *Confidential v. Confidential* | Allen & Glassman, Chartered, Counsel for Petitioner | Circuit Court of Cook County, Illinois |

| | | |
|---|---|---|
| *Confidential v. Confidential* | Law Offices of Mark Waecker, A.P.C, Counsel for Plaintiff | Superior Court of the State of California |
| *United States v. Confidential* | Federal Public Defender for the District of Columbia, Counsel for Defendant (provided expert consultation & advisory only) | United States District Court for the District of Columbia |
| *Confidential v. Confidential* | Marvillo Abramowitz Grand Iason & Anello PC & Sharova Law, Counsel for Defendant | Supreme Court of New York |
| *Confidential v. Confidential* | Taylor English Duma LLP, Counsel for Defendant | Circuit Court of the 17th Judicial Circuit for Broward County, Florida |

# APPENDIX B

FTX.US USER AGREEMENT

*Last updated: May 20, 2020*

Welcome to FTX.US! This is the User Agreement between you and West Realm Shires Services Inc., a Delaware company doing business as FTX.US ("FTX.US" or us). Please read this FTX.US User Agreement (the "Terms") and our Privacy Policy ("Privacy Policy") carefully because they govern your use of the website located at FTX.US and other domain names offering or linking to the website (the "Site") and cryptocurrency services accessible via the Site and any corresponding mobile application ("App") offered by FTX,US. To make these Terms easier to read, the Site, our services and App are collectively called the "Services."

**IMPORTANT NOTICE REGARDING ARBITRATION: WHEN YOU AGREE TO THESE TERMS YOU ARE AGREEING (WITH LIMITED EXCEPTION) TO RESOLVE ANY DISPUTE BETWEEN YOU AND FTX.US THROUGH BINDING, INDIVIDUAL ARBITRATION RATHER THAN IN COURT. PLEASE REVIEW CAREFULLY SECTION 32 "DISPUTE RESOLUTION" BELOW FOR DETAILS REGARDING ARBITRATION.**

**As with any asset, the value of cryptocurrencies of all types (including those called "stable coins") can go up or down and there can be a substantial risk that you lose money buying, selling, holding, or investing in cryptocurrency. You should carefully consider whether trading or holding cryptocurrency is suitable for you in light of your financial condition. FTX.US is not registered with the U.S. Securities and Exchange Commission and does not offer securities services in the United States or to U.S. persons.**

1. <u>Agreement to Terms/Privacy Policy</u>. By using our Services, you agree to be bound by these Terms.  If you don't agree to be bound by these Terms, do not use the Services. If you are accessing and using the Services on behalf of a company (such as your employer) or other legal entity, you represent and warrant that you have the authority to bind that entity to these Terms. In that case, "you" and "your" will refer to that entity. Please review our Privacy Policy, which also governs your use of the Services, for information on how we collect, use and share your information.

2. <u>Changes to these Terms or the Services</u>. We may amend or update the Terms from time to time in our sole discretion. If we do, we'll let you know by posting the updated Terms on the Site, to the App and/or may also send other communications. It's important that you review the Terms whenever we update them or you use the Services. If you continue to use the Services after we have posted updated Terms it means that you accept and agree to the changes. If you don't agree to be bound by the changes, you may not use the Services anymore. The only exception is for changes to the "Dispute Resolution" section, for which you have followed the process in Section 32(g). Because our Services are evolving over time we may change or discontinue all or any part of the Services, at any time and without notice, at our sole discretion.

3. <u>Who May Use the Services?</u> You may use the Services only if you are 18 years or older (or other age of majority in your jurisdiction) and capable of forming a binding contract with FTX.US, and not otherwise barred from using the Services under applicable law. You may not use the Services if you conduct a Prohibited Business or are in a Prohibited Jurisdiction as specified in the appendices thereto. Our Services are offered to persons in our sole discretion as we may choose to not offer the Services or discontinue access to the Services to you or any person or entity for any reason in our sole discretion. We do not accept individuals or entities that we decide not to permit from time to time in our discretion.

4. <u>Feedback</u>. We appreciate feedback, comments, ideas, proposals and suggestions for improvements to the Services ("Feedback"). If you choose to submit Feedback, you agree that we are free to use it without any restriction or compensation to you.

5.  <u>Account Access/Delays in Service</u>**.** You must register for a FTX.US account to use the FTX.US Services (a "**FTX.US Account**"). By using a FTX.US Account you agree and represent that you will use the Services only for yourself, and not on behalf of any third party, unless you have obtained prior approval from FTX.US. You are fully responsible for all activity that occurs under your FTX.US Account. We may, in our sole discretion, refuse to open a FTX.US Account, or limit the number of accounts that you may hold or suspend or terminate any FTX.US Account or the trading of specific cryptocurrency in your account.

During registration for your FTX.US Account or thereafter upon our request, you agree to provide us with the information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crimes and permit us to keep a record of such information. You will need to complete certain verification procedures before you are permitted to use the FTX.US Services. Your access to one or more FTX.US Services and the limits that apply to your use of the FTX.US Services, may be altered as a result of information collected about you on an ongoing basis. The information we request may include certain personal information, including, but not limited to, your name, address, telephone number, e-mail address, date of birth, taxpayer identification number, a government identification, and information regarding your bank account (such as the name of the bank, the account type, routing number, and account number), your source of funds and financial information, and in some cases (where permitted by law), special categories of personal data, such as your biometric information. In providing us with this or any other information that may be required, you confirm that the information is accurate and authentic. You agree to keep us updated if any of the information you provide changes. **You authorize us to make inquiries, whether directly or through third parties, that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take action we reasonably deem necessary based on the results of such inquiries. When we carry out these inquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full. This is an identity check only and should have no adverse effect on your credit rating.** Further, you authorize your wireless operator (AT&T, Sprint, T-Mobile, US Cellular, Verizon, or any other branded wireless operator) to use your mobile number, name, address, email, network status, customer type, customer role, billing type, mobile device identifiers (IMSI and IMEI) and other subscriber status details, if available, solely to allow verification of your identity and to compare information you have provided to FTX.US with your wireless operator account profile information for the duration of the business relationship. See our Privacy Policy for how we treat your data.

To access the Services, you must have the necessary equipment (such as a smartphone or laptop) and the associated telecommunication service subscriptions to access the Internet. Access to the Services may become degraded or unavailable during times of significant volatility or volume. This could result in the inability to buy or sell for periods of time and may also lead to support response time delays. WE DO NOT REPRESENT THAT THE SITE OR THE SERVICES WILL BE AVAILABLE WITHOUT INTERRUPTION AND WE DO NOT GUARANTEE THAT ANY ORDER WILL BE EXECUTED, ACCEPTED, RECORDED, OR REMAIN OPEN. FTX.US shall not be liable for any losses resulting from or arising out of transaction delays.

6.  <u>Account Services</u>. As part of your FTX.US Account, FTX.US provides qualifying users access to accounts for you to store, track, transfer, and manage your balances of cryptocurrency and/or dollars or other supported currency. All cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit. You can load funds into your account from a valid bank account via ACH transfer or wire transfer, or other accepted payment methods such as credit or debit cards. Your balance is in a pending state and will not be credited to your FTX.US Account until after the bank transfer has cleared, usually with 5 business days. We may debit your linked bank account as soon as you initiate payment. Other payment methods may take a longer period to clear, and withdrawals may be limited for a period after a receipt of payments. Your FTX.US Account allows you to hold and transfer US dollars which are held by FTX.US for your benefit at U.S. FDIC-insured banks. FTX.US may impose withdrawal limits on your FTX.US Account from time to time in its discretion. Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US. Your balances in your FTX.US Account are not segregated and

cryptocurrency or cash are held in shared addresses or accounts, as applicable. A valid purchase of cryptocurrency that is accepted by FTX.US generally will initiate on the business day we receive your instructions. Purchased cryptocurrency or transferred payments will be credited to your FTX.US Account as soon as funds have settled to FTX.US, which in the case of a bank account or credit or debit card may take up to five business days. If FTX.US cannot complete your transaction for any reason (such as price movement, or an order exceeding the maximum order size), FTX.US will reject the order and notify you of such rejection. You will not be charged for a rejected transaction. When you give us instructions to purchase (buy) cryptocurrency, you cannot withdraw your consent to that purchase unless the purchase is not scheduled to occur until a future date, provided that you may withdraw your consent up until the end of the business day before the date is scheduled to take place. FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US. You acknowledge that your FTX.US Account is not subject to protections or insurance provided by the Federal Deposit Insurance Corporation or the Securities Investor Protection Corporation.

The use of the Services is subject to a limit on the amount of volume, you may transact or transfer in a given period (e.g., daily). Your transaction limits may vary depending on your payment method, verification steps you have completed, and other factors. FTX.US reserves the right to change applicable limits as we deem necessary in our sole discretion. To increase transaction limits or upon our request in our discretion, we may require you to submit additional information about yourself or your business, provide records, and arrange for meetings with FTX.US staff (such process, "Enhanced Due Diligence"). FTX.US reserves the right to charge you costs and fees associated with Enhanced Due Diligence, provided that we notify you in advance of any such charges accruing. In our sole discretion, we may refuse to raise your limits or we may lower your limits at a subsequent time even if you have completed Enhanced Due Diligence.

7. <u>Supported Cryptocurrencies</u>. You may only use the Services in connection with those particular cryptocurrencies shown available for sale and purchase on FTX.US website. Services and supported assets may vary by jurisdiction. As a result of our security protocols, it may be necessary for us to retrieve private keys or related information from offline storage in order to facilitate a cryptocurrency transfer in accordance with your instructions, and you acknowledge that this may delay the initiation or crediting of such cryptocurrency in your FTX.US Account. Under no circumstances should you attempt to use your FTX.US Account to store, send, request, or receive cryptocurrency we do not support. FTX.US assumes no responsibility in connection with any attempt to use your FTX.US Account with any cryptocurrency that we do not support. Unless listed for availability of the FTX.US website, we do not support protocols and/or functionality which supplement or interact with cryptocurrency that you may hold in your FTX.US Account, or with forked protocols, metacoins, colored coins, side chains, or other derivative, enhanced, or forked protocols, tokens, or coins or other functionality, such as staking, protocol governance, and/or any smart contract functionality, which may supplement or interact with a cryptocurrency we support. Do not use your FTX.US Account to attempt to receive, request, send, store, or engage in any other type of transaction or functionality involving any such protocol as FTX.US is not configured to detect, secure, or process these transactions and functionality. Any attempted transactions in such items will result in loss of the item.

We do not own or control the underlying software protocols which govern the operation of cryptocurrency supported on our platform. Generally, the underlying protocols are open source, and anyone can use, copy, modify, and distribute them. We assume no responsibility for the operation of the underlying protocols and we are not able to guarantee the functionality or security of network operations. In particular, the underlying

protocols may be subject to sudden changes that materially affect the availability, value, functionality, and/or the name of the cryptocurrency you store in your FTX.US Account. It is your responsibility to make yourself aware of upcoming operating changes and you must carefully consider publicly available information in determining whether to continue to use a FTX.US Account for the affected cryptocurrency. In the event of any such operational change, FTX.US reserves the right to takes such steps as may be necessary to protect the security and safety of assets held on the FTX.US platform, including temporarily suspending operations for the involved digital currency(ies), and other necessary steps without notice. FTX.US's response to any material operating change is subject to its sole discretion and includes deciding not to support any new digital currency, fork, or other actions.

8.   Fees. In general, FTX.US makes money when you purchase or sell digital currency on our Site. A full list of FTX.US fees for your FTX.US Account can be found through our Website. By using FTX.US Services you agree to pay all applicable fees. FTX.US reserves the right to adjust its pricing and fees and any applicable waivers at any time. We may charge network fees (miner fees) to process a cryptocurrency transaction on your behalf. We will calculate the network fee in our discretion. Bank fees charged to FTX.US are netted out of transfers to or from FTX.US. You are responsible for paying any additional fees charged by your financial service provider. We will not process a transfer if associated bank fees exceed the value of the transfer. You may be required to deposit additional funds to cover bank fees if you desire to complete such a transfer.

9.   Cryptocurrency Transactions. Once a cryptocurrency transfer is submitted to a cryptocurrency network, the transaction will be unconfirmed and remain in a pending state for a period of time sufficient to confirmation of the transaction by the cryptocurrency network. A cryptocurrency transfer is not complete while it is in a pending state. Pending cryptocurrency transfers that are initiated from a FTX.US Account may reflect a pending transaction status and may not be available to you for use on the FTX.US platform or otherwise while the transaction is pending.

When you or a third party sends cryptocurrency to a FTX.US Account from an external wallet or account not hosted on FTX.US, the person initiating the transaction is solely responsible for executing the transaction properly, which may include, among other things, payment of sufficient network or miner's fees in order for the transaction to be successful. Insufficient network fees may cause a transfer to remain in a pending state outside of FTX.US's control and we are not responsible for delays or loss incurred as a result of an error in the initiation of the transaction and have no obligation to assist in the remediation of such transactions. By initiating a transfer to FTX.US, you attest that you are transacting in a cryptocurrency that is identified as trading on the FTX.US Website which conforms to the particular FTX.US wallet into which funds are directed. FTX.US incurs no obligation whatsoever with regard to unsupported digital currency sent to a FTX.US Account or supported cryptocurrency sent to an incompatible cryptocurrency wallet address. Erroneously transmitted funds will be lost. We recommend customers send a small amount of cryptocurrency as a test prior to initiating a send of a significant amount of supported cryptocurrency.

When you send cryptocurrency from your FTX.US Account to an external address, such transfers are executed at your instruction by FTX.US. You should verify all transaction information prior to submitting instructions to us. FTX.US shall bear no liability or responsibility in the event you enter an incorrect blockchain destination

address. We do not guarantee the identity or value received by a recipient of a transfer initiated by you. Cryptocurrency transfers cannot be reversed once they have been broadcast to the relevant cryptocurrency network, although they may be in a pending state, and designated accordingly, while the transaction is processed by network operators. FTX.US does not control the cryptocurrency network and makes no guarantees that a cryptocurrency transfer will be confirmed by the network.

We may refuse to process or cancel any pending transfers as required by law or any court or other authority to which FTX.US is subject in any jurisdiction. Additionally, we may require you to wait some amount of time after completion of a transaction before permitting you to use further FTX.US Services and/or before permitting you to engage in transactions beyond certain volume limits.

We may allow you to initiate a cryptocurrency transfer to a FTX.US customer by designating that customer's email address. If you initiate a cryptocurrency transfer to an email address, and the recipient does not have an existing FTX.US Account, we will invite the recipient to open a FTX.US Account. If the recipient does not open a FTX.US Account within 60 days, we will return the relevant cryptocurrency to your FTX Account.

If FTX.US elects to offer recurring transaction availability, and you initiate recurring transactions, you authorize us to initiate recurring electronic payments in accordance with your selected cryptocurrency or payments, such as recurring automated clearing house (ACH) debit or credit entries from or to your linked bank account. Your recurring transactions will occur in identical, periodic installments, based on your period selection (e.g., daily, weekly, monthly), until either you or FTX.US cancels the recurring order. If you select a bank account as your payment method for a recurring transaction, and such transaction falls on a weekend or holiday, or after bank business hours, the ACH credit or debit will be executed on the next business day, although the cryptocurrency fees at the time of the regularly-scheduled transaction will apply. If your bank is unable to process any electronic ACH debit entry, we will notify you of cancellation of the transaction and may avail itself of remedies set forth in these Terms to recover any amount owed to FTX.US. You agree to notify FTX.US in writing of any changes in your linked bank account information prior to a recurring transaction. FTX.US may, at any time, terminate recurring transactions by providing notice to you.

10. <u>Password Security: Contact Information</u>. You are responsible for creating a strong password and maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), API keys or any other codes that you use to access the Services. Any loss or compromise of the foregoing information and/or your personal information may result in unauthorized access to your FTX.US Account(s) by third-parties and the loss or theft of any cryptocurrency and/or funds held in your FTX.US Account(s) and any associated accounts, including your linked bank account(s) and credit card(s). You are responsible for keeping your information up to date in your FTX Account in order to receive any notices or alerts that we may send you. You should never allow remote access or share your computer screen with someone else when you are logged on to your FTX.US Account. FTX.US will never under any circumstances ask you for your IDs, passwords, or 2-factor authentication codes. We assume no responsibility for any loss that you may sustain due to compromise of account login credentials. In the event you believe your FTX.US Account(s) information has been compromised, contact us immediately at support@ftx.us.

11. <u>Unauthorized and Incorrect Transactions</u>. When a transaction occurs using your credentials, we will assume that you authorized such transaction, unless you notify us otherwise. If you believe you did not authorize a particular transaction or that a transaction was incorrectly carried out, you must contact us as soon as possible by email at support@ftx.us. Check your transaction history regularly to ensure you notify us as soon as possible of any unauthorized or incorrect transactions to. In any event and without limitation, we are not responsible and you release us from damages and agree to not commence any Disputes (as such term is defined below) for any claim for unauthorized or incorrect transactions unless you have notified us within one (1) year from the first date such transaction posted to your account.

12. <u>Reversals & Cancellations</u>. You cannot cancel, reverse, or change any transaction marked as complete or pending. If your payment is not successful, if your payment method has insufficient funds, or if you reverse a payment made from funds in your bank account, you authorize FTX.US, in its sole discretion, either to cancel the transaction or to debit your other payment methods, including your dollar or cryptocurrency balance in your FTX.US Account or other linked accounts, in any amount necessary to complete the transaction. You are responsible for maintaining an adequate balance and/or sufficient credit limits in order to avoid overdraft, non-sufficient funds (NSF), or similar fees charged by your payment provider. We reserve the right to refuse to process, or to cancel or reverse, any transaction or transfer in our sole discretion, even after funds have been debited from your account(s), if we suspect the transaction involves (or has a high risk of involvement in) money laundering, terrorist financing, fraud, or any other type of financial crime; in response to a subpoena, court order, or other government order; if we reasonably suspect that the transaction is erroneous; or if FTX.US suspects the transaction violates our policies and procedures or creates risk to FTX.US, FTX.US will reverse the transaction and we are under no obligation to allow you to reinstate a purchase or sale order at the same price or on the same terms as the cancelled transaction.

13. <u>Debts</u>. In the event that there are outstanding amounts owed to us hereunder, including in your FTX.US Account, FTX.US reserves the right to debit your FTX.US Account accordingly and/or to withhold amounts from funds you may transfer to your FTX.US Account.

14. <u>Your Content</u>. Our Services may allow you to store or share content such as text (in posts or communications with others), files, documents, graphics, images, music, software, audio and video. Anything (other than Feedback) that you post or otherwise make available through the Services is referred to as "User Content". FTX.US does not claim any ownership rights in any User Content and nothing in these Terms will be deemed to restrict any rights that you may have to your User Content. By making any User Content available through the Services you hereby grant to FTX.US a non-exclusive, transferable, worldwide, royalty-free license, with the right to sublicense, to use, copy, modify, create derivative works based upon, distribute, publicly display, and publicly perform your User Content in connection with operating and providing the Services. You are solely responsible for all your User Content. You represent and warrant that you have (and will have) all rights that are necessary to grant us the license rights in your User Content under these Terms. You represent and warrant that neither your User Content, nor your use and provision of your User Content to be made available through the Services, nor any use of your User Content by FTX.US on or through the Services will infringe, misappropriate or violate a third party's intellectual property rights, or rights of publicity or privacy, or result in the violation of any applicable law or regulation. You can remove your User Content by specifically deleting it. You should know that in certain instances, some of your User Content (such as posts or comments you make) may not be completely removed and copies of your User Content may continue to exist on the Services. To the maximum extent permitted by law, we are not responsible or liable for the removal or deletion of (or the failure to remove or delete) any of your User Content. We may make available through the Services content that is subject to intellectual property rights. We retain all rights to that content.

15. <u>Limited License for Website and Apps</u>. We grant you a limited, nonexclusive, nontransferable license, subject to these Terms, to access and use the FTX.US Services, FTX.US Site, and related content, materials, information (collectively, the "Content") solely for purposes approved by FTX.US from time to time. Any other use of the FTX.US Site or Content is expressly prohibited and all other right, title, and interest in the FTX.US Services, FTX.US Site or Content is exclusively the property of FTX.US and its licensors. You agree you will not copy, transmit, distribute, sell, license, reverse engineer, modify, publish, or participate in the transfer or sale of, create derivative works from, or in any other way exploit any of the Content, in whole or in part without the prior written consent of FTX.US. "FTXUS.com", "FTX.US", "and all logos related to the FTX.US Services or displayed on the FTX.US Site are either trademarks or registered marks of FTX.US or its licensors. You may not copy, imitate or use them without FTX.US's prior written consent.

If you comply with these Terms, FTX.US grants to you a limited non-exclusive, non-transferable license, with no right to sublicense, to download and install the App on your personal computers, mobile handsets, tablets, wearable devices, and/or other devices and to run the App solely for your own personal non-commercial purposes. Except as expressly permitted in these Terms, you may not: (i) copy, modify or create derivative works based on the App; (ii) distribute, transfer, sublicense, lease, lend or rent the App to any third party; (iii) reverse engineer, decompile or disassemble the App (unless applicable law permits, despite this limitation); or (iv) make the functionality of the App available to multiple users through any means.

With respect to any App that you acquire from the Apple App Store or use on an iOS device, Apple has no obligation to furnish any maintenance and support services with respect to the App. In the event of any failure of the App to conform to any applicable warranty, you may notify Apple, and Apple will refund the App purchase price to you (if applicable) and, to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the App. Apple is not responsible for addressing any claims by you or any third party relating to the App or your possession and use of it, including, but not limited to: (i) product liability claims; (ii) any claim that the App fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection or similar legislation. Apple is not responsible for the investigation, defense, settlement and discharge of any third-party claim that your possession and use of the App infringe that third party's intellectual property rights. Apple and its subsidiaries, are third-party beneficiaries of these Terms, and upon your acceptance of the Terms, Apple will have the right (and will be deemed to have accepted the right) to enforce these Terms against you as a third-party beneficiary thereof. You represent and warrant that (i) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a terrorist-supporting country; and (ii) you are not listed on any U.S. Government list of prohibited or restricted parties. You must also comply with any applicable third-party terms of service when using the App.

16. <u>General Prohibitions</u>. You agree not to do any of the following:

(a)      Post, upload, publish, submit or transmit any User Content that: (i) infringes, misappropriates or violates a third party's patent, copyright, trademark, trade secret, moral rights or other intellectual property rights, or rights of publicity or privacy; (ii) violates, or encourages any conduct that would violate, any applicable law or regulation or would give rise to civil liability; (iii) is fraudulent, false, misleading or deceptive; (iv) is defamatory, obscene, pornographic, vulgar or offensive; (v) promotes discrimination,

bigotry, racism, hatred, harassment or harm against any individual or group; (vi) is violent or threatening or promotes violence or actions that are threatening to any person or entity; or (vii) promotes illegal or harmful activities or substances;

(b)      Use, display, mirror or frame the Services or any individual element within the Services, FTX.US's name, any FTX.US trademark, logo or other proprietary information, or the layout and design of any page or form contained on a page, without FTX.US's express written consent;

(c)      Access, tamper with, or use non-public areas of the Services, FTX.US's computer systems, or the technical delivery systems of FTX.US's providers;

(d)      Attempt to probe, scan or test the vulnerability of any FTX.US system or network or breach any security or authentication measures;

(e)      Avoid, bypass, remove, deactivate, impair, descramble or otherwise circumvent any technological measure implemented by FTX.US or any of FTX.US's providers or any other third party (including another user) to protect the Services;

(f)      Attempt to access or search the Services or download content from the Services using any engine, software, tool, agent, device or mechanism (including spiders, robots, crawlers, data mining tools or the like) other than the software and/or search agents provided by FTX.US or other generally available third-party web browsers;

(g)      Send any unsolicited or unauthorized advertising, promotional materials, email, junk mail, spam, chain letters or other form of solicitation;

(h)      Use any meta tags or other hidden text or metadata utilizing a FTX.US trademark, logo URL or product name without FTX.US's express written consent;

(i)      Use the Services, or any portion thereof, for any commercial purpose or for the benefit of any third party or in any manner not permitted by these Terms;

(j)      Forge any TCP/IP packet header or any part of the header information in any email or newsgroup posting, or in any way use the Services to send altered, deceptive or false source-identifying information;

(k)      Attempt to decipher, decompile, disassemble or reverse engineer any of the software used to provide the Services;

(l)      Interfere with, or attempt to interfere with, the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, or mail-bombing the Services;

(m)      Collect or store any personally identifiable information from the Services from other users of the Services without their express permission;

(n)      Impersonate or misrepresent your affiliation with any person or entity;

(o)      Violate any applicable law or regulation; or

(p)      Encourage or enable any other individual to do any of the foregoing.

FTX.US is not obligated to monitor access to or use of the Services or to review or edit any content. However, we have the right to do so for the purpose of operating the Services, to ensure compliance with these Terms and to comply with applicable law or other legal requirements. We reserve the right, but are not obligated, to remove or disable access to any content, including User Content, at any time and without notice, including, but not limited to, if

we, at our sole discretion, consider it objectionable or in violation of these Terms. We have the right to investigate violations of these Terms or conduct that affects the Services. We may also consult and cooperate with law enforcement authorities to prosecute users who violate the law.

17. Links to Third Party Websites or Resources. The Services (including the App) may allow you to access third-party websites or other resources. We provide access only as a convenience and are not responsible for the content, products or services on or available from those resources or links displayed on such websites. You acknowledge sole responsibility for and assume all risk arising from, your use of any third-party resources.

18. No Assurance of Accuracy. Although we intend to provide accurate and timely information on the FTX.US Site, the content provided through the Services may not always be entirely accurate, complete or current and may also include technical inaccuracies or typographical errors. In an effort to continue to provide you with as complete and accurate information as possible, information may be changed or updated from time to time without notice, including without limitation information regarding our policies, products and services. Accordingly, you should verify all information before relying on it, and all decisions based on information contained on the FTX.US Site or through the App are your sole responsibility and we shall have no liability for such decisions. Information provided by third parties, including historical price and supply data for cryptocurrency, is for informational purposes only and FTX.US makes no representations or warranties to its accuracy.

19. Promotions. From time to time, FTX.US may make available special offers or conduct promotions for qualifying customers. Subject to applicable laws, FTX.US or the issuer of a cryptocurrency subject to an offer or promotion may establish qualifying criteria to participate in any special promotion its sole discretion. FTX.US may revoke any special offer at any time without notice. Once cryptocurrency has been deposited in a user's cryptocurrency FTX Account, that cryptocurrency becomes the property of the FTX.US user with all applicable property rights, including those noted in these Terms. FTX.US shall have no obligation to make special offers available to all customers. FTX.US makes no recommendation and does not provide any advice about the value or utility of any cryptocurrency subject to a promotion.

20. Taxes. It is your sole responsibility to determine whether, and to what extent, any taxes apply to any transactions you conduct through the Services, and to withhold, collect, report and remit the correct amounts of taxes to the appropriate tax authorities. Your transaction history is available through your FTX.US Account(s).

21. No Investment Advice or Brokerage. For the avoidance of doubt, FTX.US does not provide investment, tax, or legal advice, nor does FTX.US broker trades on your behalf. All FTX.US trades are executed automatically, based on the parameters of your order instructions and in accordance with posted trade execution procedures, and you are solely responsible for determining whether any investment, investment strategy or related transaction is appropriate for you based on your personal investment objectives, financial circumstances and risk tolerance. You should consult your legal or tax professional regarding your specific situation. FTX.US may provide educational information about cryptocurrency. Information may include, but is not limited to, blog posts, articles, links to to third-party content, news feeds, tutorials, and videos. The information provided does not constitute investment advice, financial advice, trading advice, or any other sort of advice, and you should not treat any of the content as such. FTX.US does not recommend that any cryptocurrency should be bought, earned, sold, or held by you. Before making the decision to buy, sell or hold any cryptocurrency, you should conduct your own due diligence and consult your financial advisors before making any investment decision. FTX.US will not be held responsible for the decisions you make to buy, sell, or hold cryptocurrency based on the information provided by FTX.US or others.

22. Computer Viruses. We shall not bear any liability, whatsoever, for any damage or interruptions caused by any computer viruses or other malicious code that may affect your computer or other equipment, or any phishing,

spoofing or other attack. We advise the regular use of a reputable and readily available virus screening and prevention software. You should also be aware that SMS and email services are vulnerable to spoofing and phishing attacks and should use care in reviewing messages purporting to originate from FTX.US. Always log into your FTX.US Account(s) through the FTX.US Site to review any transactions or required actions if you have any uncertainty regarding the authenticity of any communication or notice.

23. Termination. We may suspend or terminate your access to and use of the Services, including suspending access to or terminating your account, at our sole discretion, at any time and without notice to you. You may cancel your account at any time by withdrawing your balances and sending us an email at support@ftx.us. Upon any termination, discontinuation or cancellation of the Services or your account, the following Sections will survive: Sections 5, 6, 9, 12, 13, 14, 15. 17, 19, 21, 22, 23, this 24, 25, 26, 27, 28, 29, 30, 31, and 32.

If FTX.US suspends or closes your account, or terminates your use of FTX.US Services for any reason, we will provide you with notice of our actions unless a court order or other legal process prohibits FTX.US from providing you with such notice. You acknowledge that FTX.US's decision to take certain actions, including limiting access to, suspending, or closing your account, may be based on confidential criteria that are essential to FTX.US's risk management and security protocols. You agree that FTX.US is under no obligation to disclose the details of its risk management and security procedures to you.

You will be permitted to transfer cryptocurrency or funds associated with your FTX.US Account ninety (90) days after account deactivation or cancellation unless such transfer is otherwise prohibited (i) under the law, including but not limited to applicable sanctions programs, or (ii) by a facially valid subpoena or court order.

24. Warranty Disclaimers. THE SERVICES ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, WE EXPLICITLY DISCLAIM ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. We make no warranty that the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. We make no warranty regarding the quality, accuracy, timeliness, truthfulness, completeness or reliability of any information or content on the Services.

25. Indemnity. You will indemnify and hold FTX.US and its officers, directors, employees and agents, harmless from and against any claims, disputes, demands, liabilities, damages, losses, and costs and expenses, including, without limitation, reasonable legal and accounting fees arising out of or in any way connected with (a) your access to or use of the Services, (b) your User Content, or (c) your violation of these Terms.

26. Limitation of Liability.TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER FTX.US NOR ITS SERVICE PROVIDERS INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE SERVICES WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, EXPECTED GAINS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE SERVICES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THESE TERMS OR FROM THE USE OF OR INABILITY TO USE THE SERVICES, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT FTX.US OR ITS SERVICE PROVIDERS HAS

BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

IN NO EVENT SHALL FTX.US, ITS AFFILIATES AND SERVICE PROVIDERS, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE (A) FOR ANY AMOUNT GREATER THAN THE VALUE OF THE SUPPORTED DIGITAL CURRENCY ON DEPOSIT IN YOUR FTX.US ACCOUNT(S) OR (B) FOR ANY LOST PROFITS, DIMINUTION IN VALUE OR BUSINESS OPPORTUNITY, ANY LOSS, DAMAGE, CORRUPTION OR BREACH OF DATA OR ANY OTHER INTANGIBLE PROPERTY OR ANY SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES, WHETHER BASED IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH AUTHORIZED OR UNAUTHORIZED USE OF THE FTX.US SITE OR THE FTX.US SERVICES, OR THESE TERMS, EVEN IF AN AUTHORIZED REPRESENTATIVE OF FTX.US HAS BEEN ADVISED OF OR KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE, EXCEPT TO THE EXTENT OF A FINAL JUDICIAL DETERMINATION THAT SUCH DAMAGES WERE A RESULT OF FTX.US'S GROSS NEGLIGENCE, FRAUD, WILLFUL MISCONDUCT OR INTENTIONAL VIOLATION OF LAW.. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

THE FTX.US SERVICES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS, IMPLIED OR STATUTORY. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FTX.US SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND/OR NON-INFRINGEMENT. FTX.US DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES THAT ACCESS TO THE SITE, ANY PART OF THE FTX.US SERVICES, OR ANY OF THE MATERIALS CONTAINED THEREIN, WILL BE CONTINUOUS, UNINTERRUPTED, TIMELY, OR ERROR-FREE. FTX.US DOES NOT GUARANTEE THAT ANY ORDER WILL BE EXECUTED, ACCEPTED, RECORDED OR REMAIN OPEN. EXCEPT FOR THE EXPRESS STATEMENTS SET FORTH IN THESE TERMS, YOU HEREBY ACKNOWLEDGE AND AGREE THAT YOU HAVE NOT RELIED UPON ANY OTHER STATEMENT OR UNDERSTANDING, WHETHER WRITTEN OR ORAL, WITH RESPECT TO YOUR USE AND ACCESS OF THE FTX.US SERVICES AND FTX.US SITE. WITHOUT LIMITING THE FOREGOING, YOU HEREBY UNDERSTAND AND AGREE THAT FTX.US WILL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES ARISING OUT OF OR RELATING TO: (A) ANY INACCURACY, DEFECT OR OMISSION OF DIGITAL CURRENCY PRICE DATA, (B) ANY ERROR OR DELAY IN THE TRANSMISSION OF SUCH DATA, OR (C) INTERRUPTION IN ANY SUCH DATA.

FTX.US makes no representations about the accuracy, order, timeliness or completeness of historical cryptocurrency price data available on the FTX.US Site. FTX.US will make reasonable efforts to ensure that requests for electronic debits and credits involving bank accounts, credit cards, and check issuances are processed in a timely manner but FTX.US makes no representations or warranties regarding the amount of time needed to complete processing which is dependent upon many factors outside of our control.

IF YOU ARE A NEW JERSEY RESIDENT, the provisions of this Section 28 are intended to apply only to the extent permitted under New Jersey law.

27.  <u>Death of Account Holder</u>. For security reasons, if we receive legal documentation confirming your death or other information leading us to believe you have died, we will freeze your FTX.US Account and during this time, no transactions may be completed until:(i) your designated fiduciary has opened a new FTX.US Account, as further described below, and the entirety of your FTX.US Account has been transferred to such new account, or (ii) we have received proof in a form satisfactory to us that you have not died. If we have reason to believe you may have died but we do not have proof of your death in a form satisfactory to us, you authorize us to make inquiries, whether directly or through third parties, that we consider necessary to ascertain whether you have died. Upon receipt by us of proof satisfactory to us that you have died, the fiduciary you have designated in a

valid Will or similar testamentary document will be required to open a new FTX.US Account. If you have not designated a fiduciary, then we reserve the right to (i) treat as your fiduciary any person entitled to inherit your FTX.US Account, as determined by us upon receipt and review of the documentation we, in our sole and absolute discretion, deem necessary or appropriate, including (but not limited to) a Will, a living trust or a Small Estate Affidavit, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over your estate. In the event we determine, in our sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, we reserve the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to your FTX.US Account. Pursuant to the above, the opening of a new FTX.US Account by a designated fiduciary is mandatory following the death of a FTX.US Account owner, and you hereby agree that your fiduciary will be required to open a new FTX.US Account and provide the information required under these Terms in order to gain access to the contents of your FTX.US Account.

28.  Unclaimed Property. If FTX.US is holding funds (whether fiat currency or cryptocurrency) in your account, and FTX.US is unable to contact you and has no record of your use of the Services for several years, applicable law may require FTX.US to report these funds (including fiat currency and cryptocurrency) as unclaimed property to the applicable jurisdiction. If this occurs, FTX.US will try to locate you at the address shown in our records, but if FTX.US is unable to locate you, it may be required to deliver any such funds to the applicable state or jurisdiction as unclaimed property.

29.  Governing Law and Forum Choice. These Terms and any action related thereto will be governed by the Federal Arbitration Act, federal arbitration law, and the laws of the State of California without regard to its conflict of laws provisions. Except as otherwise expressly set forth in Section 32 "Dispute Resolution," the exclusive jurisdiction for all Disputes (defined below) that you and FTX.US are not required to arbitrate will be the state and federal courts located in Alameda County in California, and you and FTX.US each waive any objection to jurisdiction and venue in such courts.

30.  Dispute Resolution.

(a)    Mandatory Arbitration of Disputes. We each agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services (collectively, "**Disputes**") will be resolved **solely by binding, individual arbitration and not in a class, representative or consolidated action or proceeding**. You and FTX.US agree that the U.S. Federal Arbitration Act governs the interpretation and enforcement of these Terms, and that you and FTX.US are each waiving the right to a trial by jury or to participate in a class action. This arbitration provision shall survive termination of these Terms.

(b)    Exceptions. As limited exceptions to Section 32(a) above: (i) we both may seek to resolve a Dispute in small claims court if it qualifies; and (ii) we each retain the right to seek injunctive or other equitable relief from a court to prevent (or enjoin) the infringement or misappropriation of our intellectual property rights.

(c)    Conducting Arbitration and Arbitration Rules. The arbitration will be conducted by the American Arbitration Association ("**AAA**") under its Consumer Arbitration Rules (the "**AAA Rules**") then in effect, except as modified by these Terms. The AAA Rules are available at www.adr.org or by calling 1-800-778-7879. A party who wishes to start arbitration must submit a written Demand for Arbitration to AAA and give notice to the other party as specified in the AAA Rules. The AAA provides a form Demand for Arbitration at www.adr.org. Any arbitration hearings will take place in the county, city (or parish) where you live, unless we both agree to a different location. The parties agree that the arbitrator shall have exclusive authority to decide all issues relating to the interpretation, applicability, enforceability and scope of this arbitration agreement. To the extent the location of the arbitration hearing is more than 100 miles from a

location of FTX.US offices, FTX.US reserves the right to appear by video conference to the fullest extent permitted by law.

(d)  Arbitration Costs. Payment of all filing, administration and arbitrator fees will be governed by the AAA Rules, and we won't seek to recover the administration and arbitrator fees we are responsible for paying, unless the arbitrator finds your Dispute frivolous. If we prevail in arbitration we'll pay all of our attorneys' fees and costs and won't seek to recover them from you. If you prevail in arbitration you will be entitled to an award of attorneys' fees and expenses to the extent provided under applicable law.

(e)  Injunctive and Declaratory Relief. Except as provided in Section 32(b) above, the arbitrator shall determine all issues of liability on the merits of any claim asserted by either party and may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. To the extent that you or we prevail on a claim and seek public injunctive relief (that is, injunctive relief that has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the public), the entitlement to and extent of such relief must be litigated in a civil court of competent jurisdiction and not in arbitration. The parties agree that litigation of any issues of public injunctive relief shall be stayed pending the outcome of the merits of any individual claims in arbitration.

(f)  Class Action Waiver. **YOU AND FTX.US AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**  Further, if the parties' dispute is resolved through arbitration, the arbitrator may not consolidate another person's claims with your claims, and may not otherwise preside over any form of a representative or class proceeding.  If this specific provision is found to be unenforceable, then the entirety of this Dispute Resolution section shall be null and void.

(g)  Effect of Changes on Arbitration. Notwithstanding the provisions of Section 3 "Changes to Terms or Services" above, if FTX.US changes any of the terms of this Section 32 "Dispute Resolution" after the date you most recently accepted these Terms, you may reject any such change by sending us written notice (including by email to support@ftx.us) within 30 days of the date such change became effective, as indicated in the "Last Updated" date above or in the date of FTX.US's email to you notifying you of such change. By rejecting any change, you are agreeing that you will arbitrate any Dispute between you and FTX.US in accordance with the terms of this Section 32 "Dispute Resolution" as of the date you most recently accepted these Terms.

(h)  Severability. With the exception of any of the provisions in Section 32(f) of these Terms ("**Class Action Waiver**"), if an arbitrator or court of competent jurisdiction decides that any part of these Terms is invalid or unenforceable, the other parts of these Terms will still apply.

31.  General Terms.

(i)  Reservation of Rights. FTX.US and its licensors exclusively own all right, title and interest in and to the Services, including all associated intellectual property rights. You acknowledge that the Services are protected by copyright, trademark, and other laws of the United States and foreign countries. You agree not to remove, alter or obscure any copyright, trademark, service mark or other proprietary rights notices incorporated in or accompanying the Services.

(j)  Entire Agreement. These Terms constitute the entire and exclusive understanding and agreement between FTX.US and you regarding the Services, and these Terms supersede and replace all prior oral or written understandings or agreements between FTX.US and you regarding the Services. If any provision of these Terms is held invalid or unenforceable by an arbitrator or a court of competent jurisdiction, that provision will be enforced to the maximum extent permissible and the other provisions of these Terms will remain in full force and effect. You may not assign or transfer these Terms, by operation of law or otherwise,

without FTX.US's prior written consent. Any attempt by you to assign or transfer these Terms, without such consent, will be null. FTX.US may freely assign or transfer these Terms without restriction. Subject to the foregoing, these Terms will bind and inure to the benefit of the parties, their successors and permitted assigns. In the event that FTX.US is acquired by or merged with a third party entity, we reserve the right, in any of these circumstances, to transfer or assign the information we have collected from you as part of such merger, acquisition, sale, or other change of control.

(k)      <u>Notices</u>. Any notices or other communications provided by FTX.US under these Terms will be given: (i) via email; or (ii) by posting to the Services. For notices made by email, the date of receipt will be deemed the date on which such notice is transmitted.

(l)      <u>Waiver of Rights</u>. FTX.US's failure to enforce any right or provision of these Terms will not be considered a waiver of such right or provision. The waiver of any such right or provision will be effective only if in writing and signed by a duly authorized representative of FTX.US. Except as expressly set forth in these Terms, the exercise by either party of any of its remedies under these Terms will be without prejudice to its other remedies under these Terms or otherwise. These Terms shall not be construed to waive rights that cannot be waived under applicable state laws in the state where you are located.

(m)      <u>Relationship of the Parties</u>. FTX.US is an independent contractor for all purposes. Nothing in these Terms shall be deemed or is intended to be deemed, nor shall it cause, you and FTX.US to be treated as partners, joint ventures, or otherwise as joint associates for profit, or either you or FTX.US to be treated as the agent of the other.

(n)      <u>Force Majeure</u>. We shall not be liable for delays, failures to execute trades, failure in performance or interruption of service which result directly or indirectly from any cause or condition beyond our reasonable control, including but not limited to, significant market volatility, denial of service attacks, hacking, any delay or failure due to any act of God, act of civil or military authorities, act of terrorists, civil disturbance, war, strike or other labor dispute, fire, interruption in telecommunications or Internet services or network provider services, failure of equipment and/or software, other catastrophe or any other occurrence which is substantially beyond our control or not directly caused by us and shall not affect the validity and enforceability of any remaining provisions.

32.   <u>Contact Information</u>. If you have any questions about these Terms or the Services, please contact FTX.US at support@ftx.us or by registered or certified mail to the following address:


West Realm Shires Services, Inc. d/b/a FTX US

2000 Center St 4th Fl

Berkeley CA 94704

APPENDIX 1: Prohibited Businesses and Prohibited Jurisdictions

By opening a FTX.US Account, you confirm that you will not use FTX.US Services in connection with any of following businesses, activities, practices, or items:

We. prohibit businesses who use or intend to use its services in connection with any of following businesses, activities, practices, or items:

o Investment and Credit Services: Securities brokers; mortgage consulting or debt reduction services; credit counseling or repair; real estate opportunities; investment schemes

o Restricted Financial Services: Check cashing, bail bonds; collections agencies.

o Intellectual Property or Proprietary Rights Infringement: Sales, distribution, or access to counterfeit music, movies, software, or other licensed materials without the appropriate authorization from the rights holder

o Counterfeit or Unauthorized Goods: Unauthorized sale or resale of brand name or designer products or services; sale of goods or services that are illegally imported or exported or which are stolen

o Regulated Products and Services: Marijuana dispensaries and related businesses; sale of tobacco, e-cigarettes, and e-liquid; online prescription or pharmaceutical services; age restricted goods or services; weapons and munitions; gunpowder and other explosives; fireworks and related goods; toxic, flammable, and radioactive materials; products and services with varying legal status on a state-by-state basis

o Drugs and Drug Paraphernalia: Sale of narcotics, controlled substances, and any equipment designed for making or using drugs, such as bongs, vaporizers, and hookahs

o Pseudo-Pharmaceuticals: Pharmaceuticals and other products that make health claims that have not been approved or verified by the applicable local and/or national regulatory body

o Substances designed to mimic illegal drugs: Sale of a legal substance that provides the same effect as an illegal drug (e.g., salvia, kratom)

o Adult Content and Services: Pornography and other obscene materials (including literature, imagery and other media); sites offering any sexually-related services such as prostitution, escorts, pay-per view, adult live chat features

o Multi-level Marketing: Pyramid schemes, network marketing, and referral marketing programs

o Unfair, predatory or deceptive practices: Investment opportunities or other services that promise high rewards; Sale or resale of a service without added benefit to the buyer; resale of government offerings without authorization or added value; sites that we determine in our sole discretion to be unfair, deceptive, or predatory towards consumers

o High risk businesses: any businesses that we believe poses elevated financial risk, legal liability, or violates card network or bank policies

We prohibit access to our Services in the following jurisdictions:

• Any jurisdiction that is subject to the sanctions programs administered by the U.S. Treasury and other governing bodies.

• New York and Washington

• Any jurisdiction that we may determine poses elevated financial risk, legal liability, or violates card network or bank policies

APPENDIX 2: E-Sign Disclosure and Consent

This policy describes how FTX.US delivers communications to you electronically. We may amend this policy at any time by providing a revised version on our website. The revised version will be effective at the time we post it. We will provide you with prior notice of any material changes via our website.

**Electronic Delivery of Communications**

You agree and consent to receive electronically all communications, agreements, documents, notices and disclosures (collectively, "Communications") that we provide in connection with your FTX.US Account(s) and your use of FTX.US Services. Communications include:

- Terms of use and policies you agree to (e.g., the FTX.US User Agreement and Privacy Policy), including updates to these agreements or policies;

- Account details, history, transaction receipts, confirmations, and any other Account or transaction information;

- Legal, regulatory, and tax disclosures or statements we may be required to make available to you; and

- Responses to claims or customer support inquiries filed in connection with your Account.

We will provide these Communications to you by posting them on the FTX.US website, emailing them to you at the primary email address listed in your FTX.US profile, communicating to you via instant chat, and/or through other electronic communication such as text message or mobile push notification.

**Hardware and Software Requirements**

In order to access and retain electronic Communications, you will need the following computer hardware and software:

- A device with an Internet connection;

- A current web browser that includes 128-bit encryption (e.g. Internet Explorer version 9.0 and above, Firefox version 3.6 and above, Chrome version 31.0 and above, or Safari 7.0 and above) with cookies enabled;

- A valid email address (your primary email address on file with FTX.US); and

- Sufficient storage space to save past Communications or an installed printer to print them.

**How to Withdraw Your Consent**

You may withdraw your consent to receive Communications electronically by contacting us at support@ftx.us . If you fail to provide or if you withdraw your consent to receive Communications electronically, FTX.US reserves the right to immediately close your Account or charge you additional fees for paper copies.

**Updating your Information**

It is your responsibility to provide us with a true, accurate and complete e-mail address and your contact information, and to keep such information up to date. You understand and agree that if FTX.US sends you an electronic Communication but you do not receive it because your primary email address on file is incorrect, out of date, blocked by your service provider, or you are otherwise unable to receive electronic Communications, FTX.US will be deemed to have provided the Communication to you.

You may update your information by logging into your account and visiting settings or by contacting our support team.

# APPENDIX C

The Wayback Machine - http://web.archive.org/web/20221018024940/https://help.ftx.us/hc/en-us/articles/908...

 

FTX.US / FTX App / App Features

**Categories** ⌄

# FTX Earn

You can earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

See the Legal Disclaimers at the end of this article for more information about the terms and conditions and how staking and yield generation work on FTX.

---

**Opting In to FTX Earn** 

## Opting In to FTX Earn

1. On the **Wallet Tab**, tap the button that says **Earn Up to 8% on your Funds**.



2. Tap **Start Earning**.



3. You will now be earning up to 8% APY on your deposits, both current and future!

Alternatively, you can:

1. Tap ⚙ at the top right of your screen.

2. Tap **Settings**.

3. Tap **Profile**.



4. Tap **Earn rewards on assets**.



5. Tap **Start Earning** to change the setting.



**NOTE:** You need to **disable** Spot Margin Trading in order to earn yield on supported currencies.

## Opting Out of FTX Earn    ✕

## Opting Out of FTX Earn

1. Tap ⚙ at the top right of your screen.

2. Tap **Profile**.



3. Tap **Earn rewards on assets**.



4. Tap the **Disable** button. You now have opted out of Earn, but can change your mind later!



Alternatively, you can tap on **Total earned** on the Wallet tab and then the **Stop earning yield on assets** button.



**NOTE:** You need to **disable** Spot Margin Trading in order to earn yield on supported currencies.

# FAQs

What assets can I keep in my FTX App account to earn yield? 

## What assets can I keep in my FTX App account to earn yield?

Any cryptocurrency or fiat that FTX App supports can earn! You don't even have to purchase your crypto on FTX App to earn - just deposit from other wallets or exchanges or from your bank to start earning right away!

How do I view my earnings? 

## How do I view my earnings?

Once you opt-in to Earn, the yield earnings are automatically added to the wallet that it's calculated from. Both the calculation and payout are done hourly. By tapping the eligible fiat/crypto wallet, you should see the holdings increase by the "Total earned" amount (not the USD value due to price fluctuation).

You can tap **Total Earned** on the Invest tab to see your Total USD earnings, as well as a breakdown of all wallets that have earned and are currently earning.

How do you calculate APY? Does my balance compound daily? ✕

## How do you calculate APY? Does my balance compound daily?

APY stands for Annual Percentage Yield. This is the rate you earn on an investment over a year and includes any compounded interest. FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 USD value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

| Assets supported | Amount | Rate |
| --- | --- | --- |
| All crypto and fiat | Up to $10,000 | 8% |
| All crypto and fiat | All funds after $10,000 | 5% |

*Example:*

1. I have $10,000 USD in my account. I will earn 8% APY on my deposit of USD.

2. I have $5,000 USD value each of Bitcoin and Dogecoin in my account, plus $10,000 worth of USD. I will earn 8% APY on the first $10,000 worth of assets deposited regardless of asset, and 5% APY on the next $10,000, for an average APY of 6.5% on my total deposit.

All assets kept in your wallets will earn the same crypto or fiat that is held in the wallet, and will earn at the same rate. In Example 2 above, you will earn 6.5% on both the DOGE and the BTC. There is no way to designate one coin to earn 8% and the rest at 5% - they will all earn at the same average rate based on how many coins you are holding.

**Is my principal locked? Can I withdraw my principal anytime?**                    ✕

## Is my principal locked? Can I withdraw my principal anytime?

You are free to withdraw your principal and yield payments at any time, provided that your deposit is fully withdrawable otherwise (see below).

Any assets purchased with early credit are eligible to be staked and earn yield and will accrue that yield from time of deposit. Your yield will be withdrawable when the full deposit is eligible to be withdrawn.

**Is this available in my country?**                    ✕

Can't find what you're looking for?

 

Contact us

**RESOURCES**

Blog

FTX Whitelabel

Fees

API Docs

**COMPANY**

About

FTX Policy

FTX Climate

Legal

**SUPPORT**

Announcements

Learn

Contact Support

**PARTNERS**

FTX International

FTX.US

© 2022 FTX US. All rights reserved.