# EXHIBIT A

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION SECTION

CASE NO: 2022-022900-CA-01

SECTION: CA43

MICHAEL NORRIS, BRANDON ROWAN, MICHAEL LIVIERATOS, SHENGYUN HUANG, VIJETH SHETTY, and BO YANG,

        Plaintiffs,

v.

DAVID ORTIZ, THOMAS BRADY, and KEVIN O'LEARY,

        Defendants.

_____/


## **DEFENDANTS' MOTION TO STAY IN FAVOR OF FIRST-FILED FEDERAL ACTION**

      Defendants David Ortiz, Thomas Brady, and Kevin O'Leary (collectively, "Defendants") move to stay this action pending resolution of an identical first-filed action involving the <u>same</u> facts, asserting the <u>same</u> counts, and filed against the <u>same</u> defendants (and others) on behalf of functionally the <u>same</u> plaintiffs by the <u>same</u> counsel. Florida law – including binding precedent from the Third District Court of Appeal – mandates that this action be stayed.[1]

---

[1] By filing this motion, Defendants do not waive and preserve all defenses they have to Plaintiffs' claims. To the extent necessary, Defendants request an extension of time to assert their Rule 1.140(b) defenses until after this stay request is finally resolved.

#### SUMMARY

The Court must stay this proceeding—one of multiple duplicative actions brought as part of transparent forum shopping efforts, which involved filing nine separate, virtually identical actions first in the Southern District of Florida (where the first action was filed) and then this Court.[2] Each one raises exactly the same allegations and causes of action against Defendants here and other defendants. Plaintiffs' counsel filed this case and the other duplicative actions <u>after</u> filing their initial action in the U.S. District Court for the Southern District of Florida: *Garrison v. Bankman-Fried*, No. 1:22-cv-23753-KMM (S.D. Fla.) (the "*Garrison* Action"), which is pending before the Hon. K. Michael Moore. Ultimately, Plaintiffs' counsel dismissed seven of the actions, leaving the *Garrison* Action and this action as the two remaining parallel actions.

The *Garrison* Action is the "first-filed," putative nationwide class action; it encompasses the entirety of the issues raised in this action, based on identical facts and raising the identical causes of action against Defendants, asserted by functionally the same plaintiffs. After filing the *Garrison* Action, Plaintiffs' counsel filed this case (not as a putative class action) and then amended it to be a multi-plaintiff action after dismissing their other individual-plaintiff state-court actions, apparently to maneuver to have <u>this</u> Court make crucial rulings on threshold legal issues pertinent to the first-filed *Garrison* Action.[3]

Florida law does not permit this. This proceeding must be stayed under the "first-filed" rule (also called the "principle of priority"), a firmly established doctrine of comity applicable where two courts sequentially obtained concurrent jurisdiction over substantially similar lawsuits. Here,

---

[2] Plaintiffs are represented by the law firm The Moskowitz Law Firm, PLLC – the same law firm that brought each of these nine actions.

[3] *See* Michael Mora, *Miami Judge to Weigh Whether Crypto Platform FTX's Investment Product Is a Security* (Daily Business Review, Jan. 20, 2023) (https://www.law.com/dailybusinessreview/2023/01/20/miami-judge-to-weigh-whether-crypto-platform-ftxs-investment-product-is-a-security/) (last accessed Jan. 28, 2023).

the first-filed action – the *Garrison* Action – was filed on November 15, 2022. This action was filed over two weeks later on December 2, 2022. The two cases are essentially identical: The factual allegations are the same (with the complaints largely copied and pasted), the causes of action are identical, Defendants here are also defendants in the *Garrison* Action, and Plaintiffs here are members of the first-filed putative class and thus functionally identical.

Binding precedent requires that this action be stayed. As the Third District Court of Appeal held in *OPKO Health, Inc. v. Lipsius*, 279 So. 3d 787 (Fla. 3d DCA 2019), "'Although a trial court has broad discretion to order or refuse a stay of an action pending before it, <u>it is nonetheless an abuse of discretion to refuse to stay a subsequently filed state court action in favor of a previously filed federal action which involves the same parties and the same or substantially similar issues</u>.'" *Id.* at 791 (quoting *Fla. Crushed Stone Co. v. Travelers Indem. Co.*, 632 So. 2d 217, 220 (Fla. 5th DCA 1994)) (emphasis added); *see also Roche v. Cyrulnik*, 337 So. 3d 86, 88 (Fla. 3d DCA 2021) ("Generally, when a state lawsuit is filed that involves the same nucleus of facts as a previously filed federal lawsuit, principles of comity and the desire to avoid inconsistent results require the stay of the subsequently filed state action until the prior filed federal action has been adjudicated.") (citing *OPKO Health*, 279 So. 3d at 791).

As shown below, this action is squarely controlled by the "first-filed" rule recognized in *OPKO Health* and *Roche*. The *Garrison* Action will indisputably address and resolve every issue in this action, and the federal court was the first court to obtain and exercise jurisdiction over this dispute. Principles of comity—and binding precedent—require this Court to yield its jurisdiction to Judge Moore's prior jurisdiction. A stay of this action pending the resolution of the *Garrison* Action is mandated.

<u>**BACKGROUND**</u>

This action and the *Garrison* Action have a convoluted procedural history, even in the short time they have been pending in, respectively, this Court and the Southern District of Florida.

*The Federal Actions*

The *Garrison* Action was filed on November 15, 2022, and assigned to Judge Moore.[4] The initial class action complaint was brought by plaintiff Edwin Garrison against Defendants Tom Brady, Kevin O'Leary, and David Ortiz, along with additional defendants Sam Bankman-Fried, Gisele Bündchen, Stephen Curry, the Golden State Warriors, Shaquille O'Neal, Udonis Haslem, William Trevor Lawrence, Shohei Ohtani, Naomi Osaka, and Lawrence Gene David.[5]

Shortly after the *Garrison* Action was filed, the same plaintiffs' counsel filed two additional, functionally-identical putative class-actions against overlapping defendants in the Southern District of Florida. The first was assigned to Judge Gayles. *See Kavuri v. Bankman-Fried*, No. 22-cv-23817-DPG (S.D. Fla.).[6] The second—which also named Mr. Garrison as a co-plaintiff in the amended pleading—was initially assigned to Judge Bloom. *See Podalsky v. Bankman-Fried*, No. 22-cv-23983 (S.D. Fla.) (the "*Podalsky* Action").[7] On December 8th, the day after filing the *Podalsky* Action, Plaintiffs' counsel noticed voluntary dismissals in *Garrison* and *Kavuri*. *See* Ex. A (Dkt. 14); Ex. C (Dkt. 5). Later that day, Plaintiffs' counsel filed a consolidated amended complaint in the *Podalsky* Action, adding the named plaintiffs in *Kavuri* and *Garrison*. *See* Ex. F. *Kavuri* was dismissed, but *Garrison* was not. The next day, Judge Bloom transferred

---

[4] A copy of the current *Garrison* docket (as of the afternoon of January 30, 2023) is attached as Exhibit **A**.

[5] A copy of the initial pleading in *Garrison* is attached as Exhibit **B**.

[6] A copy of the *Kavuri* docket is attached as Exhibit **C**.

[7] Copies of the *Podalsky* docket, initial pleading, and amended pleading are attached as Exhibit **D,** Exhibit **E**, and Exhibit **F**.

the *Podalsky* Action to Judge Moore, *see* Ex. D (Dkt. 5), who *sua sponte* consolidated *Podalsky* with the first-filed *Garrison* Action and—as discussed below—ordered that all filings in the consolidated cases be filed in the *Garrison* Action, *see* Ex. A (Dkt. 7).

Plaintiffs never filed any of the mandatory notices of related actions.[8] Yet they admitted in the amended pleading in the *Podalsky* action that the *Garrison* and *Podalsky* cases were related. As stated in the *Podalsky Amended Complaint*, the *Podalsky* action was filed

> to effectively consolidate the class actions **brought by Edwin Garrison, the Plaintiff who filed the first class action in the country** against Sam Bankman-Fried and others for these claims on behalf of FTX customers who were United States residents, and Sunil Kavuri, who filed a class action on behalf of FTX's international customers. … This is the similar approach that other FTX investors took with individual **Florida state court cases that are now effectively consolidated before the Honorable Michael Hanzman** of the Miami-Dade Complex Business Litigation Division, *Michael Norris, et al. v. Thomas Brady, et al.*, No. 2022-022900-CA-01 (Fla. 11th Jud. Cir.).

*Id.* at 2 n.2 (all emphasis added).

But that method of "consolidat[ing]" actions filed in the Southern District of Florida is not permitted. On December 9, 2022, Judge Moore *sua sponte* determined that the *Garrison* and *Podalsky* Actions "have common questions of fact and consolidation is appropriate," ordered consolidation of the two actions "for all purposes, including trial" under the *Garrison* Action case number,[9] ordered an amended complaint be filed in the *Garrison* Action, administratively closed

---

[8] The Local Rules of the Southern District of Florida provide, "It shall be the continuing duty of the attorneys of record in every action or proceeding to bring promptly to the attention of the Court and opposing counsel the existence of other actions or proceedings as described in Section 2.15.00 of the Court's Internal Operating Procedures, as well as the existence of any similar actions or proceedings then pending before another court or administrative agency. Such notice shall be given by filing with the Court and serving a 'Notice of Pending, Refiled, Related or Similar Actions,' containing a list and description thereof sufficient for identification." S.D. Fla. L.R. 3.8. However, no such notices were filed in any of the three actions filed by plaintiffs. *See* Exs. A, C & D.

[9] As the lower-numbered action, *Garrison* takes priority, and therefore, Judge Moore administratively closed *Podalsky* and consolidated *Podalsky* with *Garrison*—the higher-numbered

– but did not dismiss – the *Podalsky* Action, and required that "[a]ll future filings MUST be made only in <u>the lead case</u>, Case No. 1:22-cv-23753-KMM [*i.e.*, the *Garrison* Action]. *See Podalsky* docket at Dkt. No. 7 (PAPERLESS ORDER CONSOLIDATING CASES) (capitalization in original; underline emphasis added).

The amended pleading was filed as ordered by Judge Moore in the *Garrison* Action – the "lead case" – on December 16, 2022.[10] This amendment parallels the *Podalsky Amended Complaint*, with the original three federal plaintiffs in their separate actions (Garrison, Podalsky, and Kavuri) being joined by four additional plaintiffs (Skyler Lindeen, Alexander Chernyavsky, Garry Gallant, and David Nicol). *See Garrison Amended Complaint* at 10-12.[11]

As described at the outset of the *Garrison Amended Complaint*,

Plaintiffs file this Consolidated Complaint (the only Class Action in the Country), on behalf of themselves, and all other similarly situated US and non-US FTX consumers, against Defendants, who all promoted, assisted in, and/or actively participated in FTX Trading LTD d/b/a FTX's ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively, the "FTX Entities"), offer and sale of unregistered securities, identical FTX yield-bearing accounts ("YBAs").

*Id.* at 1. As in the original pleading, Plaintiffs allege that Defendants appeared in YouTube videos and other advertisements and that, even though these advertisements made no mention of YBAs, Defendants were somehow responsible for both selling YBAs to Plaintiffs and failing to register the YBAs as securities with the federal Securities Exchange Commission. *Id.* at 65-85. Plaintiffs

---

action. *See* S.D. Fla. IOP 2.06.00 ("Transfer of Higher-Numbered Cases") & IOP 2.15.00 ("Transfer of Similar Actions").

[10] A copy of the *Amended Class Action Complaint and Demand for Jury Trial* (the "*Garrison Amended Complaint*") is attached as Exhibit **G**.

[11] These individuals were also the named plaintiffs in the original pleading filed in the *Podalsky* Action. *See* Ex. E.

framed the *Garrison* Action as maybe "the <u>only</u> avenue for any of the victims to recover any of their damages." *Id.* at 1 (¶ 1) (emphasis added).

The amended *Garrison* claims are brought against the same group of defendants named in the original *Garrison* pleading – including Defendants here – all now denominated the "FTX Brand Ambassador Defendants," who are defined as Thomas Brady, Gisele Bündchen, Kevin O'Leary, Udonis Haslem, David Ortiz, Stephen Curry, the Golden State Warriors, Shaquille O'Neal, William Trevor Lawrence, Shohei Ohtani, Naomi Osaka, and Lawrence Gene David. *See id.* at 12-14 (¶¶ 31-42). The amendment also names the "FTX Insider Defendants," who are defined as Caroline Ellison, allegedly Alameda Research, LLC's former CEO; Sam Trabucco, allegedly former Co-CEO of Alameda Research; Gary "Zixiao" Wang, allegedly co-founder of Alameda Research and FTX; Nishad Singh, allegedly former Director of Engineering of FTX[12]; and Dan Friedberg, allegedly the former Chief Compliance Officer of FTX. *See id.* at 14 (¶¶ 43-48). Although not listed as an "FTX Insider Defendant," Sam Bankman-Fried continues to be identified as a defendant. *See id.* at, *e.g.*, 22-23 (¶¶ 75-79).

The amended *Garrison* pleading also asserts the same four counts as the original pleading against "Defendants" as a collective on behalf of the putative classes:

- Count One – "Violations of the Florida Statute Section 517.07, The Florida Securities and Investor Protection Act (Plaintiffs Individually and on behalf of the Classes)";
- Count Two – "For Violations of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, Florida Statutes, *et seq*. (Plaintiffs Individually and on behalf of the Classes)";
- Count Three – "Civil Conspiracy (Plaintiffs Individually and on behalf of the Classes)"; and,

---

[12] Mr. Singh was an original defendant in this action, but was dropped from the amended pleading. *See infra*.

- Count Four – "Declaratory Judgment (Declaratory Judgment Act, Florida Statutes §§ 86.011 et seq.) (Plaintiffs Individually and on behalf of the Classes)."

*See id.* at 91-96. The *Garrison Amended Complaint* defines the putative classes as follows:

Plaintiffs seek to represent the following Global Class, Nationwide Class, and Florida Subclass (collectively, "the Classes"):

**(1) Global Class:** All persons and entities residing outside of the United States who, within the applicable limitations period, purchased or enrolled in a YBA.

**(2) Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA.

**(3) Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a YBA.

*Id.* at 85-86 (¶ 234) (all bold and underline in original).

Service was accomplished in the *Garrison* Action as to the first defendant—the Golden State Warriors, LLC, which is not a defendant in this action—on January 4, 2023, as shown by the waiver of service filed on January 6, 2023. *See* Ex. A (Dkt. 17).[13] After discussions with Plaintiffs' counsel and, respectively, counsel for Mr. Ortiz, Mr. Brady, and Mr. O'Leary, service was accomplished for Defendants beginning on January 16, 2023, after each timely returned a federal waiver of service form.

<u>*The Eleventh Judicial Circuit Actions*</u>

More than two weeks after initiating the *Garrison* Action, Plaintiffs' counsel filed the instant action on behalf of only Plaintiff Norris on December 2, 2022, naming as the defendants Nishad Sing and Defendant Ortiz. *See Complaint and Demand for Jury Trial* (copy attached as Exhibit **I**). The initial pleading asserts the same four counts based on the same facts as the *Garrison*

---

[13] A copy of the "Waiver of the Service of Summons" on behalf of the Golden State Warriors LLC filed in *Garrison* is attached as Exhibit **H**.

*Complaint*, and is brought by an individual plaintiff who is a member of the putative class in the *Garrison* Complaint.

Paralleling Plaintiffs' counsel's filing activities in federal court, the instant action was filed in this Court along with several other nearly-identical actions – all of which were filed after the *Garrison* Action was initiated (on November 15, 2022), all of which were assigned to the Hon. Alan Fine (CA 44), and all of which were voluntarily dismissed:

- *Bo Yang v. Thomas Brady and Kevin O'Leary*, No. 2022-022015-CA-01 (11th Jud. Cir., Miami-Dade County, Fla.), which was filed on November 17, 2022. A copy of the *Yang* docket is attached as Exhibit **J**.

- *Shengyun Huang v. Thomas Brady and Kevin O'Leary*, No. 2022-022139-CA-01 (11th Jud. Cir., Miami-Dade County, Fla.), which was filed on November 18, 2022. A copy of the *Huang* docket is attached as Exhibit **K**.

- *Vijeth Shetty v. Thomas Brady and Kevin O'Leary*, No. 2022-022137-CA-01 (11th Jud. Cir., Miami-Dade County, Fla.), which was also filed on November 18, 2022. A copy of the *Shetty* docket is attached as Exhibit **L**.

- *Michael Livieratos v. Thomas Brady and Kevin O'Leary*, No. 2022-022255-CA-01 (11th Jud. Cir., Miami-Dade County, Fla.), which was filed on November 21, 2022. A copy of the *Livieratos* docket is attached as Exhibit **M**.

- *Brandon Rowan v. Gary Wang and Udonis Haslem*, No. 2022-022902-CA-01 (11th Jud. Cir., Miami-Dade County, Fla.), which was filed on December 2, 2022. A copy of the *Rowan* docket is attached as Exhibit **N**.

On December 5, 2022, immediately following dismissal of these five individual actions, each of these state-court plaintiffs—*i.e.*, Rowan, Livieratos, Huang, Shetty, and Yang—joined with Plaintiff Norris in the *Amended Complaint and Demand for Jury Trial* ("*Norris Amended Complaint*") filed in this action.[14] *See id.* at 2. Significantly, the *Norris Amended Complaint* looks exactly like the original *Garrison* pleading (filed on November 15, 2022) and the factual allegations are essentially identical. *Compare* Ex. B *with* Ex. O. The defendants are Mr. Ortiz, Mr. Brady, and Mr. O'Leary—*i.e.*, the same individuals who were originally and remain

---

[14] A copy of the *Norris Amended Complaint* is attached as Exhibit **O**.

defendants in the federal *Garrison* and *Podalsky* Actions. *See Norris Amended Complaint* at 10-11; *see also Garrison Amended Complaint* at 12-13 (¶¶ 31, 33 & 35).[15] And Plaintiffs describe themselves as persons "that all invested millions of dollars in FTX" who are suing Defendants because they allegedly

> each promoted, assisted in, and actively participated in, FTX Trading LTD d/b/a FTX's ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively, the "FTX Entities"), offer and sale of unregistered securities, in the form of identical Yield-Bearing Accounts ("YBAs"), seeking to recover damages, declaratory and/or injunctive relief stemming from the offer and sale of FTX Trading's and FTX US's yield-bearing cryptocurrency accounts.

*Norris Amended Complaint* at 1. Thus, Plaintiffs in this action fall squarely within the definition of the putative class on which the *Garrison* Action is brought. *Compare Norris Amended Complaint* at 1 *with Garrison Amended Complaint* at ¶ 234(2) (defining the "Nationwide Class" as "All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA."); ¶ 234(3) (defining the "Florida Subclass" as "All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a YBA.").

The four counts of the *Norris Amended Complaint* are <u>identical</u> to the four counts of the *Garrison Amended Complaint*, with the only difference being that the counts in *Norris* are not brought on behalf of putative classes. The *Norris* counts are:

- Count One – "Violations of the Florida Statute Section 517.07, The Florida Securities and Investor Protection Act";
- Count Two – "For Violations of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, Florida Statutes, *et seq*.";
- Count Three – "Civil Conspiracy"; and,

---

[15] Notably, Mr. Singh—who was an original defendant in this action—is now named as a defendant in the *Garrison Amended Complaint* as one of the "FTX Insider Defendants." *See id.* at ¶¶ 43 & 47.

- Count Four – "Declaratory Judgment (Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq.*"

*Norris Amended Complaint* at 29-32; *compare Garrison Amended Complaint* at 91-95.

After discussions with Plaintiffs' counsel and, respectively, counsel for Mr. Ortiz, Mr. Brady, and Mr. O'Leary, waivers of service of process under Rule 1.070(i) were accomplished for Defendants beginning on January 17, 2023, after each timely returned a waiver form.

### ARGUMENT

The claims and alleged facts in this action and the *Garrison* Action are the same, Defendants in this action are also defendants in the *Garrison* Action, the counts in the two actions are identical, and the plaintiffs are functionally the same because Plaintiffs fall squarely within the definition of the "Nationwide Class" and/or the "Florida Subclass" on whose behalf the *Garrison* Action is purportedly brought. Accordingly, as *OPKO Health*, *Roche*, and a multitude of other Florida appellate decisions make clear, Florida law mandates that this action be stayed in favor of the *Garrison* Action. *See OPKO Health*, 279 So. 3d at 791; *Roche*, 337 So. 3d at 88.[16]

Indeed, almost a century ago, the Florida Supreme Court held, "Where a state and federal court have concurrent jurisdiction over the same parties or privies and the same subject-matter, the tribunal where jurisdiction first attaches retains it exclusively and will be left to determine the

---

[16] *See also Ocwen Loan Servicing, LLC v. 21 Asset Mgmt. Holding, LLC*, 307 So. 3d 923, 925 (Fla. 3d DCA 2020) (granting certiorari and quashing order denying stay in favor of first-filed action) (citing and quoting *OPKO Health*, 279 So. 3d at 791); *Inphynet Contracting Servs., Inc. v. Matthews*, 196 So. 3d 449, 465 (Fla. 4th DCA 2016) ("In the context of class actions, we have said that where federal and state courts have concurrent jurisdiction over the parties and identical causes of action, the latter court to obtain jurisdiction should stay all proceedings in deference to the first court."); *Robeson v. Melton*, 52 So. 3d 676, 679 (Fla. 4th DCA 2009) (in view of the first-filed federal action, "the trial court should stay the entire subsequently filed and substantially related state action"); *Beckford v. Gen. Motors Corp.*, 919 So. 2d 612, 613 (Fla. 3d DCA 2006) ("It is well-settled that when a previously filed federal action is pending between substantially the same parties on substantially the same issues, a subsequently filed state action should be stayed pending the disposition of the federal action.").

controversy and to fully perform and exhaust its jurisdiction and to decide every issue or question properly arising in the case." *Wade v. Clower*, 114 So. 548, 551 (Fla. 1927). This basic principle—which is also called the "principle of priority"—has been followed repeatedly since the *Wade* decision by the Third District and other Florida appellate courts.[17]

Here, the facts are indisputable and unquestionably require a stay. First, the *Garrison* Action was filed first, and the federal court was the first to exercise jurisdiction. Second, the *Garrison* Action is identical to this one: It is based on the very same facts and allegations, and it asserts the same four causes of action against Defendants. And, third, the parties are the same in both actions. Defendants are also defendants in the *Garrison* Action, and Plaintiffs here are putative class members in the *Garrison* Action.

Given these facts, the "principle of priority" doctrine "dictates" that the U.S. District Court for the Southern District of Florida—where the first-filed *Garrison* Action is pending—"retains the exclusive right to hear the questions and issues arising from the case." *OPKO Health*, 279 So. 3d at 793.[18] To permit this case to proceed in violation of Florida law and well-settled

---

[17] *See, e.g.*, *Ocwen Loan*, 307 So. 3d at 925; *OPKO Health*, 279 So. 3d at 793; *Robeson*, 52 So. 3d at 679; *Pilevsky v. Morgans Hotel Group Mgmt., LLC*, 961 So. 2d 1032, 1036 (Fla. 3d DCA 2007) ("Because many of the issues in the Florida action will be resolved by the New York action, it is necessary to stay the Florida action until such time as the New York action is concluded."); *Beckford*, 919 So. 2d at 613; *Oviedo v. Ventura Music Grp.*, 797 So. 2d 634 (Fla. 3d DCA 2001) (quashing order denying motion to stay); *Shooster v. BT Orlando Ltd. P'ship*, 766 So. 2d 1114, 1115 (Fla. 5th DCA 2000) (quashing order by successor judge vacating stay order); *Fla. Crushed Stone Co.*, 632 So. 2d at 220 (Fla. 5th DCA 1994) (reversing denial of stay).

[18] *See also Inphynet Contracting Servs.*, 196 So. 3d at 465 (the "Third District has stated that when there is a previously-filed class action case which involves substantially similar parties and issues, the subsequently-filed action should be stayed"); *Polaris Public Income Funds v. Einhorn*, 625 So. 2d 128, 129 (Fla. 3d DCA 1993) (state action brought by a putative class of nationwide purchasers in New York was sufficiently similar in parties and issues to warrant a stay of a Florida case brought by a subset of Florida purchasers because the "the Florida action is essentially subsumed within the New York action"); *J.M. Smucker Co. v. Rudge*, 877 So. 2d 820, 823 (Fla. 3d DCA 2004) (staying three Florida class actions in favor of a related, first-filed class action in Illinois seeking to certify a nationwide class of purchasers).

principles of comity would subject both courts and Defendants to "'duplication of efforts and costs, as well as the possibility of inconsistent judgments,'" which are the twin concerns underlying the principle of priority. *Id*. at 791 (quoting *J.M. Smucker Co.*, 877 So. 2d at 822). The Court simply cannot permit Plaintiffs to continue to abuse the federal and state court systems and impose these burdens upon this Court, the federal court, and Defendants.

In sum, a clearer basis for a stay could hardly be shown.

## CONCLUSION

The principle that the second-filed action involving the same parties, facts, and issues should be stayed in favor of the first-served action is firmly settled under Florida law. This action, as the second-filed action, should be stayed pending the resolution of the *Garrison* Action.

Respectfully submitted,

Date: January 31, 2023

**AKERMAN LLP**
201 East Las Olas Boulevard – Suite 1800
Ft. Lauderdale, FL 33301
Tel.: 954-463-2700
Fax: 954-468-2454

By: */s/ Christopher S. Carver*
   Christopher S. Carver, Esq.
   Florida Bar No. 993580
   christopher.carver@akerman.com
   cary.gonzalez@akerman.com
   Jason S. Oletsky, Esq.
   Florida Bar No. 9301
   jason.oletsky@akerman.com
   jill.parnes@akerman.com
   Katherine A Johnson, Esq.
   Florida Bar No. 1040357
   katie.johnson@akerman.com
   joyce.gutierrez@akerman.com

*Attorneys for Defendant David Ortiz*

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**
100 Southeast Third Avenue

-13-

Suite 805
Fort Lauderdale, Florida 33394
Tel: (954) 462-1200

2 South Biscayne Blvd., Suite 2530
Miami, Florida 33131
Tel: (305)-400-4260

By: /s/ Michael A. Pineiro
    Jeffrey Neiman
    jneiman@mnrlawfirm.com
    Fla Bar. No. 544469
    Jeffrey Marcus
    jmarcus@mnrlawfirm.com
    Fla. Bar No. 310890
    Michael Pineiro
    mpineiro@mnrlawfirm.com
    Fla. Bar No. 041897
    Brandon Floch
    bfloch@mnrlawfirm.com
    Fla. Bar No. 125218

*Counsel for Defendant Kevin O'Leary*

**COLSON HICKS EIDSON, P.A.**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: (305) 476-7400
Facsimile: (305) 476-7444

By: /s/ Roberto Martínez
    Roberto Martínez
    Florida Bar No. 305596
    bob@colson.com
    Stephanie A. Casey
    Florida Bar No. 97483
    scasey@colson.com
    Zachary Lipshultz
    Florida Bar No. 123594
    zach@colson.com

*Attorneys for Defendant Thomas Brady*

<u>NOTICE OF COMPLIANCE WITH MEET AND CONFER REQUIREMENT</u>

On January 17, 2023, Christopher S. Carver, Esq., counsel for Defendant Ortiz consulted with Plaintiffs' counsel, Joseph M. Kaye, Esq., by telephone and provided him with the citations for *OPKO Health* and *Roche* during that discussion. Mr. Carver followed up with Mr. Kaye and Plaintiffs' lead counsel, Adam Moskowitz, Esq., in person on January 27, 2023. Plaintiff's counsel stated they oppose the motion on January 27, 2023.

/s/ *Christopher S. Carver*
Attorney

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 31st day of January, 2023, a true and correct copy of *Defendants' Motion to Stay in Favor of First-Filed Federal Action* was filed electronically through the Florida Court's E-Filing Portal, which will provide electronic service of the filling to all counsel of record.

/s/ *Christopher S. Carver*
Attorney

-15-

# Exhibit A

JB,REF_DISCOV

# U.S. District Court
## Southern District of Florida (Miami)
### CIVIL DOCKET FOR CASE #: 1:22–cv–23753–KMM

Garrison v. Bankman–Fried et al
Assigned to: Judge K. Michael Moore
Referred to: Magistrate Judge Jacqueline Becerra
Cause: 28:1332 – Diversity: Securities Fraud

Date Filed: 11/15/2022
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**Edwin Garrison**                    represented by **Joseph M. Kaye**
The Moskowitz Law Firm, PLLC
2 Alhambra Plaza, Suite 601
Miami, FL 33134
(305) 740–1423
Email: joseph@moskowitz–law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen N. Zack**
Boies Schiller & Flexner
100 SE 2nd Street
Suite 2800, Miami Tower
Miami, FL 33131–2144
305–539–8400
Fax: 305–539–1307
Email: szack@bsfllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ursula Ungaro**
Boies Schiller Flexner LLP
100 SE 2nd Street
Suite 2800
Miami, FL 33131
305–479–6553
Email: uungaro@bsfllp.com *(Inactive)*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Boies**
Boies Schiller Flexner LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 446–2320
Email: aboies@bsfllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Boies**
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504
(914) 749–8200
Email: dboies@bsfllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
The Moskowitz Law Firm, PLLC
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134–6036

305 740–1423
Email: adam@moskowitz–law.com
*ATTORNEY TO BE NOTICED*

V.

**Consol Plaintiff**

**Gregg Podalsky**                          represented by   **Joseph M. Kaye**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Stephen N. Zack**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Ursula Ungaro**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Adam M. Moskowitz**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Alexander Boies**
                                                             Boies Schiller Flexner LLP
                                                             333 Main Street
                                                             Armonk, NY 10504
                                                             914–749–8200
                                                             Email: aboies@bsfllp.com
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **David Boies**
                                                             (See above for address)
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Skyler Lindeen**                          represented by   **Joseph M. Kaye**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Stephen N. Zack**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Ursula Ungaro**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Adam M. Moskowitz**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Alexander Boies**
                                                             (See above for address)
                                                             *PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**David Boies**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Alexander Chernyavsky**                    represented by   **Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen N. Zack**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ursula Ungaro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alexander Boies**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Boies**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Gary Gallant**                    represented by   **Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen N. Zack**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ursula Ungaro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alexander Boies**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Boies**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**David Nicol**                    represented by  **Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen N. Zack**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ursula Ungaro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alexander Boies**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Boies**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**Sunil Kavuri**                    represented by  **Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen N. Zack**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Sam Bankman–Fried**

**Defendant**

**Thomas Brady**                    represented by  **Roberto Martinez**
Colson Hicks Eidson
255 Alhambra Circle
Penthouse
Coral Gables, FL 33134–2351
305–476–7400
Fax: 476–7444
Email: bob@colson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie Anne Casey**
Colson Hicks Eidson

255 Alhambra Circle, PH
Coral Gables, FL 33134
(305) 476–7400
Fax: (305) 476–7444
Email: scasey@colson.com
*ATTORNEY TO BE NOTICED*

**Zachary Andrew Lipshultz**
Colson Hicks Eidson
255 Alhambra Circle
Coral Gables, FL 33134
3054767400
Email: zach@colson.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Gisele Bundchen**                    represented by **Roberto Martinez**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Stephanie Anne Casey**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Zachary Andrew Lipshultz**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Stephen Curry**

**Defendant**

**Golden State Warriors LLC**

**Defendant**

**Shaquille O'Neal**

**Defendant**

**Udonis Haslem**

**Defendant**

**David Ortiz**                        represented by **Christopher Stephen Carver**
                                        Akerman LLP
                                        Three Brickell City Centre Suite 1100
                                        98 Southeast Seventh Street
                                        Miami, FL 33131
                                        305–982–5572
                                        Fax: 305–374–5095
                                        Email: christopher.carver@akerman.com
                                        *ATTORNEY TO BE NOTICED*

                                        **Jason Samuel Oletsky**
                                        Akerman LLP
                                        201 East Las Olas Boulevard
                                        Ste 1800
                                        Fort Lauderdale, FL 33301
                                        954–759–8909
                                        Fax: 954–463–2224
                                        Email: jason.oletsky@akerman.com
                                        *ATTORNEY TO BE NOTICED*

**Katherine Ann Johnson**
Akerman LLP
201 E. Las Olas Blvd., Suite 1800
Fort Lauderdale, FL 33301
954–463–2700
Fax: 954–463–2224
Email: Katie.johnson@akerman.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**William Trevor Lawrence**

**Defendant**

**Shohei Ohtani**

**Defendant**

**Naomi Osaka**

**Defendant**

**Lawrence Gene David**

**Defendant**

**Kevin O'Leary**


V.

**Consol Defendant**

**Caroline Ellison**

**Consol Defendant**

**Sam Trabucco**

**Consol Defendant**

**Gary Wang**

**Consol Defendant**

**Nishad Singh**

**Consol Defendant**

**Dan Friedberg**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/15/2022 | 1 | COMPLAINT *CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL* against All Defendants. Filing fees $ 402.00 receipt number AFLSDC–16103423, filed by Edwin Garrison. (Attachments: # 1 Civil Cover Sheet)(Moskowitz, Adam) (Entered: 11/15/2022) |
| 11/15/2022 | 2 | Clerks Notice of Judge Assignment to Judge K. Michael Moore. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Lauren F. Louis is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (aao) (Entered: 11/16/2022) |
| 11/16/2022 | 3 | ORDER OF RECUSAL. Magistrate Judge Lauren F. Louis recused. Magistrate Judge Jacqueline Becerra added. Signed by Magistrate Judge Lauren Fleischer Louis on |

| | | 11/16/2022. *See attached document for full details*. (vjk) (Main Document 3 replaced on 11/16/2022) (vjk). Modified pdf on 11/16/2022 (vjk). (Entered: 11/16/2022) |
|---|---|---|
| 11/16/2022 | <u>4</u> | Bar Letter re: Admissions sent to attorney David Boies and Alex Boies, mailing date November 16, 2022, (pt) (Entered: 11/16/2022) |
| 11/16/2022 | 5 | PAPERLESS PRETRIAL ORDER. This order has been entered upon the filing of the complaint. Plaintiff's counsel is hereby ORDERED to forward to all defendants, upon receipt of a responsive pleading, a copy of this Order. It is further ORDERED that S.D. Fla. L.R. 16.1 shall apply to this case and the parties shall hold a scheduling conference no later than twenty (20) days after the filing of the first responsive pleading by the last responding defendant, or within sixty (60) days after the filing of the complaint, whichever occurs first. However, if all defendants have not been served by the expiration of this deadline, Plaintiff shall move for an enlargement of time to hold the scheduling conference, not to exceed 90 days from the filing of the Complaint. Within ten (10) days of the scheduling conference, counsel shall file a joint scheduling report. Failure of counsel to file a joint scheduling report within the deadlines set forth above may result in dismissal, default, and the imposition of other sanctions including attorney's fees and costs. The parties should note that the time period for filing a joint scheduling report is not tolled by the filing of any other pleading, such as an amended complaint or Rule 12 motion. The scheduling conference may be held via telephone. At the conference, the parties shall comply with the following agenda that the Court adopts from S.D. Fla. L.R. 16.1: (1) Documents (S.D. Fla. L.R. 16.1.B.1 and 2) – The parties shall determine the procedure for exchanging a copy of, or a description by category and location of, all documents and other evidence that is reasonably available and that a party expects to offer or may offer if the need arises. Fed. R. Civ. P. 26(a)(1)(B). (a) Documents include computations of the nature and extent of any category of damages claimed by the disclosing party unless the computations are privileged or otherwise protected from disclosure. Fed. R. Civ. P. 26(a)(1)(C). (b) Documents include insurance agreements which may be at issue with the satisfaction of the judgment. Fed. R. Civ. P. 26(a)(1)(D). (2) List of Witnesses – The parties shall exchange the name, address and telephone number of each individual known to have knowledge of the facts supporting the material allegations of the pleading filed by the party. Fed. R. Civ. P. 26(a)(1)(A). The parties have a continuing obligation to disclose this information. (3) Discussions and Deadlines (S.D. Fla. L.R. 16.1.B.2) – The parties shall discuss the nature and basis of their claims and defenses and the possibilities for a prompt settlement or resolution of the case. Failure to comply with this Order or to exchange the information listed above may result in sanctions and/or the exclusion of documents or witnesses at the time of trial. S.D. Fla. L.R. 16.1.I.<br><br>**The parties are hereby on notice that this Court requires all filings to be formatted in 12 point Times New Roman font and double spaced, including any footnotes, with one inch margins on all sides.** Failure to follow these formatting guidelines may result in the filing being stricken, any opposing filing being granted by default, and the imposition of other sanctions, including attorney's fees and costs. **Multiple Plaintiffs or Defendants shall file joint motions with co–parties unless there are clear conflicts of position.** If conflicts of position exist, parties shall explain the conflicts in their separate motions. Failure to comply with ANY of these procedures may result in the imposition of appropriate sanctions, including but not limited to, the striking of the motion or dismissal of this action. **The parties shall seek extensions of time in a timely fashion.** "A motion for extension of time is not self–executing.... Yet, by filing these motions on or near the last day, and then sitting idle pending the Court's disposition of the motion, parties essentially grant their own motion. The Court will not condone this." Compere v. Nusret Miami, LLC, 2020 WL 2844888, at *2 (S.D. Fla. May 7, 2020) (internal citations omitted).<br><br>Pursuant to Administrative Order 2016–70 of the Southern District of Florida and consistent with the Court of Appeals for the Eleventh Circuit's Local Rules and Internal Operating Procedures, within three (3) days of the conclusion of a trial or other proceeding, parties must file via CM/ECF electronic versions of documentary exhibits admitted into evidence, including photographs of non–documentary physical exhibits. The Parties are directed to comply with each of the requirements set forth in Administrative Order 2016–70 unless directed otherwise by the Court.<br><br><u>Telephonic appearances are not permitted for any purpose. Upon reaching a settlement in</u> |

| | | |
|---|---|---|
| | | this matter the parties are instructed to notify the Court by telephone and to file a Notice of Settlement within twenty–four (24) hours.<br><br>Signed by Judge K. Michael Moore on 11/16/2022. (rfr) (Entered: 11/16/2022) |
| 11/16/2022 | 6 | PAPERLESS ORDER REFERRING PRETRIAL DISCOVERY MATTERS TO MAGISTRATE JUDGE JACQUELINE BECERRA. PURSUANT to 28 U.S.C. § 636 and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida, the above–captioned Cause is referred to United States Magistrate Judge Jacqueline Becerra to take all necessary and proper action as required by law with respect to any and all pretrial discovery matters. Any motion affecting deadlines set by the Court's Scheduling Order is excluded from this referral, unless specifically referred by separate Order. It is FURTHER ORDERED that the parties shall comply with Magistrate Judge Jacqueline Becerra's discovery procedures. Signed by Judge K. Michael Moore on 11/16/2022. (rfr) (Entered: 11/16/2022) |
| 11/23/2022 | 7 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for David Boies. Filing Fee $ 200.00 Receipt # AFLSDC–16123593 by Edwin Garrison. Responses due by 12/7/2022 (Attachments: # 1 Text of Proposed Order)(Moskowitz, Adam) (Entered: 11/23/2022) |
| 11/23/2022 | 8 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Alexander Boies. Filing Fee $ 200.00 Receipt # AFLSDC–16123609 by Edwin Garrison. Responses due by 12/7/2022 (Attachments: # 1 Text of Proposed Order)(Moskowitz, Adam) (Entered: 11/23/2022) |
| 11/28/2022 | 9 | PAPERLESS ORDER. THIS CAUSE came before the Court upon the Motion for David Boies to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. 7 . UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 7 is GRANTED. David Boies may appear pro hac vice in this matter. The Clerk of Court shall provide electronic notification of all electronic filings to dboies@bsfllp.com. Signed by Judge K. Michael Moore on 11/28/2022. (rfr) (Entered: 11/28/2022) |
| 11/28/2022 | 10 | PAPERLESS ORDER. THIS CAUSE came before the Court upon the Motion for Alexander Boies to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. 8 . UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion 8 is GRANTED. Alexander Boies may appear pro hac vice in this matter. The Clerk of Court shall provide electronic notification of all electronic filings to aboies@bsfllp.com. Signed by Judge K. Michael Moore on 11/28/2022. (rfr) (Entered: 11/28/2022) |
| 12/02/2022 | 11 | NOTICE of Filing Proposed Summons(es) by Edwin Garrison re 1 Complaint filed by Edwin Garrison (Attachments: # 1 Summon(s), # 2 Summon(s), # 3 Summon(s), # 4 Summon(s), # 5 Summon(s), # 6 Summon(s), # 7 Summon(s), # 8 Summon(s), # 9 Summon(s), # 10 Summon(s), # 11 Summon(s), # 12 Summon(s)) (Moskowitz, Adam) (Entered: 12/02/2022) |
| 12/05/2022 | 12 | Summons Issued as to Thomas Brady, Gisele Bundchen, Stephen Curry, Lawrence Gene David, Golden State Warriors LLC, Udonis Haslem, William Trevor Lawrence, Kevin O'Leary, Shaquille O'Neal, Shohei Ohtani, David Ortiz, Naomi Osaka. (ls) (Entered: 12/05/2022) |
| 12/08/2022 | 13 | NOTICE of Filing Proposed Summons(es) by Edwin Garrison (Attachments: # 1 Summon(s)) (Moskowitz, Adam) (Entered: 12/08/2022) |
| 12/08/2022 | 14 | NOTICE of Voluntary Dismissal *PLAINTIFFS NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE* by Edwin Garrison (Moskowitz, Adam) (Entered: 12/08/2022) |
| 12/09/2022 | 15 | Summons Issued as to Sam Bankman–Fried. (ls) (Entered: 12/09/2022) |
| 12/16/2022 | 16 | AMENDED COMPLAINT *AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL* against Sam Bankman–Fried, Thomas Brady, Gisele Bundchen, Stephen Curry, Lawrence Gene David, Caroline Ellison, Dan Friedberg, Golden State Warriors LLC, Udonis Haslem, William Trevor Lawrence, Kevin O'Leary, Shaquille |

| | | O'Neal, Shohei Ohtani, David Ortiz, Naomi Osaka, Nishad Singh, Sam Trabucco, Gary Wang, filed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. (Attachments: # 1 Exhibit A)(Moskowitz, Adam) (Entered: 12/16/2022) |
|---|---|---|
| 01/06/2023 | 17 | WAIVER OF SERVICE Returned Executed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. Golden State Warriors LLC waiver sent on 1/4/2023, response/answer due 3/6/2023. (Moskowitz, Adam) (Entered: 01/06/2023) |
| 01/17/2023 | 18 | WAIVER OF SERVICE Returned Executed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. Lawrence Gene David waiver sent on 12/27/2022, response/answer due 2/27/2023. (Moskowitz, Adam) (Entered: 01/17/2023) |
| 01/17/2023 | 19 | WAIVER OF SERVICE Returned Executed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. Thomas Brady waiver sent on 12/27/2022, response/answer due 2/27/2023. (Moskowitz, Adam) (Entered: 01/17/2023) |
| 01/17/2023 | 20 | WAIVER OF SERVICE Returned Executed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. Gisele Bundchen waiver sent on 12/27/2022, response/answer due 2/27/2023. (Moskowitz, Adam) (Entered: 01/17/2023) |
| 01/24/2023 | 21 | NOTICE of Attorney Appearance by Christopher Stephen Carver on behalf of David Ortiz. Attorney Christopher Stephen Carver added to party David Ortiz(pty:dft). Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM (Carver, Christopher) (Entered: 01/24/2023) |
| 01/24/2023 | 22 | NOTICE of Attorney Appearance by Jason Samuel Oletsky on behalf of David Ortiz. Attorney Jason Samuel Oletsky added to party David Ortiz(pty:dft). (Oletsky, Jason) (Entered: 01/24/2023) |
| 01/24/2023 | 23 | NOTICE of Attorney Appearance by Katherine Ann Johnson on behalf of David Ortiz. Attorney Katherine Ann Johnson added to party David Ortiz(pty:dft). Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM (Johnson, Katherine) (Entered: 01/24/2023) |
| 01/25/2023 | 24 | WAIVER OF SERVICE Returned Executed by Skyler Lindeen, Edwin Garrison, Alexander Chernyavsky, David Nicol, Sunil Kavuri, Gregg Podalsky, Gary Gallant. David Ortiz waiver sent on 1/11/2023, response/answer due 3/13/2023. (Moskowitz, Adam) (Entered: 01/25/2023) |
| 01/25/2023 | 25 | NOTICE of Attorney Appearance by Roberto Martinez on behalf of Tom Brady, Gisele Bundchen. Attorney Roberto Martinez added to party Tom Brady(pty:dft), Attorney Roberto Martinez added to party Gisele Bundchen(pty:dft). Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM (Martinez, Roberto) (Entered: 01/25/2023) |
| 01/25/2023 | 26 | NOTICE of Attorney Appearance by Stephanie Anne Casey on behalf of Tom Brady, Gisele Bundchen, Thomas Brady. Attorney Stephanie Anne Casey added to party Tom Brady(pty:dft), Attorney Stephanie Anne Casey added to party Gisele Bundchen(pty:dft), Attorney Stephanie Anne Casey added to party Thomas Brady(pty:dft), Attorney Stephanie Anne Casey added to party Gisele Bundchen(pty:dft). Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM (Casey, Stephanie) (Entered: 01/25/2023) |
| 01/25/2023 | 27 | NOTICE of Attorney Appearance by Zachary Andrew Lipshultz on behalf of Tom Brady, Gisele Bundchen, Thomas Brady. Attorney Zachary Andrew Lipshultz added to party Tom Brady(pty:dft), Attorney Zachary Andrew Lipshultz added to party Gisele Bundchen(pty:dft), Attorney Zachary Andrew Lipshultz added to party Thomas Brady(pty:dft), Attorney Zachary Andrew Lipshultz added to party Gisele Bundchen(pty:dft). Associated Cases: 1:22-cv-23753-KMM, 1:22-cv-23983-KMM (Lipshultz, Zachary) (Entered: 01/25/2023) |

| 01/26/2023 | 28 | Clerk's Notice to Filer re <u>25</u> Notice of Attorney Appearance,. **Attorney Did Not Associate Themselves**; ERROR – Filing attorney neglected to associate themselves to the case. The Clerk has added the attorney to the case. It is not necessary to refile this document future filings must comply with the CM/ECF Administrative Procedures and Local Rules by filing a Notice of Attorney Appearance and linking themselves to the case. (ls) (Entered: 01/26/2023) |
| 01/30/2023 | <u>29</u> | NOTICE by Alexander Chernyavsky, Gary Gallant, Edwin Garrison, Sunil Kavuri, Skyler Lindeen, David Nicol, Gregg Podalsky *Letter from David Boies to Judge K. Michael Moore*. Attorney Stephen N. Zack added to party Sunil Kavuri(pty:conpla). (Attachments: # <u>1</u> Letter from David Boies to Judge K. Michael Moore) (Zack, Stephen) (Entered: 01/30/2023) |
| 01/30/2023 | <u>30</u> | NOTICE of Change of Address, Email or Law Firm Name by Katherine Ann Johnson (Johnson, Katherine) (Entered: 01/30/2023) |

Exhibit B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO.

**EDWIN GARRISON**, *et al.,* on behalf of
themselves and all others similarly situated,

        *Plaintiffs,*                    **CLASS ACTION COMPLAINT**

*v.*                                        **JURY DEMAND**

**SAM BANKMAN-FRIED**, *et al.,*

        *Defendants.*

_____/

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

"Then there's things that have happened with Voyager *and with FTX now*—that's somebody running a company that's *just dumb as fu\*\* greedy*. So, what does Sam Bankman do? He just, give me more, give me more, give me more, so I'm gonna borrow money, loan it to my affiliated company, and hope and pretend to myself that the FTT tokens that are in there on my balance sheet are gonna sustain their value."[1]

### – Mark Cuban, Nov. 12, 2022



### – Defendant Sam Bankman Fried (Former CEO, FTX)

---

[1] https://www.yahoo.com/video/ftx-twitter-chaos-embarrassing-athletes-195343800.html (accessed November 15, 2022).

Plaintiff Edwin Garrison ("Plaintiffs") files this class action complaint on behalf of himself, and all others similarly situated, against Sam Bankman-Fried, Tom Brady, Gisele Bundchen, Stephen Curry, Golden State Warriors, Shaquille O'Neal, Udonis Haslem, David Ortiz, William Trevor Lawrence, Shohei Ohtani, Naomi Osaka, Lawrence Gene David, and Kevin O'Leary (collectively, "Defendants"), all parties who either controlled, promoted, assisted in, and actively participated in FTX Trading LTD d/b/a FTX's ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively, the "FTX Entities"), offer and sale of unregistered securities in the form of yield-bearing accounts ("YBAs") to residents of the United States, seeking to recover damages, declaratory and/or injunctive relief stemming from the offer and sale of FTX Trading's and FTX US's yield-bearing cryptocurrency accounts.[2]

## INTRODUCTION

1.  The Deceptive and failed FTX Platform was based upon false representations and deceptive conduct. Although many incriminating FTX emails and texts have already been destroyed, we located them and they evidence how FTX's fraudulent scheme was designed to take advantage of unsophisticated investors from across the country, who utilize mobile apps to make their investments. As a result, American consumers collectively sustained over $11 billion dollars in damages. FTX organized and emanated its fraudulent plan from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where 3-time NBA Champions the Miami Heat play.

## FACTUAL BACKGROUND

2.  On December 24, 2021, counsel for Plaintiff and the proposed class members brought the first (and only) putative nationwide class action complaint against the now-defunct cryptocurrency trading app, Voyager, styled *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-

---

[2]    Undersigned Counsel represents many hundreds of injured Voyager investors in the related action against Mark Cuban and the Dallas Mavericks, styled *Pierce Robertson, et al., v. Mark Cuban, et al.,* No. 22-CV-22538-ALTMAN/REID (S.D. Fla.), currently pending before the Honorable Federal Judge Roy Altman here in the Southern District of Florida, and have been following these FTX events as they unfolded very closely. Moreover, discovery has yet to commence, but Plaintiff's counsel anticipates adding additional responsible parties as Defendants.

ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the platform owned and operated by Voyager Digital Ltd. ("Voyager") and Voyager Digital LLC ("VDL") was an unregulated and unsustainable fraud. In the *Cassidy* Action, Plaintiffs also alleged that Defendant Ehrlich, Voyager's CEO, teamed up with Defendants Cuban and the Dallas Mavericks to promote Voyager, by making false representations and employing other means of deception. As a result, the Voyager plaintiff and Voyager class members, all sustained losses in excess of $5 billion.

3.     The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting Voyager—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Dallas Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

4.     After the *Cassidy* Complaint was filed, the following important actions took place:

(a)     the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b)     seven state Attorneys General (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPA was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022; and

(c)     on March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the EPA was not exempt from registration under the law, and instead that

it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[3]

5.       On July 5, 2022, Voyager Digital Holdings, Inc. and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases (the "Voyager Bankruptcy Cases") are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

6.       On September 28, 2022, Voyager filed a motion in the Voyager Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

7.       Everyone involved in the Voyager Bankruptcy Cases thought that the FTX Entities were the *deus ex machina* come to save the day by bailing out Voyager and paying back at least some of the losses the Voyager customers sustained.

8.       Instead, as explained below, the FTX Entities imploded, their over $30 billion in value evaporated almost overnight, and the FTX Entities found themselves filing their own emergency Chapter 11 bankruptcy petition in Delaware. The Deceptive FTX Platform maintained by the FTX Entities was truly a house of cards, a Ponzi scheme where the FTX Entities shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the YBAs and loans to pay interest to the old ones and to attempt to maintain the appearance of liquidity.

9.       Part of the scheme employed by the FTX Entities involved utilizing some of the biggest names in sports and entertainment—like these Defendants—to raise funds and drive American consumers to invest in the YBAs, which were offered and sold largely from the FTX Entities' domestic base of operations here in Miami, Florida, pouring billions of dollars into the Deceptive FTX Platform to keep the whole scheme afloat.

---

[3] https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed October 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed November 15, 2022).

10.     Importantly, although Defendants disclosed their partnerships with the FTX Entities, they have never disclosed the nature, scope, and amount of compensation they personally received in exchange for the promotion of the Deceptive FTX Platform, which the SEC has explained that a failure to disclose this information would be a violation of the anti-touting provisions of the federal securities laws.[4]  Moreover, none of these defendants performed any due diligence prior to marketing these FTX products to the public.

11.     The SEC took action against boxing champ Floyd Mayweather and music producer DJ Khaled after they were paid by cryptocurrency issuers to tweet promotional statements about investing in Initial Coin Offerings (ICOs), ordering them both to pay disgorgement, penalties and interest for promoting investments in ICOs, including one from cryptocurrency issuer Centra Tech, Inc, for a combined total of $767,500 because they failed to disclose that their promotional efforts on Twitter were paid endorsements.[5]

12.     Other celebrities similarly accused and prosecuted for failing to disclose their paid endorsements include Kim Kardashian and basketball player Paul Pierce.[6] According to the Federal Trade Commission, cryptocurrency scams have increased more than ten-fold year-over-year with consumers losing more than $80 million since October 2020, due in large part to the use of such celebrity endorsements.[7]

13.     As explained more fully in this Complaint, Defendants' misrepresentations and omissions made and broadcast around the country through the television and internet render them liable to Plaintiff and class members for soliciting their purchases of the unregistered YBAs. *Wildes v. Bitconnect Int'l PLC*, No. 20-11675 (11th Cir. Feb. 18, 2022) (holding that promoters of cryptocurrency through online videos could be liable for soliciting the purchase of unregistered securities through mass communication, and no "personal solicitation" was necessary for solicitation to be actionable).

---

[4]       https://www.ubergizmo.com/2017/11/sec-celebrities-disclose-payment-cryptocurrency-endorsements/#:~:text=It%20has%20issued%20a%20statement%20warning%20celebrities%20that,without%20disclosing%20that%20they%E2%80%99ve%20been%20paid%20for%20it (accessed November 15, 2022).

[5]                 https://news.bloomberglaw.com/us-law-week/insights-celebrity-endorsements-and-cryptocurrency-a-cautionary-tale (accessed November 15, 2022).

[6]       https://blockbulletin.com/news/altcoins/kim-kardashian-among-other-celebrities-sued-for-promoting-cryptocurrencies/ (accessed November 15, 2022).

[7] https://florida.foolproofme.org/articles/770-celebrity-cryptocurrency-scam (accessed August 10, 2022).

14.     This action seeks to hold Defendants responsible for the many billions of dollars in damages they caused Plaintiff and the Classes and to force Defendants to make them whole.

## PARTIES

15.     Plaintiff Edwin Garrison is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Garrison did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Garrison has sustained damages for which Defendants are liable.

16.     Defendant Thomas Brady, NFL quarterback currently playing for the Tampa Bay Buccaneers, is a brand ambassador of FTX, and is a citizen and resident of Miami-Dade County, Florida.

17.     Defendant Gisele Bundchen, one of the world's highest-paid models and a brand ambassador for FTX, is a citizen and resident of Miami-Dade County, Florida.

18.     Defendant Kevin O'Leary, "Mr. Wonderful," a businessman, television personality appearing regularly on *Shark Tank*, and brand ambassador for FTX, is a citizen and resident of Miami Beach, Florida.

19.     Defendant Udonis Haslem, an American professional basketball player for the Miami Heat of the NBA and brand ambassador of FTX, is a citizen and resident of Miami-Dade County, Florida.

20.     Defendant David Ortiz, former designated hitter and first baseman in the MLB and a brand ambassador for FTX, is a citizen and resident of the State of Florida.

21.     Defendant Sam Bankman-Fried, founder and former CEO of FTX and former billionaire, is a citizen and resident of the Bahamas.

22.     Defendant Stephen Curry, professional basketball player for the Golden State Warriors of the NBA and brand ambassador for FTX, is a citizen and resident of the State of California.

23.     Defendant Golden State Warriors LLC is a professional basketball team in the NBA that officially launched their partnership with FTX in 2022 with the unveiling of the FTX logo on the

court at the Chase Center, and is a corporation operating and existing under the laws of the State of California.

24.     Defendant Shaquille O'Neal, former professional NBA basketball star, sports analyst, entrepreneur, and FTX brand ambassador, is a citizen and resident of Collin County, Texas.

25.     Defendant William Trevor Lawrence, the quarterback for the Jacksonville Jaguars of the NFL and a brand ambassador for FTX, is a citizen and resident of the state of Mississippi.

26.     Defendant Shohei Ohtani, a professional baseball pitcher, designated hitter and outfielder for the Los Angeles Angels of the MLB and a brand ambassador for FTX, is a citizen and resident of the State of California.

27.     Defendant Naomi Osaka, a professional tennis player and brand ambassador for FTX, is a citizen and resident of Beverly Hills, California.

28.     Defendant Lawrence Gene David, an American comedian, writer, actor, television producer, and FTX brand ambassador, is a citizen and resident of Los Angeles, California.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

30.     This Court has personal jurisdiction against Defendants because they conduct business in Florida, and/or have otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of FTX's YBAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of FTX's unregistered securities to consumers in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

31.     Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members either reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

32.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

## FACTUAL ALLEGATIONS

### A.     Background on FTX.

33.     Until seeking the protection of the Bankruptcy Court, the FTX Entities operated a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive FTX Platform") that placed cryptocurrency trade orders on behalf of users like Plaintiff and Class Members and offered interest bearing cryptocurrency accounts.

34.     The FTX group of companies (FTX Group or FTX) was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established in order to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

35.     Prior to that, The Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his crypto trading firm, Alameda Research, in 2017,[8] after stints in the charity world and at trading firm Jane Street.[9]

36.     The FTX.com exchange was extremely successful since its launch. This year around $15 billion of assets are traded daily on the platform, which now represents approximately 10% of global volume for crypto trading. The FTX team has grew to over 300 globally. Although the FTX Entities' primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[10]

37.     FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 *billion dollars*.

38.     Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

---

[8]     https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed November 15, 2022).

[9]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed November 15, 2022).

[10]     https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed November 15, 2022).

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

39.     At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[11]

40.     In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[12]

41.     Bankman-Fried's cryptocurrency empire was officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[13]

42.     After obtaining this information, Changpeng "CZ" Zhao, the CEO of Binance, decided to liquidate roughly $530 million-worth of FTT. Customers also raced to pull out, and FTX saw an estimated $6 billion in withdrawals over the course of 72 hours, which it struggled to fulfill.[14] The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8th, that Binance would buy FTX, effectively bailing it out.[15]

43.     The next day, Binance announced that it was withdrawing from the deal, citing findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[16] The news sent FTT plunging even further — Bankman-Fried saw 94% of his net

---

[11]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed November 15, 2022).

[12]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed November 15, 2022).

[13]     https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed November 15, 2022).

[14]     https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed November 15, 2022).

[15]     https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed November 15, 2022).

[16]     https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed November 15, 2022).

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

worth wiped out in a single day.[17] On November 11th, unable to obtain a bailout, FTX filed for
Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[18]

      44.    Following his resignation, Bankman-Fried issued a 22-tweet-long explanation of where
he believed he and the FTX Entities went wrong:[19]



*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*



**SBF** ✔ @SBF_FTX · Nov 10                                        ···
4) FTX International currently has a total market value of assets/collateral
higher than client deposits (moves with prices!).

But that's different from liquidity for delivery--as you can tell from the state
of withdrawals.  The liquidity varies widely, from very to very little.

○  174            ⟲  636            ♡  3,592            ⬆



**SBF** ✔ @SBF_FTX · Nov 10                                        ···
5) The full story here is one I'm still fleshing out every detail of, but as a very
high level, I fucked up twice.

The first time, a poor internal labeling of bank-related accounts meant that I
was substantially off on my sense of users' margin.  I thought it was way
lower.

○  251            ⟲  749            ♡  3,407            ⬆



**SBF** ✔ @SBF_FTX · Nov 10                                        ···
6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours.  We saw roughly $5b of
withdrawals on Sunday--the largest by a huge margin.

○  241            ⟲  907            ♡  3,823            ⬆

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*



**SBF** ✓ @SBF_FTX · Nov 10

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough.  I should have said more. I'm sorry--I was slammed with things to do and didn't give updates to you all.

○ 116          ⇄ 278          ♡ 2,882          ⬆



**SBF** ✓ @SBF_FTX · Nov 10

8) And so we are where we are.  Which sucks, and that's on me.

I'm sorry.

○ 155          ⇄ 357          ♡ 3,122          ⬆



**SBF** ✓ @SBF_FTX · Nov 10

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that.  To take responsibility, and do what I can.

○ 162          ⇄ 357          ♡ 3,715          ⬆



**SBF** ✓ @SBF_FTX · Nov 10

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that.  But I'm going to try.  And give anything I have to if that will make it work.

○ 164          ⇄ 394          ♡ 3,377          ⬆

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*



**SBF** ✓ @SBF_FTX · Nov 10 ···
11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

💬 87   🔁 234   ♡ 2,625   ⬆



**SBF** ✓ @SBF_FTX · Nov 10 ···
12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

💬 102   🔁 274   ♡ 3,007   ⬆



**SBF** ✓ @SBF_FTX · Nov 10 ···
13) Because at the end of the day, I was CEO, which means that *I* was responsible for making sure that things went well.  *I*, ultimately, should have been on top of everything.

I clearly failed in that.  I'm sorry.

💬 180   🔁 423   ♡ 4,122   ⬆



**SBF** ✓ @SBF_FTX · Nov 10 ···
14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

💬 129   🔁 235   ♡ 2,502   ⬆

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*







*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*



SBF ✓ @SBF_FTX · Nov 10

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers.  That's it.

○ 144          ⟲ 158          ♡ 1,970          ⬆



SBF ✓ @SBF_FTX · Nov 10

19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

○ 406          ⟲ 760          ♡ 2,776          ⬆



SBF ✓ @SBF_FTX · Nov 10

20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses.  So for now, all I'll say is:

well played; you won.

○ 1,532          ⟲ 3,303          ♡ 8,047          ⬆



SBF ✓ @SBF_FTX · Nov 10

21) NOT ADVICE, OF ANY KIND, IN ANY WAY

I WAS NOT VERY CAREFUL WITH MY WORDS HERE, AND DO NOT MEAN ANY OF THEM IN A TECHNICAL OR LEGAL SENSE; I MAY WELL HAVE NOT DESCRIBED THINGS RIGHT though I'm trying to be transparent.  I'M NOT A GOOD DEV AND PROBABLY MISDESCRIBED SOMETHING.

○ 908          ⟲ 1,055          ♡ 3,463          ⬆

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*



45. According to a recent Reuters report, however, another explanation contributing to the precarious house of cards that was the Deceptive FTX Platform is that earlier this year, Bankman-Fried secretly transferred *at least $4 billion* in customer funds from FTX to Alameda without telling anyone, after Alameda was hit with a series of losses, and that the FTX entities lent more than *half* of its *$16 billion* in *customer funds* to Alameda in total, with more than *$10 billion in loans outstanding*.[20]

**B.      FTX's offer and sale of YBAs, which are unregistered securities.**

46. Beginning in 2019, the FTX Entities began offering interest-bearing cryptocurrency accounts to public investors. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

47. FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

48. The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Entities offered variable interest rewards on crypto assets held in the YBAs on the Deceptive FTX Platform, which rates were determined by the FTX Entities in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Entities pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

---

[20]      https://markets.businessinsider.com/news/currencies/ftx-crash-client-funds-alameda-binance-sbf-sec-cftc-probe-2022-11?utm_medium=ingest&utm_source=markets (accessed November 15, 2022).

49.     On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

> I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

> I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

>> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

>> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

> FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

> FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[21] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading.3 It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY? Does my balance compound daily?* that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency

---

[21] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application with developed by Blockfolio.

18

that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

**FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.

**FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.

FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX

US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

## C. The Defendants Aggressively Marketed the FTX Platform

50.     In addition to the conduct of Defendant Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the Deceptive FTX Platform.

51.     In April 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the Deceptive FTX Platform.

52.    FTX's explanation for using stars like Brady, Bunchden, and the other Defendants was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[22]

53.    In other words, the FTX Entities needed celebrities like Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of the YBAs, which are unregistered securities. Below are representative statements and advertisements Defendants made to drive the offers and/or sales of the YBAs, which Plaintiff and Class Members will supplement as the case progresses and discovery unfolds.

### i.    Tom Brady and Gisele Bundchen



54.    The star quarterback and the businesswoman and model, then a couple, became FTX ambassadors last year. They also took equity stakes in FTX Trading Ltd.

55.    Mr. Brady and Ms. Bündchen also joined the company's $20-million ad campaign in 2021. They filmed a commercial called "FTX. You In?" showing them telling acquaintances to join the FTX platform. The ad can be viewed here: https://www.youtube.com/watch?v=uymLJoKFlW8

---

[22] https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed November 15, 2022).

     ii.    **Kevin O'Leary**



56.    "Mr. Wonderful," both a brand ambassador and an FTX shareholder, made several public statements designed to induce consumers to invest in the YBAs.

57.    "To find crypto investments opportunities that met my own rigorous standards of compliance, I entered into this relationship with @FTX_Official," Mr. O'Leary said on Twitter last year. Mr. O'Leary **recently deleted the tweet**.

58.    He also served as a judge for the FTX Charity Hackathon in Miami in March of 2022.[23]

59.    And *very* recently, on October 12, 2022, O'Leary stated confidently that FTX was totally compliant and a safe place to hold assets. O'Leary stated that: "I have to disclose I'm a paid spokesperson to a FTX and shareholder there, too, cause we mentioned him and I'm a big advocate for Sam because he has two parents who are compliance lawyers. If there's ever a place I could be that I'm not gonna get in trouble it's going to be in FTX so you know that's there they're great people but he gets the job in compliance which is why he's working so hard to get regulation."[24]

---

[23] https://ftxcharityhackathon.com/ (accessed November 15, 2022).
[24] *See* https://www.youtube.com/watch?v=iwD_zWgyUz8 beginning at 17:32 (accessed November 15, 2022)

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*



60.     He went on to state that "[t]here are a lot of signs right now that point to things looking bad. Crypto has taken a big hit and investors are wondering if things will turn around. If you follow history and the pattern of things, you know that this is RIGHT ON TRACK and we'll soon see a resurgence with crypto. Do you think we're entering a Bullish period? Let me know in the comments!"[25]

### iii.     Udonis Haslem



61.     Udonis Haslem, the Captain of the Miami HEAT and Miami legend, became an FTX global ambassador. Much like Brady and Bunchden, Haslem starred in FTX's "You In, Miami?" ad campaign that launched at the start of the 2021 - 2022 Miami HEAT season.

62.     In the ad, which be viewed here: https://www.youtube.com/watch?v=83FDP53yPa8, Haslem states "FTX has arrived in 305. So I just got one question: Are you in, Miami?" Others respond "If he's in, I'm in." Haslem concludes "Our city. Our team. FTX. You in, Miami?"

---

[25] *Id.*

### iv. David Ortiz



63. Defendant David Ortiz, who became an FTX brand ambassador and hyped the YBAs in exchange for cryptocurrency and multiple collections of NFTs, also ran his own FTX "You In?" ad, which began running nationwide during the first game of the 2021 World Series.

64. In the ad, which can be found here: https://www.ispot.tv/ad/qSlm/ftx-big-papi-is-in, Ortiz is watching a game on the television when he receives a phone call from The Moon. Inspired by the "moonblast" home run scored on the field, The Moon frantically tells David about opportunities to get into cryptocurrency with FTX. David decides it's an offer he can't refuse and joins fellow sports stars Stephen Curry and Tom Brady on the platform. FTX announces it is the official crypto exchange of MLB.

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

###### v. Steph Curry



65.     Defendant Stephen Curry had his own nationwide ad campaign pushing the Deceptive FTX Platform, known as the "#notanexpert" campaign.[26] Throughout the ad, Curry repeatedly denies being cast as an expert in cryptocurrency, culminating in his statement that "I'm not an expert, ***and I don't need to be.*** With FTX I have everything I need to buy, sell, and trade crypto ***safely.***"[27]

66.     The purpose of Curry being an ambassador is to expand the reach of the crypto firm and "tout the viability of cryptocurrency to new audiences around the world," FTX said in a press release.[28] In other words, to drive adoption of the Deceptive FTX Platform and to facilitate the sales of unregistered YBAs to unsuspecting and unwitting retail consumers.

67.     "I'm excited to partner with a company that demystifies the crypto space and eliminates the intimidation factor for first-time users," Curry said in the statement, highlighting that "first-time," inexperienced users were the intended targets of the campaign.[29]

---

[26] https://www.youtube.com/watch?v=gsy2N-XI04o (accessed November 15, 2022).
[27] *Id.*
[28] https://www.prnewswire.com/news-releases/nba-superstar-stephen-curry-becomes-global-ambassador-and-shareholder-of-leading-cryptocurrency-exchange-ftx-through-long-term-partnership-301370497.html (accessed November 15, 2022).
[29] *Id.*

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

### vi.    Golden State Warriors



Official Crypto Platform and NFT Marketplace
of the **Golden State Warriors**

68.    The Golden State Warriors and FTX officially launched their partnership in 2022 with the unveiling of the FTX logo on the court at the Chase Center. As the Warriors' Official Cryptocurrency Platform and NFT Marketplace, the franchise dropped NFTs on FTX.us beginning in early 2022. The partnership between the Warriors and FTX marked the first international rights partner for the Warriors, meaning the GSW and FTX had a visible market presence, inclusive of logo and likeness, internationally.

69.    The deal also included the Warriors' G League team, the Golden Guardians and Warriors Gaming Squad (affiliated esports teams), in-arena signage at Chase Center, and virtual floor signage at Warriors games.[30]

---

[30] https://www.instagram.com/p/CYiBaq8JLx7/ (accessed November 15, 2022).

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

   vii. **Shaquille O'Neal**



   70. Defendant Shaquille O'Neal, former professional NBA basketball star, sports analyst, and entrepreneur, also became an FTX ambassador, stating in a video posted on FTX's Twitter account that "I'm excited to be partnering with FTX to help make crypto accessible for everyone. I'm all in. Are you?"[31]

---

[31] https://twitter.com/FTX_Official/status/1532119977381208066?s=20&t=5wTm55FDE6c0cCD9vCndYg (accessed November 15, 2022).

27

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

### viii.    Trevor Lawrence



71.     Defendant William Trevor Lawrence, the first pick in the 2021 NFL draft and now quarterback for the Jacksonville Jaguars of the NFL, became a brand ambassador for FTX in exchange for unspecified cryptocurrency payments, which sponsorship was announced in April 2021.[32] The stated purpose of the sponsorship was because "Trevor is someone people can have a personal and human connection with for [FTX] and to the crypto space."[33]

---

[32] https://twitter.com/ftx_app/status/1386667859393253376 (accessed November 15, 2022).
[33] https://www.forbes.com/sites/chriscason/2021/04/26/trevor-lawrence-makes-first-investment-move-with-first-of-its-kind-partnership-with-blockfolio/?sh=7190ee6f47ef (accessed November 15, 2022).

### ix. Shohei Ohtani



72.     The FTX Entities entered into a long-term partnership with global icon and history-making MLB Superstar Shohei Ohtani. In addition to being an FTX global ambassador, Mr. Ohtani received all of his compensation in equity and cryptocurrencies.[34] In exchange for those unspecified payments, Mr. Ohtani served as a spokesperson for FTX to increase awareness of the Deceptive FTX Platform and to drive adoption of and investments in the unregistered YBA securities on a global scale through a variety of initiatives. [35]

---

[34] https://www.prnewswire.com/news-releases/mlb-superstar-shohei-ohtani-joins-ftx-as-global-ambassador-through-long-term-partnership-301425911.html (accessed November 15, 2022).
[35] *Id.*

### x. Naomi Osaka



73. Defendant Naomi Osaka, a 24-year-old professional tennis player and four-time Grand Slam singles champion, became a brand ambassador for FTX, with the express purpose of "getting more women to start investing in crypto."[36] Osaka wore the FTX logo on the kit she wore at tournaments, including the 2022 Miami Open.[37] In exchange for an equity stake in FTX and payments in unspecified amounts of cryptocurrency, Osaka directed and produced content in association with the FTX Entities designed to promote the offer and sale of the unregistered YBA securities, hoping "she will reach a global audience."[38]

74. Osaka confirmed her involvement by tweeting a glitzy new FTX ad to her **1.1 million followers**, which can be viewed here: https://youtu.be/pkuf8avR50k. It shows the tennis star competing in a comic strip — and over dramatic music, she says: "They thought they made the rules for us. They thought they could control us. They were wrong."

75. The video then cuts to a boardroom full of marketing executives talking about the ad in a tongue-in-cheek way — and discussing other ideas… including Osaka heading to the moon. An idea to have a QR code bouncing around the screen (a clear nod to Coinbase's Super Bowl spot) is dismissed for being "boring."

---

[36] https://coinmarketcap.com/alexandria/article/naomi-osaka-tennis-star-teams-up-with-ftx-and-she-s-getting-paid-in-crypto-too (accessed November 15, 2022).
[37] *Id*.
[38] *Id*.

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

76.     They settle on letting Osaka speaking for herself — and play a mock-up of the tennis ace giving an interview to a news channel where she says: "I'm Naomi Osaka and I'm proud to partner with FTX. Making cryptocurrency accessible is a goal that FTX and I are striving towards." The ad ends with the tagline: "Naomi is in. You in?"

### xi.     Larry David



77.     For his part, the legendary comedian and creator of *Seinfeld* and *Curb Your Enthusiasm*, Larry David, created an ad for the FTX Entities called "Don't Miss Out on Crypto," which aired during the 2022 Super Bowl, making FTX one of the most retweeted brands during the Super Bowl, and winning the "Most Comical" honorific from *USA Today*'s Ad Meter.[39]

78.     The ad—the only Super Bowl commercial David ever appeared in—featured David being a skeptic on such historically important inventions as the wheel, the fork, the toilet, democracy, the light bulb, the dishwasher, the Sony Walkman, and, of course, FTX, and cautioned viewers, "<u>Don't</u> be like Larry." The ad can be viewed here: https://youtu.be/BH5-rSxilxo

---

[39] https://admeter.usatoday.com/lists/usa-today-ad-meter-replay-ratings-2022-final-results/ (accessed November 15, 2022).

## CLASS ACTION ALLEGATIONS

79.     As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.     Class Definitions

80.     Plaintiffs seek to represent the following Nationwide Classes and State Subclasses (collectively, "the Classes").  If the Court agrees with Undersigned Counsel that the claims asserted here will apply to all class members, the Court may only have to certify the Nationwide Issue Class:

> **(1)** **<u>Nationwide Class</u>:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA.
>
> **(2)** **<u>Florida Subclass</u>:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a YBA.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Entities and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

81.     Plaintiffs reserve the right to modify or amend the definition of the proposed Nationwide Class and Florida Subclass, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Nationwide Class in part because all offers of FTX YBAs to Plaintiffs and the Class Members (in which Defendants each substantially participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell an FTX YBA stems from a transactional occurrence that emanated from the State of Florida. Plaintiffs seek certification of the Florida Subclass in the alternative.

### B.     Numerosity

82.     The Classes are comprised of thousands, if not millions, of consumers nationwide, to whom FTX offered and/or sold YBAs. Moreover, thousands, if not millions, of consumers nationwide and throughout these states have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes is thus so numerous that joinder of all

members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through FTX's corporate records.

## C. Commonality/Predominance

83. This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

    (a) whether the YBAs were unregistered securities under federal or Florida law;

    (b) whether Defendants' participation and/or actions in FTX's offerings and sales of YBAs violate the provisions of the Securities Act and Florida securities law.

    (c) the type and measure of damages suffered by Plaintiffs and the Classes.

    (a) whether Defendants' practices violate the FDUTPA;

    (b) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

    (c) whether Plaintiffs and Class members are entitled to injunctive relief;

    (d) whether Plaintiffs and Class members are entitled to declaratory relief; and

    (e) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

## D. Typicality

84. Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's YBAs as a result of Defendants' actions and/or participation in the offering and sale of these unregistered securities, and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to either Defendant that are unique to Plaintiffs.

## E. Adequacy of Representation

85. Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and

legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

## F.     Requirements of Fed. R. Civ. P. 23(b)(3)

86.     The questions of law or fact common to Plaintiffs' and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling the YBAs, which are unregistered securities, and/or (2) in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform.

87.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

88.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

## G.     Superiority

89.     A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a)   Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b)   Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c)   There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d)   The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e)   Individual suits would not be cost effective or economically maintainable as individual actions; and

(f)   The action is manageable as a class action.

**H.**     **Requirements of Fed. R. Civ. P. 23(b)(2)**

90.     Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the YBAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

91.     Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.**     **Requirements of Fed. R. Civ. P. 23(c)(4)**

92.     As it is clear that one of the predominant issues regarding Defendants' liability is whether the YBAs FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

93.     As it is clear that another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.**     **Nature of Notice to the Proposed Classes.**

94.     The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## <u>COUNT ONE</u>

### Violations of the Florida Statute Section 517.07,

### The Florida Securities and Investor Protection Act

### (Plaintiffs Individually and on behalf of the Nationwide Class, alternatively on behalf of the Florida subclass)

95.      Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–94 above, as if fully set forth herein.

96.      Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

97.      Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

98.      The YBA is a security pursuant to Fla. Stat. § 517.021(22)(a).

99.      The YBAs sold and offered for sale to Plaintiffs and Class members were not:

a.   exempt from registration under Fla. Stat. § 517.051;

b.   a federal covered security;

c.   registered with the Office of Financial Regulations (OFR); or

d.   sold in a transaction exempt under Fla. Stat. § 517.061.

100.     The FTX Entities sold and offered to sell the unregistered YBAs to Plaintiffs and the members of the Class.

101.     Defendants are directors, officers, partners and/or agents of the FTX Entities pursuant to Fla. Stat. § 517.211.

102.     The FTX Entities, with Defendants' material assistance, offered and sold the unregistered YBAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiff and members of the Classes sustained damages as herein described.

## COUNT TWO

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**

**§ 501.201, Florida Statutes,** *et seq.*

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively on behalf of the Florida subclass)**

103.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–94 above, as if fully set forth herein.

104.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

105.     Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

106.     Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

107.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

108.     Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

109.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the Deceptive FTX Platform and in the amount of their lost investments.

110.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

111.     Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

112.     Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Class to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## **COUNT THREE**

### **Civil Conspiracy**

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively on behalf of the Florida subclass)**

113.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–94 above, as if fully set forth herein.

114.     The FTX Entities and Defendants made numerous misrepresentations and omissions to Plaintiff and Class Members about the Deceptive FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive FTX Platform were safe and were not being invested in unregistered securities.

115.     The FTX Entities entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in the YBAs and/or use the Deceptive FTX Platform.

116.     Defendants engaged in unlawful acts with the FTX Entities, namely, the misrepresentations and omissions made to Plaintiffs and the Class and the sale of unregistered securities.

117.     Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Entities; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Entities, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

118.     Defendants' conspiracy with the FTX Entities to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT FOUR

### Declaratory Judgment

### (Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq.*)

### (Plaintiffs Individually and on behalf of the Nationwide Class, alternatively on behalf of the Florida subclass)

119.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–94 as if fully set forth herein.

120.    This Count is asserted against Defendants under Florida Statutes §§ 86.011, *et seq.*

121.    There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

122.    Plaintiffs and the members of the Class have an obvious and significant interest in this lawsuit.

123.    Plaintiffs and members of the Class purchased YBAs, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as further described hereinabove.

124.    If the true facts had been known, including but not limited to that the YBAs are unregistered securities, the Deceptive FTX Platform does not work as represented, and Defendants were paid exorbitant sums of money to peddle Voyager to the nation, Plaintiffs and the Class would not have purchased YBAs in the first place.

125.    Thus, there is a justiciable controversy over whether the YBAs were sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiffs and the Class.

126.    Plaintiffs and the Class seek an order declaring that the YBAs were securities required to be registered with the SEC and state regulatory authorities, that the Deceptive FTX Platform did not work as represented, and Defendants were paid exorbitant sums of money to peddle FTX to the nation.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

    a.     Certifying the Classes as requested herein;

    b.     Awarding actual, direct and compensatory damages;

    c.     Awarding restitution and disgorgement of revenues if warranted;

    d.     Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

    e.     Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

    f.     Awarding statutory and multiple damages, as appropriate;

    g.     Awarding attorneys' fees and costs; and

    h.     Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

*Edwin Garrison v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

Dated: November 15, 2022

Respectfully submitted,

**By:** */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

**By:** */s/ David Boies*
David Boies
(*Pro Hac Vice* Application Forthcoming)
Alex Boies
(*Pro Hac Vice* Application Forthcoming)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Phone: (914) 749–8200
dboies@bsfllp.com

**By:** */s/ Stephen Neal Zack*
Stephen Neal Zack
Florida Bar No. 145215
Hon. Ursula Ungaro (Ret.)
Florida Bar No. 200883
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., Suite 2800
Miami, FL 33131
Office: 305-539-8400
szack@bsfllp.com
uungaro@bsfllp.com

*Co-Counsel for Plaintiffs and the Class*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

EDWIN GARRISON, on behalf of himself and all others similarly situated

## DEFENDANTS

Thomas Brady, Gisele Bundchen, Kevin O'Leary, Sam Bankman-Fried, Stephen Curry, Golden State Warriors, Shaquille O'Neal, Udonis Haslem, David Ortiz, Trevor Lawrence, Shohei Ohtani, Naomi Osaka, Larry David

**(b)** County of Residence of First Listed Plaintiff Oklahoma County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Miami-Dade County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Adam Moskowitz, and Joseph M. Kaye
THE MOSKOWITZ LAW FIRM, PLLC,
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134

David Boies, Stephen Neal Zack,
Alex Boies and Ursula Ungaro
BOIES SCHILLER FLEXNER LLP
100 SE 2nd St., Suite 2800, Miami, FL 33131

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☒ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| Student Loans | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| (Excl. Veterans) | | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **Other:** | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed (See VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation Transfer
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Multidistrict Litigation – Direct File
☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

*(See instructions):* a) Re-filed Case ☐ YES ☒ NO   b) Related Cases ☒ YES ☐ NO

JUDGE: Roy K. Altman

Robertson, et al. v. Cuban, et al.
DOCKET NUMBER: 1:22-cv-22538-RKA

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
Fla. Stat. §§ 501.201, 28 U.S.C. § 1332(d)(2)(A) and 28 U.S.C. § 1332(a)(1)
LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

DATE 11/15/2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Adam Moskowitz

**FOR OFFICE USE ONLY : RECEIPT #** _____ **AMOUNT** _____ **IFP** _____ **JUDGE** _____ **MAG JUDGE** _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** (a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction**. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked. Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit**. Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions</u>.

**V.** **Origin**. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

**VI.** **Related/Refiled Cases**. This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

**VII.** **Cause of Action**. Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity**. Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VIII.** **Requested in Complaint**. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature**. Date and sign the civil cover sheet.

# Exhibit C

CLOSED,EGT

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:22-cv-23817-DPG

Kavuri v. Bankman-Fried et al
Assigned to: Judge Darrin P. Gayles
Cause: 28:1332 - Diversity: Securities Fraud

Date Filed: 11/21/2022
Date Terminated: 12/09/2022
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**Sunil Kavuri**

represented by **Adam M. Moskowitz**
The Moskowitz Law Firm, PLLC
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134-6036
305 740-1423
Email: adam@moskowitz-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Boies**
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504
914-749-8200
Email: aboies@bsfllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Boies**
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200
Email: dboies@bsfllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Kaye**
The Moskowitz Law Firm, PLLC
2 Alhambra Plaza, Suite 601
Miami, FL 33134
(305) 740-1423
Email: joseph@moskowitz-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen N. Zack**
Boies Schiller & Flexner
100 SE 2nd Street
Suite 2800, Miami Tower
Miami, FL 33131-2144
305-539-8400
Fax: 305-539-1307
Email: szack@bsfllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Sam Bankman-Fried**

**Defendant**

**Thomas Brady**

**Defendant**

**Gisele Bundchen**

**Defendant**

**Udonis Haslem**

**Defendant**

**David Ortiz**

**Defendant**

**Stephen Curry**

**Defendant**

**Golden State Warriors LLC**

**Defendant**

**Shaquille ONeal**

**Defendant**

**William Trevor Lawrence**

**Defendant**

**Shohei Ohtani**

**Defendant**

**Naomi Osaka**

**Defendant**

**Lawrence Gene David**

**Defendant**

**Kevin OLeary**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/21/2022 | 1 | COMPLAINT *CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL* against All Defendants. Filing fees $ 402.00 receipt number AFLSDC-16116581, filed by Sunil Kavuri. (Attachments: # 1 Civil Cover Sheet)(Moskowitz, Adam) (Entered: 11/21/2022) |
| 11/21/2022 | 2 | Clerks Notice of Judge Assignment to Judge Darrin P. Gayles. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Edwin G. Torres is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (mab) (Entered: 11/21/2022) |
| 11/22/2022 | 3 | Bar Letter re: Admissions sent to attorneys David Boies and Alex Boies, mailing date November 22, 2022. (cw) (Entered: 11/22/2022) |
| 11/22/2022 | 4 | NOTICE OF COURT PRACTICE. Unless otherwise specified by the Court, every motion shall be double-spaced in Times New Roman 12-point typeface. **Multiple Plaintiffs or Defendants shall file joint motions with co-parties unless there are clear conflicts of position.** If conflicts of position exist, parties shall explain the conflicts in their separate motions. Failure to comply with **ANY** of these procedures may result in the imposition of appropriate sanctions, including but not limited to, the striking of the motion or dismissal of this action. Signed by Judge Darrin P. Gayles (bhy) (Entered: 11/22/2022) |
| 12/08/2022 | 5 | NOTICE of Voluntary Dismissal *PLAINTIFFS NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE* by Sunil Kavuri (Moskowitz, Adam) (Entered: 12/08/2022) |

| 12/09/2022 | 6 | PAPERLESS ORDER DISMISSING CASE WITHOUT PREJUDICE pursuant to 5 Plaintiff's Notice of Voluntary Dismissal without Prejudice. This case is closed. Any pending motions are denied as moot. Signed by Judge Darrin P. Gayles (bhy) (Entered: 12/09/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/19/2022 15:43:50 | | |
| **PACER Login:** | AkermanFTL | **Client Code:** | 99997-056008 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-23817-DPG |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

Exhibit D

CLOSED,LFL

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:22-cv-23983-KMM

Podalsky et al v. Bankman-Fried et al
Assigned to: Judge K. Michael Moore
Lead case: 1:22-cv-23753-KMM
Member case: (View Member Case)
Cause: 28:1332 - Diversity: Securities Fraud

Date Filed: 12/07/2022
Date Terminated: 12/09/2022
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**Gregg Podalsky**

represented by **Joseph M. Kaye**
The Moskowitz Law Firm, PLLC
2 Alhambra Plaza, Suite 601
Miami, FL 33134
(305) 740-1423
Email: joseph@moskowitz-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen N. Zack**
Boies Schiller & Flexner
100 SE 2nd Street
Suite 2800, Miami Tower
Miami, FL 33131-2144
305-539-8400
Fax: 305-539-1307
Email: szack@bsfllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ursula Ungaro**
Boies Schiller Flexner LLP
100 SE 2nd Street
Suite 2800
Miami, FL 33131
305-479-6553
Email: uungaro@bsfllp.com *(Inactive)*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Boies**
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504
914-749-8200
Email: aboies@bsfllp.com
*ATTORNEY TO BE NOTICED*

**David Boies**
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200
Email: dboies@bsfllp.com
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
The Moskowitz Law Firm, PLLC
2 Alhambra Plaza, Suite 601

Coral Gables, FL 33134-6036
305 740-1423
Email: adam@moskowitz-law.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Skyler Lindeen**                     represented by **Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen N. Zack**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ursula Ungaro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Boies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Boies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alexander Chernyavsky**              represented by **Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen N. Zack**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ursula Ungaro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Boies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Boies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gary Gallant**                       represented by **Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen N. Zack**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ursula Ungaro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Boies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Boies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>
**David Nicol**                                        represented by **Joseph M. Kaye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen N. Zack**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ursula Ungaro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Boies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Boies**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>
**Sunil Kavuri**                                       represented by **Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>
**Edwin Garrison**                                     represented by **Adam M. Moskowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.
<u>**Defendant**</u>
**Sam Bankman-Fried**

**Defendant**

**Tom Brady**

**Defendant**

**Gisele Bundchen**

**Defendant**

**Kevin OLeary**

**Defendant**

**Udonis Haslem**

**Defendant**

**David Ortiz**

**Defendant**

**Caroline Ellison**

**Defendant**

**Sam Trabucco**

**Defendant**

**Gary Wang**

**Defendant**

**Nishad Singh**

**Defendant**

**Dan Friedberg**

**Defendant**

**Stephen Curry**

**Defendant**

**Golden State Warriors LLC**

**Defendant**

**Shaquille ONeal**

**Defendant**

**William Trevor Lawrence**

**Defendant**

**Shohei Ohtani**

**Defendant**

**Naomi Osaka**

**Defendant**

**Lawrence Gene David**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/07/2022 | 1 | COMPLAINT *CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL* against All Defendants. Filing fees $ 402.00 receipt number AFLSDC-16155270, filed by Skyler Lindeen, Gregg Podalsky, Alexander Chernyavsky, Gary Gallant, David Nicol. (Attachments: # 1 Civil Cover Sheet)(Moskowitz, Adam) (Entered: 12/07/2022) |
| 12/07/2022 | 2 | Clerks Notice of Judge Assignment to Judge Beth Bloom.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Alicia M. Otazo-Reyes is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (aao) (Entered: 12/08/2022) |

| 12/08/2022 | 3 | Bar Letter re: Admissions sent to attorney David Boies and Alex Boies, mailing date December 8, 2022, (pt) (Entered: 12/08/2022) |
|---|---|---|
| 12/08/2022 | 4 | AMENDED COMPLAINT *and Demand for Jury Trial* against All Defendants, filed by Skyler Lindeen, Gregg Podalsky, Alexander Chernyavsky, Gary Gallant, David Nicol, Sunil Kavuri, Edwin Garrison. (Moskowitz, Adam) (Entered: 12/08/2022) |
| 12/09/2022 | 5 | ORDER TRANSFERRING CASE to Judge K. Michael Moore for all further proceedings, accepted and signed on 12/8/2022. Judge Beth Bloom no longer assigned to case. Signed by Judge Beth Bloom on 12/8/2022. *See attached document for full details*. (ls) (Entered: 12/09/2022) |
| 12/09/2022 | 6 | PAPERLESS PRETRIAL ORDER. This order has been entered upon the filing of the complaint. Plaintiff's counsel is hereby ORDERED to forward to all defendants, upon receipt of a responsive pleading, a copy of this Order. It is further ORDERED that S.D. Fla. L.R. 16.1 shall apply to this case and the parties shall hold a scheduling conference no later than twenty (20) days after the filing of the first responsive pleading by the last responding defendant, or within sixty (60) days after the filing of the complaint, whichever occurs first. However, if all defendants have not been served by the expiration of this deadline, Plaintiff shall move for an enlargement of time to hold the scheduling conference, not to exceed 90 days from the filing of the Complaint. Within ten (10) days of the scheduling conference, counsel shall file a joint scheduling report. Failure of counsel to file a joint scheduling report within the deadlines set forth above may result in dismissal, default, and the imposition of other sanctions including attorney's fees and costs. The parties should note that the time period for filing a joint scheduling report is not tolled by the filing of any other pleading, such as an amended complaint or Rule 12 motion. The scheduling conference may be held via telephone. At the conference, the parties shall comply with the following agenda that the Court adopts from S.D. Fla. L.R. 16.1: (1) Documents (S.D. Fla. L.R. 16.1.B.1 and 2) - The parties shall determine the procedure for exchanging a copy of, or a description by category and location of, all documents and other evidence that is reasonably available and that a party expects to offer or may offer if the need arises. Fed. R. Civ. P. 26(a)(1)(B). (a) Documents include computations of the nature and extent of any category of damages claimed by the disclosing party unless the computations are privileged or otherwise protected from disclosure. Fed. R. Civ. P. 26(a)(1)(C). (b) Documents include insurance agreements which may be at issue with the satisfaction of the judgment. Fed. R. Civ. P. 26(a)(1)(D). (2) List of Witnesses - The parties shall exchange the name, address and telephone number of each individual known to have knowledge of the facts supporting the material allegations of the pleading filed by the party. Fed. R. Civ. P. 26(a)(1)(A). The parties have a continuing obligation to disclose this information. (3) Discussions and Deadlines (S.D. Fla. L.R. 16.1.B.2) - The parties shall discuss the nature and basis of their claims and defenses and the possibilities for a prompt settlement or resolution of the case. Failure to comply with this Order or to exchange the information listed above may result in sanctions and/or the exclusion of documents or witnesses at the time of trial. S.D. Fla. L.R. 16.1.I.<br><br>**The parties are hereby on notice that this Court requires all filings to be formatted in 12 point Times New Roman font and double spaced, including any footnotes, with one inch margins on all sides.** Failure to follow these formatting guidelines may result in the filing being stricken, any opposing filing being granted by default, and the imposition of other sanctions, including attorney's fees and costs. **Multiple Plaintiffs or Defendants shall file joint motions with co-parties unless there are clear conflicts of position.** If conflicts of position exist, parties shall explain the conflicts in their separate motions. Failure to comply with ANY of these procedures may result in the imposition of appropriate sanctions, including but not limited to, the striking of the motion or dismissal of this action. **The parties shall seek extensions of time in a timely fashion.** "A motion for extension of time is not self-executing.... Yet, by filing these motions on or near the last day, and then sitting idle pending the Court's disposition of the motion, parties essentially grant their own motion. The Court will not condone this." Compere v. Nusret Miami, LLC, 2020 WL 2844888, at *2 (S.D. Fla. May 7, 2020) (internal citations omitted).<br><br>Pursuant to Administrative Order 2016-70 of the Southern District of Florida and consistent with the Court of Appeals for the Eleventh Circuit's Local Rules and Internal Operating Procedures, within three (3) days of the conclusion of a trial or other proceeding, parties must file via CM/ECF electronic versions of documentary exhibits admitted into evidence, including photographs of non-documentary physical exhibits. The Parties are directed to comply with each of the requirements set forth in Administrative Order 2016-70 unless directed otherwise by the Court.<br><br>Telephonic appearances are not permitted for any purpose. Upon reaching a settlement in this matter the parties are instructed to notify the Court by telephone and to file a Notice of Settlement within twenty-four (24) hours.<br><br>Signed by Judge K. Michael Moore on 12/9/2022. (rfr) (Entered: 12/09/2022) |
| 12/09/2022 | 7 | PAPERLESS ORDER CONSOLIDATING CASES. THIS CAUSE came before the Court upon a sua sponte review of the record. Rule 42(a) of the Federal Rules of Civil Procedure allows the Court to consolidate actions that have common questions of law or fact. Fed. R. Civ. P. 42(a). Here, the Court finds that Case Nos. 1:22-cv-23753-KMM and 1:22-cv-23983-KMM have common questions of fact and consolidation is appropriate. |

|  |  | Accordingly, Case No. 1:22-cv-23983-KMM is hereby CONSOLIDATED with **Case No. 1:22-cv-23753-KMM** for all purposes, including trial. The Clerk of the Court is INSTRUCTED to administratively CLOSE Case No. 1:22-cv-23983-KMM. All future filings MUST be made only in the lead case, **Case No. 1:22-cv-23753-KMM**. All pending motions, if any, in Case No. 1:22-cv-23983-KMM are DENIED AS MOOT.<br><br>It is further ORDERED that Plaintiff shall file an amended complaint in Case No. 1:22-cv-23753-KMM within seven (7) days of the entry of this Order. The Court further VACATES the pretrial order entered in Case No. 1:22-cv-23983-KMM. Signed by Judge K. Michael Moore on 12/9/2022. (rfr) (Entered: 12/09/2022) |
| 12/09/2022 |  | Cases associated. (ls)(per DE # 7 ) (Entered: 12/09/2022) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 12/19/2022 14:14:18 | | |
| **PACER Login:** | AkermanFTL | **Client Code:** | 99997-056008 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-23983-KMM |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

# Exhibit E

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO.

**GREGG PODALSKY**, *et al.,* on behalf of
themselves and all others similarly situated,

        *Plaintiff,*                             **CLASS ACTION COMPLAINT**

*v.*                                            **JURY DEMAND**

**SAM BANKMAN-FRIED**, *et al.,*

        *Defendants.*

_____/

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

"Then there's things that have happened with Voyager *and with FTX now*—that's somebody running a company that's *just dumb as fu\*\* greedy*. So, what does Sam Bankman do? He just, give me more, give me more, give me more, so I'm gonna borrow money, loan it to my affiliated company, and hope and pretend to myself that the FTT tokens that are in there on my balance sheet are gonna sustain their value."[1]

### – Mark Cuban, Nov. 12, 2022



### – Defendant Sam Bankman Fried (Former CEO, FTX)

---

[1] https://www.yahoo.com/video/ftx-twitter-chaos-embarrassing-athletes-195343800.html (accessed December 7, 2022).

Plaintiffs Gregg Podalsky, Gary Gallant, Skyler Lindeen, Alexander Chernyavsky, and David Nicol ("Plaintiffs") file this class action complaint on behalf of themselves, and all others similarly situated, against Sam Bankman-Fried, Caroline Ellison, Gary Wang, Nishad Singh, Sam Trabucco, Dan Friedberg, Tom Brady, Gisele Bundchen, Stephen Curry, Golden State Warriors, Shaquille O'Neal, Udonis Haslem, David Ortiz, William Trevor Lawrence, Shohei Ohtani, Naomi Osaka, Lawrence Gene David, and Kevin O'Leary (collectively, "Defendants"), all parties who either controlled, promoted, assisted in, or actively participated in FTX Trading LTD d/b/a FTX's ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively, the "FTX Entities"), offer and sale of unregistered securities in the form of yield-bearing accounts ("YBAs") to persons and entities residing both inside and outside of the United States, seeking to recover damages, declaratory and/or injunctive relief stemming from the offer and sale of the FTX Entities' yield-bearing cryptocurrency accounts.

**INTRODUCTION**

1.      Most experts agree that the FTX Collapse Disaster is the largest and greatest financial fraud in history. The new CEO of FTX, who helped wind down the prior Enron fraud, admitted that what he quickly uncovered in FTX to date, is worse than in the Enron Fraud. Almost $14 billion dollars is unaccounted for, and certainly billions of dollars have been stolen from investors across the globe. FTX will be involved in federal bankruptcy proceedings for many years to come and there is no guarantee that the victims will be able to see any recovery from those processes.

2.      One common and identical question in this case, and in many other cryptocurrency litigation matters, is simply whether the SEC was correct, in finding that all of these YBAs are (or are not) the sale of "unregistered securities." This question can and should be decided quickly for all of the parties, so that all cryptocurrency litigation can be quickly advanced and the victims (and alleged co-conspirators) have a clear and expedited path.

3.      Moreover, this question was already practically answered in the affirmative through various regulatory statements, guidance, and actions issued by the Securities and Exchange Commission and other regulatory entities. For example, on November 1, 2017, in the "SEC Statement Urging Caution Around Celebrity Backed ICOs,"[2]

---

[2]      https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos (accessed December 7, 2022).

In the SEC's Report of Investigation concerning The DAO,[3] the Commission warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws. **Persons making these endorsements may also be liable** for potential violations of the anti-fraud provisions of the federal securities laws, **for participating in an unregistered offer and sale of securities**, and for acting as unregistered brokers. The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

4.      Not only that, but the SEC and state securities regulators have also targeted cryptocurrency brokers and exchanges just like FTX for offering almost this exact same type of interest-bearing account, finding that exchanges such as BlockFi,[4] Voyager,[5] and Celsius[6] all offered these same accounts as unregistered securities.

5.      Another narrow issue that is common to the entire class, whose focus is solely objective, is whether these Defendants violated state consumer laws by failing to abide by any of the FTC long established rules and regulations, specifically on what is required for a celebrity endorsement of crypto currency. The answer to just these two, narrow questions will greatly advance litigation across the globe relating to the FTX Disaster, help determine who may be liable for aiding and abetting this massive fraud, one way or another and may also help advance (for either side) all of the other pending massive litigation, against other cryptocurrency platforms (such as Voyager) that offered similar YBAs.

6.      There can be no dispute that claims in this case must provide for *strict liability,* and therefore if these YBAs are found to be "securities," Defendants can simply have no defense to the claims in this action. **The "caveat emptor" defense that Defendants and others are pushing in the press will have no application.**

---

[3] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed December 7, 2022)

[4] https://www.sec.gov/news/press-release/2022-26 (accessed December 7, 2022).

[5]      https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/ (accessed December 7, 2022).

[6] https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwjvjNvg27j7AhWfRTABHfwzDe4QFnoECAsQAQ&url=https%3A%2F%2Fwww.nj.gov%2Foag%2Fnewsreleases21%2FCelsius-Order-9.17.21.pdf&usg=AOvVaw0Zd94fuhFSsOoGKM-vQ3YI (accessed December 7, 2022).

7.     This is not a case where Plaintiffs made a "risky" investment in stock or cryptocurrency, or that they lost money speculating on various cryptocurrency projects. Plaintiffs' claims arises simply from the purchase of a YBA, an account with FTX that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate returns on their significant holdings in the accounts, regardless of whether those assets were held as USD, legal tender or cryptocurrency, and regardless of whether any trades were made with the assets held in the YBA. In other words, the YBA was portrayed to be like a bank account, something that was "very safe" and "protected." That is the narrative that Defendants pushed in promoting the offer and sale of the YBAs, which are unregistered securities. For that, Defendants are liable for Plaintiffs' losses, jointly and severally and to the same extent as if they were themselves the FTX Entities.

8.     Literally overnight, Plaintiffs' assets held in their YBAs on the Deceptive FTX Platform were robbed from them as FTX imploded and former-CEO, Sam Bankman-Fried, filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened because, as explained by the new CEO of the failed FTX Entities:

> I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.
>
> ***Never*** in my career have I seen such a complete failure of corporate controls and such a **complete absence of trustworthy financial information** as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, **unsophisticated** and **potentially compromised** individuals, **this situation is unprecedented**.

*See* In re: FTX Trading Ltd, et al., No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17, 2022) (emphasis added).

9.     This should not have happened. Not to Plaintiffs, and not to the thousands of other FTX customers who now find themselves in the same predicament.

10.     The Cryptocurrency National Disaster is growing by the billions almost every day. More crypto companies are filing new federal bankruptcy petitions each day, all running for protection from the billions of dollars of losses they directly caused to thousands of investors here in Florida and

across the globe. This is by far the largest securities national disaster, greatly surpassing the Madoff Ponzi Scheme, and could very likely become a complex international litigation disaster, similar to how the hundreds of thousands of asbestos cases swamped all courts across the globe. Unless a workable, coordinated, and organized structure is established now, at the very onset of these proceedings, here in Miami, which served as the epicenter for the crypto fraud, the FTX victims will continue to suffer and the only people to benefit will be the professionals in the bankruptcy and civil courts.

11.     The Deceptive and failed FTX Platform emanated from Miami, Florida and was based upon false representations and deceptive conduct. FTX's fraudulent scheme was designed to take advantage of unsophisticated investors from across the globe, who utilize mobile apps to make their investments. As a result, consumers around the globe collectively sustained billions of dollars in damages. FTX organized and emanated its fraudulent plan from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where 3-time NBA Champions the Miami Heat play.

## **FACTUAL BACKGROUND**

12.     On December 24, 2021, counsel for Plaintiffs and the proposed class members brought the first (and only) putative nationwide class action complaint against the now-defunct cryptocurrency trading app, Voyager, styled *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the platform owned and operated by Voyager Digital Ltd. ("Voyager") and Voyager Digital LLC ("VDL") was an unregulated and unsustainable fraud. In the *Cassidy* Action, plaintiffs also alleged that Defendant Ehrlich, Voyager's CEO, teamed up with Defendants Cuban and the Dallas Mavericks to promote Voyager, by making false representations and employing other means of deception. As a result, the Voyager plaintiffs and Voyager class members, all sustained losses in excess of $5 billion.

13.     The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting Voyager—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Dallas Mavericks, is a major stakeholder in Voyager. The complaint

alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

14.     After the *Cassidy* Complaint was filed, the following important actions took place:

(a)     the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b)     seven state Attorneys General (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPA was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022; and

(c)     on March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the EPA was not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[7]

15.     On July 5, 2022, Voyager Digital Holdings, Inc. and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases (the "Voyager Bankruptcy Cases") are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

16.     On September 28, 2022, Voyager filed a motion in the Voyager Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (i) the value of cryptocurrency on the Voyager platform as of a date to be

---

[7] https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed October 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed December 7, 2022).

determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

17.    Everyone involved in the Voyager Bankruptcy Cases thought that the FTX Entities were the *deus ex machina* come to save the day by bailing out Voyager and paying back at least some of the losses the Voyager customers sustained.

18.    Instead, as explained below, the FTX Entities imploded, their over $30 billion in value evaporated almost overnight, and the FTX Entities found themselves filing their own emergency Chapter 11 bankruptcy petition in Delaware. The Deceptive FTX Platform maintained by the FTX Entities was truly a house of cards, a Ponzi scheme where the FTX Entities shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the YBAs and loans to pay interest to the old ones and to attempt to maintain the appearance of liquidity.

19.    Part of the scheme employed by the FTX Entities involved utilizing some of the biggest names in sports and entertainment to raise funds and drive global consumers to invest in the YBAs, which were offered and sold largely from the FTX Entities' domestic base of operations here in Miami, Florida, pouring billions of dollars into the Deceptive FTX Platform to keep the whole scheme afloat.

20.    Importantly, although Defendants disclosed their partnerships with the FTX Entities, they have never disclosed the nature, scope, and amount of compensation they personally received in exchange for the promotion of the Deceptive FTX Platform, which the SEC has explained that a failure to disclose this information would be a violation of the anti-touting provisions of the federal securities laws.[8] Moreover, none of these defendants performed any due diligence prior to marketing these FTX products to the public.

21.    The SEC took action against boxing champ Floyd Mayweather and music producer DJ Khaled after they were paid by cryptocurrency issuers to tweet promotional statements about investing in Initial Coin Offerings (ICOs), ordering them both to pay disgorgement, penalties and interest for promoting investments in ICOs, including one from cryptocurrency issuer Centra Tech,

---

[8]    https://www.ubergizmo.com/2017/11/sec-celebrities-disclose-payment-cryptocurrency-endorsements/#:~:text=It%20has%20issued%20a%20statement%20warning%20celebrities%20that,without%20disclosing%20that%20they%E2%80%99ve%20been%20paid%20for%20it (accessed December 7, 2022).

Inc, for a combined total of $767,500 because they failed to disclose that their promotional efforts on Twitter were paid endorsements.[9]

22.     Other celebrities similarly accused and prosecuted for failing to disclose their paid endorsements include Kim Kardashian and basketball player Paul Pierce.[10] According to the Federal Trade Commission, cryptocurrency scams have increased more than ten-fold year-over-year with consumers losing more than $80 million since October 2020, due in large part to the use of such celebrity endorsements.[11]

23.     As explained more fully in this Complaint, Defendants' misrepresentations and omissions made and broadcast around the globe through the television and internet render them liable to Plaintiff and class members for soliciting their purchases of the unregistered YBAs. *Wildes v. Bitconnect Int'l PLC*, No. 20-11675 (11th Cir. Feb. 18, 2022) (holding that promoters of cryptocurrency through online videos could be liable for soliciting the purchase of unregistered securities through mass communication, and no "personal solicitation" was necessary for solicitation to be actionable).

24.     This action seeks to hold Defendants responsible for the many billions of dollars in damages they caused Plaintiff and the Class and to force Defendants to make them whole.

## PARTIES

25.     Plaintiff Gregg Podalsky is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Podalsky did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Podalsky has sustained damages for which Defendants are liable.

26.     Plaintiff Skyler Lindeen is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Lindeen purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest

---

[9]         https://news.bloomberglaw.com/us-law-week/insights-celebrity-endorsements-and-cryptocurrency-a-cautionary-tale (accessed December 7, 2022).

[10]        https://blockbulletin.com/news/altcoins/kim-kardashian-among-other-celebrities-sued-for-promoting-cryptocurrencies/ (accessed December 7, 2022).

[11]        https://florida.foolproofme.org/articles/770-celebrity-cryptocurrency-scam (accessed December 7, 2022).

on his holdings. Plaintiff Lindeen did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Lindeen has sustained damages for which Defendants are liable.

27.     Plaintiff Alexander Chernyavsky is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Chernyavsky did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Chernyavsky has sustained damages for which Defendants are liable.

28.     Plaintiff Gary Gallant is a citizen and resident of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Gallant purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Gallant did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Gallant has sustained damages for which Defendants are liable.

29.     Plaintiff David Nicol is a citizen and resident of Sydney, Australia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Nicol purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Nicol did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Nicol has sustained damages for which Defendants are liable.

30.     Defendant Thomas Brady, NFL quarterback currently playing for the Tampa Bay Buccaneers, is a brand ambassador of FTX, and is a citizen and resident of Miami-Dade County, Florida.

31.     Defendant Gisele Bundchen, one of the world's highest-paid models and a brand ambassador for FTX, is a citizen and resident of Miami-Dade County, Florida.

32.     Defendant Kevin O'Leary, "Mr. Wonderful," a businessman, television personality appearing regularly on *Shark Tank*, and brand ambassador for FTX, is a citizen and resident of Miami Beach, Florida.

33.     Defendant Udonis Haslem, an American professional basketball player for the Miami Heat of the NBA and brand ambassador of FTX, is a citizen and resident of Miami-Dade County, Florida.

34.     Defendant David Ortiz, former designated hitter and first baseman in the MLB and a brand ambassador for FTX, is a citizen and resident of the State of Florida.

35.     Defendant Sam Bankman-Fried, founder and former CEO of FTX and former billionaire, is a citizen and resident of the Bahamas.

36.     Defendant Caroline Ellison is the former CEO of Alameda Research, LLC, a trading firm launched by Defendant Sam Bankman-Fried. She oversaw many of the risky bets Alameda took with regard to FTX customers' crypto tokens. Defendant Ellison is a resident of Hong Kong.

37.     Defendant Sam Trabucco, the former Co-CEO of Alameda Research, LLC, is a citizen and resident of the State of California.

38.     Defendant Gary Wang, co-founder of Alameda Research and FTX, upon information and belief is currently residing in the Bahamas.

39.     Defendant Nishad Singh, the former Director of Engineering of FTX, upon information and belief is currently residing in the Bahamas.

40.     Defendant Dan Friedberg, the former Chief Compliance Officer of FTX, is a citizen and resident of Seattle, Washington.

41.     Defendant Stephen Curry, professional basketball player for the Golden State Warriors of the NBA and brand ambassador for FTX, is a citizen and resident of the State of California.

42.     Defendant Golden State Warriors LLC is a professional basketball team in the NBA that officially launched their partnership with FTX in 2022 with the unveiling of the FTX logo on the court at the Chase Center, and is a corporation operating and existing under the laws of the State of California.

43.     Defendant Shaquille O'Neal, former professional NBA basketball star, sports analyst, entrepreneur, and FTX brand ambassador, is a citizen and resident of Collin County, Texas.

44.     Defendant William Trevor Lawrence, the quarterback for the Jacksonville Jaguars of the NFL and a brand ambassador for FTX, is a citizen and resident of the state of Mississippi.

45.     Defendant Shohei Ohtani, a professional baseball pitcher, designated hitter and outfielder for the Los Angeles Angels of the MLB and a brand ambassador for FTX, is a citizen and resident of the State of California.

46.     Defendant Naomi Osaka, a professional tennis player and brand ambassador for FTX, is a citizen and resident of Beverly Hills, California.

47.     Defendant Lawrence Gene David, an American comedian, writer, actor, television producer, and FTX brand ambassador, is a citizen and resident of Los Angeles, California.

## JURISDICTION AND VENUE

48.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

49.     This Court has personal jurisdiction against Defendants because they conduct business in Florida, and/or have otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of FTX's YBAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of FTX's unregistered securities to consumers in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

50.     Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members either reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

51.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

A.     **Background on FTX and its Key Players.**

52.     Until seeking the protection of the Bankruptcy Court, the FTX Entities operated a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive FTX Platform") that placed cryptocurrency trade orders on behalf of users like Plaintiff and Class Members and offered interest bearing cryptocurrency accounts.

### Defendant Sam Bankman-Fried

53.     The FTX group of companies (FTX Group or FTX) was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established in order to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

54.     Prior to that, The Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his quantitative crypto trading firm, Alameda Research, in November 2017,[12] after stints in the charity world and at trading firm Jane Street.[13] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

### Defendants Caroline Ellison and Sam Trabucco

55.     By 2018, Defendant Bankman-Fried had persuaded Defendant Ellison to join him at Alameda Research. Defendant Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told Forbes magazine in an interview regarding her initial impressions of Alameda.

56.     In late 2018, the headquarters of Alameda Research was relocated to Hong Kong. The team at Alameda Research included Defendant Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang. Defendant Caroline Ellison and Sam Trabucco were also part of the group and upon moving to Hong Kong the group lived like college students and fiercely traded crypto.

57.     After Defendant Bankman-Fried established FTX in 2019, Defendant Ellison began taking more responsibility at Alameda Research along with Sam Trabucco, who served as CEO.

58.     In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after Bankman-Fried resigned from the firm in an effort to put distance between the exchange and trading shop he founded. As co-CEO, Trabucco helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift. For instance, he said Alameda traders began exploring yield

---

[12]      https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed December 7, 2022).

[13]      https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 7, 2022).

farming in decentralized finance (DeFi). Ellison became sole CEO in August 2022, following Trabucco's departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[14]

59.     Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF rent, and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

60.     "Young people tend to be too risk averse," Ellison said in a more recent Alameda podcast episode.[15]

61.     The Wall Street Journal recently reported that Ellison told Alameda staffers in a video call that she was one of four people (along with Sam Bankman-Fried, Gary Wang, and Nishad Singh) who were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[16]

### Defendant Gary Wang

62.     Wang is not like his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. In fact, there's little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

63.     Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[17]

64.     Before co-founding Alameda Research (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on the Future Fund's website.[18] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

65.     The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

---

[14]     https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed December 7, 2022).
[15]     https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed December 7, 2022).
[16]     https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed December 7, 2022).
[17]     https://blog.ftx.com/blog/raising-the-bar/ (accessed December 7, 2022)
[18]     https://ftxfuturefund.org/about/ (accessed December 7, 2022).

66.    It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[19]

67.    Nishad Singh, the head of engineering at FTX, said Wang was a "really good mentor" who offered suggestions and advice to push things out on short timescales.

68.    In the aftermath of FTX's collapse, and the subsequent $400 million hack, questions are circulating around who could possibly have abused client funds. Wang is a prominent suspect, as one of the few people with "root access" to the exchange's code base, according to The Block.[20]

69.    Wang is also one of the board members of FTX Future Fund – the charity guided by "effective altruism" that aims to "use reason and evidence to do the most good possible for the most people."

70.    Wang, one of the 10 roommates in Bankman-Fried' luxury penthouse in the Bahamas, is reportedly among the four people cited by Caroline Ellison who knew about the decision to send customer funds to Alameda, according to people who spoke to the Wall Street Journal.[21]

71.    A few Wang photos are circulating on the internet, though little else is known about the mysterious co-founder who preferred to stay in the shadows as SBF chased the limelight. In a now infamous picture on FTX's website, CTO Wang is seen with his back facing the camera as he focuses on the monitors in front of him.

72.    At the age of 28, Wang topped Forbes' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[22]

---

[19]    https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5    (accessed December 7, 2022).

[20]    https://www.theblock.co/post/186476/who-is-billionaire-ftx-co-founder-gary-wang-and-why-is-he-still-committing-code (accessed December 7, 2022).

[21]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 7, 2022).

[22]    https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be96dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed December 7, 2022).

73. Wang is reportedly now "under supervision" by Bahamian authorities along with Bankman-Fried and Singh.[23]

### Defendant Nishad Singh

74. Nishad Singh joined Alameda Research in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

75. Singh is thought to be a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a 10-person luxury penthouse in Nassau, the Bahamas.

76. He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and may have been informed of a plan to backstop losses at Alameda with FTX customer funds.[24]

77. Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, Berkeley graduate talked about why he left his dream job at Facebook to join Alameda Research in a FTX podcast.[25]

78. "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

79. Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

80. In the podcast, Singh said he was also attracted to the company's cultural commitment to effective altruism,[26] a movement that "aims to find the best ways to help others," which he discovered in college.

---

[23] https://cointelegraph.com/news/sam-bankman-fried-is-under-supervision-in-bahamas-looking-to-flee-to-dubai (accessed December 7, 2022).

[24] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 7, 2022).

[25] https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed December 7, 2022).

[26] https://www.coindesk.com/layer2/2022/11/11/how-sam-bankman-frieds-effective-altruism-blew-up-ftx/ (accessed December 7, 2022).

81.    Singh is a board member of FTX Future Fund, a part of the FTX Foundation, a philanthropic collective funded principally by Bankman-Fried and other senior FTX executives.

82.    "It was pretty clear that everybody working [at Alameda] was highly motivated, was sort of effective altruism-aligned, which mattered a lot to me and was really [a] bright spot. I could learn a lot from them," Singh said in the podcast.

83.    After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

84.    "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company blog.[27] Singh also reportedly built most of FTX's "technological infrastructure" and managed the development team.

85.    Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[28] A similar relationship may be in place at FTX's core properties.[29]

86.    Singh is reportedly now "under supervision" by Bahamian authorities along with Bankman-Fried and Wang.[30]

### Dan Friedberg

87.    Daniel S. Friedberg was the chief compliance officer at FTX, the person who oversaw FTX's compliance initiatives before it imploded. He joined the firm in March 2020, and was instrumental in perpetuating its nefarious activities, in part by helping to cover up any indications that the FTX scheme was unraveling.

88.    Although Friedberg was supposed to be the adult in the room overseeing the operations of the FTX empire, he did so thousands of miles away, remotely, from Seattle, Washington. As FTX's chief regulatory officer, Friedberg was tasked with monitoring customer protection

---

[27] https://blog.ftx.com/blog/raising-the-bar/ (accessed December 7, 2022).
[28]    https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed December 7, 2022).
[29]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 7, 2022).
[30]    https://cointelegraph.com/news/sam-bankman-fried-is-under-supervision-in-bahamas-looking-to-flee-to-dubai (accessed December 7, 2022).

practices, ensuring product offerings complied with existing rules and overseeing internal audits and reviews. He did none of this.

89.     Friedberg has also been tied to an online poker scandal in 2008, where Ultimate Bet's founder Russ Hamilton was accused of installing a "God mode" on his gambling platform that only certain players had access to – resulting in an estimated $50 million in misappropriated funds.

90.     In a surreptitiously recorded file, Friedberg reportedly advised Hamilton to claim he was a victim of the Ultimate Bets "God mode" scam, and push blame on an unnamed consultant to the company who exploited the site's servers. The audio recordings were published in 2013 under uncertain circumstances and have not been independently verified by CoinDesk.

91.     "I did take this money and I'm not trying to make it right, Dan, so we gotta get that out of the way right away, real quick," Hamilton allegedly said in the audio recording.[31] Hamilton also founded the World Champion online poker platform.

92.     Veteran short seller Marc Cohodes, one of the few to publicly question the rapid rise of FTX before its fall in a September interview with trading-focused webcast Hedgeye,[32] had noted the potential conflicts of hiring someone connected to a cheating scandal to oversee compliance at the $32 billion FTX exchange.

93.     Similarly here, Dan Friedberg in his role as Chief Compliance Officer oversaw both FTX and Alameda, which had its own "god mode," i.e., Alameda was secretly exempted from FTX's auto-liquidation protocols.

94.     Friedberg's penchant for duplicity to make legal problems vanish for his corporate paymasters didn't end with UB's demise. NBC News recently reported on a 2020 incident involving SBF's promotion of the Ethereum-based Cover Protocol and the unfortunate experience of one Dave Mastrianni, an investor who was prevented from cashing out his $400,000 in paper winnings due to "insufficient liquidity" on FTX before the COVER token cratered.33

95.     When Mastrianni contacted FTX to accuse SBF of having a "pump and dump" role in the debacle, Friedberg called back with an offer. How would Mastrianni, a graphic artist, like a job creating NFTs for FTX? Friedberg offered Mastrianni an 'adviser' contract that would pay him one

---

[31] http://craakker.blogspot.com/2013/05/pokers-watergate-moment.html (accessed December 7, 2022).

[32] https://app.hedgeye.com/insights/122943-marc-cohodes-ftx-is-dirty-rotten-to-the-core-hedgeye-investing-s?with_category=17-insights (accessed December 7, 2022).

[33] https://www.nbcnews.com/news/epic-fall-sam-bankman-fried-was-hailed-crypto-genius-clients-saw-smoke-rcna56583 (accessed December 7, 2022).

BTC for 30 days' work, but it also required Mastrianni to absolve FTX, Alameda, and its affiliates of any responsibility for Mastrianni's COVER losses.

96.     Mastrianni eventually agreed, but while he did receive that one BTC, FTX never accepted any of his artwork. Freidberg later emailed to inform him that the payment "was primarily for your release of all claims" and, with that goal accomplished, FTX had no more reason to maintain this subterfuge.

97.     In August, the Federal Deposit Insurance Corporation (FDIC) sent a letter to Friedberg and then-FTX US CEO Brett Harrison to "cease and desist" using marketing language that could have been erroneously interpreted as saying that exchange users accounts were ensured by the federal banking regulator. Harrison subsequently deleted the tweet.

98.     Before joining FTX, Friedberg was a partner at Fenwick & West LLP, where he led the law firm's cryptocurrency division, according to a now-deprecated LinkedIn page. He received a JD and MBA degree from the University of Wisconsin-Madison.

**B.     The Rise and Fall of FTX.**

99.     The FTX.com exchange was extremely successful since its launch. This year around $15 billion of assets are traded daily on the platform, which now represents approximately 10% of global volume for crypto trading. The FTX team has grew to over 300 globally. Although the FTX Entities' primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[34]

100.    FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 *billion dollars*.

101.    Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

102.    At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[35]

---

[34]     https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed December 7, 2022).

[35]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 7, 2022).

103.     In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[36]

104.     Bankman-Fried's cryptocurrency empire was officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[37]

105.     After obtaining this information, Changpeng "CZ" Zhao, the CEO of Binance, decided to liquidate roughly $530 million-worth of FTT. Customers also raced to pull out, and FTX saw an estimated $6 billion in withdrawals over the course of 72 hours, which it struggled to fulfill.[38] The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8th, that Binance would buy FTX, effectively bailing it out.[39]

106.     The next day, Binance announced that it was withdrawing from the deal, citing findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[40] The news sent FTT plunging even further — Bankman-Fried saw 94% of his net

---

[36]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 7, 2022).

[37]     https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed December 7, 2022).

[38]     https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed December 7, 2022).

[39]     https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed December 7, 2022).

[40]     https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed December 7, 2022).

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

worth wiped out in a single day.[41] On November 11th, unable to obtain a bailout, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[42]

107.    Following his resignation, Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Entities went wrong:[43]



---

[41]    https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed December 7, 2022).

[42]    https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed December 7, 2022).

[43]    https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed December 7, 2022).







*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*



**SBF** ✓ @SBF_FTX · Nov 10

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough.  I should have said more. I'm sorry--I was slammed with things to do and didn't give updates to you all.

◯ 116        ⇅ 278        ♡ 2,882        ⬆

**SBF** ✓ @SBF_FTX · Nov 10

8) And so we are where we are.  Which sucks, and that's on me.

I'm sorry.

◯ 155        ⇅ 357        ♡ 3,122        ⬆

**SBF** ✓ @SBF_FTX · Nov 10

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that.  To take responsibility, and do what I can.

◯ 162        ⇅ 357        ♡ 3,715        ⬆

**SBF** ✓ @SBF_FTX · Nov 10

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that.  But I'm going to try.  And give anything I have to if that will make it work.

◯ 164        ⇅ 394        ♡ 3,377        ⬆

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*



**SBF** ✓ @SBF_FTX · Nov 10
11) There are a number of players who we are in talks with, LOIs, term
sheets, etc.

We'll see how that ends up.

🗨 87     ↻ 234     ♡ 2,625     ⬆



**SBF** ✓ @SBF_FTX · Nov 10
12) Every penny of that--and of the existing collateral--will go straight to
users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for
what's right for their career, and who weren't responsible for any of the fuck
ups.

🗨 102     ↻ 274     ♡ 3,007     ⬆



**SBF** ✓ @SBF_FTX · Nov 10
13) Because at the end of the day, I was CEO, which means that *I* was
responsible for making sure that things went well.  *I*, ultimately, should
have been on top of everything.

I clearly failed in that.  I'm sorry.

🗨 180     ↻ 423     ♡ 4,122     ⬆



**SBF** ✓ @SBF_FTX · Nov 10
14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

🗨 129     ↻ 235     ♡ 2,502     ⬆

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*



**SBF** ✓
@SBF_FTX

15) First, one way or another, Alameda Research is winding down trading.

They aren't doing any of the weird things that I see on Twitter--and nothing large at all.  And one way or another, soon they won't be trading on FTX anymore.

9:13 AM · Nov 10, 2022 · Twitter Web App

**405** Retweets   **201** Quote Tweets   **3,911** Likes



**SBF** ✓ @SBF_FTX · Nov 10
Replying to @SBF_FTX
16) Second, in any scenario in which FTX continues operating, its first priority will be radical transparency--transparency it probably always should have been giving.

Giving as close to on-chain transparency as it can: so that people know *exactly* what is happening on it.

214       320       2,255



**SBF** ✓ @SBF_FTX · Nov 10
17) All of the stakeholders would have a hard look at FTX governance.  I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users--would have a large part to play in how it would be run.

Solely trust.

137       198       1,878

24



**SBF** ✓ @SBF_FTX · Nov 10

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers. That's it.

💬 144   🔁 158   ♡ 1,970   ↑



**SBF** ✓ @SBF_FTX · Nov 10

19) A few other assorted comments:

This was about FTX International. FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid. Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406   🔁 760   ♡ 2,776   ↑



**SBF** ✓ @SBF_FTX · Nov 10

20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses. So for now, all I'll say is:

well played; you won.

💬 1,532   🔁 3,303   ♡ 8,047   ↑



**SBF** ✓ @SBF_FTX · Nov 10

21) NOT ADVICE, OF ANY KIND, IN ANY WAY

I WAS NOT VERY CAREFUL WITH MY WORDS HERE, AND DO NOT MEAN ANY OF THEM IN A TECHNICAL OR LEGAL SENSE; I MAY WELL HAVE NOT DESCRIBED THINGS RIGHT though I'm trying to be transparent. I'M NOT A GOOD DEV AND PROBABLY MISDESCRIBED SOMETHING.

💬 908   🔁 1,055   ♡ 3,463   ↑

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*



108.     According to a recent Reuters report, however, another explanation contributing to
the precarious house of cards that was the Deceptive FTX Platform is that earlier this year, Bankman-
Fried secretly transferred *at least $4 billion* in customer funds from FTX to Alameda without telling
anyone, after Alameda was hit with a series of losses, and that the FTX entities lent more than *half* of
its *$16 billion* in *customer funds* to Alameda in total, with more than *$10 billion in loans
outstanding*.[44]

**C.      FTX's offer and sale of YBAs, which are unregistered securities.**

109.     Beginning in 2019, the FTX Entities began offering interest-bearing cryptocurrency
accounts to public investors. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

110.     FTX maintains that it does not offer for sale any product that constitutes a "security"
under federal or state law. Under federal securities laws as construed by the United States Supreme
Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment
contract is a form of security under United States securities laws when (1) the purchaser makes an
investment of money or exchanges another item of value (2) in a common enterprise (3) with the
reasonable expectation of profits to be derived from the efforts of others.

111.     The YBAs were "securities" as defined by the United States securities laws and as
interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Entities offered variable
interest rewards on crypto assets held in the YBAs on the Deceptive FTX Platform, which rates were
determined by the FTX Entities in their sole discretion. In order to generate revenue to fund the
promised interest, the FTX Entities pooled the YBA assets to engage in lending and staking activities
from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a
"security" under state and federal law.

---

[44]      https://markets.businessinsider.com/news/currencies/ftx-crash-client-funds-alameda-binance-
sbf-sec-cftc-probe-2022-11?utm_medium=ingest&utm_source=markets (accessed   December   7,
2022).

112.     On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[45] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY? Does my balance compound daily?* that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency

---

[45] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application with developed by Blockfolio.

that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> **FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.
>
> **FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.
>
> FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX

US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

## D. The Defendants Aggressively Marketed the FTX Platform

113.    In addition to the conduct of Defendant Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the Deceptive FTX Platform.

114.    In April 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the Deceptive FTX Platform.

115.    FTX's explanation for using stars like Brady, Bunchden, and the other Defendants was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[46]

116.    In other words, the FTX Entities needed celebrities like Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of the YBAs, which are unregistered securities. Below are representative statements and advertisements Defendants made to drive the offers and/or sales of the YBAs, which Plaintiff and Class Members will supplement as the case progresses and discovery unfolds.

### i.    Defendants Tom Brady and Gisele Bundchen



117.    The star quarterback and the businesswoman and model, then a couple, became FTX ambassadors last year. They also took equity stakes in FTX Trading Ltd.

118.    Mr. Brady and Ms. Bündchen also joined the company's $20-million ad campaign in 2021. They filmed a commercial called "FTX. You In?" showing them telling acquaintances to join the FTX platform. The ad can be viewed here: https://www.youtube.com/watch?v=uymLJoKFlW8

---

[46]    https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed December 7, 2022).

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

### ii. Defendant Kevin O'Leary



119.    "Mr. Wonderful," both a brand ambassador and an FTX shareholder, made several public statements designed to induce consumers to invest in the YBAs.

120.    "To find crypto investments opportunities that met my own rigorous standards of compliance, I entered into this relationship with @FTX_Official," Mr. O'Leary said on Twitter last year. Mr. O'Leary **recently deleted the tweet**.

121.    He also served as a judge for the FTX Charity Hackathon in Miami in March of 2022.[47]

122.    And *very* recently, on October 12, 2022, O'Leary stated confidently that FTX was totally compliant and a safe place to hold assets. O'Leary stated that: "I have to disclose I'm a paid spokesperson to a FTX and shareholder there, too, cause we mentioned him and I'm a big advocate for Sam because he has two parents who are compliance lawyers.  If there's ever a place I could be that I'm not gonna get in trouble it's going to be in FTX so you know that's there they're great people but he gets the job in compliance which is why he's working so hard to get regulation."[48]

---

[47] https://ftxcharityhackathon.com/ (accessed December 7, 2022).
[48] *See* https://www.youtube.com/watch?v=iwD_zWgyUz8 beginning at 17:32 (accessed December 7, 2022)



123.     He went on to state that "[t]here are a lot of signs right now that point to things looking bad. Crypto has taken a big hit and investors are wondering if things will turn around. If you follow history and the pattern of things, you know that this is RIGHT ON TRACK and we'll soon see a resurgence with crypto. Do you think we're entering a Bullish period? Let me know in the comments!"[49]

### iii.     Defendant Udonis Haslem



124.     Udonis Haslem, the Captain of the Miami HEAT and Miami legend, became an FTX global ambassador. Much like Brady and Bunchden, Haslem starred in FTX's "You In, Miami?" ad campaign that launched at the start of the 2021 - 2022 Miami HEAT season.

125.     In the ad, which be viewed here: https://www.youtube.com/watch?v=83FDP53yPa8, Haslem states "FTX has arrived in 305. So I just got one question: Are you in, Miami?" Others respond "If he's in, I'm in." Haslem concludes "Our city. Our team. FTX. You in, Miami?"

---

[49] *Id.*

### iv. Defendant David Ortiz



126. Defendant David Ortiz, who became an FTX brand ambassador and hyped the YBAs in exchange for cryptocurrency and multiple collections of NFTs, also ran his own FTX "You In?" ad, which began running nationwide during the first game of the 2021 World Series.

127. In the ad, which can be found here: https://www.ispot.tv/ad/qSlm/ftx-big-papi-is-in, Ortiz is watching a game on the television when he receives a phone call from The Moon. Inspired by the "moonblast" home run scored on the field, The Moon frantically tells David about opportunities to get into cryptocurrency with FTX. David decides it's an offer he can't refuse and joins fellow sports stars Stephen Curry and Tom Brady on the platform. FTX announces it is the official crypto exchange of MLB.

v.    **Defendant Steph Curry**



128.    Defendant Stephen Curry had his own nationwide ad campaign pushing the Deceptive FTX Platform, known as the "#notanexpert" campaign.[50] Throughout the ad, Curry repeatedly denies being cast as an expert in cryptocurrency, culminating in his statement that "I'm not an expert, ***and I don't need to be.*** With FTX I have everything I need to buy, sell, and trade crypto ***safely.***"[51]

129.    The purpose of Curry being an ambassador is to expand the reach of the crypto firm and "tout the viability of cryptocurrency to new audiences around the world," FTX said in a press release.[52] In other words, to drive adoption of the Deceptive FTX Platform and to facilitate the sales of unregistered YBAs to unsuspecting and unwitting retail consumers.

130.    "I'm excited to partner with a company that demystifies the crypto space and eliminates the intimidation factor for first-time users," Curry said in the statement, highlighting that "first-time," inexperienced users were the intended targets of the campaign.[53]

---

[50] https://www.youtube.com/watch?v=gsy2N-XI04o (accessed December 7, 2022).
[51] *Id.*
[52]    https://www.prnewswire.com/news-releases/nba-superstar-stephen-curry-becomes-global-ambassador-and-shareholder-of-leading-cryptocurrency-exchange-ftx-through-long-term-partnership-301370497.html (accessed December 7, 2022).
[53] *Id.*

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

vi.     **Defendant Golden State Warriors**



Official Crypto Platform and NFT Marketplace
of the **Golden State Warriors**

131.    The Golden State Warriors and FTX officially launched their partnership in 2022 with the unveiling of the FTX logo on the court at the Chase Center. As the Warriors' Official Cryptocurrency Platform and NFT Marketplace, the franchise dropped NFTs on FTX.us beginning in early 2022. The partnership between the Warriors and FTX marked the first international rights partner for the Warriors, meaning the GSW and FTX had a visible market presence, inclusive of logo and likeness, internationally.

132.    The deal also included the Warriors' G League team, the Golden Guardians and Warriors Gaming Squad (affiliated esports teams), in-arena signage at Chase Center, and virtual floor signage at Warriors games.[54]

---

[54] https://www.instagram.com/p/CYiBaq8JLx7/ (accessed December 7, 2022).

      vii.    **Defendant Shaquille O'Neal**



133.    Defendant Shaquille O'Neal, former professional NBA basketball star, sports analyst, and entrepreneur, also became an FTX ambassador, stating in a video posted on FTX's Twitter account that "I'm excited to be partnering with FTX to help make crypto accessible for everyone. I'm all in. Are you?"[55]

---

[55]

https://twitter.com/FTX_Official/status/1532119977381208066?s=20&t=5wTm55FDE6c0cCD9vCndYg (accessed December 7, 2022).

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

   viii.    **Defendant Trevor Lawrence**



134.    Defendant William Trevor Lawrence, the first pick in the 2021 NFL draft and now quarterback for the Jacksonville Jaguars of the NFL, became a brand ambassador for FTX in exchange for unspecified cryptocurrency payments, which sponsorship was announced in April 2021.[56] The stated purpose of the sponsorship was because "Trevor is someone people can have a personal and human connection with for [FTX] and to the crypto space."[57]

---

[56] https://twitter.com/ftx_app/status/1386667859393253376 (accessed December 7, 2022).
[57] https://www.forbes.com/sites/chriscason/2021/04/26/trevor-lawrence-makes-first-investment-move-with-first-of-its-kind-partnership-with-blockfolio/?sh=7190ee6f47ef (accessed December 7, 2022).

### ix.    Defendant Shohei Ohtani



135.    The FTX Entities entered into a long-term partnership with global icon and history-making MLB Superstar Shohei Ohtani. In addition to being an FTX global ambassador, Mr. Ohtani received all of his compensation in equity and cryptocurrencies.[58] In exchange for those unspecified payments, Mr. Ohtani served as a spokesperson for FTX to increase awareness of the Deceptive FTX Platform and to drive adoption of and investments in the unregistered YBA securities on a global scale through a variety of initiatives.[59]

---

[58]    https://www.prnewswire.com/news-releases/mlb-superstar-shohei-ohtani-joins-ftx-as-global-ambassador-through-long-term-partnership-301425911.html (accessed December 7, 2022).
[59] *Id.*

x. **Defendant Naomi Osaka**



136.    Defendant Naomi Osaka, a 24-year-old professional tennis player and four-time Grand Slam singles champion, became a brand ambassador for FTX, with the express purpose of "getting more women to start investing in crypto."[60] Osaka wore the FTX logo on the kit she wore at tournaments, including the 2022 Miami Open.[61] In exchange for an equity stake in FTX and payments in unspecified amounts of cryptocurrency, Osaka directed and produced content in association with the FTX Entities designed to promote the offer and sale of the unregistered YBA securities, hoping "she will reach a global audience."[62]

137.    Osaka confirmed her involvement by tweeting a glitzy new FTX ad to her **1.1 million followers**, which can be viewed here: https://youtu.be/pkuf8avR50k. It shows the tennis star competing in a comic strip — and over dramatic music, she says: "They thought they made the rules for us. They thought they could control us. They were wrong."

138.    The video then cuts to a boardroom full of marketing executives talking about the ad in a tongue-in-cheek way — and discussing other ideas… including Osaka heading to the moon. An

---

[60]     https://coinmarketcap.com/alexandria/article/naomi-osaka-tennis-star-teams-up-with-ftx-and-she-s-getting-paid-in-crypto-too (accessed December 7, 2022).
[61] *Id.*
[62] *Id.*

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

idea to have a QR code bouncing around the screen (a clear nod to Coinbase's Super Bowl spot) is dismissed for being "boring."

139.    They settle on letting Osaka speaking for herself — and play a mock-up of the tennis ace giving an interview to a news channel where she says:  "I'm Naomi Osaka and I'm proud to partner with FTX. Making cryptocurrency accessible is a goal that FTX and I are striving towards." The ad ends with the tagline: "Naomi is in. You in?"

### xi.    Defendant Larry David



140.    For his part, the legendary comedian and creator of *Seinfeld* and *Curb Your Enthusiasm*, Larry David, created an ad for the FTX Entities called "Don't Miss Out on Crypto," which aired during the 2022 Super Bowl, making FTX one of the most retweeted brands during the Super Bowl, and winning the "Most Comical" honorific from *USA Today*'s Ad Meter.[63]

141.    The ad—the only Super Bowl commercial David ever appeared in—featured David being a skeptic on such historically important inventions as the wheel, the fork, the toilet, democracy, the light bulb, the dishwasher, the Sony Walkman, and, of course, FTX, and cautioned viewers, "Don't be like Larry." The ad can be viewed here: https://youtu.be/BH5-rSxilxo

---

[63]         https://admeter.usatoday.com/lists/usa-today-ad-meter-replay-ratings-2022-final-results/ (accessed December 7, 2022).

## CLASS ACTION ALLEGATIONS

142.    As detailed below in the individual counts, Plaintiff brings this lawsuit on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.    Class Definitions

143.    Plaintiffs seek to represent the following Global Class, Nationwide Class, and Florida Subclass ("the Classes"):

      (1) **Global Class:** All persons and entities residing outside of the United States who, within the applicable limitations period, purchased or enrolled in a YBA.

      (2) **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA.

      (3) **Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a YBA.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Entities and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

144.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiff seeks certification of the Classes in part because all offers of FTX YBAs to Plaintiff and the Class Members (in which Defendants each substantially participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell an FTX YBA stems from a transactional occurrence that emanated from the State of Florida.

### B.    Numerosity

145.    The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold YBAs. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

class members is currently unknown to Plaintiff but is easily identifiable through FTX's corporate records.

### C.    Commonality/Predominance

146.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

      (a)   whether the YBAs were unregistered securities under federal or Florida law;

      (b)   whether Defendants' participation and/or actions in FTX's offerings and sales of YBAs violate the provisions of the Securities Act and Florida securities law.

      (c)   the type and measure of damages suffered by Plaintiff and the Class.

      (a)   whether Defendants' practices violate the FDUTPA;

      (b)   whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

      (c)   whether Plaintiff and Class members are entitled to injunctive relief;

      (d)   whether Plaintiff and Class members are entitled to declaratory relief; and

      (e)   whether Plaintiff and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

### D.    Typicality

147.    Plaintiff's claims are typical of the claims of the members of the Class because all members were injured through the uniform misconduct described above, namely that Plaintiff and all class members were offered and/or sold FTX's YBAs because of Defendants' actions and/or participation in the offering and sale of these unregistered securities, and Plaintiff is advancing the same claims and legal theories on behalf of himself and all such members. Further, there are no defenses available to either Defendant that are unique to Plaintiff.

### E.    Adequacy of Representation

148.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class. Plaintiff anticipates no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiff has chosen the undersigned law firms, which has the financial and legal

resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

**F.     Requirements of Fed. R. Civ. P. 23(b)(3)**

149.     The questions of law or fact common to Plaintiff's and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Class. All claims by Plaintiff and the unnamed members of the Class are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling the YBAs, which are unregistered securities, and/or (2) in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform.

150.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

151.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Class as is in the case at bar, common questions will be held to predominate over individual questions.

**G.     Superiority**

152.     A class action is superior to individual actions for the proposed Class, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.     Requirements of Fed. R. Civ. P. 23(b)(2)**

153.    Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the YBAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

154.    Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.     Requirements of Fed. R. Civ. P. 23(c)(4)**

155.    As it is clear that one of the predominant issues regarding Defendants' liability is whether the YBAs FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

156.    As it is clear that another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.     Nature of Notice to the Proposed Class.**

157.    The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiff contemplates that notice will be provided to Class Members by e-mail, mail, and published notice.

**<u>COUNT ONE</u>**

**Violations of the Florida Statute Section 517.07,**

**The Florida Securities and Investor Protection Act**

**(Plaintiffs Individually and on behalf of the Classes)**

158.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–157 above, as if fully set forth herein.

159.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

160.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

161.    The YBA is a security pursuant to Fla. Stat. § 517.021(22)(a).

162.    The YBAs sold and offered for sale to Plaintiff and Class members were not:

    a.  exempt from registration under Fla. Stat. § 517.051;

    b.  a federal covered security;

    c.  registered with the Office of Financial Regulations (OFR); or

    d.  sold in a transaction exempt under Fla. Stat. § 517.061.

163.    The FTX Entities sold and offered to sell the unregistered YBAs to Plaintiffs and the members of the Class.

164.    Defendants are directors, officers, partners and/or agents of the FTX Entities pursuant to Fla. Stat. § 517.211.

165.    The FTX Entities, with Defendants' material assistance, offered and sold the unregistered YBAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

## COUNT TWO

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**

**§ 501.201, Florida Statutes, *et seq.***

**(Plaintiffs Individually and on behalf of the Classes)**

166.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–157 above, as if fully set forth herein.

167.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

168.     Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

169.     Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

170.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

171.     Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

172.     Plaintiffs and consumers in the Classes have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the Deceptive FTX Platform and in the amount of their lost investments.

173.     The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

174.     Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs.

175.     Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable

harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## COUNT THREE

### Civil Conspiracy

### (Plaintiffs Individually and on behalf of the Classes)

176.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–157 above, as if fully set forth herein.

177.     The FTX Entities and Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the Deceptive FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive FTX Platform were safe and were not being invested in unregistered securities.

178.     The FTX Entities entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the YBAs and/or use the Deceptive FTX Platform.

179.     Defendants engaged in unlawful acts with the FTX Entities, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities.

180.     Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Entities; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Entities, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

181.     Defendants' conspiracy with the FTX Entities to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

## COUNT FOUR

### Declaratory Judgment

### (Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq.*)

### (Plaintiffs Individually and on behalf of the Classes)

182.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–157 as if fully set forth herein.

183.     This Count is asserted against Defendants under Florida Statutes §§ 86.011, *et seq.*

184.     There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

185.     Plaintiffs and the members of the Classes have an obvious and significant interest in this lawsuit.

186.     Plaintiffs and members of the Classes purchased YBAs, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as further described hereinabove.

187.     If the true facts had been known, including but not limited to that the YBAs are unregistered securities, the Deceptive FTX Platform does not work as represented, and Defendants were paid exorbitant sums of money to peddle Voyager to the nation, Plaintiffs and the Classes would not have purchased YBAs in the first place.

188.     Thus, there is a justiciable controversy over whether the YBAs were sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiff and the Class.

189.     Plaintiff and the Class seek an order declaring that the YBAs were securities required to be registered with the SEC and state regulatory authorities, that the Deceptive FTX Platform did not work as represented, and Defendants were paid exorbitant sums of money to peddle FTX to the nation.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

    a.    Certifying the Class as requested herein;

    b.    Awarding actual, direct and compensatory damages;

    c.    Awarding restitution and disgorgement of revenues if warranted;

    d.    Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

    e.    Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

    f.    Awarding statutory and multiple damages, as appropriate;

    g.    Awarding attorneys' fees and costs; and

    h.    Providing such further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Class Action Complaint and Demand for Jury Trial*

Dated: December 7, 2022

Respectfully submitted,

**By:** */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

**By:** */s/ David Boies*
David Boies
(*Pro Hac Vice* Application Forthcoming)
Alex Boies
(*Pro Hac Vice* Application Forthcoming)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Phone: (914) 749–8200
dboies@bsfllp.com

**By:** */s/ Stephen Neal Zack*
Stephen Neal Zack
Florida Bar No. 145215
Hon. Ursula Ungaro (Ret.)
Florida Bar No. 200883
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., Suite 2800
Miami, FL 33131
Office: 305-539-8400
szack@bsfllp.com
uungaro@bsfllp.com

*Co-Counsel for Plaintiff and the Class*

JS 44 (Rev. 10/20) FLSD Revised 02/12/2021

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**
GREGG PODALSKY, et al, on behalf of himself and all others similarly situated

**DEFENDANTS**
Thomas Brady, Gisele Bundchen, Kevin O'Leary, Sam Bankman-Fried, Stephen Curry, Golden State Warriors, Shaquille O'Neal, Udonis Haslem, David Ortiz, Trevor Lawrence, Shohei Ohtani, Naomi Osaka, et al.

**(b)** County of Residence of First Listed Plaintiff Broward County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Miami-Dade County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Adam Moskowitz, and Joseph M. Kaye
THE MOSKOWITZ LAW FIRM, PLLC,
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134

David Boies, Stephen Neal Zack,
Alex Boies and Ursula Ungaro
BOIES SCHILLER FLEXNER LLP
100 SE 2nd St., Suite 2800, Miami, FL 33131

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☒ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff
☐ 3  Federal Question *(U.S. Government Not a Party)*
☐ 2  U.S. Government Defendant
☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)*  and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted
    Student Loans
    (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Med. Malpractice

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

PERSONAL INJURY
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**PRISONER PETITIONS**
Habeas Corpus:
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
Other:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee – Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent – Abbreviated New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729 (a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit (15 USC 1681 or 1692)
☐ 485 Telephone Consumer Protection Act (TCPA)
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☒ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed (See VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation Transfer
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Multidistrict Litigation – Direct File
☐ 9 Remanded from Appellate Court

**VI. RELATED/ RE-FILED CASE(S)**
(See instructions): a) Re-filed Case ☐YES ☒ NO   b) Related Cases ☒YES ☐ NO   Robertson, et al. v. Cuban, et al
JUDGE:                                          DOCKET NUMBER:

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
Fla. Stat. §§ 501.201, 28 U.S.C. § 1332(d)(2)(A) and 28 U.S.C. § 1332(a)(1)
LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**
DATE 12/07/2022
SIGNATURE OF ATTORNEY OF RECORD
/s/ Adam Moskowitz

FOR OFFICE USE ONLY : RECEIPT #        AMOUNT        IFP        JUDGE        MAG JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** (a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction**. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked. Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit**. Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin**. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

**VI.** **Related/Refiled Cases**. This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

**VII.** **Cause of Action**. Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity**. Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VIII.** **Requested in Complaint**. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature**. Date and sign the civil cover sheet.

Exhibit F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:22-cv-23983-BB**

**GREGG PODALSKY**, *et al.,* on behalf of
themselves and all others similarly situated,

                    *Plaintiff,*                          **AMENDED CLASS ACTION**
                                                          **COMPLAINT**

*v.*
                                                          **JURY DEMAND**

**SAM BANKMAN-FRIED**, *et al.,*

                    *Defendants.*
_____/

**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

"Then there's things that have happened with Voyager *and with FTX now*—that's somebody running a company that's *just dumb as fu\*\* greedy*. So, what does Sam Bankman do? He just, give me more, give me more, give me more, so I'm gonna borrow money, loan it to my affiliated company, and hope and pretend to myself that the FTT tokens that are in there on my balance sheet are gonna sustain their value."[1]

**– Mark Cuban, Nov. 12, 2022**



**– Defendant Sam Bankman Fried (Former CEO, FTX)**

_____

[1] https://www.yahoo.com/video/ftx-twitter-chaos-embarrassing-athletes-195343800.html (accessed December 8, 2022).

Plaintiffs Gregg Podalsky, Skyler Lindeen, Alexander Chernyavsky, Edwin Garrison, Gary Gallant, Sunil Kavuri, and David Nicol ("Plaintiffs") file this class action complaint on behalf of themselves, and all others similarly situated, against Sam Bankman-Fried, Caroline Ellison, Gary Wang, Nishad Singh, Sam Trabucco, Dan Friedberg, Tom Brady, Gisele Bundchen, Stephen Curry, Golden State Warriors, Shaquille O'Neal, Udonis Haslem, David Ortiz, William Trevor Lawrence, Shohei Ohtani, Naomi Osaka, Lawrence Gene David, and Kevin O'Leary (collectively, "Defendants"), all parties who either controlled, promoted, assisted in, or actively participated in FTX Trading LTD d/b/a FTX's ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively, the "FTX Entities"), offer and sale of unregistered securities in the form of yield-bearing accounts ("YBAs") to persons and entities residing both inside and outside of the United States, seeking to recover damages, declaratory and/or injunctive relief stemming from the offer and sale of the FTX Entities' yield-bearing cryptocurrency accounts.[2]

## INTRODUCTION

1.    Most experts agree that the FTX Collapse Disaster is the largest and greatest financial fraud in history. The new CEO of FTX, who helped wind down the prior Enron fraud, admitted that what he quickly uncovered in FTX to date, is worse than in the Enron Fraud. Almost $14 billion dollars is unaccounted for, and certainly billions of dollars have been stolen from investors across the globe. FTX will be involved in federal bankruptcy proceedings for many years to come and there is no guarantee that the victims will be able to see any recovery from those processes.

2.    One common and identical question in this case, and in many other cryptocurrency litigation matters, is simply whether the SEC was correct, in finding that all of these YBAs are (or are not) the sale of "unregistered securities." This question can and should be decided quickly for all of

---

[2] Plaintiffs file this Amended Complaint in order to effectively consolidate the class actions brought by Edwin Garrison, the Plaintiff who filed the first class action in the country against Sam Bankman-Fried and others for these claims on behalf of FTX customers who were United States residents, and Sunil Kavuri, who filed a class action on behalf of FTX's international customers. As this class action is the first one in the country that includes claims against a number of former FTX and Alameda Research insiders on behalf of both United States and International FTX customers, Plaintiffs and their counsel agreed the most expedient and efficient route (particularly because no Defendants have yet been served in any of these federal actions) would be to consolidate these claims through this amended pleading before this Court. This is the similar approach that other FTX investors took with individual Florida state court cases that are now effectively consolidated before the Honorable Michael Hanzman of the Miami-Dade Complex Business Litigation Division, *Michael Norris, et al. v. Thomas Brady, et al.,* No. 2022-022900-CA-01 (Fla. 11th Jud. Cir.).

the parties, so that all cryptocurrency litigation can be quickly advanced and the victims (and alleged co-conspirators) have a clear and expedited path.

3.      Moreover, this question was already practically answered in the affirmative through various regulatory statements, guidance, and actions issued by the Securities and Exchange Commission and other regulatory entities. For example, on November 1, 2017, in the "SEC Statement Urging Caution Around Celebrity Backed ICOs,"[3]

> In the SEC's Report of Investigation concerning The DAO,[4] the Commission warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws.  Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion.  A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws.  **Persons making these endorsements may also be liable** for potential violations of the anti-fraud provisions of the federal securities laws, **for participating in an unregistered offer and sale of securities**, and for acting as unregistered brokers.  The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

4.      Not only that, but the SEC and state securities regulators have also targeted cryptocurrency brokers and exchanges just like FTX for offering almost this exact same type of interest-bearing account, finding that exchanges such as BlockFi,[5] Voyager,[6] and Celsius[7] all offered these same accounts as unregistered securities.

5.      Another narrow issue that is common to the entire class, whose focus is solely objective, is whether these Defendants violated state consumer laws by failing to abide by any of the FTC long established rules and regulations, specifically on what is required for a celebrity endorsement of crypto currency. The answer to just these two, narrow questions will greatly advance litigation

---

[3]      https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos (accessed December 8, 2022).

[4] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed December 8, 2022)

[5] https://www.sec.gov/news/press-release/2022-26 (accessed December 8, 2022).

[6]      https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/ (accessed December 8, 2022).

[7]
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwjvjNvg27j7AhWfRTABHfwzDe4QFnoECAsQAQ&url=https%3A%2F%2Fwww.nj.gov%2Foag%2Fnewsreleases21%2FCelsius-Order-9.17.21.pdf&usg=AOvVaw0Zd94fuhFSsOoGKM-vQ3YI (accessed December 8, 2022).

across the globe relating to the FTX Disaster, help determine who may be liable for aiding and abetting this massive fraud, one way or another and may also help advance (for either side) all of the other pending massive litigation, against other cryptocurrency platforms (such as Voyager) that offered similar YBAs.

6.     There can be no dispute that claims in this case must provide for ***strict liability,*** and therefore if these YBAs are found to be "securities," Defendants can simply have no defense to the claims in this action. **The "caveat emptor" defense that Defendants and others are pushing in the press will have no application.**

7.     This is not a case where Plaintiffs made a "risky" investment in stock or cryptocurrency, or that they lost money speculating on various cryptocurrency projects. Plaintiffs' claims arises simply from the purchase of a YBA, an account with FTX that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate returns on their significant holdings in the accounts, regardless of whether those assets were held as USD, legal tender or cryptocurrency, and regardless of whether any trades were made with the assets held in the YBA. In other words, the YBA was portrayed to be like a bank account, something that was "very safe" and "protected." That is the narrative that Defendants pushed in promoting the offer and sale of the YBAs, which are unregistered securities. For that, Defendants are liable for Plaintiffs' losses, jointly and severally and to the same extent as if they were themselves the FTX Entities.

8.     Literally overnight, Plaintiffs' assets held in their YBAs on the Deceptive FTX Platform were robbed from them as FTX imploded and former-CEO, Sam Bankman-Fried, filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened because, as explained by the new CEO of the failed FTX Entities:

> I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.
>
> ***Never*** in my career have I seen such a complete failure of corporate controls and such a **complete absence of trustworthy financial information** as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced,

**unsophisticated** and **potentially compromised** individuals, **this situation is underprecedented**.

*See* In re: FTX Trading Ltd, et al., No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17, 2022) (emphasis added).

9.      This should not have happened. Not to Plaintiffs, and not to the thousands of other FTX customers who now find themselves in the same predicament.

10.      The Cryptocurrency National Disaster is growing by the billions almost every day. More crypto companies are filing new federal bankruptcy petitions each day, all running for protection from the billions of dollars of losses they directly caused to thousands of investors here in Florida and across the globe. This is by far the largest securities national disaster, greatly surpassing the Madoff Ponzi Scheme, and could very likely become a complex international litigation disaster, similar to how the hundreds of thousands of asbestos cases swamped all courts across the globe. Unless a workable, coordinated, and organized structure is established now, at the very onset of these proceedings, here in Miami, which served as the epicenter for the crypto fraud, the FTX victims will continue to suffer and the only people to benefit will be the professionals in the bankruptcy and civil courts.

11.      The Deceptive and failed FTX Platform emanated from Miami, Florida and was based upon false representations and deceptive conduct. FTX's fraudulent scheme was designed to take advantage of unsophisticated investors from across the globe, who utilize mobile apps to make their investments. As a result, consumers around the globe collectively sustained billions of dollars in damages. FTX organized and emanated its fraudulent plan from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where 3-time NBA Champions the Miami Heat play.

## **FACTUAL BACKGROUND**

12.      On December 24, 2021, counsel for Plaintiffs and the proposed class members brought the first (and only) putative nationwide class action complaint against the now-defunct cryptocurrency trading app, Voyager, styled *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the platform owned and

operated by Voyager Digital Ltd. ("Voyager") and Voyager Digital LLC ("VDL") was an unregulated and unsustainable fraud. In the *Cassidy* Action, plaintiffs also alleged that Defendant Ehrlich, Voyager's CEO, teamed up with Defendants Cuban and the Dallas Mavericks to promote Voyager, by making false representations and employing other means of deception. As a result, the Voyager plaintiffs and Voyager class members, all sustained losses in excess of $5 billion.

13.     The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting Voyager—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Dallas Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

14.     After the *Cassidy* Complaint was filed, the following important actions took place:

(a)     the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b)     seven state Attorneys General (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPA was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022; and

(c)     on March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the EPA was not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[8]

---

[8] https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed October 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed December 8, 2022).

15.     On July 5, 2022, Voyager Digital Holdings, Inc. and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases (the "Voyager Bankruptcy Cases") are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

16.     On September 28, 2022, Voyager filed a motion in the Voyager Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

17.     Everyone involved in the Voyager Bankruptcy Cases thought that the FTX Entities were the *deus ex machina* come to save the day by bailing out Voyager and paying back at least some of the losses the Voyager customers sustained.

18.     Instead, as explained below, the FTX Entities imploded, their over $30 billion in value evaporated almost overnight, and the FTX Entities found themselves filing their own emergency Chapter 11 bankruptcy petition in Delaware. The Deceptive FTX Platform maintained by the FTX Entities was truly a house of cards, a Ponzi scheme where the FTX Entities shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the YBAs and loans to pay interest to the old ones and to attempt to maintain the appearance of liquidity.

19.     Part of the scheme employed by the FTX Entities involved utilizing some of the biggest names in sports and entertainment to raise funds and drive global consumers to invest in the YBAs, which were offered and sold largely from the FTX Entities' domestic base of operations here in Miami, Florida, pouring billions of dollars into the Deceptive FTX Platform to keep the whole scheme afloat.

20.     Importantly, although Defendants disclosed their partnerships with the FTX Entities, they have never disclosed the nature, scope, and amount of compensation they personally received in exchange for the promotion of the Deceptive FTX Platform, which the SEC has explained that a failure to disclose this information would be a violation of the anti-touting provisions of the federal

securities laws.[9]  Moreover, none of these defendants performed any due diligence prior to marketing these FTX products to the public.

21.     The SEC took action against boxing champ Floyd Mayweather and music producer DJ Khaled after they were paid by cryptocurrency issuers to tweet promotional statements about investing in Initial Coin Offerings (ICOs), ordering them both to pay disgorgement, penalties and interest for promoting investments in ICOs, including one from cryptocurrency issuer Centra Tech, Inc, for a combined total of $767,500 because they failed to disclose that their promotional efforts on Twitter were paid endorsements.[10]

22.     Other celebrities similarly accused and prosecuted for failing to disclose their paid endorsements include Kim Kardashian and basketball player Paul Pierce.[11] According to the Federal Trade Commission, cryptocurrency scams have increased more than ten-fold year-over-year with consumers losing more than $80 million since October 2020, due in large part to the use of such celebrity endorsements. [12]

23.     As explained more fully in this Complaint, Defendants' misrepresentations and omissions made and broadcast around the globe through the television and internet render them liable to Plaintiff and class members for soliciting their purchases of the unregistered YBAs. *Wildes v. Bitconnect Int'l PLC*, No. 20-11675 (11th Cir. Feb. 18, 2022) (holding that promoters of cryptocurrency through online videos could be liable for soliciting the purchase of unregistered securities through mass communication, and no "personal solicitation" was necessary for solicitation to be actionable).

24.     This action seeks to hold Defendants responsible for the many billions of dollars in damages they caused Plaintiff and the Class and to force Defendants to make them whole.

---

[9]      https://www.ubergizmo.com/2017/11/sec-celebrities-disclose-payment-cryptocurrency-endorsements/#:~:text=It%20has%20issued%20a%20statement%20warning%20celebrities%20that,without%20disclosing%20that%20they%E2%80%99ve%20been%20paid%20for%20it (accessed December 8, 2022).

[10]     https://news.bloomberglaw.com/us-law-week/insights-celebrity-endorsements-and-cryptocurrency-a-cautionary-tale (accessed December 8, 2022).

[11]     https://blockbulletin.com/news/altcoins/kim-kardashian-among-other-celebrities-sued-for-promoting-cryptocurrencies/ (accessed December 8, 2022).

[12]  https://florida.foolproofme.org/articles/770-celebrity-cryptocurrency-scam (accessed December 8, 2022).

## PARTIES

25.     Plaintiff Gregg Podalsky is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Podalsky did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Podalsky has sustained damages for which Defendants are liable.

26.     Plaintiff Skyler Lindeen is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Lindeen purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Lindeen did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Lindeen has sustained damages for which Defendants are liable.

27.     Plaintiff Alexander Chernyavsky is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Chernyavsky did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Chernyavsky has sustained damages for which Defendants are liable.

28.     Plaintiff Edwin Garrison is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Garrison did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Garrison has sustained damages for which Defendants are liable.

29.     Plaintiff Gary Gallant is a citizen and resident of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Gallant purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Gallant did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Gallant has sustained damages for which Defendants are liable.

30.     Plaintiff Sunil Kavuri is a citizen and resident of the United Kingdom. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Kavuri did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Kavuri has sustained damages for which Defendants are liable.

31.     Plaintiff David Nicol is a citizen and resident of Sydney, Australia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Nicol purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Nicol did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Nicol has sustained damages for which Defendants are liable.

32.     Defendant Thomas Brady, NFL quarterback currently playing for the Tampa Bay Buccaneers, is a brand ambassador of FTX, and is a citizen and resident of Miami-Dade County, Florida.

33.     Defendant Gisele Bundchen, one of the world's highest-paid models and a brand ambassador for FTX, is a citizen and resident of Miami-Dade County, Florida.

34.     Defendant Kevin O'Leary, "Mr. Wonderful," a businessman, television personality appearing regularly on *Shark Tank*, and brand ambassador for FTX, is a citizen and resident of Miami Beach, Florida.

35.     Defendant Udonis Haslem, an American professional basketball player for the Miami Heat of the NBA and brand ambassador of FTX, is a citizen and resident of Miami-Dade County, Florida.

36. Defendant David Ortiz, former designated hitter and first baseman in the MLB and a brand ambassador for FTX, is a citizen and resident of the State of Florida.

37. Defendant Sam Bankman-Fried, founder and former CEO of FTX and former billionaire, is a citizen and resident of the Bahamas.

38. Defendant Caroline Ellison is the former CEO of Alameda Research, LLC, a trading firm launched by Defendant Sam Bankman-Fried. She oversaw many of the risky bets Alameda took with regard to FTX customers' crypto tokens. Defendant Ellison is a resident of Hong Kong.

39. Defendant Sam Trabucco, the former Co-CEO of Alameda Research, LLC, is a citizen and resident of the State of California.

40. Defendant Gary Wang, co-founder of Alameda Research and FTX, upon information and belief is currently residing in the Bahamas.

41. Defendant Nishad Singh, the former Director of Engineering of FTX, upon information and belief is currently residing in the Bahamas.

42. Defendant Dan Friedberg, the former Chief Compliance Officer of FTX, is a citizen and resident of Seattle, Washington.

43. Defendant Stephen Curry, professional basketball player for the Golden State Warriors of the NBA and brand ambassador for FTX, is a citizen and resident of the State of California.

44. Defendant Golden State Warriors LLC is a professional basketball team in the NBA that officially launched their partnership with FTX in 2022 with the unveiling of the FTX logo on the court at the Chase Center, and is a corporation operating and existing under the laws of the State of California.

45. Defendant Shaquille O'Neal, former professional NBA basketball star, sports analyst, entrepreneur, and FTX brand ambassador, is a citizen and resident of Collin County, Texas.

46. Defendant William Trevor Lawrence, the quarterback for the Jacksonville Jaguars of the NFL and a brand ambassador for FTX, is a citizen and resident of the state of Mississippi.

47. Defendant Shohei Ohtani, a professional baseball pitcher, designated hitter and outfielder for the Los Angeles Angels of the MLB and a brand ambassador for FTX, is a citizen and resident of the State of California.

48. Defendant Naomi Osaka, a professional tennis player and brand ambassador for FTX, is a citizen and resident of Beverly Hills, California.

49.     Defendant Lawrence Gene David, an American comedian, writer, actor, television producer, and FTX brand ambassador, is a citizen and resident of Los Angeles, California.

## JURISDICTION AND VENUE

50.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

51.     This Court has personal jurisdiction against Defendants because they conduct business in Florida, and/or have otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of FTX's YBAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of FTX's unregistered securities to consumers in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

52.     Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members either reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

53.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

**A.      Background on FTX and its Key Players.**

54.     Until seeking the protection of the Bankruptcy Court, the FTX Entities operated a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive FTX Platform") that placed cryptocurrency trade orders on behalf of users like Plaintiff and Class Members and offered interest bearing cryptocurrency accounts.

### *Defendant Sam Bankman-Fried*

55.     The FTX group of companies (FTX Group or FTX) was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established in order to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the

FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

56.     Prior to that, The Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his quantitative crypto trading firm, Alameda Research, in November 2017,[13] after stints in the charity world and at trading firm Jane Street.[14] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

### Defendants Caroline Ellison and Sam Trabucco

57.     By 2018, Defendant Bankman-Fried had persuaded Defendant Ellison to join him at Alameda Research. Defendant Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told Forbes magazine in an interview regarding her initial impressions of Alameda.

58.     In late 2018, the headquarters of Alameda Research was relocated to Hong Kong. The team at Alameda Research included Defendant Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang. Defendant Caroline Ellison and Sam Trabucco were also part of the group and upon moving to Hong Kong the group lived like college students and fiercely traded crypto.

59.     After Defendant Bankman-Fried established FTX in 2019, Defendant Ellison began taking more responsibility at Alameda Research along with Sam Trabucco, who served as CEO.

60.     In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after Bankman-Fried resigned from the firm in an effort to put distance between the exchange and trading shop he founded. As co-CEO, Trabucco helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift. For instance, he said Alameda traders began exploring yield farming in decentralized finance (DeFi). Ellison became sole CEO in August 2022, following Trabucco's departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[15]

61.     Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF rent, and was occasionally

---

[13]     https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed December 8, 2022).

[14]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 8, 2022).

[15]     https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed December 8, 2022).

in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

62.     "Young people tend to be too risk averse," Ellison said in a more recent Alameda podcast episode.[16]

63.     The Wall Street Journal recently reported that Ellison told Alameda staffers in a video call that she was one of four people (along with Sam Bankman-Fried, Gary Wang, and Nishad Singh) who were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[17]

### Defendant Gary Wang

64.     Wang is not like his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. In fact, there's little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

65.     Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[18]

66.     Before co-founding Alameda Research (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on the Future Fund's website.[19] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

67.     The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

68.     It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[20]

---

[16] https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed December 8, 2022).
[17]     https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed December 8, 2022).
[18] https://blog.ftx.com/blog/raising-the-bar/ (accessed December 8, 2022)
[19] https://ftxfuturefund.org/about/ (accessed December 8, 2022).
[20]     https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5 (accessed December 8, 2022).

69.     Nishad Singh, the head of engineering at FTX, said Wang was a "really good mentor" who offered suggestions and advice to push things out on short timescales.

70.     In the aftermath of FTX's collapse, and the subsequent $400 million hack, questions are circulating around who could possibly have abused client funds. Wang is a prominent suspect, as one of the few people with "root access" to the exchange's code base, according to The Block.[21]

71.     Wang is also one of the board members of FTX Future Fund – the charity guided by "effective altruism" that aims to "use reason and evidence to do the most good possible for the most people."

72.     Wang, one of the 10 roommates in Bankman-Fried' luxury penthouse in the Bahamas, is reportedly among the four people cited by Caroline Ellison who knew about the decision to send customer funds to Alameda, according to people who spoke to the Wall Street Journal.[22]

73.     A few Wang photos are circulating on the internet, though little else is known about the mysterious co-founder who preferred to stay in the shadows as SBF chased the limelight. In a now infamous picture on FTX's website, CTO Wang is seen with his back facing the camera as he focuses on the monitors in front of him.

74.     At the age of 28, Wang topped Forbes' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[23]

75.     Wang is reportedly now "under supervision" by Bahamian authorities along with Bankman-Fried and Singh.[24]

---

[21]   https://www.theblock.co/post/186476/who-is-billionaire-ftx-co-founder-gary-wang-and-why-is-he-still-committing-code (accessed December 8, 2022).

[22]   https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 8, 2022).

[23]   https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be96dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed December 8, 2022).

[24]   https://cointelegraph.com/news/sam-bankman-fried-is-under-supervision-in-bahamas-looking-to-flee-to-dubai (accessed December 8, 2022).

*Defendant Nishad Singh*

76.     Nishad Singh joined Alameda Research in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

77.     Singh is thought to be a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a 10-person luxury penthouse in Nassau, the Bahamas.

78.     He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and may have been informed of a plan to backstop losses at Alameda with FTX customer funds.[25]

79.     Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, Berkeley graduate talked about why he left his dream job at Facebook to join Alameda Research in a FTX podcast.[26]

80.     "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

81.     Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

82.     In the podcast, Singh said he was also attracted to the company's cultural commitment to effective altruism,[27] a movement that "aims to find the best ways to help others," which he discovered in college.

83.     Singh is a board member of FTX Future Fund, a part of the FTX Foundation, a philanthropic collective funded principally by Bankman-Fried and other senior FTX executives.

84.     "It was pretty clear that everybody working [at Alameda] was highly motivated, was sort of effective altruism-aligned, which mattered a lot to me and was really [a] bright spot. I could learn a lot from them," Singh said in the podcast.

---

[25]     https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 8, 2022).
[26]     https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed December 8, 2022).
[27]     https://www.coindesk.com/layer2/2022/11/11/how-sam-bankman-frieds-effective-altruism-blew-up-ftx/ (accessed December 8, 2022).

85.     After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

86.     "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company blog.[28] Singh also reportedly built most of FTX's "technological infrastructure" and managed the development team.

87.     Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[29] A similar relationship may be in place at FTX's core properties.[30]

88.     Singh is reportedly now "under supervision" by Bahamian authorities along with Bankman-Fried and Wang.[31]

### Dan Friedberg

89.     Daniel S. Friedberg was the chief compliance officer at FTX, the person who oversaw FTX's compliance initiatives before it imploded. He joined the firm in March 2020, and was instrumental in perpetuating its nefarious activities, in part by helping to cover up any indications that the FTX scheme was unraveling.

90.     Although Friedberg was supposed to be the adult in the room overseeing the operations of the FTX empire, he did so thousands of miles away, remotely, from Seattle, Washington. As FTX's chief regulatory officer, Friedberg was tasked with monitoring customer protection practices, ensuring product offerings complied with existing rules and overseeing internal audits and reviews. He did none of this.

91.     Friedberg has also been tied to an online poker scandal in 2008, where Ultimate Bet's founder Russ Hamilton was accused of installing a "God mode" on his gambling platform that only certain players had access to – resulting in an estimated $50 million in misappropriated funds.

---

[28] https://blog.ftx.com/blog/raising-the-bar/ (accessed December 8, 2022).

[29]     https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed December 8, 2022).

[30]     https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 8, 2022).

[31]     https://cointelegraph.com/news/sam-bankman-fried-is-under-supervision-in-bahamas-looking-to-flee-to-dubai (accessed December 8, 2022).

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

92.    In a surreptitiously recorded file, Friedberg reportedly advised Hamilton to claim he was a victim of the Ultimate Bets "God mode" scam, and push blame on an unnamed consultant to the company who exploited the site's servers. The audio recordings were published in 2013 under uncertain circumstances and have not been independently verified by CoinDesk.

93.    "I did take this money and I'm not trying to make it right, Dan, so we gotta get that out of the way right away, real quick," Hamilton allegedly said in the audio recording.[32] Hamilton also founded the World Champion online poker platform.

94.    Veteran short seller Marc Cohodes, one of the few to publicly question the rapid rise of FTX before its fall in a September interview with trading-focused webcast Hedgeye,[33] had noted the potential conflicts of hiring someone connected to a cheating scandal to oversee compliance at the $32 billion FTX exchange.

95.    Similarly here, Dan Friedberg in his role as Chief Compliance Officer oversaw both FTX and Alameda, which had its own "god mode," i.e., Alameda was secretly exempted from FTX's auto-liquidation protocols.

96.    Friedberg's penchant for duplicity to make legal problems vanish for his corporate paymasters didn't end with UB's demise. NBC News recently reported on a 2020 incident involving SBF's promotion of the Ethereum-based Cover Protocol and the unfortunate experience of one Dave Mastrianni, an investor who was prevented from cashing out his $400,000 in paper winnings due to "insufficient liquidity" on FTX before the COVER token cratered.[34]

97.    When Mastrianni contacted FTX to accuse SBF of having a "pump and dump" role in the debacle, Friedberg called back with an offer. How would Mastrianni, a graphic artist, like a job creating NFTs for FTX? Friedberg offered Mastrianni an 'adviser' contract that would pay him one BTC for 30 days' work, but it also required Mastrianni to absolve FTX, Alameda, and its affiliates of any responsibility for Mastrianni's COVER losses.

98.    Mastrianni eventually agreed, but while he did receive that one BTC, FTX never accepted any of his artwork. Freidberg later emailed to inform him that the payment "was primarily

---

[32] http://craakker.blogspot.com/2013/05/pokers-watergate-moment.html (accessed December 8, 2022).

[33] https://app.hedgeye.com/insights/122943-marc-cohodes-ftx-is-dirty-rotten-to-the-core-hedgeye-investing-s?with_category=17-insights (accessed December 8, 2022).

[34] https://www.nbcnews.com/news/epic-fall-sam-bankman-fried-was-hailed-crypto-genius-clients-saw-smoke-rcna56583 (accessed December 8, 2022).

for your release of all claims" and, with that goal accomplished, FTX had no more reason to maintain this subterfuge.

99.      In August, the Federal Deposit Insurance Corporation (FDIC) sent a letter to Friedberg and then-FTX US CEO Brett Harrison to "cease and desist" using marketing language that could have been erroneously interpreted as saying that exchange users accounts were ensured by the federal banking regulator. Harrison subsequently deleted the tweet.

100.      Before joining FTX, Friedberg was a partner at Fenwick & West LLP, where he led the law firm's cryptocurrency division, according to a now-deprecated LinkedIn page. He received a JD and MBA degree from the University of Wisconsin-Madison.

**B.      The Rise and Fall of FTX.**

101.      The FTX.com exchange was extremely successful since its launch. This year around $15 billion of assets are traded daily on the platform, which now represents approximately 10% of global volume for crypto trading. The FTX team has grew to over 300 globally. Although the FTX Entities' primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[35]

102.      FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 *billion dollars*.

103.      Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

104.      At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[36]

105.      In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[37]

---

[35]      https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed December 8, 2022).

[36]      https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 8, 2022).

[37]      https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 8, 2022).

106.     Bankman-Fried's cryptocurrency empire was officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[38]

107.     After obtaining this information, Changpeng "CZ" Zhao, the CEO of Binance, decided to liquidate roughly $530 million-worth of FTT. Customers also raced to pull out, and FTX saw an estimated $6 billion in withdrawals over the course of 72 hours, which it struggled to fulfill.[39] The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8th, that Binance would buy FTX, effectively bailing it out.[40]

108.     The next day, Binance announced that it was withdrawing from the deal, citing findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[41] The news sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[42] On November 11th, unable to obtain a bailout, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[43]

109.     Following his resignation, Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Entities went wrong:[44]

---

[38]     https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed December 8, 2022).

[39]     https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed December 8, 2022).

[40]     https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed December 8, 2022).

[41]     https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed December 8, 2022).

[42]     https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed December 8, 2022).

[43]     https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed December 8, 2022).

[44]     https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed December 8, 2022).











**SBF** ✓ @SBF_FTX · Nov 10

8) And so we are where we are.  Which sucks, and that's on me.

I'm sorry.

○ 155        ⟲ 357        ♡ 3,122        ⬆

**SBF** ✓ @SBF_FTX · Nov 10

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that.  To take responsibility, and do what I can.

○ 162        ⟲ 357        ♡ 3,715        ⬆

**SBF** ✓ @SBF_FTX · Nov 10

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that.  But I'm going to try.  And give anything I have to if that will make it work.

○ 164        ⟲ 394        ♡ 3,377        ⬆



**SBF** ✓ @SBF_FTX · Nov 10

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

○ 87        ⟲ 234        ♡ 2,625        ⬆

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*



**SBF** @SBF_FTX · Nov 10

12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

○ 102          ⇄ 274          ♡ 3,007          ⬆



**SBF** @SBF_FTX · Nov 10

13) Because at the end of the day, I was CEO, which means that *I* was responsible for making sure that things went well. *I*, ultimately, should have been on top of everything.

I clearly failed in that. I'm sorry.

○ 180          ⇄ 423          ♡ 4,122          ⬆



**SBF** @SBF_FTX · Nov 10

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

○ 129          ⇄ 235          ♡ 2,502          ⬆

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*







*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*









*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*



110.    According to a recent Reuters report, however, another explanation contributing to the precarious house of cards that was the Deceptive FTX Platform is that earlier this year, Bankman-Fried secretly transferred *at least $4 billion* in customer funds from FTX to Alameda without telling anyone, after Alameda was hit with a series of losses, and that the FTX entities lent more than *half* of its *$16 billion* in *customer funds* to Alameda in total, with more than *$10 billion in loans outstanding*.[45]

**C.    FTX's offer and sale of YBAs, which are unregistered securities.**

111.    Beginning in 2019, the FTX Entities began offering interest-bearing cryptocurrency accounts to public investors. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

112.    FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

113.    The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Entities offered variable interest rewards on crypto assets held in the YBAs on the Deceptive FTX Platform, which rates were determined by the FTX Entities in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Entities pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

---

[45]    https://markets.businessinsider.com/news/currencies/ftx-crash-client-funds-alameda-binance-sbf-sec-cftc-probe-2022-11?utm_medium=ingest&utm_source=markets (accessed December 8, 2022).

114.     On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[46] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY? Does my balance compound daily?* that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency

---

[46] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application with developed by Blockfolio.

that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> **FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.
>
> **FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.
>
> FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX

US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

## D. The Defendants Aggressively Marketed the FTX Platform

115.    In addition to the conduct of Defendant Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the Deceptive FTX Platform.

116.    In April 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the Deceptive FTX Platform.

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

117.    FTX's explanation for using stars like Brady, Bunchden, and the other Defendants was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[47]

118.    In other words, the FTX Entities needed celebrities like Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of the YBAs, which are unregistered securities. Below are representative statements and advertisements Defendants made to drive the offers and/or sales of the YBAs, which Plaintiff and Class Members will supplement as the case progresses and discovery unfolds.

### i.    Defendants Tom Brady and Gisele Bundchen



119.    The star quarterback and the businesswoman and model, then a couple, became FTX ambassadors last year. They also took equity stakes in FTX Trading Ltd.

120.    Mr. Brady and Ms. Bündchen also joined the company's $20-million ad campaign in 2021. They filmed a commercial called "FTX. You In?" showing them telling acquaintances to join the FTX platform. The ad can be viewed here: https://www.youtube.com/watch?v=uymLJoKFlW8

---

[47]    https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed December 8, 2022).

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

ii.     **Defendant Kevin O'Leary**



121.    "Mr. Wonderful," both a brand ambassador and an FTX shareholder, made several public statements designed to induce consumers to invest in the YBAs.

122.    "To find crypto investments opportunities that met my own rigorous standards of compliance, I entered into this relationship with @FTX_Official," Mr. O'Leary said on Twitter last year. Mr. O'Leary ***recently deleted the tweet***.

123.    He also served as a judge for the FTX Charity Hackathon in Miami in March of 2022.[48]

124.    And *very* recently, on October 12, 2022, O'Leary stated confidently that FTX was totally compliant and a safe place to hold assets. O'Leary stated that: "I have to disclose I'm a paid spokesperson to a FTX and shareholder there, too, cause we mentioned him and I'm a big advocate for Sam because he has two parents who are compliance lawyers.  If there's ever a place I could be that I'm not gonna get in trouble it's going to be in FTX so you know that's there they're great people but he gets the job in compliance which is why he's working so hard to get regulation."[49]

---

[48] https://ftxcharityhackathon.com/ (accessed December 8, 2022).
[49] *See* https://www.youtube.com/watch?v=iwD_zWgyUz8 beginning at 17:32 (accessed December 8, 2022)

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*



125.     He went on to state that "[t]here are a lot of signs right now that point to things looking bad. Crypto has taken a big hit and investors are wondering if things will turn around. If you follow history and the pattern of things, you know that this is RIGHT ON TRACK and we'll soon see a resurgence with crypto. Do you think we're entering a Bullish period? Let me know in the comments!"[50]

### iii.     Defendant Udonis Haslem



126.     Udonis Haslem, the Captain of the Miami HEAT and Miami legend, became an FTX global ambassador. Much like Brady and Bunchden, Haslem starred in FTX's "You In, Miami?" ad campaign that launched at the start of the 2021 - 2022 Miami HEAT season.

127.     In the ad, which be viewed here: https://www.youtube.com/watch?v=83FDP53yPa8, Haslem states "FTX has arrived in 305. So I just got one question: Are you in, Miami?" Others respond "If he's in, I'm in." Haslem concludes "Our city. Our team. FTX. You in, Miami?"

---

[50] *Id.*

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

### iv. Defendant David Ortiz



128.     Defendant David Ortiz, who became an FTX brand ambassador and hyped the YBAs in exchange for cryptocurrency and multiple collections of NFTs, also ran his own FTX "You In?" ad, which began running nationwide during the first game of the 2021 World Series.

129.     In the ad, which can be found here: https://www.ispot.tv/ad/qSlm/ftx-big-papi-is-in, Ortiz is watching a game on the television when he receives a phone call from The Moon. Inspired by the "moonblast" home run scored on the field, The Moon frantically tells David about opportunities to get into cryptocurrency with FTX. David decides it's an offer he can't refuse and joins fellow sports stars Stephen Curry and Tom Brady on the platform. FTX announces it is the official crypto exchange of MLB.

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

> ### v.   Defendant Steph Curry



130.    Defendant Stephen Curry had his own nationwide ad campaign pushing the Deceptive FTX Platform, known as the "#notanexpert" campaign.[51] Throughout the ad, Curry repeatedly denies being cast as an expert in cryptocurrency, culminating in his statement that "I'm not an expert, ***and I don't need to be.*** With FTX I have everything I need to buy, sell, and trade crypto ***safely.***"[52]

131.    The purpose of Curry being an ambassador is to expand the reach of the crypto firm and "tout the viability of cryptocurrency to new audiences around the world," FTX said in a press release.[53] In other words, to drive adoption of the Deceptive FTX Platform and to facilitate the sales of unregistered YBAs to unsuspecting and unwitting retail consumers.

132.    "I'm excited to partner with a company that demystifies the crypto space and eliminates the intimidation factor for first-time users," Curry said in the statement, highlighting that "first-time," inexperienced users were the intended targets of the campaign.[54]

---

[51] https://www.youtube.com/watch?v=gsy2N-XI04o (accessed December 8, 2022).
[52] *Id.*
[53]     https://www.prnewswire.com/news-releases/nba-superstar-stephen-curry-becomes-global-ambassador-and-shareholder-of-leading-cryptocurrency-exchange-ftx-through-long-term-partnership-301370497.html (accessed December 8, 2022).
[54] *Id.*

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

### vi.     Defendant Golden State Warriors



**Official Crypto Platform and NFT Marketplace
of the Golden State Warriors**

133.    The Golden State Warriors and FTX officially launched their partnership in 2022 with the unveiling of the FTX logo on the court at the Chase Center. As the Warriors' Official Cryptocurrency Platform and NFT Marketplace, the franchise dropped NFTs on FTX.us beginning in early 2022. The partnership between the Warriors and FTX marked the first international rights partner for the Warriors, meaning the GSW and FTX had a visible market presence, inclusive of logo and likeness, internationally.

134.    The deal also included the Warriors' G League team, the Golden Guardians and Warriors Gaming Squad (affiliated esports teams), in-arena signage at Chase Center, and virtual floor signage at Warriors games.[55]

---

[55] https://www.instagram.com/p/CYiBaq8JLx7/ (accessed December 8, 2022).

### vii.    Defendant Shaquille O'Neal



135.    Defendant Shaquille O'Neal, former professional NBA basketball star, sports analyst, and entrepreneur, also became an FTX ambassador, stating in a video posted on FTX's Twitter account that "I'm excited to be partnering with FTX to help make crypto accessible for everyone. I'm all in. Are you?"[56]

---

[56]

https://twitter.com/FTX_Official/status/1532119977381208066?s=20&t=5wTm55FDE6c0cCD9vCndYg (accessed December 8, 2022).

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

### viii.   Defendant Trevor Lawrence



136.   Defendant William Trevor Lawrence, the first pick in the 2021 NFL draft and now quarterback for the Jacksonville Jaguars of the NFL, became a brand ambassador for FTX in exchange for unspecified cryptocurrency payments, which sponsorship was announced in April 2021.[57] The stated purpose of the sponsorship was because "Trevor is someone people can have a personal and human connection with for [FTX] and to the crypto space."[58]

---

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

### ix.    Defendant Shohei Ohtani



137.    The FTX Entities entered into a long-term partnership with global icon and history-making MLB Superstar Shohei Ohtani. In addition to being an FTX global ambassador, Mr. Ohtani received all of his compensation in equity and cryptocurrencies.[59] In exchange for those unspecified payments, Mr. Ohtani served as a spokesperson for FTX to increase awareness of the Deceptive FTX Platform and to drive adoption of and investments in the unregistered YBA securities on a global scale through a variety of initiatives. [60]

---

[59]    https://www.prnewswire.com/news-releases/mlb-superstar-shohei-ohtani-joins-ftx-as-global-ambassador-through-long-term-partnership-301425911.html (accessed December 8, 2022).
[60] *Id.*

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

### x. Defendant Naomi Osaka



138.     Defendant Naomi Osaka, a 24-year-old professional tennis player and four-time Grand Slam singles champion, became a brand ambassador for FTX, with the express purpose of "getting more women to start investing in crypto."[61] Osaka wore the FTX logo on the kit she wore at tournaments, including the 2022 Miami Open.[62] In exchange for an equity stake in FTX and payments in unspecified amounts of cryptocurrency, Osaka directed and produced content in association with the FTX Entities designed to promote the offer and sale of the unregistered YBA securities, hoping "she will reach a global audience."[63]

139.     Osaka confirmed her involvement by tweeting a glitzy new FTX ad to her **1.1 million followers**, which can be viewed here: https://youtu.be/pkuf8avR50k. It shows the tennis star competing in a comic strip — and over dramatic music, she says: "They thought they made the rules for us. They thought they could control us. They were wrong."

140.     The video then cuts to a boardroom full of marketing executives talking about the ad in a tongue-in-cheek way — and discussing other ideas… including Osaka heading to the moon. An idea to have a QR code bouncing around the screen (a clear nod to Coinbase's Super Bowl spot) is dismissed for being "boring."

---

[61]     https://coinmarketcap.com/alexandria/article/naomi-osaka-tennis-star-teams-up-with-ftx-and-she-s-getting-paid-in-crypto-too (accessed December 8, 2022).
[62] *Id.*
[63] *Id.*

141.    They settle on letting Osaka speaking for herself — and play a mock-up of the tennis ace giving an interview to a news channel where she says: "I'm Naomi Osaka and I'm proud to partner with FTX. Making cryptocurrency accessible is a goal that FTX and I are striving towards." The ad ends with the tagline: "Naomi is in. You in?"

### xi.    Defendant Larry David



142.    For his part, the legendary comedian and creator of *Seinfeld* and *Curb Your Enthusiasm*, Larry David, created an ad for the FTX Entities called "Don't Miss Out on Crypto," which aired during the 2022 Super Bowl, making FTX one of the most retweeted brands during the Super Bowl, and winning the "Most Comical" honorific from *USA Today*'s Ad Meter.[64]

143.    The ad—the only Super Bowl commercial David ever appeared in—featured David being a skeptic on such historically important inventions as the wheel, the fork, the toilet, democracy, the light bulb, the dishwasher, the Sony Walkman, and, of course, FTX, and cautioned viewers, "Don't be like Larry." The ad can be viewed here: https://youtu.be/BH5-rSxilxo

---

[64]    https://admeter.usatoday.com/lists/usa-today-ad-meter-replay-ratings-2022-final-results/ (accessed December 8, 2022).

## CLASS ACTION ALLEGATIONS

144.    As detailed below in the individual counts, Plaintiff brings this lawsuit on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

**A.    Class Definitions**

145.    Plaintiffs seek to represent the following Global Class, Nationwide Class, and Florida Subclass (collectively, "the Classes"):

> **(1) Global Class**: All persons and entities residing outside of the United States who, within the applicable limitations period, purchased or enrolled in a YBA.
>
> **(2) Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA.
>
> **(3) Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a YBA.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Entities and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

146.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of FTX YBAs to Plaintiffs and the Class Members (in which Defendants each substantially participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell an FTX YBA stems from a transactional occurrence that emanated from the State of Florida.

**B.    Numerosity**

147.    The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold YBAs. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of

class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

## C.    Commonality/Predominance

148.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a)    whether the YBAs were unregistered securities under federal or Florida law;

(b)    whether Defendants' participation and/or actions in FTX's offerings and sales of YBAs violate the provisions of the Securities Act and Florida securities law.

(c)    the type and measure of damages suffered by Plaintiffs and the Class.

(a)    whether Defendants' practices violate the FDUTPA;

(b)    whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(c)    whether Plaintiffs and Class members are entitled to injunctive relief;

(d)    whether Plaintiffs and Class members are entitled to declaratory relief; and

(e)    whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

## D.    Typicality

149.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's YBAs because of Defendants' actions and/or participation in the offering and sale of these unregistered securities, and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any Defendant that are unique to Plaintiffs.

## E.    Adequacy of Representation

150.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and

legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

**F.     Requirements of Fed. R. Civ. P. 23(b)(3)**

151.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling the YBAs, which are unregistered securities, and/or (2) in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform.

152.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

153.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**G.     Superiority**

154.    A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

> (a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;
>
> (b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;
>
> (d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;
>
> (e) Individual suits would not be cost effective or economically maintainable as individual actions; and
>
> (f) The action is manageable as a class action.

**H.      Requirements of Fed. R. Civ. P. 23(b)(2)**

155.      Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the YBAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

156.      Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.      Requirements of Fed. R. Civ. P. 23(c)(4)**

157.      As it is clear that one of the predominant issues regarding Defendants' liability is whether the YBAs FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

158.      As it is clear that another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.      Nature of Notice to the Proposed Class.**

159.      The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## COUNT ONE

### Violations of the Florida Statute Section 517.07,

### The Florida Securities and Investor Protection Act

### (Plaintiffs Individually and on behalf of the Classes)

160.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–159 above, as if fully set forth herein.

161.     Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

162.     Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

163.     The YBA is a security pursuant to Fla. Stat. § 517.021(22)(a).

164.     The YBAs sold and offered for sale to Plaintiff and Class members were not:

    a.    exempt from registration under Fla. Stat. § 517.051;

    b.    a federal covered security;

    c.    registered with the Office of Financial Regulations (OFR); or

    d.    sold in a transaction exempt under Fla. Stat. § 517.061.

165.     The FTX Entities sold and offered to sell the unregistered YBAs to Plaintiffs and the members of the Class.

166.     Defendants are directors, officers, partners and/or agents of the FTX Entities pursuant to Fla. Stat. § 517.211.

167.     The FTX Entities, with Defendants' material assistance, offered and sold the unregistered YBAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

## COUNT TWO

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**

**§ 501.201, Florida Statutes, *et seq.***

**(Plaintiffs Individually and on behalf of the Classes)**

168.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–159 above, as if fully set forth herein.

169.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

170.    Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

171.    Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

172.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

173.    Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

174.    Plaintiffs and consumers in the Classes have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the Deceptive FTX Platform and in the amount of their lost investments.

175.    The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

176.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs.

177.    Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable

harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## COUNT THREE

### Civil Conspiracy

### (Plaintiffs Individually and on behalf of the Classes)

178.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–159 above, as if fully set forth herein.

179.    The FTX Entities and Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the Deceptive FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive FTX Platform were safe and were not being invested in unregistered securities.

180.    The FTX Entities entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the YBAs and/or use the Deceptive FTX Platform.

181.    Defendants engaged in unlawful acts with the FTX Entities, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities.

182.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Entities; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Entities, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

183.    Defendants' conspiracy with the FTX Entities to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

## COUNT FOUR

### Declaratory Judgment

### (Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq.*)

### (Plaintiffs Individually and on behalf of the Classes)

184.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–159 as if fully set forth herein.

185.     This Count is asserted against Defendants under Florida Statutes §§ 86.011, *et seq.*

186.     There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

187.     Plaintiffs and the members of the Classes have an obvious and significant interest in this lawsuit.

188.     Plaintiffs and members of the Classes purchased YBAs, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as further described hereinabove.

189.     If the true facts had been known, including but not limited to that the YBAs are unregistered securities, the Deceptive FTX Platform does not work as represented, and Defendants were paid exorbitant sums of money to peddle Voyager to the nation, Plaintiffs and the Classes would not have purchased YBAs in the first place.

190.     Thus, there is a justiciable controversy over whether the YBAs were sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiff and the Class.

191.     Plaintiff and the Class seek an order declaring that the YBAs were securities required to be registered with the SEC and state regulatory authorities, that the Deceptive FTX Platform did not work as represented, and Defendants were paid exorbitant sums of money to peddle FTX to the nation.

*Gregg Podalsky, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

    a.      Certifying the Class as requested herein;

    b.      Awarding actual, direct and compensatory damages;

    c.      Awarding restitution and disgorgement of revenues if warranted;

    d.      Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

    e.      Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

    f.      Awarding statutory and multiple damages, as appropriate;

    g.      Awarding attorneys' fees and costs; and

    h.      Providing such further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: December 8, 2022                    Respectfully submitted,

By: */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

By: */s/ David Boies*
David Boies
(*Pro Hac Vice* Application Forthcoming)
Alex Boies
(*Pro Hac Vice* Application Forthcoming)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Phone: (914) 749–8200
dboies@bsfllp.com

By: */s/ Stephen Neal Zack*
Stephen Neal Zack
Florida Bar No. 145215
Hon. Ursula Ungaro (Ret.)
Florida Bar No. 200883
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., Suite 2800
Miami, FL 33131
Office: 305-539-8400
szack@bsfllp.com
uungaro@bsfllp.com

*Co-Counsel for Plaintiff and the Class*

# Exhibit G

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:22-cv-23753-KMM

**EDWIN GARRISON**, *et al.,* on behalf of
themselves and all others similarly situated,

               *Plaintiffs,*

*v.*

**SAM BANKMAN-FRIED**, *et al.*,

             *Defendants.*

                                 /

**AMENDED CLASS ACTION
COMPLAINT**

**JURY DEMAND**

## AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiffs file this Consolidated Complaint (the only Class Action in the Country), on behalf of themselves, and all other similarly situated US and non-US FTX consumers, against Defendants, who all promoted, assisted in, and/or actively participated in FTX Trading LTD d/b/a FTX's ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively, the "FTX Entities"), offer and sale of unregistered securities, identical FTX yield-bearing accounts ("YBAs").

## INTRODUCTION

      1.     Everyone now agrees the FTX Disaster is the largest financial fraud in US history. The former FTX CEO is in jail and the new CEO—who helped wind down Enron—concluded the fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe. FTX will be involved in federal bankruptcy proceedings for many years and there is no guarantee that <u>any of the victims</u> will be able to see <u>any recovery</u> from those proceedings. This Federal Consolidated Action may be the only avenue for any of the victims to recover any of their damages. This action is specifically brought against persons and celebrities who were specifically

warned by the SEC back in 2017 (and in many FTC Guidelines), that if these FTX YBA's are found to be "securities," those persons may be liable under state and federal regulations for: (1) promoting an unregistered security, or (2) failing to properly disclose their payments and compensation. Those specific claims have a strict liability standard with no *caveat emptor* defense.

2. The question of whether the sale of every YBA is (or is not) the sale of "unregistered securities" has practically been answered in the affirmative through various regulatory statements, guidance, and actions issued by the Securities and Exchange Commission and other regulatory entities. For example, on November 1, 2017, in the "SEC Statement Urging Caution Around Celebrity Backed ICOs,"[1]

> In the SEC's Report of Investigation concerning The DAO,[2] the Commission warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws. **Persons making these endorsements may also be liable** for potential violations of the anti-fraud provisions of the federal securities laws, **for participating in an unregistered offer and sale of securities**, and for acting as unregistered brokers. The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

3. The SEC and state securities regulators over the past 5 years, have already found liable numerous celebrities, cryptocurrency brokers and exchanges just like FTX for offering this

---

[1]      https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos (accessed December 16, 2022).

[2] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed December 16, 2022)

exact same type of interest-bearing account, finding that exchanges such as BlockFi,[3] Voyager,[4] and Celsius[5] all offered these same accounts as unregistered securities.

4.      A second narrow issue that is common to the entire Proposed Class, whose focus is solely objective, is whether these Defendants violated state consumer laws by failing to abide by any of the FTC's long established rules and regulations, specifically on what is required for a celebrity endorsement of cryptocurrency.

5.      We all need to be clear. This is <u>not</u> a case where Plaintiffs made a "risky" investment in stock or cryptocurrency, or that they lost money speculating on various cryptocurrency projects. Plaintiffs' claims arise simply from the purchase of and investment in a YBA, a savings type of account with FTX that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate returns on their significant holdings in the accounts, regardless of whether those assets were held as USD, legal tender or cryptocurrency, and regardless of whether any trades were made with the assets held in the YBA. In other words, the YBA was portrayed to be like a bank account, something that was "very safe" and "protected." That is the narrative that Defendants pushed in promoting the offer and sale of the YBAs, which are unregistered securities. For that, Defendants are liable for Plaintiffs' losses, jointly and severally and to the same extent as if they were themselves the FTX Entities.

---

[3] https://www.sec.gov/news/press-release/2022-26 (accessed December 16, 2022).

[4]      https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/ (accessed December 16, 2022).

[5]
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwjvjNvg27j7AhWfRTABHfwzDe4QFnoECAsQAQ&url=https%3A%2F%2Fwww.nj.gov%2Foag%2Fnewsreleases21%2FCelsius-Order-9.17.21.pdf&usg=AOvVaw0Zd94fuhFSsOoGKM-vQ3YI (accessed December 16, 2022).

6.     Literally overnight, Plaintiffs' assets held in their YBAs on the Deceptive FTX

Platform were robbed from them as FTX imploded and former-CEO, Sam Bankman-Fried, filed a

Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened because, as

explained by the new CEO of the failed FTX Entities:

> I have over 40 years of legal and restructuring experience. I have been the
> Chief Restructuring Officer or Chief Executive Officer in several of the largest
> corporate failures in history. I have supervised situations involving allegations of
> criminal activity and malfeasance (Enron). I have supervised situations involving
> novel financial structures (Enron and Residential Capital) and cross-border asset
> recovery and maximization (Nortel and Overseas Shipholding). Nearly every
> situation in which I have been involved has been characterized by defects of some
> sort in internal controls, regulatory compliance, human resources and systems
> integrity.
>
> ***Never*** in my career have I seen such a complete failure of corporate controls
> and such a **complete absence of trustworthy financial information** as occurred
> here. From compromised systems integrity and faulty regulatory oversight abroad,
> to the concentration of control in the hands of a very small group of inexperienced,
> **unsophisticated** and **potentially compromised** individuals, **this situation is**
> **underprecedented**.

*See* In re: FTX Trading Ltd, et al., No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17,

2022) (emphasis added).

7.     The Cryptocurrency National Disaster is growing by the billions almost every day.

More crypto companies are filing new federal bankruptcy petitions each day, all running for

protection from the billions of dollars of losses they directly caused to thousands of investors here

in Florida and across the globe. This is by far the largest securities national disaster, greatly

surpassing the Madoff Ponzi Scheme, and could very likely become a complex international

litigation disaster, similar to how the hundreds of thousands of asbestos cases swamped all courts

across the globe. Unless a workable, coordinated, and organized structure is established now, at

the very onset of these proceedings, here in Miami, which served as the epicenter for the crypto

fraud, the FTX victims will continue to suffer and the only people to benefit will be the professionals in the bankruptcy and civil courts.

8.      The Deceptive and failed FTX Platform all emanated from here in Miami, Florida, FTX's domestic headquarters and the host of the largest and most famous International World Cryptocurrency Conventions. FTX's fraudulent scheme was designed to take advantage of unsophisticated investors from across the globe, who utilize mobile apps to make their investments. As a result, consumers around the globe collectively sustained billions of dollars in damages. FTX organized and emanated its fraudulent plan from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where 3-time NBA Champions the Miami Heat play.

## FACTUAL BACKGROUND

9.      Undersigned Counsel have been investigated and litigating these specific issues for over a year before this Court. On December 24, 2021, counsel for Plaintiffs and the proposed class members brought the first (and only) putative nationwide class action complaint against the now-defunct cryptocurrency trading app, Voyager, styled *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the platform owned and operated by Voyager Digital Ltd. ("Voyager") and Voyager Digital LLC ("VDL") was an unregulated and unsustainable fraud. In the *Cassidy* Action, plaintiffs also alleged that

Defendant Ehrlich, Voyager's CEO, teamed up with Defendants Cuban and the Dallas Mavericks to promote Voyager, by making false representations and employing other means of deception. As a result, the Voyager plaintiffs and Voyager class members, all sustained losses in excess of $5 billion.

10.     The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting Voyager—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Dallas Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

11.     After the *Cassidy* Complaint was filed, the following important actions took place:

(a)     the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b)     seven state Attorneys General (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPA was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022; and

(c)     on March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the EPA was not exempt from registration under the law, and instead

6

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[6]

12.　　On July 5, 2022, Voyager Digital Holdings, Inc. and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases (the "Voyager Bankruptcy Cases") are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

13.　　On September 28, 2022, Voyager filed a motion in the Voyager Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

14.　　Everyone involved in the Voyager Bankruptcy Cases thought that the FTX Entities were the *deus ex machina* come to save the day by bailing out Voyager and paying back at least some of the losses the Voyager customers sustained.

15.　　Instead, as explained below, the FTX Entities imploded, their over $30 billion in value evaporated almost overnight, and the FTX Entities found themselves filing their own emergency Chapter 11 bankruptcy petition in Delaware. The Deceptive FTX Platform maintained by the FTX Entities was truly a house of cards, a Ponzi scheme where the FTX Entities shuffled

---

[6]　　https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed October 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed December 16, 2022).

customer funds between their opaque affiliated entities, using new investor funds obtained through

investments in the YBAs and loans to pay interest to the old ones and to attempt to maintain the

appearance of liquidity.

16.     Part of the scheme employed by the FTX Entities involved utilizing some of the

biggest names in sports and entertainment to raise funds and drive global consumers to invest in

the YBAs, which were offered and sold largely from the FTX Entities' domestic base of operations

here in Miami, Florida, pouring billions of dollars into the Deceptive FTX Platform to keep the

whole scheme afloat.

17.     Importantly, although Defendants disclosed their partnerships with the FTX

Entities, they have never disclosed the nature, scope, and amount of compensation they personally

received in exchange for the promotion of the Deceptive FTX Platform, which the SEC has

explained that a failure to disclose this information would be a violation of the anti-touting

provisions of the federal securities laws.[7] Moreover, none of these Defendants performed any due

diligence prior to marketing these FTX products to the public.

18.     The SEC took action against boxing champ Floyd Mayweather and music producer

DJ Khaled after they were paid by cryptocurrency issuers to tweet promotional statements about

investing in Initial Coin Offerings (ICOs), ordering them both to pay disgorgement, penalties and

interest for promoting investments in ICOs, including one from cryptocurrency issuer Centra Tech,

---

[7]     https://www.ubergizmo.com/2017/11/sec-celebrities-disclose-payment-cryptocurrency-endorsements/#:~:text=It%20has%20issued%20a%20statement%20warning%20celebrities%20that,without%20disclosing%20that%20they%E2%80%99ve%20been%20paid%20for%20it
(accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

Inc., for a combined total of $767,500 because they failed to disclose that their promotional efforts on Twitter were paid endorsements.[8]

19.     Other celebrities similarly accused and prosecuted for failing to disclose their paid endorsements include Kim Kardashian and basketball player Paul Pierce.[9] According to the Federal Trade Commission, cryptocurrency scams have increased more than ten-fold year-over-year with consumers losing more than $80 million since October 2020, due in large part to the use of such celebrity endorsements. [10]

20.     As explained more fully in this Complaint, Defendants' misrepresentations and omissions made and broadcast around the globe through the television and internet render them liable to Plaintiff and class members for soliciting their purchases of the unregistered YBAs. *Wildes v. Bitconnect Int'l PLC*, No. 20-11675 (11th Cir. Feb. 18, 2022) (holding that promoters of cryptocurrency through online videos could be liable for soliciting the purchase of unregistered securities through mass communication, and no "personal solicitation" was necessary for solicitation to be actionable).

21.     This action seeks to hold Defendants responsible for the many billions of dollars in damages they caused Plaintiffs and the Class and to force Defendants to make them whole.

**PARTIES**

22.     **Plaintiffs** are all residents of US and/or a foreign government, and all purchased FTX YBAs.

---

[8]     https://news.bloomberglaw.com/us-law-week/insights-celebrity-endorsements-and-cryptocurrency-a-cautionary-tale (accessed December 16, 2022).
[9]     https://blockbulletin.com/news/altcoins/kim-kardashian-among-other-celebrities-sued-for-promoting-cryptocurrencies/ (accessed December 16, 2022).
[10] https://florida.foolproofme.org/articles/770-celebrity-cryptocurrency-scam (accessed December 16, 2022).

23.     **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Garrison did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Garrison has sustained damages for which Defendants are liable.

24.     **Plaintiff Gregg Podalsky** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Podalsky did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Podalsky has sustained damages for which Defendants are liable.

25.     **Plaintiff Skyler Lindeen** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Lindeen purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Lindeen did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those

misrepresentations and omissions. As a result, Plaintiff Lindeen has sustained damages for which Defendants are liable.

26.     **Plaintiff Alexander Chernyavsky** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Chernyavsky did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Chernyavsky has sustained damages for which Defendants are liable.

27.     **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Kavuri did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Kavuri has sustained damages for which Defendants are liable.

28.     **Plaintiff Gary Gallant** is a citizen and resident of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Gallant purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Gallant did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed

11

in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Gallant has sustained damages for which Defendants are liable.

29.     **Plaintiff David Nicol** is a citizen and resident of Sydney, Australia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Nicol purchased an unregistered security from FTX in the form of a YBA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Nicol did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Nicol has sustained damages for which Defendants are liable.

30.     **FTX Brand Ambassador Defendants** are all persons and/or companies, that: (1) agreed to serve as "Brand Ambassadors" for FTX, (2) all admittedly advertised and promoted the sale of the FTX YBAs and (3) none of them disclosed, in any of their marketing campaigns and/or advertisements, that they were paid hundreds of millions of dollars by FTX and profited from the sale of FTX YBAs, in clear violation of SEC, FTC and various federal and state regulations.

31.     **Defendant Thomas Brady**, NFL quarterback currently playing for the Tampa Bay Buccaneers, is a brand ambassador of FTX, and is a citizen and resident of Miami-Dade County, Florida.

32.     **Defendant Gisele Bundchen,** one of the world's highest-paid models and a brand ambassador for FTX, is a citizen and resident of Miami-Dade County, Florida.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

33.     **Defendant Kevin O'Leary,** "Mr. Wonderful," a businessman, television personality appearing regularly on *Shark Tank*, and brand ambassador for FTX, is a citizen and resident of Miami Beach, Florida.

34.     **Defendant Udonis Haslem**, an American professional basketball player for the Miami Heat of the NBA and brand ambassador of FTX, is a citizen and resident of Miami-Dade County, Florida.

35.     **Defendant David Ortiz,** former designated hitter and first baseman in the MLB and a brand ambassador for FTX, is a citizen and resident of the State of Florida.

36.     **Defendant Stephen Curry,** professional basketball player for the Golden State Warriors of the NBA and brand ambassador for FTX, is a citizen and resident of the State of California.

37.     **Defendant Golden State Warriors** LLC is a professional basketball team in the NBA that officially launched their partnership with FTX in 2022 with the unveiling of the FTX logo on the court at the Chase Center, and is a corporation operating and existing under the laws of the State of California.

38.     **Defendant Shaquille O'Neal,** former professional NBA basketball star, sports analyst, entrepreneur, and FTX brand ambassador, is a citizen and resident of Collin County, Texas.

39.     **Defendant William Trevor Lawrence,** the quarterback for the Jacksonville Jaguars of the NFL and a brand ambassador for FTX, is a citizen and resident of the state of Mississippi.

40.    **Defendant Shohei Ohtani,** a professional baseball pitcher, designated hitter and outfielder for the Los Angeles Angels of the MLB and a brand ambassador for FTX, is a citizen and resident of the State of California.

41.    **Defendant Naomi Osaka**, a professional tennis player and brand ambassador for FTX, is a citizen and resident of Beverly Hills, California.

42.    **Defendant Lawrence Gene David,** an American comedian, writer, actor, television producer, and FTX brand ambassador, is a citizen and resident of Los Angeles, California.

43.    **<u>FTX Insider Defendants</u>** are all persons that controlled, assisted and worked at FTX that helped promote, and sell the FTX YBAs but are not personally involved in the FTX restructuring process.

44.    **Defendant Caroline Ellison** is the former CEO of Alameda Research, LLC, a trading firm launched by Defendant Sam Bankman-Fried. She oversaw many of the risky bets Alameda took with regard to FTX customers' crypto tokens. Defendant Ellison is a resident of Hong Kong.

45.    **Defendant Sam Trabucco,** the former Co-CEO of Alameda Research, LLC, is a citizen and resident of the State of California.

46.    **Defendant Gary (Zixiao) Wang**, co-founder of Alameda Research and FTX, upon information and belief is currently residing in the Bahamas.

47.    **Defendant Nishad Singh,** the former Director of Engineering of FTX, upon information and belief is currently residing in the Bahamas.

48.    **Defendant Dan Friedberg,** the former Chief Compliance Officer of FTX, is a citizen and resident of Seattle, Washington.

## JURISDICTION AND VENUE

49.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

50.     This Court has personal jurisdiction against Defendants because they conduct substantial and not isolated business in Florida, and/or have otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of FTX's YBAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of FTX's unregistered securities to consumers in Florida. Further, Defendants have engaged in a conspiracy in which some of the co-conspirators—including some who are Defendants in this action—committed overt acts in furtherance of the conspiracy in the State of Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

51.     Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members either reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

52.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

**A.    Background on FTX and its Key Players.**

53.    Until seeking the protection of the Bankruptcy Court, the FTX Entities operated a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive FTX Platform") that placed cryptocurrency trade orders on behalf of users like Plaintiff and Class Members and offered interest bearing cryptocurrency accounts.

54.    Attached as **Exhibit A** is the Expert Report of Paul Sibenik, Lead Case Manager at CipherBlade Blockchain Investigation Agency, which is incorporated into this complaint in its entirety by reference, and additionally as cited.

55.    As Sibenik explains, in many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry. Ex. A ¶ 10.

56.    More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Ex. A ¶ 11. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets. *Id.*

57.    The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. Ex. A ¶ 12. This credit can be regarded as a liability of the exchange to its customer. *Id.*

58.    If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

a)  Trade it for another cryptocurrency

b)  Trade it for fiat currency

c)  Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

Case 1:23-cv-20439-KMW Document 161 Entered on FLSD Docket 10/06/2023 Page 207 of 400
*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

    d) Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances. Ex. A ¶ 13.

59. The exchange accounts should very much be regarded as being custodial in nature. Ex. A ¶ 14. This means that the customer does not *control* access to the assets 'in' their account. *Id.* The customer needs to make a request to the exchange to be able to access and send those balances. *Id.* The exchange then debits the user account and sends the assets. *Id.* Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange. *Id.*

60. One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so. Ex. A ¶ 15.

61. For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. Ex. A ¶ 16. FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> *"Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account."*
>
> *"None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."*
>
> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms),*

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

> you may withdraw your Digital Assets by sending them to a different
> blockchain address controlled by you or a third party."[11]

*Id.*

62.     While FTX violated their own terms of service, it would also have been true that some of these claims would have been demonstrably false to begin even if there was hypothetically no wrongdoing on the part of FTX. Ex A ¶ 17. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature. *Id.* This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. *Id.* However, it should also be noted that the digital assets aren't technically 'in' the account at all. *Id.* At a technical level, an exchange account cannot hold or store cryptocurrency. *Id.* The account stores a record of a liability or an IOU to the exchange's customer. *Id.* When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. *Id.* Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true. *Id.*

63.     With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds. Ex. A ¶ 18.

---

[11]     https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf
(accessed December 16, 2022).

64.     While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented, for reasons I will demonstrate later in this report. Ex. A ¶ 19.

65.     The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account. Ex. A ¶ 20.

66.     Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regards to the type of assets that they can investment customer assets in. Ex. A ¶ 21. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

67.     Exchanges on the other hand, are not subject to capital control requirements. Ex. A ¶ 22. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public. *Id.*

68.     Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. Ex. A ¶ 23. And exchanges have no requirement to have any type of insurance equivalent to

FDIC insurance. *Id.* While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted. *Id.*

69.     Due to the aforementioned reasons and risks surrounding the lack of regulation, as well various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets. Ex. A ¶ 24.

70.     The inherent riskiness associated with storing assets on a cryptocurrency exchange is well-known to the vast majority of well-educated and knowledgeable cryptocurrency users. Ex. A ¶ 25. This is evidenced by the frequent expression 'not your keys, not your coins,' essentially meaning that if you don't *control* the cryptocurrency in your account, it's not really yours. *Id.* 'Your' cryptocurrency belongs to the exchange if you elect to store it 'on' the exchange, and if they renege or are unable to fulfill their liability to you, you as the beneficial cryptocurrency owner of the cryptocurrency, have effectively lost your money. *Id.*

71.     This is further referenced by the extensive track record of the many cryptocurrency exchanges that have shut down and ultimately failed,[12] often in spectacular fashion. Ex. A ¶ 26. The most common reasons for an exchange's failure include:

a)  The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency.

b)  The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency.

---

[12] https://www.cryptowisser.com/exchange-graveyard/ (accessed December 16, 2022).

    c) A hack or theft by an external actor

    d) Embezzlement, or theft by an internal actor, typically founder(s) of the exchange

    e) Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

*Id.*

72. When exchanges do shut down (and this happens relatively frequently) it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back. Ex. A ¶ 27.

73. Suffice to say cryptocurrency exchanges are generally not a safe place to store assets, even amongst exchanges that don't offer a yield-bearing program. Ex. A ¶ 28. When exchanges have a yield-bearing program, or otherwise elect to leverage or loan our customer assets (with or without customer consent), it significantly increases the risk of the exchange failing and becoming insolvent. *Id.* Cryptocurrency exchanges can do a variety of things to minimize such risks and improve safety. *Id.* However, what an exchange says, and what they actually do are two different things entirely. *Id.* It is common for CEOs and executives of exchanges that have failed or in the process of failing to describe their exchange as 'safe,' 'secure,' 'well-regulated,' 'compliant,' 'transparent,' or in a good financial position even when the exact opposite is true. *Id.* FTX was not an exception to this trend. One should not assume or believe that an exchange is any of these things just because they say it. *Id.*

74. This is not to suggest that exchanges cannot be a much safer place to store assets. Ex. A ¶ 29. They can be with appropriate regulation and oversight. In fact, it appears that for FTX Japan[13] specifically, those investors will be made whole or almost whole due to sensical

---

[13] https://www.coindesk.com/consensus-magazine/2022/12/13/japan-was-the-safest-place-to-be-an-ftx-customer/

regulations that were put in place in light of the lessons learned from the failures of Mt. Gox and Coincheck exchanges in Japan. *Id.*

### Defendant Sam Bankman-Fried

75.     The FTX group of companies (FTX Group or FTX) was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established in order to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

76.     Prior to that, The Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his quantitative crypto trading firm, Alameda Research, in November 2017,[14] after stints in the charity world and at trading firm Jane Street.[15] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

### Defendants Caroline Ellison and Sam Trabucco

77.     By 2018, Defendant Bankman-Fried had persuaded Defendant Ellison to join him at Alameda Research. Defendant Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told Forbes magazine in an interview regarding her initial impressions of Alameda.

---

[14]     https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed December 16, 2022).

[15]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 16, 2022).

78.    In late 2018, the headquarters of Alameda Research was relocated to Hong Kong. The team at Alameda Research included Defendant Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang. Defendant Caroline Ellison and Sam Trabucco were also part of the group and upon moving to Hong Kong the group lived like college students and fiercely traded crypto.

79.    After Defendant Bankman-Fried established FTX in 2019, Defendant Ellison began taking more responsibility at Alameda Research along with Sam Trabucco, who served as CEO.

80.    In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after Bankman-Fried resigned from the firm in an effort to put distance between the exchange and trading shop he founded. As co-CEO, Trabucco helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift. For instance, he said Alameda traders began exploring yield farming in decentralized finance (DeFi). Ellison became sole CEO in August 2022, following Trabucco's departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[16]

81.    Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF rent, and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

---

[16]    https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed December 16, 2022).

82.     "Young people tend to be too risk averse," Ellison said in a more recent Alameda podcast episode.[17]

83.     The Wall Street Journal recently reported that Ellison told Alameda staffers in a video call that she was one of four people (along with Sam Bankman-Fried, Gary Wang, and Nishad Singh) who were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[18]

### *Defendant Gary Wang*

84.     Wang is not like his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. In fact, there's little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

85.     Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[19]

86.     Before co-founding Alameda Research (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on the Future Fund's website.[20] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

87.     The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of

---

[17] https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed December 16, 2022).
[18] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed December 16, 2022).
[19] https://blog.ftx.com/blog/raising-the-bar/ (accessed December 16, 2022)
[20] https://ftxfuturefund.org/about/ (accessed December 16, 2022).

arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

88.     It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[21]

89.     Nishad Singh, the head of engineering at FTX, said Wang was a "really good mentor" who offered suggestions and advice to push things out on short timescales.

90.     In the aftermath of FTX's collapse, and the subsequent $400 million hack, questions are circulating around who could possibly have abused client funds. Wang is a prominent suspect, as one of the few people with "root access" to the exchange's code base, according to The Block.[22]

91.     Wang is also one of the board members of FTX Future Fund – the charity guided by "effective altruism" that aims to "use reason and evidence to do the most good possible for the most people."

92.     Wang, one of the 10 roommates in Bankman-Fried' luxury penthouse in the Bahamas, is reportedly among the four people cited by Caroline Ellison who knew about the decision to send customer funds to Alameda, according to people who spoke to the Wall Street Journal.[23]

---

[21]     https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5     (accessed December 16, 2022).

[22]     https://www.theblock.co/post/186476/who-is-billionaire-ftx-co-founder-gary-wang-and-why-is-he-still-committing-code (accessed December 16, 2022).

[23]     https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

93.     A few Wang photos are circulating on the internet, though little else is known about the mysterious co-founder who preferred to stay in the shadows as SBF chased the limelight. In a now infamous picture on FTX's website, CTO Wang is seen with his back facing the camera as he focuses on the monitors in front of him.

94.     At the age of 28, Wang topped Forbes' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[24]

95.     Wang is reportedly now "under supervision" by Bahamian authorities along with Bankman-Fried and Singh.[25]

### Defendant Nishad Singh

96.     Nishad Singh joined Alameda Research in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

97.     Singh is thought to be a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a 10-person luxury penthouse in Nassau, the Bahamas.

---

[24]
https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be96dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed December 16, 2022).
[25] https://cointelegraph.com/news/sam-bankman-fried-is-under-supervision-in-bahamas-looking-to-flee-to-dubai (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

98.     He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and may have been informed of a plan to backstop losses at Alameda with FTX customer funds.[26]

99.     Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, Berkeley graduate talked about why he left his dream job at Facebook to join Alameda Research in a FTX podcast.[27]

100.    "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

101.    Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

102.    In the podcast, Singh said he was also attracted to the company's cultural commitment to effective altruism,[28] a movement that "aims to find the best ways to help others," which he discovered in college.

103.    Singh is a board member of FTX Future Fund, a part of the FTX Foundation, a philanthropic collective funded principally by Bankman-Fried and other senior FTX executives.

---

[26]   https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 16, 2022).
[27]   https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed December 16, 2022).
[28]   https://www.coindesk.com/layer2/2022/11/11/how-sam-bankman-frieds-effective-altruism-blew-up-ftx/ (accessed December 16, 2022).

104. "It was pretty clear that everybody working [at Alameda] was highly motivated, was sort of effective altruism-aligned, which mattered a lot to me and was really [a] bright spot. I could learn a lot from them," Singh said in the podcast.

105. After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

106. "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company blog.[29] Singh also reportedly built most of FTX's "technological infrastructure" and managed the development team.

107. Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[30] A similar relationship may be in place at FTX's core properties.[31]

108. Singh is reportedly now "under supervision" by Bahamian authorities along with Bankman-Fried and Wang.[32]

### *Dan Friedberg*

109. Daniel S. Friedberg was the chief compliance officer at FTX, the person who oversaw FTX's compliance initiatives before it imploded. He joined the firm in March 2020, and

---

[29] https://blog.ftx.com/blog/raising-the-bar/ (accessed December 16, 2022).
[30] https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed December 16, 2022).
[31] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 16, 2022).
[32] https://cointelegraph.com/news/sam-bankman-fried-is-under-supervision-in-bahamas-looking-to-flee-to-dubai (accessed December 16, 2022).

was instrumental in perpetuating its nefarious activities, in part by helping to cover up any indications that the FTX scheme was unraveling.

110.   Although Friedberg was supposed to be the adult in the room overseeing the operations of the FTX empire, he did so thousands of miles away, remotely, from Seattle, Washington. As FTX's chief regulatory officer, Friedberg was tasked with monitoring customer protection practices, ensuring product offerings complied with existing rules and overseeing internal audits and reviews. He did none of this.

111.   Friedberg has also been tied to an online poker scandal in 2008, where Ultimate Bet's founder Russ Hamilton was accused of installing a "God mode" on his gambling platform that only certain players had access to – resulting in an estimated $50 million in misappropriated funds.

112.   In a surreptitiously recorded file, Friedberg reportedly advised Hamilton to claim he was a victim of the Ultimate Bets "God mode" scam, and push blame on an unnamed consultant to the company who exploited the site's servers. The audio recordings were published in 2013 under uncertain circumstances and have not been independently verified by CoinDesk.

113.   "I did take this money and I'm not trying to make it right, Dan, so we gotta get that out of the way right away, real quick," Hamilton allegedly said in the audio recording.[33] Hamilton also founded the World Champion online poker platform.

114.   Veteran short seller Marc Cohodes, one of the few to publicly question the rapid rise of FTX before its fall in a September interview with trading-focused webcast Hedgeye,[34] had

---

[33] http://craakker.blogspot.com/2013/05/pokers-watergate-moment.html (accessed December 16, 2022).
[34]      https://app.hedgeye.com/insights/122943-marc-cohodes-ftx-is-dirty-rotten-to-the-core-hedgeye-investing-s?with_category=17-insights (accessed December 16, 2022).

noted the potential conflicts of hiring someone connected to a cheating scandal to oversee compliance at the $32 billion FTX exchange.

115.    Similarly here, Dan Friedberg in his role as Chief Compliance Officer oversaw both FTX and Alameda, which had its own "god mode," i.e., Alameda was secretly exempted from FTX's auto-liquidation protocols.

116.    Friedberg's penchant for duplicity to make legal problems vanish for his corporate paymasters didn't end with UB's demise. NBC News recently reported on a 2020 incident involving SBF's promotion of the Ethereum-based Cover Protocol and the unfortunate experience of one Dave Mastrianni, an investor who was prevented from cashing out his $400,000 in paper winnings due to "insufficient liquidity" on FTX before the COVER token cratered.[35]

117.    When Mastrianni contacted FTX to accuse SBF of having a "pump and dump" role in the debacle, Friedberg called back with an offer. How would Mastrianni, a graphic artist, like a job creating NFTs for FTX? Friedberg offered Mastrianni an 'adviser' contract that would pay him one BTC for 30 days' work, but it also required Mastrianni to absolve FTX, Alameda, and its affiliates of any responsibility for Mastrianni's COVER losses.

118.    Mastrianni eventually agreed, but while he did receive that one BTC, FTX never accepted any of his artwork. Friedberg later emailed to inform him that the payment "was primarily for your release of all claims" and, with that goal accomplished, FTX had no more reason to maintain this subterfuge.

119.    In August, the Federal Deposit Insurance Corporation (FDIC) sent a letter to Friedberg and then-FTX US CEO Brett Harrison to "cease and desist" using marketing language

---

[35]    https://www.nbcnews.com/news/epic-fall-sam-bankman-fried-was-hailed-crypto-genius-clients-saw-smoke-rcna56583 (accessed December 16, 2022).

that could have been erroneously interpreted as saying that exchange users accounts were ensured by the federal banking regulator. Harrison subsequently deleted the tweet.

120.    Before joining FTX, Friedberg was a partner at Fenwick & West LLP, where he led the law firm's cryptocurrency division, according to a now-deprecated LinkedIn page. He received a JD and MBA degree from the University of Wisconsin-Madison.

## B.    The Rise and Fall of FTX.

121.    The FTX.com exchange was extremely successful since its launch. This year around $15 billion of assets are traded daily on the platform, which now represents approximately 10% of global volume for crypto trading. The FTX team has grew to over 300 globally. Although the FTX Entities' primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[36]

122.    FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 ***billion dollars***.

123.    Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

124.    At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[37]

---

[36]    https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed December 16, 2022).

[37]    https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

125.    In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[38]

126.    Bankman-Fried's cryptocurrency empire was officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[39]

127.    After obtaining this information, Changpeng "CZ" Zhao, the CEO of Binance, decided to liquidate roughly $530 million-worth of FTT. Customers also raced to pull out, and FTX saw an estimated $6 billion in withdrawals over the course of 72 hours, which it struggled to fulfill.[40] The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8th, that Binance would buy FTX, effectively bailing it out.[41]

---

[38]    https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 16, 2022).

[39]    https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed December 16, 2022).

[40]    https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed December 16, 2022).

[41]    https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed December 16, 2022).

128.    The next day, Binance announced that it was withdrawing from the deal, citing findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[42] The news sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[43] On November 11th, unable to obtain a bailout, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[44]

129.    Following his resignation, Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Entities went wrong:[45]



---

[42]    https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed December 16, 2022).

[43]    https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed December 16, 2022).

[44]    https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed December 16, 2022).

[45]    https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*







*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*







*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*



*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*







*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*



**SBF** ✔ @SBF_FTX · Nov 10
Replying to @SBF_FTX

16) Second, in any scenario in which FTX continues operating, its first priority will be radical transparency--transparency it probably always should have been giving.

Giving as close to on-chain transparency as it can: so that people know *exactly* what is happening on it.

💬 214        🔁 320        ♡ 2,255        ⬆️



**SBF** ✔ @SBF_FTX · Nov 10

17) All of the stakeholders would have a hard look at FTX governance.  I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users--would have a large part to play in how it would be run.

Solely trust.

💬 137        🔁 198        ♡ 1,878        ⬆️



**SBF** ✔ @SBF_FTX · Nov 10

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers.  That's it.

💬 144        🔁 158        ♡ 1,970        ⬆️



**SBF** ✔ @SBF_FTX · Nov 10

19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406        🔁 760        ♡ 2,776        ⬆️

38

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*







130.    According to a recent Reuters report, however, another explanation contributing to the precarious house of cards that was the Deceptive FTX Platform is that earlier this year, Bankman-Fried secretly transferred *at least $4 billion* in customer funds from FTX to Alameda without telling anyone, after Alameda was hit with a series of losses, and that the FTX entities lent

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

more than **half** of its **$16 billion** in **customer funds** to Alameda in total, with more than **$10 billion**

**in loans outstanding**.[46]

**C.      The SEC's Consistent Approach to Cryptocurrency.**

**Overview**

131.     Despite the crypto industry's cries for "regulatory clarity," the SEC's stance on cryptocurrency has been clear and consistent from the beginning. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing; clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

132.     Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

"The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities

---

[46]      https://markets.businessinsider.com/news/currencies/ftx-crash-client-funds-alameda-binance-sbf-sec-cftc-probe-2022-11?utm_medium=ingest&utm_source=markets (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." (emphasis added)"[47]

133.    Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in Superintendent of Insurance v. Bankers Life and Casualty Co.:

> "We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

134.    Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is always considered and affirmed, same as it has been by hundreds of federal courts across the country since the *Howey* Decision, which the Supreme Court adopted over 75 years ago.[48] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[49] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

135.    The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products

---

[47] https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed December 16, 2022).
[48] https://supreme.justia.com/cases/federal/us/328/293/ (accessed December 16, 2022).
[49] Id.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

and services over the past decade. The SEC first made investors aware of the dangers of investing in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[50]

136.    A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[51] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[52] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[53]

137.    In 2019, the SEC released a "Framework for "Investment Contract" Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[54]

---

[50] ia_virtualcurrencies.pdf (sec.gov) (accessed December 16, 2022).

[51] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed December 16, 2022).

[52] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed December 16, 2022).

[53] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed December 16, 2022).

[54] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed December 16, 2022).

138.   In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[55] multiple speeches,[56] Congressional testimony,[57] and several official SEC statements[58] and proclamations.[59] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[60] warning that their failure to register with the SEC may violate U.S. securities laws.[61] In one interview, Gensler said:

> "The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that."[62]

139.   On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[63] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[64] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO

---

[55] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed December 16, 2022).
[56]   https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed December 16, 2022).
[57] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed December 16, 2022).
[58]   https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed December 16, 2022).
[59]   https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed December 16, 2022).
[60]   https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed December 16, 2022).
[61]   https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler- 164215740.html (accessed December 16, 2022).
[62]   https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed December 16, 2022).
[63] SEC.gov | Kennedy and Crypto (accessed December 16, 2022).
[64] Id.

Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[65]

140.    The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[66]

141.    What follows are summaries of five cases that will help inform this litigation.

**SEC v. KIK**

142.    In Kik[67], the SEC's complaint[68], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[69]

143.    The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

---

[65] Id.

[66] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed December 16, 2022).

[67] https://www.sec.gov/news/press-release/2020-262 (accessed December 16, 2022).

[68] https://www.sec.gov/news/press-release/2019-87 (accessed December 16, 2022).

[69]    https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

**SEC v. Telegram**

144.    In Telegram,[70] the SEC filed a complaint[71] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

145.    Telegram argued[72] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

146.    On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[73] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

147.    Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the

---

[70] https://www.sec.gov/news/press-release/2020-146 (accessed December 16, 2022).
[71] https://www.sec.gov/news/press-release/2019-212 (accessed December 16, 2022).
[72]    https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed December 16, 2022).
[73] SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed December 16, 2022).

sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

### SEC v. BlockFi

148.    In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [74]with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

149.    BlockFi argued for "increased regulatory clarity" but lost.[75]

150.    To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

### SEC Wells Notice to Coinbase

151.    In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)."[76] According to Coinbase, its lawyers

---

[74] https://lnkd.in/d-Xy45ec (accessed December 16, 2022).
[75] https://blockfi.com/pioneering-regulatory-clarity (accessed December 16, 2022).
[76] The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com) (accessed December 16, 2022).

reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a *Wells* Notice*, informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

152.     According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[77]

153.     The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Familial Resemblance Test").

154.     Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

155.     Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

---

[77] *Id.*

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

156.    Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; and 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and vii) a note evidencing loans by commercial banks for current operations.

157.    The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g. is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

158.    Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors (especially disgruntled ones) would certainly expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

159.    Given the clear facts of this case, Coinbase decided to cancel the Lend program.[78]

**D.    FTX's offer and sale of YBAs, which are unregistered securities.**

160.    Beginning in 2019, the FTX Entities began offering the YBAs to public investors through its Earn program. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

161.    The details of the Earn program are still listed on the FTX website,[79] and additional information on Earn is described in a declaration submitted in the Voyager Chapter 11 proceedings by Joseph Rotunda, Director of Enforcement of the Texas State Securities Board, on October 14, 2022.[80]

162.    Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website, the company describes the Earn program thusly:

> "You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."[81]

163.    On the same webpage, the company also states:

> The **first $10,000** USD value in your deposit wallets will earn **8%** APY. Amounts held **above $10,000 up to $100,000** USD in value (subject to market fluctuations) will earn **5%** APY.[82]

164.    Nowhere on the website does FTX describe how this yield will be generated; readers are given the impression that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

---

[78] Coinbase cancels Lend program launch after SEC fight - The Verge (accessed December 16, 2022).
[79] FTX App Earn – FTX Exchange (accessed December 16, 2022).
[80] 1175310142280000000134.pdf (stretto.com) (accessed December 16, 2022).
[81] FTX App Earn – FTX Exchange (accessed December 16, 2022).
[82] *Id.*

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

165.    Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[83] Staking serves a similar function to cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange. While the exact mechanism will vary from project to project, in general, users will put their token on the line (i.e., "stake") for a chance to add a new block onto the blockchain in exchange for a reward. Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the blockchain. The network chooses validators based on the size of their stake and the length of time they've held it. Thus, the most invested participants are rewarded. If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[84]

166.    Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate. In other words, some argue that staking programs are different from lending programs because user assets are not actually being "lent" out to third parties. But in September 2022, SEC Chairman Gary Gensler told reporters that "cryptocurrencies and intermediaries that allow holders to 'stake' their coins might pass" the *Howey* Test.[85] According to Gensler, "From the coin's perspective…that's another indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." The Wall Street Journal noted that if an intermediary such as a crypto exchange offers

---

[83] For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.
[84] The staking definition comes from the Coinbase website: What is staking? | Coinbase (accessed December 16, 2022).
[85] Ether's New 'Staking' Model Could Draw SEC Attention - WSJ (accessed December 16, 2022).

staking services to its customers, Mr. Gensler said, it "looks very similar—with some changes of labeling—to lending."[86]

167.    Based upon information – included and not included – on the FTX website, it does not appear that the company is adhering to the technical, commonly understood, definition of staking. *See* Ex. A ¶¶ 36–42. The most telling indicator is that the company permits any cryptocurrency listed on their platform to be eligible for staking, even coins that do not use Proof of Stake. *Id.* ¶ 39. The FTX website specifically states that Bitcoin and Dogecoin can generate yield under the Earn program, even though these coins use the Proof of Work consensus mechanism (meaning you CANNOT technically stake Bitcoin or Dogecoin). Therefore, it is not at all clear where the promised yield is coming from.

168.    As Mr. Sibenik explains, applying *Howey* to the FTX Earn program reveals that Earn is an investment contract. An investment contract is present because users are clearly entrusting their funds to FTX. Users have to "opt-in" so that FTX may take possession over user assets and deploy them in a manner that will generate yield. As noted above, it is not clear how that yield is generated, but it is clear that FTX is deploying customer assets in a discretionary manner. Therefore, the efforts of FTX are instrumental in generating the users' yield and of course users have an expectation of profit because FTX is advertising yields of up to 8% APY:

> From a securities perspective, the Howey Test defines an investment contract as:
> a.   An investment of money
>    i.   Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining

---

[86] Id.

aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.

b.  In a common enterprise

    i.  FTX customer assets are almost always consolidated in wallets operated an controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda Research 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

c.  With the expectation of profit

    i.  FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[87]

d.  To be derived from the efforts of others

    i.  The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

    ii.  The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies. The primary strategy that FTX

---

[87]  https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn  (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

portrayed to investors was 'staking' as I discuss in the following paragraphs.

Ex. A, ¶ 43.

169.     The FTX Earn program was most likely a note per *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second, Earn was offered and sold to a broad segment of the general public. Third, FTX promoted Earn as an investment; on their website, FTX notes that Earn users will receive "yield earnings" on their "investment portfolio."[88] Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to Earn. Note that the above analysis mirrors that provided by the SEC in their BlockFi order.[89]

**FTT Token**

170.     The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test. FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange. According to crypto news site CoinDesk, "such benefits often include trading fee discounts, rebates and early access to token sales held on the platform."[90] Exchange tokens can be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media posts, and other announcements. Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer. As the exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the

---

[88] FTX App Earn – FTX Exchange (accessed December 16, 2022).
[89] https://www.sec.gov/news/press-release/2022-26 (accessed December 16, 2022).
[90] https://www.coindesk.com/learn/what-is-an-exchange-token/ (accessed December 16, 2022).

exchange token will likely increase. Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[91]

171.    FTT passes the *Howey* Test because the token was controlled by FTX; the company could create or destroy FTT at will. And the value of FTT was based upon the success of FTX, therefore the "efforts" of others prong of the Howey Test is implicated. It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency. In fact, Binance CEO Changpeng "CZ" Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[92] Exchange tokens like FTT also functionally resemble the XRP token, which the SEC alleges is an investment contract due to Ripple's control over the XRP token.[93]

172.    FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

173.    The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Entities offered variable interest rewards on crypto assets held in the YBAs on the Deceptive FTX Platform, which rates were determined by the FTX Entities in their sole discretion. In order to generate revenue to

---

[91]  See FTT price history here:  https://coinmarketcap.com/currencies/ftx-token/  (accessed December 16, 2022).

[92]      https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/ (accessed December 16, 2022).

[93] https://www.sec.gov/news/press-release/2020-338 (accessed December 16, 2022).

fund the promised interest, the FTX Entities pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

174.   On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

> I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

> I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

>> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

>> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[94] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet

---

[94] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application with developed by Blockfolio.

to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY?* Does my balance compound daily? that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.
>
> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a

hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> **FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.

> **FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.

> FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required

by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

175.    Another avenue through which FTX users may have been exposed to a securities transaction was through the basic structure of the platform. Despite cryptocurrency and blockchain's foundational premise being the ability to transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks. When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain. Rather, the exchange simply maintains its own database that indicates which cryptocurrencies it owes to its customers. This is similar to how banks operate. Money deposited in a checking account is not actually "ours." The money becomes the bank's and we are owed a debt by the bank which is governed by the terms and conditions of the account. Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not) with best practice being for exchanges to hold the majority of cryptocurrency (crypto which they are holding on behalf of customers) in multiple cold wallets. Best practice would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

176.    According to the first day declaration by John Ray, how FTX kept its crypto is a mystery:

> The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the

absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[95]

177.    In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[96] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[97] Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried."[98]

178.    To further complicate matters, recent statements given by Sam Bankman-Fried to the Wall Street Journal (WSJ) suggest that about half of the balance owed by Alameda to FTX was from wire transfers that customers made to FTX via Alameda in the early days before FTX

---

[95] 042020648197.pdf (pacer-documents.s3.amazonaws.com) (accessed December 16, 2022).
[96] *Id.*
[97] *Id.*
[98] *Id.*

had a bank account.[99] This money was intended to fund customers' accounts at FTX. Bankman-Fried claims some customers continued to use that route after FTX had a bank account and that over time, "FTX customers deposited more than $5 billion in those Alameda accounts."[100] The WSJ acknowledged that these funds "could have been recorded in two places—both as FTX customer funds and as part of Alameda's trading positions" and that "such double-counting would have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[101]

179.    The relationship between FTX and Alameda was critical to the exchange's eventual collapse. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows Capital), FTX.com lent out some of its customer assets that it did control to Alameda.[102] Presumably, the exchange benefitted from the interest paid by Alameda for the loaned cryptoassets – although some have suggested that the loans were made for free.[103] Alameda could then use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from other sources would have been much more expensive).[104] It appears that Alameda did post collateral to secure the loans of customer cryptoassets that it received, but that collateral took the

---

[99]     https://www.wsj.com/articles/ftx-founder-sam-bankman-fried-says-he-cant-account-for-billions-sent-to-alameda-11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink (accessed December 16, 2022).

[100] FTX customers deposited more than $5 billion in those Alameda accounts.

[101] *Id.*

[102] https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations (accessed December 16, 2022).

[103]    https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed December 16, 2022).

[104] For a more general discussion of the conflicts of interest inherent in these relationships, see https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html (accessed December 16, 2022).

form of FTT tokens. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX could create unlimited amounts of FTT if it wished.

180.    In short, there appear to have been two sets of leveraged transactions involved. First, Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans. Second, Alameda engaged in margin trading, essentially borrowing money to execute risky trading strategies: these trades were secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements. In an Alameda balance sheet linked to CoinDesk in early November, Alameda's largest asset holdings were listed as being FTT tokens (it is possible that it received these in a kind of bailout from FTX). Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[105] Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

181.    After the CoinDesk report came out on November 2, the CEO of FTX's rival exchange Binance, Changpeng Zhao, tweeted that Binance was planning to sell off its holdings of FTT. This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

---

[105]    https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed December 16, 2022).

182.    While we are still learning exactly what happened at FTX and Alameda in the days and months before their collapse, we do know several pieces of information that are relevant to this litigation.

183.    First, it is quite possible that fiat currency FTX customers sent to the exchange for the purpose of purchasing cryptocurrency may never have actually resulted in a cryptocurrency transaction. Instead, Alameda may have used those funds to purchase any number of assets, including investing in venture capital firms (Alameda's balance sheet in John Ray's first day declaration list venture capital assets).

184.    Second, when customers withdrew cryptoassets from FTX in the past, FTX was likely meeting these withdrawals by selling FTT. However, as the price of FTT fell in the wake of Zhao's tweet, it became increasingly expensive for FTX to convert FTT into other cryptoassets that matched customers' expectations of their portfolio holding – especially as so many FTX customers were seeking to pull their cryptoassets out of the exchange at the same time. Therefore, while customers may have believed they were buying cryptocurrencies that were not securities (i.e., commodities) the economic reality was that they were directly, or indirectly, buying securities in the form of venture capital investments, FTT, SOL, and/or SRM. Another way to think of it is that FTX and all its affiliated entities were essentially economically akin to a venture capital fund, where "investors," in the form of customers, sent funds to the firm and the firm then did whatever it wanted with these funds, including purchasing securities. Given these facts, it appears that any person who used FTX was engaged in a securities transaction of some kind, knowingly or unknowingly.

185.    Thus, as will be illustrated below, the FTX Brand Ambassadors' promotion of "FTX" was necessarily the promotion of unregistered securities.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

### E. The Defendants Aggressively Marketed the FTX Platform

186.    From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to Digital Assets."[106] The report was issued pursuant to the March 9, 2022 Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by DoJ dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces…" and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.[107]

187.    Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and

---

[106]        https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed December 16, 2022).
[107] https://web.archive.org/web/20140220003018/https://www.cs.columbia.edu/~smb/UlbrichtCriminalComplaint.pdf (accessed December 16, 2022).

drug trafficking."[108] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[109] According to the United Nations, "money raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[110] North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."[111]

188.     Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[112] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The

---

[108] Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed December 16, 2022).

[109] Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed December 16, 2022), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed December 16, 2022), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed December 16, 2022).

[110] How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed December 16, 2022).

[111] Id.

[112] HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed December 16, 2022).

report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[113]

189.    Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[114] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[115] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto

---

[113] [Ban Cryptocurrency to Fight Ransomware - WSJ](#) (accessed December 16, 2022).
[114] [Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice](#) (accessed December 16, 2022).
[115] Id.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

to scams – that's about one out of every four dollars reported lost, more than *any* other payment method."[116] The median individual loss was a staggering $2,600.

190.    Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

> "Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize."[117]

191.    There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Entities through the bankruptcy proceedings.[118]

192.    All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not

---

[116] Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov) (accessed December 16, 2022).
[117] Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed December 16, 2022).
[118] What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ

invested although they have heard at least a little about cryptocurrency.[119] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

193.    These valid concerns are one reason why crypto firms like FTX turn to celebrity endorsers. The FTX advertising campaign is particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency (note statements by O'Leary, Brady, and Curry, below). These statements were untrue, as FTX turned out to be a house of cards that misappropriated customer assets.

194.    FTX's paid endorser program was clearly designed to use the positive reputation associated with specific celebrities to convince consumers that FTX was a safe place to buy and sell cryptocurrency.

195.    As Mr. Sibenik explains, FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.' Ex. A ¶ 44–49:

> In Stephen Curry's FTX commercial, FTX's alleged safety is quite blatant stated when he claims
>
> *"With FTX, I have everything I need to buy, sell, and trade crypto safely"*
>
> Kevin O'Leary, another FTX brand ambassador stated:
>
> *"To find crypto investment opportunities that met my own rigorous standards of compliance, I entered into this relationship with FTX. It has some of the best crypto exchange offerings I've seen on the market. FTX leverages best-in-class tech to provide a quality trading experience with low fees for both professional and retail investors alike, while at the same time providing the reporting platform that serves both internal and regulatory compliance requirements"*

---

[119] [46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center](#)

Given that FTX continually misappropriated customer assets, didn't have appropriate capital controls or reasonable compliance policies in place, these claims weren't just unfounded; they were downright false.

Mr. O'Leary's assertion that FTX was a compliant exchange is even more damaging than that of the typical celebrity, however. This is because Mr. O'Leary is known for being a *Shark* on the TV show *Shark Tank* whereby Shark's make investments in startups. With those investments comes due diligence. Mrb O'Leary's endorsement of FTX certainly makes it seem that he did appropriate due diligence into FTX, when obviously, whatever due diligence that he did was grossly inadequate.

Mr. O'Leary appears to admit that his own due diligence was inadequate, and that he relied on the due diligence of others:

*"I obviously know all the institutional investors in this deal. We all look like idiots. Let's put that on the table. We relied on each other's due diligence, but we also relied on another investment theme that I felt drove a lot of interest in FTX[120] "*

Mr. O'Leary is also a strategic investor in Canada's largest cryptocurrency exchange, 'WonderFi.' The name is derived from Mr. O'Leary's nickname, 'Mr. Wonderful.' Mr. O'Leary's involvement in WonderFi could naturally lead one to believe that he knew how to perform adequate due diligence on exchanges, and that he would do so on FTX before investing and acting as a brand ambassador.

196.    Other organizations and individuals, with presumably more to gain, did find red flags at FTX and turned down FTX and/or Sam Bankman-Fried's money. The nonprofits Our World Data and MITRE declined offered gifts of $7.5 million and $485,000, respectively, from the FTX Future Fund due to undisclosed red flags.[121] In addition, CME Group CEO Terry Duffy allegedly told Sam Bankman-Fried that he was "an absolute fraud" upon having an initial

---

[120]        https://dailyhodl.com/2022/12/09/kevin-oleary-says-ftx-collapse-makes-him-and-other-investors-in-the-crypto-exchange-look-like-idiots/
[121] https://www.moneyweb.co.za/moneyweb-crypto/sam-bankman-frieds-red-flags-were-seen-in-all-corners-of-his-empire/ (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

conversation with Mr. Fried.[122] Finally, after FTX's implosion, the FT reported that FTX held

talks with Taylor Swift to sponsor the singer's tour for more than $100 million.[123] While the article

does not detail the reasons why Swift declined the FTX offer, it does include the following quote

from a person close to the negotiations:

> "Taylor would not, and did not, agree to an endorsement deal. The discussion was
> around a potential tour sponsorship that did not happen."[124]

197.    Based upon the information that has been released by FTX's new CEO John Ray

as part of the company's bankruptcy filings, it is clear that anyone who bothered to spend 20

minutes reviewing FTX's operations pre-collapse would have identified significant red flags. In

his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

> "Never in my career have I seen such a complete failure of corporate controls and
> such a complete absence of trustworthy financial information as occurred here.
> From compromised systems integrity and faulty regulatory oversight abroad, to the
> concentration of control in the hands of a very small group of inexperienced,
> unsophisticated and potentially compromised individuals, this situation is
> unprecedented."[125]

198.    Mr. Ray's pleading contains a number of troubling findings, among them: 1.) FTX

did not have centralized control of its cash, 2.) FTX had no dedicated human resources department,

which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX

Entities, 3.) A lack of disbursement controls that resulted in employees submitting payment

requests via on-line chat and these requests being approved by managers responding with

---

[122]     https://www.cnbc.com/2022/11/23/absolute-fraud-cmes-terry-duffy-says-he-saw-trouble-before-ftx-collapse-.html (accessed December 16, 2022).

[123] FTX held talks with Taylor Swift over $100mn sponsorship deal | Financial Times (accessed December 16, 2022).

[124] Id.

[125]

https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiokr3C_-L7AhWsnGoFHRdBC2kQFnoECBAQAQ&url=https%3A%2F%2Fpacer-documents.s3.amazonaws.com%2F33%2F188450%2F042020648197.pdf&usg=AOvVaw38wQJwnmP5fFftiyYkNjSG (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

personalized emojis, 4.) Corporate funds were used to purchase homes and personal items for employees, and 5.) A lack of books and records and the absence of lasting records of decision-making.

199.    It is hard to imagine that anyone who has done business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr. Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic. Of course, the same can be said for prominent venture capital (VC) firms that invested in FTX. But these investors are in the business of taking risk and VC firms have an incentive to conduct limited due diligence lest they become known as unfriendly to founders and get locked out of future deals. The same "founder friendly" dynamics played a role in lapse due diligence at WeWork and Theranos.

200.    Furthermore, customers were not opting to use FTX because of who their investors were. Instead, many customers relied on the testimonials of paid celebrity endorsers and these celebrities knew why they were being compensated. Indeed, the whole point behind paying celebrities to endorse a product is to increase sales. Thus, celebrities have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

201.    In addition to the conduct of Defendant Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the Deceptive FTX Platform.

202.    In April 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the Deceptive FTX Platform.

203.    FTX's explanation for using stars like Brady, Bunchden, and the other Defendants was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[126]

204.    In other words, the FTX Entities needed celebrities like Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of the YBAs, which are unregistered securities. Below are representative statements and advertisements Defendants made to drive the offers and/or sales of the YBAs, which Plaintiff and Class Members will supplement as the case progresses and discovery unfolds.

### i.    Defendants Tom Brady and Gisele Bundchen



---

[126]         https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed December 16, 2022).

205.    The star quarterback and the businesswoman and model, then a couple, became FTX ambassadors last year. They also took equity stakes in FTX Trading Ltd.

206.    Mr. Brady and Ms. Bündchen also joined the company's $20-million ad campaign in 2021. They filmed a commercial called "FTX. You In?" showing them telling acquaintances to join the FTX platform. The ad can be viewed here: https://www.youtube.com/watch?v=uymLJoKFlW8

207.    In a second commercial, Brady is shown executing a trade on the FTX platform on his cellular phone. Brady explains, "I mean trading crypto. FTX is the safest and easiest way to buy and sell crypto. It's the best way to get in the game."

208.    In a third commercial, FTX is again depicted using the FTX platform on his cellular phone while walking off a football field. A man asks, "FTX, that's the crytpo app right?" Brady responded, "Now its for all kinds of investing. It's better. And I like better."

209.    None of these three commercials disclose the fact that Mr. Brady was a paid brand ambassador for FTX or that he owned equity in FTX Trading Ltd.

210.    The commercials may be viewed here: https://www.youtube.com/watch?v=_aCGMyrFn-8. The shorter version of the first commercial which aired during the Superbowl may is available here: https://www.youtube.com/watch?v=4p4z2wsjhmM.

### ii.    Defendant Kevin O'Leary



211.    "Mr. Wonderful," both a brand ambassador and an FTX shareholder, made several public statements designed to induce consumers to invest in the YBAs.

212.    "To find crypto investments opportunities that met my own rigorous standards of compliance, I entered into this relationship with @FTX_Official," Mr. O'Leary said on Twitter last year. Mr. O'Leary *recently deleted the tweet*.

213.    He also served as a judge for the FTX Charity Hackathon in Miami in March of 2022.[127]

214.    And *very* recently, on October 12, 2022, O'Leary stated confidently that FTX was totally compliant and a safe place to hold assets. O'Leary stated that: "I have to disclose I'm a paid spokesperson to a FTX and shareholder there, too, cause we mentioned him and I'm a big advocate for Sam because he has two parents who are compliance lawyers. If there's ever a place I could be

---

[127] https://ftxcharityhackathon.com/ (accessed December 16, 2022).

that I'm not gonna get in trouble it's going to be in FTX so you know that's there they're great

people but he gets the job in compliance which is why he's working so hard to get regulation."[128]



215.    He went on to state that "[t]here are a lot of signs right now that point to things

looking bad. Crypto has taken a big hit and investors are wondering if things will turn around. If

you follow history and the pattern of things, you know that this is RIGHT ON TRACK and we'll

soon see a resurgence with crypto. Do you think we're entering a Bullish period? Let me know in

the comments!"[129]

### iii.    Defendant Udonis Haslem



---

[128]    *See*    https://www.youtube.com/watch?v=iwD_zWgyUz8    beginning    at    17:32    (accessed
December 16, 2022)

[129]    *Id.*

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

216. Udonis Haslem, the Captain of the Miami HEAT and Miami legend, became an FTX global ambassador. Much like Brady and Bunchden, Haslem starred in FTX's "You In, Miami?" ad campaign that launched at the start of the 2021 - 2022 Miami HEAT season.

217. In the ad, which be viewed here: https://www.youtube.com/watch?v=83FDP53yPa8, Haslem states "FTX has arrived in 305. So I just got one question: Are you in, Miami?" Others respond "If he's in, I'm in." Haslem concludes "Our city. Our team. FTX. You in, Miami?"

### iv. Defendant David Ortiz



218. Defendant David Ortiz, who became an FTX brand ambassador and hyped the YBAs in exchange for cryptocurrency and multiple collections of NFTs, also ran his own FTX "You In?" ad, which began running nationwide during the first game of the 2021 World Series. In the ad, which can be found here: https://www.ispot.tv/ad/qSlm/ftx-big-papi-is-in, Ortiz is watching a game on the television when he receives a phone call from The Moon. Inspired by the "moonblast" home run scored on the field, The Moon frantically tells David about opportunities

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

to get into cryptocurrency with FTX. David decides it's an offer he can't refuse and joins fellow

sports stars Stephen Curry and Tom Brady on the platform. FTX announces it is the official crypto

exchange of MLB.

     **v.**    **Defendant Steph Curry**



219.    Defendant Stephen Curry had his own nationwide ad campaign pushing the

Deceptive FTX Platform, known as the "#notanexpert" campaign.[130] Throughout the ad, Curry

repeatedly denies being cast as an expert in cryptocurrency, culminating in his statement that "I'm

not an expert, ***and I don't need to be.*** With FTX I have everything I need to buy, sell, and trade

crypto ***safely.***"[131]

220.    The purpose of Curry being an ambassador is to expand the reach of the crypto firm

and "tout the viability of cryptocurrency to new audiences around the world," FTX said in a press

---

[130] https://www.youtube.com/watch?v=gsy2N-XI04o (accessed December 16, 2022).
[131] *Id.*

release.[132] In other words, to drive adoption of the Deceptive FTX Platform and to facilitate the sales of unregistered YBAs to unsuspecting and unwitting retail consumers.

221.    "I'm excited to partner with a company that demystifies the crypto space and eliminates the intimidation factor for first-time users," Curry said in the statement, highlighting that "first-time," inexperienced users were the intended targets of the campaign.[133]

### vi.    Defendant Golden State Warriors



Official Crypto Platform and NFT Marketplace
of the **Golden State Warriors**

222.    The Golden State Warriors and FTX officially launched their partnership in 2022 with the unveiling of the FTX logo on the court at the Chase Center. As the Warriors' Official Cryptocurrency Platform and NFT Marketplace, the franchise dropped NFTs on FTX.us beginning in early 2022. The partnership between the Warriors and FTX marked the first international rights

---

[132]    https://www.prnewswire.com/news-releases/nba-superstar-stephen-curry-becomes-global-ambassador-and-shareholder-of-leading-cryptocurrency-exchange-ftx-through-long-term-partnership-301370497.html (accessed December 16, 2022).
[133] *Id.*

partner for the Warriors, meaning the GSW and FTX had a visible market presence, inclusive of logo and likeness, internationally.

223.    The deal also included the Warriors' G League team, the Golden Guardians and Warriors Gaming Squad (affiliated esports teams), in-arena signage at Chase Center, and virtual floor signage at Warriors games.[134]

### vii.    Defendant Shaquille O'Neal



---

[134] https://www.instagram.com/p/CYiBaq8JLx7/ (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

224.   Defendant Shaquille O'Neal, former professional NBA basketball star, sports analyst, and entrepreneur, also became an FTX ambassador, stating in a video posted on FTX's Twitter account that "I'm excited to be partnering with FTX to help make crypto accessible for everyone. I'm all in. Are you?"[135]

### viii.   Defendant Trevor Lawrence



225.   Defendant William Trevor Lawrence, the first pick in the 2021 NFL draft and now quarterback for the Jacksonville Jaguars of the NFL, became a brand ambassador for FTX in exchange for unspecified cryptocurrency payments, which sponsorship was announced in April

---

[135]
https://twitter.com/FTX_Official/status/1532119977381208066?s=20&t=5wTm55FDE6c0cCD9vCndYg (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

2021.[136] The stated purpose of the sponsorship was because "Trevor is someone people can have

a personal and human connection with for [FTX] and to the crypto space."[137]

### ix.    Defendant Shohei Ohtani



226.    The FTX Entities entered into a long-term partnership with global icon and history-

making MLB Superstar Shohei Ohtani. In addition to being an FTX global ambassador, Mr. Ohtani

received all of his compensation in equity and cryptocurrencies.[138] In exchange for those

---

[136] https://twitter.com/ftx_app/status/1386667859393253376 (accessed December 16, 2022).
[137] https://www.forbes.com/sites/chriscason/2021/04/26/trevor-lawrence-makes-first-investment-move-with-first-of-its-kind-partnership-with-blockfolio/?sh=7190ee6f47ef (accessed December 16, 2022).
[138] https://www.prnewswire.com/news-releases/mlb-superstar-shohei-ohtani-joins-ftx-as-global-ambassador-through-long-term-partnership-301425911.html (accessed December 16, 2022).

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

unspecified payments, Mr. Ohtani served as a spokesperson for FTX to increase awareness of the

Deceptive FTX Platform and to drive adoption of and investments in the unregistered YBA

securities on a global scale through a variety of initiatives. [139]

### x.    Defendant Naomi Osaka



227.    Defendant Naomi Osaka, a 24-year-old professional tennis player and four-time

Grand Slam singles champion, became a brand ambassador for FTX, with the express purpose of

"getting more women to start investing in crypto."[140] Osaka wore the FTX logo on the kit she wore

at tournaments, including the 2022 Miami Open. [141] In exchange for an equity stake in FTX and

payments in unspecified amounts of cryptocurrency, Osaka directed and produced content in

association with the FTX Entities designed to promote the offer and sale of the unregistered YBA

securities, hoping "she will reach a global audience."[142]

---

[139] *Id.*
[140]    https://coinmarketcap.com/alexandria/article/naomi-osaka-tennis-star-teams-up-with-ftx-and-she-s-getting-paid-in-crypto-too (accessed December 16, 2022).
[141] *Id.*
[142] *Id.*

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

228.    Osaka confirmed her involvement by tweeting a glitzy new FTX ad to her **1.1 million followers**, which can be viewed here: https://youtu.be/pkuf8avR50k. It shows the tennis star competing in a comic strip — and over dramatic music, she says: "They thought they made the rules for us. They thought they could control us. They were wrong."

229.    The video then cuts to a boardroom full of marketing executives talking about the ad in a tongue-in-cheek way — and discussing other ideas… including Osaka heading to the moon. An idea to have a QR code bouncing around the screen (a clear nod to Coinbase's Super Bowl spot) is dismissed for being "boring."

230.    They settle on letting Osaka speaking for herself — and play a mock-up of the tennis ace giving an interview to a news channel where she says: "I'm Naomi Osaka and I'm proud to partner with FTX. Making cryptocurrency accessible is a goal that FTX and I are striving towards." The ad ends with the tagline: "Naomi is in. You in?"

xi.    **Defendant Larry David**



231.    For his part, the legendary comedian and creator of *Seinfeld* and *Curb Your Enthusiasm*, Larry David, created an ad for the FTX Entities called "Don't Miss Out on Crypto,"

which aired during the 2022 Super Bowl, making FTX one of the most retweeted brands during the Super Bowl, and winning the "Most Comical" honorific from *USA Today*'s Ad Meter.[143]

232.    The ad—the only Super Bowl commercial David ever appeared in—featured David being a skeptic on such historically important inventions as the wheel, the fork, the toilet, democracy, the light bulb, the dishwasher, the Sony Walkman, and, of course, FTX, and cautioned viewers, "Don't be like Larry." The ad can be viewed here: https://youtu.be/BH5-rSxilxo

## CLASS ACTION ALLEGATIONS

233.    As detailed below in the individual counts, Plaintiff brings this lawsuit on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.    Class Definitions

234.    Plaintiffs seek to represent the following Global Class, Nationwide Class, and Florida Subclass (collectively, "the Classes"):

(1)  **Global Class:** All persons and entities residing outside of the United States who, within the applicable limitations period, purchased or enrolled in a YBA.

(2)  **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA.

---

[143]    https://admeter.usatoday.com/lists/usa-today-ad-meter-replay-ratings-2022-final-results/ (accessed December 16, 2022).

**(3) Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a YBA.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Entities and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

235.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of FTX YBAs to Plaintiffs and the Class Members (in which Defendants each substantially participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell an FTX YBA stems from a transactional occurrence that emanated from the State of Florida.

**B.      Numerosity**

236.    The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold YBAs. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

## C.    Commonality/Predominance

237.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether the YBAs were unregistered securities under federal or Florida law;

(b) whether Defendants' participation and/or actions in FTX's offerings and sales of YBAs violate the provisions of the Securities Act and Florida securities law.

(c) the type and measure of damages suffered by Plaintiffs and the Class.

(a) whether Defendants' practices violate the FDUTPA;

(b) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(c) whether Plaintiffs and Class members are entitled to injunctive relief;

(d) whether Plaintiffs and Class members are entitled to declaratory relief; and

(e) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

## D.    Typicality

238.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's YBAs because of Defendants' actions and/or participation in the offering and sale of these unregistered securities, and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any Defendant that are unique to Plaintiffs.

## E.     Adequacy of Representation

239.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

## F.     Requirements of Fed. R. Civ. P. 23(b)(3)

240.     The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling the YBAs, which are unregistered securities, and/or (2) in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform.

241.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

242.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

## G.     Superiority

243.     A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

## H.    Requirements of Fed. R. Civ. P. 23(b)(2)

244.    Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the YBAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

245.    Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## I.      Requirements of Fed. R. Civ. P. 23(c)(4)

246.      As it is clear that one of the predominant issues regarding Defendants' liability is whether the YBAs FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

247.      As it is clear that another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

## J.      Nature of Notice to the Proposed Class.

248.      The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## COUNT ONE

**Violations of the Florida Statute Section 517.07,**
**The Florida Securities and Investor Protection Act**
**(Plaintiffs Individually and on behalf of the Classes)**

249.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–248 above, as if fully set forth herein.

250.     Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

251.     Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

252.     The YBA is a security pursuant to Fla. Stat. § 517.021(22)(a).

253.     The YBAs sold and offered for sale to Plaintiff and Class members were not:

a. exempt from registration under Fla. Stat. § 517.051;

b. a federal covered security;

c. registered with the Office of Financial Regulations (OFR); or

d. sold in a transaction exempt under Fla. Stat. § 517.061.

254.     The FTX Entities sold and offered to sell the unregistered YBAs to Plaintiffs and the members of the Class.

255.     Defendants are directors, officers, partners and/or agents of the FTX Entities pursuant to Fla. Stat. § 517.211.

256.    The FTX Entities, with Defendants' material assistance, offered and sold the unregistered YBAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

## COUNT TWO

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**§ 501.201, Florida Statutes, *et seq.***
**(Plaintiffs Individually and on behalf of the Classes)**

257.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–248 above, as if fully set forth herein.

258.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq*. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

259.    Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

260.    Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

261.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

262.    Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

263.    Plaintiffs and consumers in the Classes have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the Deceptive FTX Platform and in the amount of their lost investments.

264.    The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

265.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs.

266.    Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## **COUNT THREE**

### **Civil Conspiracy**
### **(Plaintiffs Individually and on behalf of the Classes)**

267.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–248 above, as if fully set forth herein.

268.     The FTX Entities and Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the Deceptive FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive FTX Platform were safe and were not being invested in unregistered securities.

269.     The FTX Entities entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the YBAs and/or use the Deceptive FTX Platform.

270.     Defendants engaged in unlawful acts with the FTX Entities, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities.

271.     Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Entities; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Entities, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

272.     Defendants' conspiracy with the FTX Entities to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

## **COUNT FOUR**

**Declaratory Judgment**

**(Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq*.)**

**(Plaintiffs Individually and on behalf of the Classes)**

273.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–248 as if fully set forth herein.

274.    This Count is asserted against Defendants under Florida Statutes §§ 86.011, *et seq*.

275.    There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

276.    Plaintiffs and the members of the Classes have an obvious and significant interest in this lawsuit.

277.    Plaintiffs and members of the Classes purchased YBAs, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as further described hereinabove.

278.    If the true facts had been known, including but not limited to that the YBAs are unregistered securities, the Deceptive FTX Platform does not work as represented, and Defendants were paid exorbitant sums of money to peddle Voyager to the nation, Plaintiffs and the Classes would not have purchased YBAs in the first place.

279.    Thus, there is a justiciable controversy over whether the YBAs were sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiff and the Class.

280.     Plaintiff and the Class seek an order declaring that the YBAs were securities required to be registered with the SEC and state regulatory authorities, that the Deceptive FTX Platform did not work as represented, and Defendants were paid exorbitant sums of money to peddle FTX to the nation.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.     Certifying the Class as requested herein;

b.     Awarding actual, direct and compensatory damages;

c.     Awarding restitution and disgorgement of revenues if warranted;

d.     Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

e.     Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.     Awarding statutory and multiple damages, as appropriate;

g.     Awarding attorneys' fees and costs; and

h.     Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

*Edwin Garrison, et al. v. Samuel Bankman-Fried, et al.*
*Amended Class Action Complaint and Demand for Jury Trial*

Dated: December 16, 2022

Respectfully submitted,

By: ***/s/ Adam Moskowitz***
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

By: ***/s/ David Boies***
David Boies
(*Pro Hac Vice*)
Alex Boies
(*Pro Hac Vice*)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Phone: (914) 749–8200
dboies@bsfllp.com

By: ***/s/ Stephen Neal Zack***
Stephen Neal Zack
Florida Bar No. 145215
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., Suite 2800
Miami, FL 33131
Office: 305-539-8400
szack@bsfllp.com
uungaro@bsfllp.com

*Co-Counsel for Plaintiff and the Class*

# Exhibit A



**CipherBlade**

Blockchain Investigation Agency

# PRELIMINARY EXPERT REPORT

**Matter:** FTX Exchange

**Written By:** Paul Sibenik

**Date:** 12.16.2022

# Introduction

1. In accordance with instructions from Moskowitz Law Firm, PLLC, I have been instructed to prepare a preliminary expert report surrounding FTX Exchange,

2. More specifically, I have been asked to provide a preliminary opinion on FTX 'Earn' accounts, FTT Token, and FTX Exchange in general, as well as the risks that could affect consumers inherent in them. I have furthermore been asked to provide a technical opinion assessing if or how FTX Earn accounts meet the Howey Test.

3. I am the Lead Case Manager at CipherBlade, a leading blockchain forensics and cybercrime investigative firm which consults with blockchain projects, numerous police, law enforcement and regulatory agencies around the world, including the US FBI and US Secret Service, cryptocurrency exchanges, and other organizations. Other CipherBlade staff and I have experience in some of the most high-profile cryptocurrency investigations to date in relation to a wide range of niches including but not limited to cases involving hacking, theft, SIM-Swapping, ransomware, different types of frauds and scams (e.g., involving ICOs, NFTs, investment fraud, Ponzi Schemes), 'rugpulls,' embezzlement, as well as civil matters such as divorce cases and bankruptcy cases. I am recognized as one of the few experts in blockchain forensics and cryptocurrency cybercrime investigation. This work regularly requires the analysis of cryptocurrency transactions, wallets and addresses, alongside gathering and analyzing other data sources.

4. I regularly use blockchain forensics software to assist me in blockchain investigations. My usage of blockchain forensics software in this matter, has, thus far been extremely minimal. However, I expect blockchain forensics to play a more important role in this matter as this case develops and disclosures are obtained. For reference, however, I primarily utilize Chainalysis Reactor, which is the leading blockchain forensics software available and is utilized by various law enforcement agencies around the world, including the FBI, USSS, DHS, and DEA in the United States. Chainalysis Reactor helps professionals to better understand the flow of funds on assets on supported blockchains. It helps to aggregate and manage large amounts of transaction data and addresses to make the data more parsable. It helps professionals like me to better understand which addresses are under the control of the same individuals or entities, and for addresses that are under the control of a service or exchange, it is often able to identify the name of that service or exchange. Furthermore, Chainalysis Reactor also provides Open-Source Intelligence (OSINT) on various cryptocurrency addresses, which can help investigators understand what those addresses may be

1

associated with or can provide additional context in situations. I have a Chainalysis Reactor Certification (CRC), which is a certification offered by Chainalysis to certify knowledge and understanding of their Reactor forensics tool. I also have the Chainalysis Investigation Specialist Certification (CISC), an additional certification by Chainalysis designed specifically for the most advanced Reactor users, which dives deep into advanced investigative techniques and obfuscation approaches sometimes used by individuals trying to launder ill-gotten cryptocurrency. I furthermore have the Chainalysis Ethereum Investigations Certification (CEIC), a certification program focused on Ethereum, as well as other EVM (Ethereum virtual machine)-compatible cryptocurrencies.

5. Additionally, a large portion of my work involves consulting with blockchain companies in various capacities pertaining to preventative measures they can or should take to reduce risks and mitigate the amount of cybercrime that their company is exposed to. This involves consulting on security practices, including those pertaining to cryptocurrency storage and management. This also involves consulting on matters of compliance so as to significantly mitigate the likelihood and/or frequency of ill-gotten funds being laundered through their service and reduce the amount of various types of fraud, including investment scams, romance scams, impersonation scams, and money muling.

6. A copy of my CV is attached in Appendix A.

7. This is a preliminary report and is subject to change. I reserve the right to amend the views expressed in this report should or when additional information be uncovered or presented to me.

8. Prior to accepting instructions to act in this matter, I made reasonable inquiries to identify any actual or potential conflicts of interest in connection with the parties concerned. No matters arose.

## A Primer on Cryptocurrency Exchanges

9. Before delving into the issues at hand, I think it's first pertinent to provide some background information on what cryptocurrency exchanges are, what purpose they serve, and how they operate, in relation to the matter at hand.

10. In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry.

11. More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

12. The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability or IOU of the exchange to its customer.

13. If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

   a) Trade it for another cryptocurrency

   b) Trade it for fiat currency

   c) Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

   d) Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

14. The exchange accounts should very much be regarded as being custodial in nature. This means that the customer does not *control* access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. The exchange then debits the user account and sends the assets. Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange.

15. One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so.

16. For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> *"Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account."*

> *"None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."*

3

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."[1]*

17. While FTX violated their own terms of service, it's would also have been true that some of these claims would have been demonstrably false to begin even if there was hypothetically no wrongdoing on the part of FTX. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature.  This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. However, it should also be noted that the digital assets aren't technically 'in' the account at all. At a technical level, an exchange account cannot hold or store cryptocurrency. The account stores a record of a liability or an IOU to the exchange's customer. When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true.

18. With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

19. While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented, for reasons I will demonstrate later in this report.

20. The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

---

[1] https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf

21. Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regards to the type of assets that they can investment customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent.

22. Exchanges on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

23. Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance. While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted.

24. Due to the aforementioned reasons and risks surrounding the lack of regulation, as well various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets.

25. The inherent riskiness associated with storing assets on a cryptocurrency exchange is well-known to the vast majority of well-educated and knowledgeable cryptocurrency users. This is evidenced by the frequent expression 'not your keys, not your coins,' essentially meaning that if you don't *control* the cryptocurrency in your account, it's not really yours. 'Your' cryptocurrency belongs to the exchange if you elect to store it 'on' the exchange, and if they renege or are unable to fulfill their liability to you, you as the beneficial cryptocurrency owner of the cryptocurrency, have effectively lost your money.

5

26. This is further referenced by the extensive track record of the many cryptocurrency exchanges that have shut down and ultimately failed,[2] often in spectacular fashion. The most common reasons for an exchange's failure include:

   a) The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency.

   b) The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency.

   c) A hack or theft by an external actor

   d) Embezzlement, or theft by an internal actor, typically founder(s) of the exchange

   e) Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

27. When exchanges do shut down (and this happens relatively frequently) it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back.

28. Suffice to say cryptocurrency exchanges are generally not a safe place to store assets, even amongst exchanges that don't offer a yield-bearing program. When exchanges have a yield-bearing program, or otherwise elect to leverage or loan our customer assets (with or without customer consent), it significantly increases the risk of the exchange failing and becoming insolvent. Cryptocurrency exchanges can do a variety of things to minimize such risks and improve safety. However, what an exchange says, and what they actually do are two different things entirely. It is common for CEOs and executives of exchanges that have failed or in the process of failing to describe their exchange as 'safe,' 'secure,' 'well-regulated,' 'compliant,' 'transparent,' or in a good financial position even when the exact opposite is true. FTX was not an exception to this trend. One should not assume or believe that an exchange is any of these things just because they make such claims.

29. This is not to suggest that exchanges cannot be a much safer place to store assets. They can be with appropriate regulation and oversight. In fact, it appears that for FTX Japan[3] specifically, those investors will be made whole or almost whole due to sensical regulations that were put in place in light of the lessons learned from the

---

[2] https://www.cryptowisser.com/exchange-graveyard/

[3] https://www.coindesk.com/consensus-magazine/2022/12/13/japan-was-the-safest-place-to-be-an-ftx-customer/

failures of Mt. Gox and Coincheck exchanges in Japan.

## FTX Earn Program

30. The FTX Earn program was a yield-bearing account that FTX customers were offered.[4] It was also offered on FTX.us for US persons.[5] The FTX website describes it as follows:

> *"You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."*

31. The yield that customers were offered is also outlined on the same page – 8% APY (Annual percentage yield) for total collective deposits under $10,000 USD equivalent, and 5% APY for collective deposits above $10,000 USD up to $100,000 USD, and no APY for amounts in excess of $100,000.

| Assets supported | Amount | Rate |
|---|---|---|
| All crypto and fiat | Up to $10,000 | 8% |
| All crypto and fiat | All funds after $10,000, up to $100,000 | 5% |

**Example:**

A. I have $10,000 USD in my account. I will earn **8% APY** on my deposit of USD.

B. I have $5,000 USD value each of Bitcoin and Dogecoin in my account, plus $10,000 worth of USD. I will earn 8% APY on the first $10,000 worth of assets deposited regardless of asset, and 5% APY on the next $10,000, for an average APY of **6.5%** on my total deposit.

All assets kept in your wallets will earn the same crypto or fiat that is held in the wallet, and will earn at the same rate. In Example B, you will earn 6.5% on both the DOGE and the BTC. **There is no way to designate one coin to earn 8% and the rest at 5% - they will all earn at the same average rate based on how many coins you are holding.**

32. FTX's Earn program is very similar to that of Voyager's earn program, and programs offered by Celsius and Blockfi, all of whom have filed for bankruptcy. The differences

---

[4] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn
[5] http://web.archive.org/web/20221018024940/https://help.ftx.us/hc/en-us/articles/9081464675735-FTX-Earn

between these programs are minimal and involve differences in phrasing 'yield' vs 'interest' vs 'rewards,' the APY offered, the frequency of payout, and the assets that were supported.

33. The FTX website does not describe how, exactly, FTX will generate the applicable yield, and does not indicate what risk factors may be apparent that could result in the inability to pay such yield.

34. The website does suggest term 'staking' however as a means of generating yield when they indicate that:

> "*By opting in and participating in staking your supported assets in your FTX accoun*t"

35. This naturally gives the impression that their assets would be used for 'staking' without being 100% clear about it.

36. The word 'staking' in the context of cryptocurrency is understood to have a technical meaning. 'Staking' is associated with a consensus mechanism known as 'Proof of Stake'(PoS) and relatedly, 'Delegated Proof of Stake,'(dPos) which *some* cryptocurrencies utilize, but many don't (such as Bitcoin for example, which uses 'Proof of Work' as a consensus mechanism).

37. Staking has a similar purpose for cryptocurrencies that utilize PoS and dPoS as what 'miners' are offered from cryptocurrencies that utilize Proof of Work. Individuals involved in staking are responsible for verifying transactions and they used their staked assets (instead of sunk costs associated with expenditure of electricity and equipment) as a way of guaranteeing the transactions they verify and add onto a blockchain are valid. If they try to add an invalid transaction, staked assets are typically burned as punishment, which creates a disincentive to act dishonestly or maliciously. In exchange for staking, users are awarded compensation accordingly in the form of newly issued cryptocurrency.

38. FTX is not itself a cryptocurrency operating on a PoS model; FTX was an exchange. One cannot 'stake' assets on an exchange. One can lend them to an exchange though, and theoretically, that exchange could then stake select cryptocurrency assets on behalf of the user (for cryptocurrencies that have Proof of Stake).

39. While there is disagreement over whether or not 'staking' is itself a security, the issue is that FTX did often not 'stake' customer assets, and indeed in many cases *could not* stake customer assets since not all cryptocurrencies utilize Proof of Stake. Yet the FTX website clearly suggests that 'all assets' in the account are subject to applicable

yield, including fiat assets (such as USD), which obviously don't even have a staking mechanism if FTX wanted to utilize it.

40. Rather than 'staking,' it appears that a primary thing FTX was doing was lending customer assets out, even from applicable that weren't part of the 'Earn' program, most notably to Alameda.[6] There are allegations that Alameda received loans from FTX interest-free.[7] Sam Bankman-Fried was a primary equity holder of both companies. FTX choosing to lend out assets, whether for free or otherwise, has nothing to do with actual staking of cryptocurrency.

41. The 'staking,' described on the FTX is purposely misleading, and not a representation of what was being offered. Users were not given the ability to 'stake' on FTX. They were given the ability to lend to FTX, and FTX would in turn invest and re-lend those assets out to questionable entities, on questionable terms, and such loans were not appropriately collateralized.

42. That being said, as it appears that even for users that did not subscribe to the Earn program, FTX leveraged and loaned out customer assets anyway to a large degree. It furthermore appears that while there were separate legal entities behind ftx.com and ftx.us, the two entities may not have been operated all that differently from one another, with Sam Bankman-Fried a primary equity holder of each, and just how independent the two entities were from each other is very much a matter of concern.

43. From a securities perspective, the Howey Test defines an investment contract as:

   a. An investment of money

      i. Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say, when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.

---

[6] https://pacer-documents.s3.amazonaws.com/33/188450/042020648197.pdf

[7] https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html

    b. In a common enterprise

        i. FTX customer assets are almost always consolidated in wallets operated a controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda Research 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

    c. With the expectation of profit

        i. FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[8]

    d. To be derived from the efforts of others

        i. The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

        ii. The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that

---

[8] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn

would employ such strategies. The primary strategy that FTX portrayed to investors was 'staking' as I discuss in the following paragraphs.

## Importance and Role of Brand Ambassadors

44. FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.' In Stephen Curry's FTX commercial, FTX's alleged safety is quite blatant stated when he claims

> *"With FTX, I have everything I need to buy, sell, and trade crypto safely"*

45. Kevin O'Leary, another FTX brand ambassador stated:

> *"To find crypto investment opportunities that met my own rigorous standards of compliance, I entered into this relationship with FTX. It has some of the best crypto exchange offerings I've seen on the market. FTX leverages best-in-class tech to provide a quality trading experience with low fees for both professional and retail investors alike, while at the same time providing the reporting platform that serves both internal and regulatory compliance requirements"*

46. Given that FTX continually misappropriated customer assets, didn't have appropriate capital controls or reasonable compliance policies in place, these claims weren't just unfounded; they were downright false.

47. Mr. O'Leary's assertion that FTX was a compliant exchange is even more damaging than that of the typical celebrity, however. This is because Mr. O'Leary is known for being a *Shark* on the TV show *Shark Tank* whereby Shark's make investments in startups. With those investments comes due diligence. Mr. O'Leary's endorsement of FTX certainly makes it seem that he did appropriate due diligence into FTX, when obviously, whatever due diligence that he did was grossly inadequate.

48. Mr. O'Leary appears to admit that his own due diligence was inadequate, and that he relied on the due diligence of others:

> *"I obviously know all the institutional investors in this deal. We all look like idiots. Let's put that on the table. We relied on each other's due diligence, but*

*we also relied on another investment theme that I felt drove a lot of interest in FTX[9]"*

49. Mr. O'Leary is also a strategic investor in what is allegedly Canada's largest cryptocurrency exchange, 'WonderFi.' The name is derived from Mr. O'Leary's nickname, 'Mr. Wonderful.' Mr. O'Leary's involvement in WonderFi could naturally lead one to believe that he knew how to perform adequate due diligence on exchanges, and that he would do so on FTX before investing and acting as a brand ambassador.

## FTX and Representations of Safety and Risks

50. The yield that users could receive as part of the FTX Earn program, as previously mentioned was 8% APY for total collective deposits under $10,000 USD equivalent, and 5% APY for collective deposits above $10,000 USD up to $100,000 USD, and no APY for amounts in excess of $100,000.

51. This type of yield structure makes no logical sense from a profitability standpoint. Why would a financial institution offer a lender a *lower* yield when they loaned more, and no yield at all beyond a certain threshold? As a business, should they want to pay out lower yields to a smaller number of people than higher yields to a larger number of people?

52. In my opinion, the reasons that FTX had this yield structure was so that they could mitigate their legal risks to customers. Simply put, a customer who loses $4,000 due to FTX's misappropriation of funds is very unlikely pursue action against the exchange, such as litigation. A customer who loses $4 million is much more likely to.

53. FTX did have a legal disclaimer associated with their Earn program, shown below:

---

[9] https://dailyhodl.com/2022/12/09/kevin-oleary-says-ftx-collapse-makes-him-and-other-investors-in-the-crypto-exchange-look-like-idiots/

## Legal Disclaimers and Terms of Service

Services are provided by FTX for its customers.

**APY refers to projected yield by staking. This yield is not interest and is not guaranteed, and changes based upon terms of applicable staking programs. FTX transmits value from your account to staking program and ensures that the value is properly transmitted to and from the program. Your customer balance is not a bank account, and is not insured.**

Only customers of FTX may be eligible to participate in the yield program.  If a customer is eligible and opts into the program, then their assets will be used to generate a fixed yield for the user.

While FTX does not anticipate any problems, it does not guarantee the future or present yield payments in the case of malfunction, although it would not intend to claw back previously received yield.  FTX *does*  back the principal generating the yield with its own funds and equity.  Nevertheless, users should exercise appropriate caution when deciding whether to enable yield for their accounts.

54. FTX again refers to staking numerous times, suggesting this was what they were primarily doing with customer assets, which wasn't true, and indeed wasn't even technically possible for a large portion of the assets that customers deposited.

55. FTX indicated that for customers who opt-in to the Earn program, FTX would take their assets to generate a fixed yield for the user, presumably via 'staking.'

56. The legal disclaimer, and certainly the brand ambassadors grossly misrepresented the level of risk associated with its Earn program. While FTX does indicate that it's 'not a bank account, and is not insured' and that 'users should exercise appropriate caution when deciding whether to enable yield for their accounts,' this hardly seems like a sufficient disclaimer and disclosure that would accurately represent the real level of risk. It certainly does not reveal that funds will be lent to affiliated entities to perform highly questionable and risky trading strategies, the lender will collateral FTT tokens with FTX for safety.

57. The FTX Earn program was clearly represented as being 'opt-in' and not 'opt-out.' However, in a declaration from Joseph Rotunda, the Director of Enforcement at the Texas State Security Board, he describes how he, as a US citizen, went to the FTX website, downloaded the FTX Trading App. He funded his account with $50, and "the default settings were automatically configured to enable earning of yield."[10] clearly notes that the earn program he was auto-enrolled in was associated with FTX US, not FTX Trading.

58. Thus, FTX's assertion that the FTX.US yield program were strictly opt-in was not true. It's certainly possible that when some US persons registered for FTX, the Earn program might have been opt-in in some cases but based on the series of events

---

[10] https://cases.stretto.com/public/x193/11753/PLEADINGS/1175310142280000000134.pdf

described by Mr. Rotunda, it's clear at the very least that a considerable portion of US persons that registered would have been auto-enrolled in the yield program. This would make it such that those users that were auto-enrolled (and who did not opt-out) appear to have engaged in an unregistered securities transaction as soon as any money was deposited to their account, whether fiat or cryptocurrency.

59. This means it appears that brand ambassadors were promoting a company and application that at least in some cases auto-enrolled US persons in the FTX Earn program which would reasonably be considered a security in my opinion, and which was also being lauded as 'safe' and 'compliant.'

## The FTT Token and Alameda

60. The FTT Token was an instrumental part of FTX's demise. FTT Tokens were created and issued by FTX, and FTT provides various benefits to its holders on FTX Exchange. The benefits include, most notably, trading fee discounts, but also ancillary benefits such as early access to token sales on the exchange.

61. It is not uncommon for many of the larger cryptocurrency exchanges to build in contrived 'utility' (such as trading discounts) for tokens that they themselves create because it can be financially lucrative for the exchange, since as the issuer they would typically retain a sizable portion of the tokens, and could elect to sell those tokens at some point, when the price is advantageous.

62. Similar to equity, the financial success of an exchange's token (FTT) is tied to the financial success and popularity of the exchange. This is because as the exchanges gains new customers, more and more customers will naturally want to buy FTT, either so they can have a discount on trading fees, or because they think the price will increase (possibly a result of new customers and demand for FTT). However, the holders of FTT have no legal rights voting rights that they would have with an equity investment.

63. Thus, as the number of customers that exchange has increases, as is often the case in a 'bull market,' the price of FTT could generally be expected to increase in value. However, in a bear market, when there is less demand and interest, and fewer new users signing up, there is naturally a lower demand for FTT that would generally cause the price to decline.

64. It is apparent that FTX (and FTX.us) effectively gave Alameda research an unlimited credit line, and Alameda could then effectively use FTX customer assets in extremely high-risk trading activity and strategies, and loans that ultimately left Alameda in extremely poor financial condition.

65. Alameda research allegedly largely provided FTT tokens (which were presumably issued or given to them by FTX) as collateral to FTX in order to obtain the loans from FTX. However, FTT tokens are highly volatile and ultimately subject to investor confidence in FTX itself. When that confidence and interest in FTX began to wane, the price of FTT started to collapse, and with that, the collateral that was designed to cover Alameda's bad debts.

66. FTX now has a bunch of comparatively worthless FTT on their balance sheet, and the price of that obviously won't recover measurably. Given what FTX's misappropriation of customer assets (both in and outside of the Earn program), investors were essentially invested in FTT tokens in large part even if they didn't know it or buy directly themselves.

## Verifiable FTX Falsehoods

67. It's evident that the FTX group was grossly mismanaged and misappropriated customer funds. It is still the early stages of finding out about all the misconduct. Much of the misconduct that has been revealed thus far and will be revealed in the coming months would not necessarily have been immediately known to brand ambassadors. This begs the question as to what are the falsehoods that were or should have been apparent to FTX brand ambassadors when partnering with FTX initially, well before their collapse?

68. The first, as we've already discussed is the claims regarding staking. Cryptocurrencies like Bitcoin and Dogecoin, which FTX offers, cannot be staked. And fiat currency (which FTX also offered yield on) also cannot be staked. Yet, FTX offers yield for them on the Earn Program. The fact that FTX would not technically be able to stake applicable cryptocurrency assets on behalf of customers as they have said and pay back yield in the same currency / cryptocurrency, was always a giant red flag that was demonstrably false, and which should have been recognized by anyone promoting FTX.

69. The second verifiably false claim by FTX that would have been evident publicly well before their downfall relates to FTX's claim that only the user has control of digital assets in their account:

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."*

15

As mentioned previously, FTX exchange accounts are custodial in nature. This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. Whether or not such requests are processed are dependent on the willingness, ability and approval of the exchange. It is very much the exchange that *controls* the assets, not their customer.

70. An additional claim in this quote that could also be argued is verifiably false is the assertion that digital assets are held 'in' the account at all (even if the exchange wasn't misappropriating funds). On a technical level, an exchange account cannot hold or store cryptocurrency. However, exchange accounts can store a record of liability for that cryptocurrency, that an exchange may have to its customer. However, because this concept of 'storage' can be difficult for people to understand, it's somewhat common, at least for newcomers and those less educated with cryptocurrency to discern that a balance held on a cryptocurrency exchange account is equivalent to those assets being 'stored' on the exchange. What a customer(s) balance is versus what an exchange actually stores in its own custody on behalf of the user should not be assumed to be the same thing; there is no regulation or assurance guaranteeing or requiring that. Only an exchange's terms of service, which might contain such language, might guarantee that, but even if it does, such terms may not be adhered to (which was the case here).

71. A third major red flag should have been readily apparent is the non-sensical yield structure for customer accounts, which in my opinion was designed in such a way so as to onboard users. As previously mentioned, this was most likely doing to limit legal risks that FTX could incur, since investors who lost smaller amounts of money are much less likely to pursue action than investors that lost considerable amounts of money.

72. A fourth falsehood should have been apparent in Sam Bankman-Fried's testimony to the US House of Representatives Financial Services committee when he stated:

> *"There is complete transparency about the positions that are held. There is a robust, consistent risk framework applied"*

No, there is not "complete transparency" and the positions that FTXs holds and held. While most cryptocurrency operate on public blockchains, the entities that own specific wallets, who controls specific accounts, and loans that are made by an exchange are not publicly available simply because such blockchains are public, and such information was not disclosed by FTX. And based on John Ray's affidavit,

16

FTX's records are so poor it's likely that large swaths of this information won't ever be known.

73. A fifth area of contention that could be said to be demonstrably false (depending on semantics) or at least misleading would be with respect to the FTX Earn program is the use of the term 'wallet.' FTX's page on the Earn program frequently talks about users' wallets (with FTX).

> *"All assets kept in your wallets will earn the same crypto or fiat that is held in the wallet, and will earn at the same rate"*

74. The term 'wallet' is one of the very first terms that cryptocurrency users hear of, which they start to use, but term is frequently misused and misunderstood. The 'wallet' terminology FTX uses perpetuates that misunderstanding.

75. A cryptocurrency wallet is inherently 'self-custodial' meaning that there is no institution holding cryptocurrency on behalf of the user, nor does the user need to seed any permission to have nor hold funds in such a wallet. Only the person who created the wallet has ability to access the wallet (unless the credentials to the wallet were to be breached or otherwise accessed by another party). A cryptocurrency wallet is an auxiliary device or medium that holds or stores private key(s) needed to access or spend cryptocurrency balances that have been allocated to address(es) that are part of the wallet.

76. The mere use of 'wallet' in this context is itself a misnomer, and very misleading, because a user *cannot* have a 'FTX wallet' of theirs. There is no such thing. A user can have wallet(s), and a FTX account, or both, but there is no such thing as an 'FTX Wallet' belonging to the user. FTX Exchange did have and control many different wallets, but for any given customer, FTX Exchange did not hold funds in a unique wallet only for that customer; that's simply not how exchanges work.

77. These are just the obvious falsehood and red flags that would be apparent on the surface. If brand ambassadors obtained information or knowledge about the inner workings of FTX, it's very likely that they would have encountered additional red flags.

**// ENDS**

Paul Sibenik

Lead Case Manager

CipherBlade

_____

# Exhibit H

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida ▼

| | | |
|---|---|---|
| EDWIN GARRISON, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 1:22-cv-23753-KMM |
| SAM BANKMAN-FRIED, et al. | ) | |
| *Defendant* | ) | |

## WAIVER OF THE SERVICE OF SUMMONS

To: Stephen N. Zack
    *(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____1/4/2023_____, the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____1/4/2023_____

_____
*Signature of the attorney or unrepresented party*

| | |
|---|---|
| _____ | _____ |
| Golden State Warriors LLC | Matthew S. Kahn |
| *Printed name of party waiving service of summons* | *Printed name* |
| | Gibson, Dunn & Crutcher LLP |
| | 555 Mission Street, San Francisco, CA 94105-0921 |
| | *Address* |
| | MKahn@gibsondunn.com |
| | *E-mail address* |
| | (415) 393-8212 |
| | *Telephone number* |

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

# Exhibit I

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI DADE-COUNTY, FLORIDA

CASE NO.

**MICHAEL NORRIS**,

　　　　　　*Plaintiff,*

**COMPLEX BUSINESS**
*v.*　　　　　　　　　　　　　　　　**LITIGATION DIVISION**

**JURY DEMAND**

**NISHAD SINGH, et al.**

　　　　　　*Defendants.*

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Michael Norris, sues Defendants, Nishad Singh and David Ortiz (collectively, "Defendants"), who each promoted, assisted in, and actively participated in the offer and sale of unregistered securities in the form of Yield-Bearing Accounts ("YBAs"), seeking to recover damages, declaratory and/or injunctive relief stemming from the offer and sale of the yield-bearing cryptocurrency accounts.

## JURISDICTION AND VENUE

1.　　　This action seeks, among other things, an expedited trial for deciding the legal question of whether the YBA offered and sold to Plaintiff—the same one offered and sold to millions of other Americans for collectively billions of dollars—constituted an unregistered security. Accordingly, this action is well within the exclusive plenary jurisdiction of the Circuit Court as the amount in controversy far exceeds $30,000.00, exclusive of interest, costs and attorney's fees. Moreover, assignment to the Complex Business Litigation Division is proper because the amount in controversy far exceeds $1 million and involves complex issues.

2.     This Court has personal jurisdiction against Defendants because they are Florida residents who conduct business in Florida, and/or have otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of YBAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of unregistered securities to consumers in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

3.     Venue is proper in this District pursuant to sections 47.011 and 47.051 because Defendants reside in this District; Defendants engaged in business in this District; and/or a substantial part of the events or omissions giving rise to the claims at issue occurred in this District.

4.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## **INTRODUCTION**

5.     There can be no dispute that claims in this case must provide for ***strict liability,*** and therefore if these YBAs are found to be "securities," all of the FTX "brand ambassadors" can simply have no defense to the claims in this action. **The "caveat emptor" defense Defendants and others are pushing in the press, will have no application.**

6.     This is not a case where Mr. Norris made a "risky" investment in stock or cryptocurrency, or that he lost money speculating on various cryptocurrency projects. Plaintiff's claim arises simply from the purchase of a YBA, an account with FTX that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate returns on his significant holdings in the account, regardless of whether those assets were held as USD or cryptocurrency, and regardless of whether any trades were made with the assets held in the YBA. In other words, the

YBA was portrayed to be like a bank account, something that was "very safe" and "protected." That is the narrative that Defendants pushed in promoting the offer and sale of the YBAs, which are unregistered securities. For that, Defendants are liable for Mr. Norris's losses, jointly and severally and to the same extent as if they were themselves FTX Trading LTD d/b/a FTX's ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") and their affiliates (collectively, the "FTX Entities").

7.      Literally overnight, Mr. Norris's assets held in his YBA on the Deceptive FTX Platform were robbed from him as FTX imploded and former-CEO, Sam Bankman-Fried, filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened because, as explained by the new CEO of the failed FTX Entities:

> I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.
>
> *Never* in my career have I seen such a complete failure of corporate controls and such a **complete absence of trustworthy financial information** as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, **unsophisticated** and **potentially compromised** individuals, **this situation is _unprecedented_**.

*See* In re: FTX Trading Ltd, et al., No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17, 2022) (emphasis added).

8.      This should not have happened. Not to Mr. Norris, and not to the thousands of other FTX customers who now find themselves in the same predicament.

9.      The Cryptocurrency National Disaster is growing by the billions almost every day. More crypto companies are filing new federal bankruptcy petitions each day,

all running for protection from the billions of dollars of losses they directly caused to thousands of investors here in Florida and across the country. This is by far the largest securities national disaster, greatly surpassing the Madoff Ponzi Scheme, and could very likely become a complex national litigation disaster, similar to how the hundreds of thousands of asbestos cases swamped all courts across the country. Unless a workable, coordinated, and organized structure is established now, at the very onset of these proceedings, here in Miami, which served as the epicenter for the crypto fraud, the FTX victims will continue to suffer and the only people to benefit will be the professionals in the bankruptcy and civil courts.

10.     One shining light of hope for all of the victims is the unprecedented, and greatly successful, litigation model established recently **by this Court** in **In re: CTS Collapse Litigation.** This Court recognized—at the very first hearing—that the CTS Collapse Litigation must "not be business as usual," because, as evidenced by litigation surrounding the 9/11 disaster, these claims can take many decades to weave through the bankruptcy, state and federal courts, and much of the available insurance recoveries are wasted on litigation, instead of for a Limited Fund for relief to all FTX victims. The Parties in Surfside were all able, under this Court's strict and expedited framework, to recover and distribute **almost $1.3 billion dollars directly to the victims in less than one year.**

11.     One common and identical question in this case, and in many other cryptocurrency litigation matters, is simply whether the SEC was correct, in finding that all of these YBAs are (or are not) the sale of "unregistered securities." Based upon this Court's great prior experience in securities litigation, that question can and should be decided quickly for all of the parties, so that all cryptocurrency litigation can be quickly advanced and the victims (and alleged co-conspirators) have a clear and expedited path.

12.     Moreover, this question was already practically answered in the affirmative through various regulatory statements, guidance, and actions issued by the Securities

and Exchange Commission and other regulatory entities. For example, on November 1, 2017, in the "SEC Statement Urging Caution Around Celebrity Backed ICOs,"[1]

> In the SEC's Report of Investigation concerning The DAO,[2] the Commission warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws.  Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion.  A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws.  **Persons making these endorsements may also be liable** for potential violations of the anti-fraud provisions of the federal securities laws, **for participating in an unregistered offer and sale of securities**, and for acting as unregistered brokers.  The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

13.     Not only that, but the SEC and state securities regulators have also targeted cryptocurrency brokers and exchanges just like FTX for offering almost this exact same type of interest-bearing account, finding that exchanges such as BlockFi,[3] Voyager,[4] and Celsius[5] all offered these same accounts as unregistered securities.

14.     The Deceptive and failed FTX Platform emanated from Miami, Florida and was based upon false representations and deceptive conduct. Although many incriminating FTX emails and texts have already been destroyed, we located them and they evidence how FTX's fraudulent scheme was designed to take advantage of

---

[1]   https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos  (accessed December 2, 2022).

[2]  https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed December 2, 2022)

[3]  https://www.sec.gov/news/press-release/2022-26 (accessed December 2, 2022).

[4]     https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/ (accessed December 2, 2022).

[5]

https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwj vjNvg27j7AhWfRTABHfwzDe4QFnoECAsQAQ&url=https%3A%2F%2Fwww.nj.gov%2Foag%2Fnewsrel eases21%2FCelsius-Order-9.17.21.pdf&usg=AOvVaw0Zd94fuhFSsOoGKM-vQ3YI (accessed December 2, 2022).

unsophisticated investors from across the country, who utilize mobile apps to make their investments. As a result, American consumers collectively sustained over $11 billion dollars in damages. FTX organized and emanated its fraudulent plan from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where 3-time NBA Champions the Miami Heat play.

## FACTUAL BACKGROUND

15.     On December 24, 2021, Plaintiff's counsel brought the first (and only) putative nationwide class action complaint against the now-defunct cryptocurrency trading app, Voyager, styled *Mark Cassidy v. Voyager Digital Ltd., et al.*, Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the platform owned and operated by Voyager Digital Ltd. ("Voyager") and Voyager Digital LLC ("VDL") was an unregulated and unsustainable fraud. In the *Cassidy* Action, Plaintiffs also alleged that Defendant Ehrlich, Voyager's CEO, teamed up with Defendants Cuban and the Dallas Mavericks to promote Voyager, by making false representations and employing other means of deception. As a result, the Voyager plaintiff and Voyager class members, all sustained losses in excess of $5 billion.

16.     The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting Voyager—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's

Dallas Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

17.    After the *Cassidy* Complaint was filed, the following important actions took place:

(a)    the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b)    seven state Attorneys General (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPA was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022; and

(c)    on March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the EPA was not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[6]

---

[6]    https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed October 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed December 2, 2022).

18.     On July 5, 2022, Voyager Digital Holdings, Inc. and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases (the "Voyager Bankruptcy Cases") are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

19.     On September 28, 2022, Voyager filed a motion in the Voyager Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

20.     Everyone involved in the Voyager Bankruptcy Cases thought that the FTX Entities were the *deus ex machina* come to save the day by bailing out Voyager and paying back at least some of the losses the Voyager customers sustained.

21.     Instead, as explained below, the FTX Entities imploded, their over $30 billion in value evaporated almost overnight, and the FTX Entities found themselves filing their own emergency Chapter 11 bankruptcy petition in Delaware. The Deceptive FTX Platform maintained by the FTX Entities was truly a house of cards, a Ponzi scheme where the FTX Entities shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the YBAs and loans to pay interest to the old ones and to attempt to maintain the appearance of liquidity.

22.     Part of the scheme employed by the FTX Entities involved utilizing some of the biggest names in sports and entertainment—like these Defendants—to raise funds and drive American consumers to invest in the YBAs, which were offered and sold

largely from the FTX Entities' domestic base of operations here in Miami, Florida, pouring billions of dollars into the Deceptive FTX Platform to keep the whole scheme afloat.

23.     Importantly, although Defendants disclosed their partnerships with the FTX Entities, they have never disclosed the nature, scope, and amount of compensation they personally received in exchange for the promotion of the Deceptive FTX Platform, which the SEC has explained that a failure to disclose this information would be a violation of the anti-touting provisions of the federal securities laws.[7] Moreover, none of these defendants performed any due diligence prior to marketing these FTX products to the public.

24.     The SEC took action against boxing champ Floyd Mayweather and music producer DJ Khaled after they were paid by cryptocurrency issuers to tweet promotional statements about investing in Initial Coin Offerings (ICOs), ordering them both to pay disgorgement, penalties and interest for promoting investments in ICOs, including one from cryptocurrency issuer Centra Tech, Inc, for a combined total of $767,500 because they failed to disclose that their promotional efforts on Twitter were paid endorsements.[8]

25.     Other celebrities similarly accused and prosecuted for failing to disclose their paid endorsements include Kim Kardashian and basketball player Paul Pierce.[9] According to the Federal Trade Commission, cryptocurrency scams have increased more than ten-fold year-over-year with consumers losing more than $80 million since October 2020, due in large part to the use of such celebrity endorsements. [10]

---

[7]            https://www.ubergizmo.com/2017/11/sec-celebrities-disclose-payment-cryptocurrency-endorsements/#:~:text=It%20has%20issued%20a%20statement%20warning%20celebrities%20that,without%20disclosing%20that%20they%E2%80%99ve%20been%20paid%20for%20it (accessed December 2, 2022).

[8]    https://news.bloomberglaw.com/us-law-week/insights-celebrity-endorsements-and-cryptocurrency-a-cautionary-tale (accessed December 2, 2022).

[9]    https://blockbulletin.com/news/altcoins/kim-kardashian-among-other-celebrities-sued-for-promoting-cryptocurrencies/ (accessed December 2, 2022).

[10] https://florida.foolproofme.org/articles/770-celebrity-cryptocurrency-scam (accessed December 2, 2022).

26.     As explained more fully in this Complaint, Defendants' misrepresentations and omissions made and broadcast around the country through the television and internet render them liable to Plaintiff and all other FTX customers for soliciting their purchases of the unregistered YBAs. *Wildes v. Bitconnect Int'l PLC*, No. 20-11675 (11th Cir. Feb. 18, 2022) (holding that promoters of cryptocurrency through online videos could be liable for soliciting the purchase of unregistered securities through mass communication, and no "personal solicitation" was necessary for solicitation to be actionable).

27.     This action seeks to hold Defendants responsible for Plaintiff's damages and for the Court to hold an expedited trial for deciding the legal question of whether the YBA offered and sold to Plaintiff—the same one offered and sold to millions of other Americans for collectively billions of dollars—constituted an unregistered security.

## PARTIES

28.     Plaintiff Michael Norris is a citizen and resident of the State of New Jersey. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Norris purchased an unregistered security from FTX in the form of a YBA and funded the account with sufficient assets to earn interest on his holdings. Plaintiff Norris did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform, as detailed in this complaint, and purchased the YBA and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Norris has sustained damages for which Defendants are liable.

29.     Defendant Nishad Singh, the former Director of Engineering of FTX, on information and belief is currently residing in the Bahamas.

30.     Defendant David Ortiz, former designated hitter and first baseman in the MLB and a brand ambassador for FTX, is a citizen and resident of the State of Florida.

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*

## FACTUAL ALLEGATIONS

### A.   Background on FTX.

31.   Until seeking the protection of the Bankruptcy Court, the FTX Entities operated a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive FTX Platform") that placed cryptocurrency trade orders on behalf of users like Plaintiff and offered interest bearing cryptocurrency accounts.

32.   The FTX group of companies (FTX Group or FTX) was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established in order to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

33.   Prior to that, The Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his crypto trading firm, Alameda Research, in 2017,[11] after stints in the charity world and at trading firm Jane Street.[12]

34.   Nishad Singh joined Alameda Research in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

---

[11]   https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11   (accessed December 2, 2022).

[12]   https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 2, 2022).

35.     Singh is thought to be a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a 10-person luxury penthouse in Nassau, the Bahamas.

36.     He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and may have been informed of a plan to backstop losses at Alameda with FTX customer funds.[13]

37.     Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, Berkeley graduate talked about why he left his dream job at Facebook to join Alameda Research in a FTX podcast.[14]

38.     "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

39.     Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

40.     In the podcast, Singh said he was also attracted to the company's cultural commitment to effective altruism,[15] a movement that "aims to find the best ways to help others," which he discovered in college.

---

[13] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 2, 2022).
[14] https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed December 2, 2022).
[15] https://www.coindesk.com/layer2/2022/11/11/how-sam-bankman-frieds-effective-altruism-blew-up-ftx/ (accessed December 2, 2022).

41.     Singh is a board member of FTX Future Fund, a part of the FTX Foundation, a philanthropic collective funded principally by Bankman-Fried and other senior FTX executives.

42.     "It was pretty clear that everybody working [at Alameda] was highly motivated, was sort of effective altruism-aligned, which mattered a lot to me and was really [a] bright spot. I could learn a lot from them," Singh said in the podcast.

43.     After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

44.     "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company blog.[16] Singh also reportedly built most of FTX's "technological infrastructure" and managed the development team.

45.     Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[17] A similar relationship may be in place at FTX's core properties.[18]

46.     Singh is reportedly now "under supervision" by Bahamian authorities along with Bankman-Fried and Wang.[19]

---

[16] https://blog.ftx.com/blog/raising-the-bar/ (accessed December 2, 2022).
[17] https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed December 2, 2022).
[18] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 2, 2022).
[19] https://cointelegraph.com/news/sam-bankman-fried-is-under-supervision-in-bahamas-looking-to-flee-to-dubai (accessed December 2, 2022).

47.     The FTX.com exchange was extremely successful since its launch. This year around $15 billion of assets are traded daily on the platform, which now represents approximately 10% of global volume for crypto trading. The FTX team has grew to over 300 globally. Although the FTX Entities' primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[20]

48.     FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 ***billion dollars***.

49.     Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

50.     At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[21]

51.     In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[22]

52.     Bankman-Fried's cryptocurrency empire was officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX –

---

[20]     https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed December 2, 2022).

[21]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 2, 2022).

[22]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 2, 2022).

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*

specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[23]

53.     After obtaining this information, Changpeng "CZ" Zhao, the CEO of Binance, decided to liquidate roughly $530 million-worth of FTT. Customers also raced to pull out, and FTX saw an estimated $6 billion in withdrawals over the course of 72 hours, which it struggled to fulfill.[24] The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8th, that Binance would buy FTX, effectively bailing it out.[25]

54.     The next day, Binance announced that it was withdrawing from the deal, citing findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[26] The news sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[27] On November 11th, unable to obtain a bailout, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[28]

---

[23]     https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed December 2, 2022).

[24]     https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed December 2, 2022).

[25]     https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed December 2, 2022).

[26]     https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed December 2, 2022).

[27]     https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed December 2, 2022).

[28]     https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed December 2, 2022).

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*

55.     Following his resignation, Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Entities went wrong:[29]



---

[29] https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed December 2, 2022).

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*



**SBF** ✓ @SBF_FTX · Nov 10

4) FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!).

But that's different from liquidity for delivery--as you can tell from the state of withdrawals.  The liquidity varies widely, from very to very little.

💬 174          ⟲ 636          ♡ 3,592          ⬆



**SBF** ✓ @SBF_FTX · Nov 10

5) The full story here is one I'm still fleshing out every detail of, but as a very high level, I fucked up twice.

The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin.  I thought it was way lower.

💬 251          ⟲ 749          ♡ 3,407          ⬆



**SBF** ✓ @SBF_FTX · Nov 10

6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours.  We saw roughly $5b of withdrawals on Sunday--the largest by a huge margin.

💬 241          ⟲ 907          ♡ 3,823          ⬆



**SBF** ✓ @SBF_FTX · Nov 10

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough.  I should have said more. I'm sorry--I was slammed with things to do and didn't give updates to you all.

💬 116          🔁 278          ♡ 2,882



**SBF** ✓ @SBF_FTX · Nov 10

8) And so we are where we are.  Which sucks, and that's on me.

I'm sorry.

💬 155          🔁 357          ♡ 3,122



**SBF** ✓ @SBF_FTX · Nov 10

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that.  To take responsibility, and do what I can.

💬 162          🔁 357          ♡ 3,715



**SBF** ✓ @SBF_FTX · Nov 10

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that.  But I'm going to try.  And give anything I have to if that will make it work.

💬 164          🔁 394          ♡ 3,377

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*



**SBF** ✔ @SBF_FTX · Nov 10

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

💬 87          🔁 234          ♡ 2,625          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

💬 102          🔁 274          ♡ 3,007          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

13) Because at the end of the day, I was CEO, which means that *I* was responsible for making sure that things went well.  *I*, ultimately, should have been on top of everything.

I clearly failed in that.  I'm sorry.

💬 180          🔁 423          ♡ 4,122          ⬆



**SBF** ✔ @SBF_FTX · Nov 10

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

💬 129          🔁 235          ♡ 2,502          ⬆

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*







*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*



SBF ✔ @SBF_FTX · Nov 10

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers.  That's it.

💬 144      🔁 158      ♡ 1,970      ⬆️



SBF ✔ @SBF_FTX · Nov 10

19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406      🔁 760      ♡ 2,776      ⬆️



SBF ✔ @SBF_FTX · Nov 10

20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses.  So for now, all I'll say is:

well played; you won.

💬 1,532      🔁 3,303      ♡ 8,047      ⬆️



SBF ✔ @SBF_FTX · Nov 10

21) NOT ADVICE, OF ANY KIND, IN ANY WAY

I WAS NOT VERY CAREFUL WITH MY WORDS HERE, AND DO NOT MEAN ANY OF THEM IN A TECHNICAL OR LEGAL SENSE; I MAY WELL HAVE NOT DESCRIBED THINGS RIGHT though I'm trying to be transparent.  I'M NOT A GOOD DEV AND PROBABLY MISDESCRIBED SOMETHING.

💬 908      🔁 1,055      ♡ 3,463      ⬆️

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*



56.     According to a recent Reuters report, however, another explanation contributing to the precarious house of cards that was the Deceptive FTX Platform is that earlier this year, Bankman-Fried secretly transferred *at least $4 billion* in customer funds from FTX to Alameda without telling anyone, after Alameda was hit with a series of losses, and that the FTX entities lent more than *half* of its *$16 billion* in *customer funds* to Alameda in total, with more than *$10 billion in loans outstanding*.[30]

**B.      FTX's offer and sale of YBAs, which are unregistered securities.**

57.     Beginning in 2019, the FTX Entities began offering interest-bearing cryptocurrency accounts to public investors. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

58.     FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

59.     The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX

---

[30]     https://markets.businessinsider.com/news/currencies/ftx-crash-client-funds-alameda-binance-sbf-sec-cftc-probe-2022-11?utm_medium=ingest&utm_source=markets (accessed December 2, 2022).

Entities offered variable interest rewards on crypto assets held in the YBAs on the Deceptive FTX Platform, which rates were determined by the FTX Entities in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Entities pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

60.     On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

> I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

> I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the

webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[31] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this

---

[31] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application with developed by Blockfolio.

webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*

App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY? Does my balance compound daily?* that read, in part, as follows:

FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

**FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of

26

**Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.

> **FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.

> FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*

in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

## C. The Defendants Aggressively Marketed the FTX Platform

61.     In addition to the conduct of Defendant Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the Deceptive FTX Platform.

62.     In April 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the Deceptive FTX Platform.

63.     FTX's explanation for using stars like Brady, Bunchden, and the other Defendants was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[32]

64.     In other words, the FTX Entities needed celebrities like Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of the YBAs, which are unregistered securities. Below are

---

[32]     https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed December 2, 2022).

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*

representative statements and advertisements Defendants made to drive the offers and/or sales of the YBAs, which Plaintiff will supplement as the case progresses and discovery unfolds.

### David Ortiz



65.     Defendant David Ortiz, who became an FTX brand ambassador and hyped the YBAs in exchange for cryptocurrency and multiple collections of NFTs, also ran his own FTX "You In?" ad, which began running nationwide during the first game of the 2021 World Series.

66.     In the ad, which can be found here: https://www.ispot.tv/ad/qSlm/ftx-big-papi-is-in, Ortiz is watching a game on the television when he receives a phone call from The Moon. Inspired by the "moonblast" home run scored on the field, The Moon frantically tells David about opportunities to get into cryptocurrency with FTX. David decides it's an offer he can't refuse and joins fellow sports stars Stephen Curry and Tom Brady on the platform. FTX announces it is the official crypto exchange of MLB.

## COUNT ONE

**Violations of the Florida Statute Section 517.07,**

**The Florida Securities and Investor Protection Act**

67.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1–66 above, as if fully set forth herein.

68.     Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

69.     Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

70.     The YBA is a security pursuant to Fla. Stat. § 517.021(22)(a).

71.     The YBAs sold and offered for sale to Plaintiff was not:

   a.   exempt from registration under Fla. Stat. § 517.051;

   b.   a federal covered security;

   c.   registered with the Office of Financial Regulations (OFR); or

   d.   sold in a transaction exempt under Fla. Stat. § 517.061.

72.     The FTX Entities sold and offered to sell the unregistered YBAs to Plainitff.

73.     Defendants are directors, officers, partners and/or agents of the FTX Entities pursuant to Fla. Stat. § 517.211.

74.     The FTX Entities, with Defendants' material assistance, offered and sold the unregistered YBAs to Plaintiff. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiff sustained damages as herein described.

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*

## <u>COUNT TWO</u>

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**

**§ 501.201, Florida Statutes, *et seq.***

75.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1–66 above, as if fully set forth herein.

76.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

77.     Plaintiff is a consumer as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

78.     Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

79.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

80.     Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

81.     Plaintiff has been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the Deceptive FTX Platform and in the amount of his lost investment.

82.     The harm suffered by Plaintiff was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*

83.     Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiff makes claims for actual damages, attorneys' fees and costs.

84.     Defendants still utilize many of the deceptive acts and practices described above. Plaintiff has suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiff to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## COUNT THREE

### Civil Conspiracy

85.     Plaintiff repeats and re-allege the allegations contained in paragraphs 1–66 above, as if fully set forth herein.

86.     The FTX Entities and Defendants made numerous misrepresentations and omissions to Plaintiff about the Deceptive FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive FTX Platform were safe and were not being invested in unregistered securities.

87.     The FTX Entities entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiff to invest in the YBAs and/or use the Deceptive FTX Platform.

88.     Defendants engaged in unlawful acts with the FTX Entities, namely, the misrepresentations and omissions made to Plaintiff and the sale of unregistered securities.

89.     Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Entities; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*

Entities, as described above and as such, knew that the representations made to Plaintiff were deceitful and fraudulent.

90.     Defendants' conspiracy with the FTX Entities to commit fraud caused damages to Plaintiff in the amount of his lost investments.


## COUNT FOUR

### Declaratory Judgment

### (Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq.*)

91.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–66 as if fully set forth herein.

92.     This Count is asserted against Defendants under Florida Statutes §§ 86.011, *et seq.*

93.     There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

94.     Plaintiff has an obvious and significant interest in this lawsuit.

95.     Plaintiff purchased a YBA, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as further described hereinabove.

96.     If the true facts had been known, including but not limited to that the YBAs are unregistered securities, the Deceptive FTX Platform does not work as represented, and Defendants were paid exorbitant sums of money to peddle Voyager to the nation, Plaintiff would not have purchased a YBA in the first place.

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*

97.     Thus, there is a justiciable controversy over whether the YBA was sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiff.

98.     Plaintiff seeks an order declaring that the YBAs are securities required to be registered with the SEC and state regulatory authorities, that the Deceptive FTX Platform did not work as represented, and Defendants were paid exorbitant sums of money to peddle FTX to the nation.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment:

a.     Awarding actual, direct and compensatory damages;

b.     Awarding restitution and disgorgement of revenues if warranted;

c.     Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful, and that the YBA offered and sold to Plaintiff—the same one offered and sold to millions of other Americans for collectively billions of dollars—constituted an unregistered security;

d.     Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

e.     Awarding statutory and multiple damages, as appropriate;

f.     Awarding attorneys' fees and costs; and

g.     Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as to all claims so triable.

*Michael Norris v. Nishad Singh, et al.*
*Complaint and Demand for Jury Trial*

Dated: December 2, 2022                    Respectfully submitted,

                                          **By: /s/ Adam Moskowitz**
                                          Adam M. Moskowitz
                                          Florida Bar No. 984280
                                          adam@moskowitz-law.com
                                          Joseph M. Kaye
                                          Florida Bar No. 117520
                                          joseph@moskowitz-law.com
                                          **THE MOSKOWITZ LAW FIRM, PLLC**
                                          2 Alhambra Plaza, Suite 601
                                          Coral Gables, FL 33134
                                          Telephone: (305) 740-1423

                                          By: s/ Jose M. Ferrer
                                          Jose M. Ferrer
                                          Florida Bar No. 173746
                                          **MARK MIGDAL & HAYDEN**
                                          80 S.W. 8th Street, Suite 1999
                                          Miami, Florida 33130
                                          Telephone: (305) 374-0440
                                          jose@markmigdal.com
                                          eservice@markmigdal.com

                                          *Co-Counsel for Plaintiff*

Exhibit J

**MIAMI-DADE COUNTY CLERK OF THE COURTS**
LUIS G. MONTALDO, CLERK AD INTERIM

Contact Us     My Account

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

◄◄ BACK

Not all search results will be displayed on-line. For example, the following case types (Sealed, Juvenile, Adoption and Mental Health Cases) may or may not be in existence and may or may not be viewable by the public pursuant to Florida Supreme Court Mandate and the corresponding Access Security Matrix.

**BO YANG VS THOMAS BRADY ET AL**

| | | | |
|---|---|---|---|
| Local Case Number: | 2022-022015-CA-01 | Filing Date: | 11/17/2022 |
| State Case Number: | 132022CA022015000001 | Judicial Section: | CA44 |
| Consolidated Case No.: | N/A | Case Type: | Securities Litigation |
| Case Status: | CLOSED | | |

### ☰ Related Cases

Total Of Related Cases: 0  +

### 👥 Parties

Total Of Parties: 3  —

| Party Description | Party Name | Attorney Information | Other Attorney(s) |
|---|---|---|---|
| Plaintiff | YANG, BO | B#:  (Bar Number)984280<br>N:  (Attorney Name)Moskowitz, Adam Matthew | |
| Defendant | BRADY, THOMAS | | |
| Defendant | O'LEARY, KEVIN | | |

### ⚓ Hearing Details

Total Of Hearings: 1  —

| Hearing Date | Hearing Time | Hearing Code | Description | Hearing Location |
|---|---|---|---|---|
| 02/15/2023 | 11:30AM | SPECSETS | Special Sets | |

### 🔊 Dockets

Total Of Dockets: 19  —

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | | 02/15/2023 | | Special Sets | Hearing | INITIAL CASE MANAGEMENT CONFERENCE |
| 📄 | 17 | 01/27/2023 | | Order of Withdrawal as Attorney of Record | Event | |
| | 16 | 12/05/2022 | | Voluntary Dismissal | Judgment | |
| 📄 | 15 | 12/05/2022 | | Order Setting the Initial Case Management Conference | Event | AND TO PREPARE A MANADATORY CASE MANAGEMENT REPORT |
| 📄 | 14 | 12/05/2022 | | Order: | Event | OF MOTION AND MEMORANDUM REQUIREMENTS |
| 📄 | 13 | 12/05/2022 | | Order: | Event | OF ADHERENCE TO COMPLEX BUSINESS LITIGATION SECTION PROCEDURES |
| 📄 | 12 | 12/05/2022 | | Order: | Event | TO CONFER AND CERTIFICATION REQUIREMENT |
| 📄 | 11 | 12/05/2022 | | Notice of Hearing- | Event | ON 02-15-2023 AT 11:30AM VIA ZOOM |
| 📄 | 10 | 12/05/2022 | 33492:4061 | Voluntary Dismissal | Event | Parties: BRADY THOMAS; O'LEARY KEVIN |



| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | | 11/30/2022 | | 20 Day Summons Issued | Service | |
|  | 9 | 11/30/2022 | | ESummons 20 Day Issued | Event | RE: INDEX # 6. Parties: O'LEARY KEVIN |
| | | 11/30/2022 | | 20 Day Summons Issued | Service | |
| | 8 | 11/30/2022 | | ESummons 20 Day Issued | Event | RE: INDEX # 5. Parties: BRADY THOMAS |
| | 7 | 11/30/2022 | | Receipt: | Event | RECEIPT#:3130023 AMT PAID:$20.00 NAME:MOSKOWITZ, ADAM MATTHEW THE MOSKOWITZ LAW FIRM 2 ALHAMBRA PLAZA SUITE 601 CORAL GABLES FL 33134-6037 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:EFILINGS TENDER AMT:$20.00 RECEIPT DATE:11/30/2022 REGISTER#:313 CASHIER:EFILINGUSER |
| | 6 | 11/23/2022 | | (M) 20 Day (P) Summons (Sub) Received | Event | |
| | 5 | 11/23/2022 | | (M) 20 Day (P) Summons (Sub) Received | Event | |
| | 4 | 11/19/2022 | | Receipt: | Event | RECEIPT#:3140077 AMT PAID:$401.00 NAME:MOSKOWITZ, ADAM MATTHEW THE MOSKOWITZ LAW FIRM 2 ALHAMBRA PLAZA SUITE 601 CORAL GABLES FL 33134-6037 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 TENDER TYPE:EFILINGS TENDER AMT:$401.00 RECEIPT DATE:11/19/2022 REGISTER#:314 CASHIER:EFILINGUSER |
| | 2 | 11/17/2022 | | Complaint | Event | |
| | 1 | 11/17/2022 | | Civil Cover Sheet - Claim Amount | Event | |

readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer

## General

Online Case Home

Civil / Family Courts Information

Login

## Help and Support

Clerk's Home

Privacy Statement

ADA Notice

Disclaimer

Contact Us

About Us

**Luis G. Montaldo**
**Clerk Ad Interim**

Miami-Dade County
Clerk of the Courts

73 W. Flagler Street
Miami, Florida 33130

305-275-1155



©2023 Clerk of the Courts. All rights reserved.



# Exhibit K



**MIAMI-DADE COUNTY CLERK OF THE COURTS**

LUIS G. MONTALDO, CLERK AD INTERIM

Contact Us    My Account    🛒

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

◄◄ BACK

**Not all search results will be displayed on-line. For example, the following case types (Sealed, Juvenile, Adoption and Mental Health Cases) may or may not be in existence and may or may not be viewable by the public pursuant to Florida Supreme Court Mandate and the corresponding** Access Security Matrix.

### SHENGYUN HUANG VS THOMAS BRADY ET AL

| | | | |
|---|---|---|---|
| Local Case Number: | 2022-022139-CA-01 | Filing Date: | 11/18/2022 |
| State Case Number: | 132022CA022139000001 | Judicial Section: | CA44 |
| Consolidated Case No.: | N/A | Case Type: | Securities Litigation |
| Case Status: | CLOSED | | |

### ☰ Related Cases                                                    Total Of Related Cases: 0 ▬

| Case Number | Filing Date | Case Type |
|---|---|---|

### 👥 Parties                                                               Total Of Parties: 3 ▬

| Party Description | Party Name | Attorney Information | Other Attorney(s) |
|---|---|---|---|
| Plaintiff | HUANG, SHENGYUN | B#: (Bar Number)984280<br>N: (Attorney Name)Moskowitz, Adam Matthew | |
| Defendant | BRADY, THOMAS | | |
| Defendant | O'LEARY, KEVIN | | |

### 🔧 Hearing Details                                                  Total Of Hearings: 1 ▬

| Hearing Date | Hearing Time | Hearing Code | Description | Hearing Location |
|---|---|---|---|---|
| 02/17/2023 | 10:15AM | SPECSETS | Special Sets | |

### 🔊 Dockets                                                            Total Of Dockets: 20 ▬

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | | 02/17/2023 | | Special Sets | Hearing | INITIAL CASE MANAGEMENT CONFERENCE |
| 📄 | 17 | 01/27/2023 | | Order of Withdrawal as Attorney of Record | Event | |
| 📄 | 18 | 01/25/2023 | | Motion to Withdraw | Event | |
| | 16 | 12/05/2022 | | Voluntary Dismissal | Judgment | |
| 📄 | 15 | 12/05/2022 | | Order Setting the Initial Case Management Conference | Event | AND TO PREPARE A MANADATORY CASE MANAGEMENT REPORT |
| 📄 | 14 | 12/05/2022 | | Order: | Event | OF MOTION AND MEMORANDUM REQUIREMENTS |
| 📄 | 13 | 12/05/2022 | 33493:818 | Voluntary Dismissal | Event | WITHOUT PREJUDICE<br>Parties: BRADY THOMAS; O'LEARY KEVIN |
| 📄 | 12 | 12/05/2022 | | Order: | Event | OF ADHERENCE TO COMPLEX BUSINESS LITIGATION SECTION PROCEDURES |



| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 11 | 12/05/2022 | | Order: | Event | TO CONFER AND CERTIFICATION REQUIREMENT |
| 📄 | 10 | 12/05/2022 | | Notice of Hearing- | Event | ON 02-17-2023 AT 10:15AM VIA ZOOM |
| | | 11/30/2022 | | 20 Day Summons Issued | Service | |
| 📄 | 9 | 11/30/2022 | | ESummons 20 Day Issued | Event | RE: INDEX # 6.<br>Parties: O'LEARY KEVIN |
| | | 11/30/2022 | | 20 Day Summons Issued | Service | |
| 📄 | 8 | 11/30/2022 | | ESummons 20 Day Issued | Event | RE: INDEX # 5.<br>Parties: BRADY THOMAS |
| | 7 | 11/30/2022 | | Receipt: | Event | RECEIPT#:3130025 AMT PAID:$20.00 NAME:MOSKOWITZ, ADAM MATTHEW THE MOSKOWITZ LAW FIRM 2 ALHAMBRA PLAZA SUITE 601 CORAL GABLES FL 33134-6037 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:EFILINGS TENDER AMT:$20.00 RECEIPT DATE:11/30/2022 REGISTER#:313 CASHIER:EFILINGUSER |
| 📄 | 6 | 11/23/2022 | | (M) 20 Day (P) Summons (Sub) Received | Event | |
| 📄 | 5 | 11/23/2022 | | (M) 20 Day (P) Summons (Sub) Received | Event | |
| | 4 | 11/22/2022 | | Receipt: | Event | RECEIPT#:3140128 AMT PAID:$401.00 NAME:MOSKOWITZ, ADAM MATTHEW THE MOSKOWITZ LAW FIRM 2 ALHAMBRA PLAZA SUITE 601 CORAL GABLES FL 33134-6037 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 TENDER TYPE:EFILINGS TENDER AMT:$401.00 RECEIPT DATE:11/22/2022 REGISTER#:314 CASHIER:EFILINGUSER |
| 📄 | 2 | 11/18/2022 | | Complaint | Event | |
| 📄 | 1 | 11/18/2022 | | Civil Cover Sheet - Claim Amount | Event | |

regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer.

## General

Online Case Home

Civil / Family Courts Information

Login

## Help and Support

Clerk's Home

Privacy Statement

ADA Notice

Disclaimer

Contact Us

About Us



**Luis G. Montaldo**
Clerk Ad Interim



Miami-Dade County
Clerk of the Courts

73 W. Flagler Street
Miami, Florida 33130

305-275-1155

©2023 Clerk of the Courts. All rights reserved.



# Exhibit L



**MIAMI-DADE COUNTY CLERK OF THE COURTS**
LUIS G. MONTALDO, CLERK AD INTERIM

Contact Us    My Account    🛒

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

◄◄ BACK

Not all search results will be displayed on-line. For example, the following case types (Sealed, Juvenile, Adoption and Mental Health Cases) may or may not be in existence and may or may not be viewable by the public pursuant to Florida Supreme Court Mandate and the corresponding Access Security Matrix.

### VIJETH SHETTY VS THOMAS BRADY ET AL

| | | | |
|---|---|---|---|
| Local Case Number: | 2022-022137-CA-01 | Filing Date: | 11/18/2022 |
| State Case Number: | 132022CA022137000001 | Judicial Section: | CA44 |
| Consolidated Case No.: | N/A | Case Type: | Securities Litigation |
| Case Status: | CLOSED | | |

### ☰ Related Cases                    Total Of Related Cases: 0  ▬

| Case Number | Filing Date | Case Type |
|---|---|---|

### 👥 Parties                    Total Of Parties: 3  ▬

| Party Description | Party Name | Attorney Information | Other Attorney(s) |
|---|---|---|---|
| Plaintiff | SHETTY, VIJETH | B#: (Bar Number)984220 N: (Attorney Name)Moskowitz, Adam Matthew | |
| Defendant | BRADY, THOMAS | | |
| Defendant | O'LEARY, KEVIN | | |

### 🔧 Hearing Details                    Total Of Hearings: 1  ▬

| Hearing Date | Hearing Time | Hearing Code | Description | Hearing Location |
|---|---|---|---|---|
| 02/17/2023 | 10:00AM | SPECSETS | Special Sets | |

### 📡 Dockets                    Total Of Dockets: 19  ▬

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | | 02/17/2023 | | Special Sets | Hearing | INITIAL CASE MANAGEMENT CONFERENCE |
| 📄 | 17 | 01/27/2023 | | Order of Withdrawal as Attorney of Record | Event | |
| | 16 | 12/05/2022 | | Voluntary Dismissal | Judgment | |
| 📄 | 15 | 12/05/2022 | | Order Setting the Initial Case Management Conference | Event | AND TO PREPARE A MANADATORY CASE MANAGEMENT REPORT |
| 📄 | 14 | 12/05/2022 | | Order: | Event | OF MOTION AND MEMORANDUM REQUIREMENTS |
| 📄 | 13 | 12/05/2022 | | Order: | Event | OF ADHERENCE TO COMPLEX BUSINESS LITIGATION SECTION PROCEDURES |
| 📄 | 12 | 12/05/2022 | | Order: | Event | TO CONFER AND CERTIFICATION REQUIREMENT |
| 📄 | 11 | 12/05/2022 | | Notice of Hearing- | Event | ON 02-17-2023 AT 10AM VIA ZOOM |



| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 10 | 12/05/2022 | 33492:270 | Voluntary Dismissal | Event | **WITHOUT PREJUDICE** Parties: BRADY THOMAS; O'LEARY KEVIN |
| | | 11/30/2022 | | 20 Day Summons Issued | Service | |
| 📄 | 9 | 11/30/2022 | | ESummons 20 Day Issued | Event | **RE: INDEX # 6.** Parties: O'LEARY KEVIN |
| | | 11/30/2022 | | 20 Day Summons Issued | Service | |
| 📄 | 8 | 11/30/2022 | | ESummons 20 Day Issued | Event | **RE: INDEX # 5.** Parties: BRADY THOMAS |
| | 7 | 11/30/2022 | | Receipt: | Event | **RECEIPT#:3130026 AMT PAID:$20.00 NAME:MOSKOWITZ, ADAM MATTHEW THE MOSKOWITZ LAW FIRM 2 ALHAMBRA PLAZA SUITE 601 CORAL GABLES FL 33134-6037 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:EFILINGS TENDER AMT:$20.00 RECEIPT DATE:11/30/2022 REGISTER#:313 CASHIER:EFILINGUSER** |
| 📄 | 6 | 11/23/2022 | | (M) 20 Day (P) Summons (Sub) Received | Event | |
| 📄 | 5 | 11/23/2022 | | (M) 20 Day (P) Summons (Sub) Received | Event | |
| | 4 | 11/22/2022 | | Receipt: | Event | **RECEIPT#:3140126 AMT PAID:$401.00 NAME:MOSKOWITZ, ADAM MATTHEW THE MOSKOWITZ LAW FIRM 2 ALHAMBRA PLAZA SUITE 601 CORAL GABLES FL 33134-6037 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 TENDER TYPE:EFILINGS TENDER AMT:$401.00 RECEIPT DATE:11/22/2022 REGISTER#:314 CASHIER:EFILINGUSER** |
| 📄 | 2 | 11/18/2022 | | Complaint | Event | |
| 📄 | 1 | 11/18/2022 | | Civil Cover Sheet - Claim Amount | Event | |

regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer.

## General

Online Case Home

Civil / Family Courts Information

Login

## Help and Support

Clerk's Home

Privacy Statement

ADA Notice

Disclaimer

Contact Us

About Us



**Luis G. Montaldo**
**Clerk Ad Interim**

Miami-Dade County
Clerk of the Courts



73 W. Flagler Street
Miami, Florida 33130

305-275-1155

©2023 Clerk of the Courts. All rights reserved.



# Exhibit M



**MIAMI-DADE COUNTY CLERK OF THE COURTS**
LUIS G. MONTALDO, CLERK AD INTERIM

Contact Us    My Account    🛒

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

◄◄ BACK

Not all search results will be displayed on-line. For example, the following case types (Sealed, Juvenile, Adoption and Mental Health Cases) may or may not be in existence and may or may not be viewable by the public pursuant to Florida Supreme Court Mandate and the corresponding Access Security Matrix.

### MICHAEL LIVIERATOS VS THOMAS BRADY ET AL

| | | | |
|---|---|---|---|
| Local Case Number: | 2022-022255-CA-01 | Filing Date: | 11/21/2022 |
| State Case Number: | 132022CA022255000001 | Judicial Section: | CA44 |
| Consolidated Case No.: | N/A | Case Type: | Securities Litigation |
| Case Status: | CLOSED | | |

### ☰ Related Cases                                        Total Of Related Cases: 0  ▬

| Case Number | Filing Date | Case Type |
|---|---|---|

### 👥 Parties                                               Total Of Parties: 3  ▬

| Party Description | Party Name | Attorney Information | Other Attorney(s) |
|---|---|---|---|
| Plaintiff | LIVIERATOS, MICHAEL | B#:  (Bar Number)173746<br>N:  (Attorney Name)Ferrer, Jose M, ESQ | |
| Defendant | BRADY, THOMAS | | |
| Defendant | O LEARY, KEVIN | | |

### 🔧 Hearing Details                                       Total Of Hearings: 1  ▬

| Hearing Date | Hearing Time | Hearing Code | Description | Hearing Location |
|---|---|---|---|---|
| 02/17/2023 | 10:30AM | SPECSETS | Special Sets | |

### 🔊 Dockets                                               Total Of Dockets: 19  ▬

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | | 02/17/2023 | | Special Sets | Hearing | **INITIAL CASE MANAGEMENT CONFERENCE** |
| | 17 | 12/22/2022 | | Order of Dismissal | Judgment | |
| 📄 | 16 | 12/22/2022 | 33516:3322 | Order of Dismissal | Event | **WITHOUT PREJUDICE**<br>Parties: BRADY THOMAS; O LEARY KEVIN |
| 📄 | 15 | 12/05/2022 | | Order: | Event | **OF MOTION AND MEMORANDUM REQUIREMENTA** |
| 📄 | 14 | 12/05/2022 | | Order Setting the Initial Case Management Conference | Event | **AND TO PREPARE A MANADATORY CASE MANAGEMENT REPORT** |
| 📄 | 13 | 12/05/2022 | | Order: | Event | **OF ADHERENCE TO COMPLEX BUSINESS LITIGATION SECTION PROCEDURES** |
| 📄 | 12 | 12/05/2022 | | Order: | Event | **TO CONFER AND CERTIFICATION REQUIREMENT** |
| 📄 | 11 | 12/05/2022 | 33493:217 | Voluntary Dismissal | Event | |
| 📄 | 10 | 12/05/2022 | | Notice of Hearing- | Event | **ON 02-17-2023 AT 10:30AM VIA ZOOM** |



| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | | 11/30/2022 | | 20 Day Summons Issued | Service | |
|  | 9 | 11/30/2022 | | ESummons 20 Day Issued | Event | RE: INDEX # 6. Parties: O LEARY KEVIN |
| | | 11/30/2022 | | 20 Day Summons Issued | Service | |
|  | 8 | 11/30/2022 | | ESummons 20 Day Issued | Event | RE: INDEX # 5. Parties: BRADY THOMAS |
| | 7 | 11/30/2022 | | Receipt: | Event | RECEIPT#:3130032 AMT PAID:$20.00 NAME:FERRER, JOSE M, ESQ MARK MIGDAL & HAYDEN 80 S.W. 8TH STREET, SUITE 199 MIAMI FL 33130 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:EFILINGS TENDER AMT:$20.00 RECEIPT DATE:11/30/2022 REGISTER#:313 CASHIER:EFILINGUSER |
|  | 6 | 11/23/2022 | | (M) 20 Day (P) Summons (Sub) Received | Event | |
|  | 5 | 11/23/2022 | | (M) 20 Day (P) Summons (Sub) Received | Event | |
| | 4 | 11/23/2022 | | Receipt: | Event | RECEIPT#:3110041 AMT PAID:$401.00 NAME:FERRER, JOSE M, ESQ MARK MIGDAL & HAYDEN 80 S.W. 8TH STREET, SUITE 199 MIAMI FL 33130 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 TENDER TYPE:EFILINGS TENDER AMT:$401.00 RECEIPT DATE:11/23/2022 REGISTER#:311 CASHIER:EFILINGUSER |
|  | 2 | 11/21/2022 | | Complaint | Event | |
|  | 1 | 11/21/2022 | | Civil Cover Sheet - Claim Amount | Event | |

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer.

## General

Online Case Home

Civil / Family Courts Information

Login

## Help and Support

Clerk's Home

Privacy Statement

ADA Notice

Disclaimer

Contact Us

About Us



**Luis G. Montaldo**
**Clerk Ad Interim**

Miami-Dade County
Clerk of the Courts

73 W. Flagler Street
Miami, Florida 33130

305-275-1155

©2023 Clerk of the Courts. All rights reserved.



Exhibit N

**MIAMI-DADE COUNTY CLERK OF THE COURTS**
LUIS G. MONTALDO, CLERK AD INTERIM

Contact Us    My Account

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

◀◀ BACK

Not all search results will be displayed on-line. For example, the following case types (Sealed, Juvenile, Adoption and Mental Health Cases) may or may not be in existence and may or may not be viewable by the public pursuant to Florida Supreme Court Mandate and the corresponding Access Security Matrix.

**BRANDON ROWAN VS GARY WANG ET AL**

| | | | |
|---|---|---|---|
| Local Case Number: | 2022-022902-CA-01 | Filing Date: | 12/02/2022 |
| State Case Number: | 132022CA022902000001 | Judicial Section: | CA44 |
| Consolidated Case No.: | N/A | Case Type: | Securities Litigation |
| Case Status: | CLOSED | | |

## ☰ Related Cases                                    Total Of Related Cases: 0 ▬

| Case Number | Filing Date | Case Type |
|---|---|---|

## 👥 Parties                                           Total Of Parties: 3 ▬

| Party Description | Party Name | Attorney Information | Other Attorney(s) |
|---|---|---|---|
| Plaintiff | Rowan, Brandon | B#: (Bar Number)984280 N: (Attorney Name)Moskowitz, Adam Matthew | |
| Defendant | Wang, Gary | | |
| Defendant | Haslem, Udonis | | |

## 🔧 Hearing Details                                  Total Of Hearings: 0 ▬

| Hearing Date | Hearing Time | Hearing Code | Description | Hearing Location |
|---|---|---|---|---|

## 📶 Dockets                                           Total Of Dockets: 5 ▬

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | 5 | 12/06/2022 | | Receipt: | Event | RECEIPT#:3150061 AMT PAID:$401.00 NAME:MOSKOWITZ, ADAM MATTHEW THE MOSKOWITZ LAW FIRM 2 ALHAMBRA PLAZA SUITE 601 CORAL GABLES FL 33134-6037 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 TENDER TYPE:EFILINGS TENDER AMT:$401.00 RECEIPT DATE:12/06/2022 REGISTER#:315 CASHIER:EFILINGUSER |
| | 6 | 12/05/2022 | | Voluntary Dismissal | Judgment | |
| 📄 | 3 | 12/05/2022 | 33492:306 | Voluntary Dismissal | Event | Parties: Wang Gary; Haslem Udonis |
| 📄 | 2 | 12/02/2022 | | Complaint | Event | |
| 📄 | 1 | 12/02/2022 | | Civil Cover Sheet - Claim Amount | Event | |

◀◀ BACK

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system,



without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer

## General

Online Case Home

Civil / Family Courts Information

Login

## Help and Support

Clerk's Home

Privacy Statement

ADA Notice

Disclaimer

Contact Us

About Us



**Luis G. Montaldo**
**Clerk Ad Interim**

Miami-Dade County
Clerk of the Courts

73 W. Flagler Street
Miami, Florida 33130

305-275-1155

©2023 Clerk of the Courts. All rights reserved.

Exhibit O

IN THE CIRCUIT COURT IN THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

MICHAEL NORRIS, et al.

   Plaintiffs,

v.

THOMAS BRADY et al.

   Defendants.

**COMPLEX BUSINESS DIVISION**

CASE NO. 2022-022900-CA-01

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

"Then there's things that have happened with Voyager ***and with FTX now***—that's somebody running a company that's ***just dumb as fu\*\* greedy***. So, what does Sam Bankman do? He just, give me more, give me more, give me more, so I'm gonna borrow money, loan it to my affiliated company, and hope and pretend to myself that the FTT tokens that are in there on my balance sheet are gonna sustain their value."[1]

**– Mark Cuban, Nov. 12, 2022**



**– Defendant Sam Bankman Fried (Former CEO, FTX)**

---

[1] https://www.yahoo.com/video/ftx-twitter-chaos-embarrassing-athletes-195343800.html (accessed December 5, 2022).

Plaintiffs, (1) Michael Norris, (2) Brandon Rowan, (3) Michael Livieratos, (4) Shengyun Huang, (5) Vijeth Shetty, and (6) Bo Yang (collectively, "Plaintiffs", that all invested millions of dollars in FTX)[2], sue Defendants, all Florida residents, Tom Brady, Kevin O'Leary and David Ortiz (collectively, "the Florida Defendants"), who each promoted, assisted in, and actively participated in, FTX Trading LTD d/b/a FTX's ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US's ("FTX US") (collectively, the "FTX Entities"), offer and sale of unregistered securities, in the form of identical Yield-Bearing Accounts ("YBAs"), seeking to recover damages, declaratory and/or injunctive relief stemming from the offer and sale of FTX Trading's and FTX US's yield-bearing cryptocurrency accounts.

## INTRODUCTION

1.      Most experts agree that the FTX Collapse Disaster is the largest and greatest financial fraud in history.  The new CEO of FTX, who helped wind down the prior Enron fraud, admitted that what he quickly uncovered in FTX to date, is worse than in the Enron Fraud.  Almost $14 billion dollars is unaccounted for, and certainly billions of dollars have been stolen from investors across the globe.  FTX will be involved in federal bankruptcy proceedings for many years to come and there is no guarantee that the victims will be able to see any recovery from those processes.

2.      This state complaint is brought by a sampling of those individual injured investors, against only the Florida Defendants, who directly profited from promoting the sale of unregistered securities, and who all admittedly never complied with any of the FTC's long-established federal regulations, requiring full disclosure for all paid endorsements, especially for touting investment products and, in fact, specifically for promoting cryptocurrency platforms.

3.      One common and identical question in this case, and in many other cryptocurrency litigation matters, is simply whether the SEC was initially correct, in finding that all of these YBAs are (or are not) the sale of "unregistered securities." Based upon this Court's great prior experience in securities litigation, that question can and should be decided quickly for all of the parties, so that all cryptocurrency litigation can be quickly advanced and the victims (and alleged co-conspirators) have a clear and expedited path.

---

[2] Each Named Plaintiff filed their own individual state court complaint before this Court. In an effort to organize and coordinate all of this litigation, Undersigned Counsel joined forces and agreed to file one Consolidated Amended Compliant. None of the Defendants were ever served with any of the original complaints and in fact, counsel for some of the defendants were told about filing of this Consolidated Complaint and agreed to this organized procedure.

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*

4.      This question was already practically answered in the affirmative through various regulatory statements, guidance, and actions issued by the Securities and Exchange Commission and other regulatory entities. For example, the SEC could not have more clearly warned the FTX Brand Ambassadors than it did on November 1, 2017, in the "SEC Statement Urging Caution Around Celebrity Backed ICOs,"[3]

> In the SEC's Report of Investigation concerning The DAO,[4] the Commission warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws.  Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion.  **A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws**.  **Persons making these endorsements may also be liable** for potential violations of the anti-fraud provisions of the federal securities laws, **for participating in an unregistered offer and sale of securities**, and for acting as unregistered brokers.  The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

5.      Not only that, but the SEC and state securities regulators have also targeted cryptocurrency brokers and exchanges just like FTX for offering almost this exact same type of interest-bearing account, finding that exchanges such as BlockFi,[5] Voyager,[6] and Celsius[7] all offered these same accounts as unregistered securities.

6.      These individual Plaintiffs seek a Declaratory Ruling by this Court, on two specific and very narrow issues, whose focus is solely objective: (1) should the FTX YBA's, that were identical and provided to every FTX investor, be considered "securities", under the applicable *Howey* test, and (2) whether the Florida Defendants violated state consumer laws by failing to abide by any of the FTC long established rules and regulations, specifically on what is required for a celebrity endorsement of

---

[3]        https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos (accessed December 5, 2022).

[4] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed December 5, 2022)

[5] https://www.sec.gov/news/press-release/2022-26 (accessed December 5, 2022).

[6]        https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/ (accessed December 5, 2022).

[7]
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwjvjNvg27j7AhWfRTABHfwzDe4QFnoECAsQAQ&url=https%3A%2F%2Fwww.nj.gov%2Foag%2Fnewsreleases21%2FCelsius-Order-9.17.21.pdf&usg=AOvVaw0Zd94fuhFSsOoGKM-vQ3YI (accessed December 5, 2022).

crypto currency. The answer to just these two, narrow questions will greatly advance litigation across the globe relating to the FTX Disaster, help determine who may be liable for aiding and abetting this massive fraud, one way or another and may also help advance (for either side) all of the other pending massive litigation, against other cryptocurrency platforms (such as Voyager) that offered similar YBAs.

7.      It is important to note that Claims in this case provide for ***strict liability,*** and therefore if these YBAs are found to be "securities," all of the FTX "brand ambassadors" may not have any defense to the claims in this action. <u>The "caveat emptor" defense that Defendants and others are pushing in the press will have no application.</u> Plaintiffs intend to seek an expedited ruling, by way of partial summary judgment or otherwise, that these YBAs legally qualify as "securities," 20 days after filing this complaint or sooner as allowed by applicable law.

8.      It must be repeated that this is not a case where Plaintiffs made a "risky" investment in any stock or cryptocurrency, or that they lost money speculating on various cryptocurrency projects. Plaintiffs' claim arises simply from the purchase of a YBA, an interest account with FTX that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate attractive, interest returns on their significant holdings in the account, regardless of whether those assets were held as USD or cryptocurrency, and regardless of whether any trades were ever made with the assets held in the YBA. In other words, the YBA was portrayed to be better (with more interest) and safer than a bank account (because they had many billions in reserve), something that was "very safe" and "protected." That is the specific narrative that Defendants pushed in promoting the offer and sale of these YBAs, which are unregistered securities. For that, the Florida Defendants are liable for Plaintiffs' losses, jointly and severally and to the same extent as if they were themselves the FTX Entities.

9.      Literally overnight, Plaintiffs' assets held in their YBAs on the Deceptive FTX Platform were robbed from them as FTX imploded and former-CEO, Sam Bankman-Fried, filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened because, as explained by the new CEO of the failed FTX Entities:

> I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.

> ***Never*** in my career have I seen such a complete failure of corporate controls and such a **complete absence of trustworthy financial information** as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, **unsophisticated** and **potentially compromised** individuals, **this situation is unprecedented**.

*See* In re: FTX Trading Ltd, et al., No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17, 2022) (emphasis added).

10.    This should not have happened. Not to any of these Plaintiffs, and not to the thousands of other FTX customers who now find themselves in the same predicament.

11.    The Cryptocurrency National Disaster is growing by the billions almost every day. More crypto companies are filing new federal bankruptcy petitions each day, all running for protection from the billions of dollars of losses they directly caused to thousands of investors here in Florida and across the country. This is by far the largest securities national disaster, greatly surpassing the Madoff Ponzi Scheme, and could very likely become a complex national litigation disaster, similar to how the hundreds of thousands of asbestos cases swamped all courts across the country. Unless a workable, coordinated, and organized structure is established now, at the very onset of these proceedings, here in Miami, which served as the epicenter for the crypto fraud, the FTX victims will continue to suffer and the only people to benefit will be the professionals in the bankruptcy and civil courts.

12.    One common and identical question in this case, and in many other cryptocurrency litigation matters, is simply whether the SEC was initially correct, in finding that all of these YBAs are (or are not) the sale of "unregistered securities." Based upon this Court's great prior experience in securities litigation, that question can and should be decided quickly for all of the parties, so that all cryptocurrency litigation can be quickly advanced and the victims (and alleged co-conspirators) have a clear and expedited path.

13.    The Deceptive and failed FTX Platform emanated from Miami, Florida (FTX moved its Global Headquarters from Bahamas to Miami) and was based upon false representations and deceptive conduct. Although many incriminating FTX emails and texts have already been destroyed, we located them and they evidence how FTX's fraudulent scheme was designed to take advantage of unsophisticated investors from across the country, who utilize mobile apps to make their investments. As a result, American consumers collectively sustained at least over $11 billion dollars in damages. FTX organized and emanated its fraudulent plan from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in

crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where 3-time NBA Champions the Miami Heat play.

**FACTUAL BACKGROUND**

14.     On December 24, 2021, Plaintiffs' counsel brought the first (and only) putative nationwide class action complaint against the now-defunct cryptocurrency trading app, Voyager, styled *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the platform owned and operated by Voyager Digital Ltd. ("Voyager") and Voyager Digital LLC ("VDL") was an unregulated and unsustainable fraud. In the *Cassidy* Action, Plaintiffs also alleged that Defendant Ehrlich, Voyager's CEO, teamed up with Defendants Cuban and the Dallas Mavericks to promote Voyager, by making false representations and employing other means of deception. As a result, the Voyager plaintiff and Voyager class members, all sustained losses in excess of $5 billion.

15.     The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting Voyager—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Dallas Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

16.     After the *Cassidy* Complaint was filed, the following important actions took place:

(a)     the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b)     seven state Attorneys General (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPA was an

unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022; and

(c)    on March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the EPA was not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[8]

17.    On July 5, 2022, Voyager Digital Holdings, Inc. and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases (the "Voyager Bankruptcy Cases") are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

18.    On September 28, 2022, Voyager filed a motion in the Voyager Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

19.    Everyone involved in the Voyager Bankruptcy Cases thought that the FTX Entities were the *deus ex machina* come to save the day by bailing out Voyager and paying back at least some of the losses the Voyager customers sustained.

20.    Instead, as explained below, the FTX Entities imploded, their over $30 billion in value evaporated almost overnight, and the FTX Entities found themselves filing their own emergency Chapter 11 bankruptcy petition in Delaware. The Deceptive FTX Platform maintained by the FTX Entities was truly a house of cards, a Ponzi scheme where the FTX Entities shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the YBAs and loans to pay interest to the old ones and to attempt to maintain the appearance of liquidity.

---

[8] https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed October 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed December 5, 2022).

21.     Part of the scheme employed by the FTX Entities involved utilizing some of the biggest names in sports and entertainment—like these Defendants—to raise funds and drive American consumers to invest in the YBAs, which were offered and sold largely from the FTX Entities' domestic base of operations here in Miami, Florida, pouring billions of dollars into the Deceptive FTX Platform to keep the whole scheme afloat.

22.     Importantly, although Defendants disclosed their partnerships with the FTX Entities, they have never disclosed the nature, scope, and amount of compensation they personally received in exchange for the promotion of the Deceptive FTX Platform, which the SEC has explained that a failure to disclose this information would be a violation of the anti-touting provisions of the federal securities laws.[9] Moreover, none of these defendants performed any due diligence prior to marketing these FTX products to the public.

23.     The SEC took action against boxing champ Floyd Mayweather and music producer DJ Khaled after they were paid by cryptocurrency issuers to tweet promotional statements about investing in Initial Coin Offerings (ICOs), ordering them both to pay disgorgement, penalties and interest for promoting investments in ICOs, including one from cryptocurrency issuer Centra Tech, Inc, for a combined total of $767,500 because they failed to disclose that their promotional efforts on Twitter were paid endorsements.[10]

24.     Other celebrities similarly accused and prosecuted for failing to disclose their paid endorsements include Kim Kardashian and basketball player Paul Pierce.[11] According to the Federal Trade Commission, cryptocurrency scams have increased more than ten-fold year-over-year with consumers losing more than $80 million since October 2020, due in large part to the use of such celebrity endorsements. [12]

25.     As explained more fully in this Complaint, Defendants' misrepresentations and omissions made and broadcast around the country through the television and internet render them

---

[9]     https://www.ubergizmo.com/2017/11/sec-celebrities-disclose-payment-cryptocurrency-endorsements/#:~:text=It%20has%20issued%20a%20statement%20warning%20celebrities%20that,without%20disclosing%20that%20they%E2%80%99ve%20been%20paid%20for%20it (accessed December 5, 2022).

[10]     https://news.bloomberglaw.com/us-law-week/insights-celebrity-endorsements-and-cryptocurrency-a-cautionary-tale (accessed December 5, 2022).

[11]     https://blockbulletin.com/news/altcoins/kim-kardashian-among-other-celebrities-sued-for-promoting-cryptocurrencies/ (accessed December 5, 2022).

[12]     https://florida.foolproofme.org/articles/770-celebrity-cryptocurrency-scam (accessed December 5, 2022).

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*

liable to Plaintiffs and all other FTX customers for soliciting their purchases of the unregistered YBAs. *Wildes v. Bitconnect Int'l PLC*, No. 20-11675 (11th Cir. Feb. 18, 2022) (holding that promoters of cryptocurrency through online videos could be liable for soliciting the purchase of unregistered securities through mass communication, and no "personal solicitation" was necessary for solicitation to be actionable).

26.     This action seeks to hold Defendants responsible for Plaintiffs' damages and for the Court to decide the legal question of whether: (1) the YBA offered and sold to Plaintiffs—the same one offered and sold to millions of other Americans for collectively billions of dollars—constituted an unregistered security, and whether (2) the FTX Florida Defendants (the FTX Brand Ambassadors) violated the Florida consumer protection statute, by violating the long standing FTC (and other) federal and state regulations, on the requirements for touting investment products through celebrity endorsements.

## PARTIES

27.     Plaintiff Michael Norris is the Plaintiff that filed the original Complaint before this Court.  He is a citizen and resident of the State of New Jersey. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Norris purchased an unregistered security from FTX in the form of a YBA and funded the account with sufficient assets to earn interest on his holdings. Plaintiff Norris did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform, as detailed in this complaint, and purchased the YBA and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Norris has sustained damages for which Defendants are liable.

28.     Plaintiff Brandon Rowan is a citizen and resident of the State of Tennessee. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Rowan purchased an unregistered security from FTX in the form of a YBA and funded the account with sufficient assets to earn interest on his holdings. Plaintiff Rowan did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform, as detailed in this complaint, and purchased the YBA and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Rowan has sustained damages for which Defendants are liable.

29.     Plaintiff Michael Livieratos is a citizen and resident of the State of Connecticut. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Livieratos purchased an unregistered security from FTX in the form of a YBA and funded the account with sufficient assets

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*

to earn interest on his holdings. Plaintiff Livieratos did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform, as detailed in this complaint, and purchased the YBA and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Livieratos has sustained damages for which Defendants are liable.

30.     Plaintiff Shengyun Huang is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Huang purchased an unregistered security from FTX in the form of a YBA and funded the account with sufficient assets to earn interest on his holdings. Plaintiff Huang did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform, as detailed in this complaint, and purchased the YBA and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Huang has sustained damages for which Defendants are liable.

31.     Plaintiff Vijeth Shetty was at all relevant times a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Shetty purchased an unregistered security from FTX in the form of a YBA and funded the account with sufficient assets to earn interest on his holdings. Plaintiff Shetty did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform, as detailed in this complaint, and purchased the YBA and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Shetty has sustained damages for which Defendants are liable.

32.     Plaintiff Bo Yang is a citizen and resident of the State of Florida. She is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Yang purchased an unregistered security from FTX in the form of a YBA and funded the account with sufficient assets to earn interest on her holdings. Plaintiff Yang did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform, as detailed in this complaint, and purchased the YBA and/or executed trades on the Deceptive FTX Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Yang has sustained damages for which Defendants are liable.

33.     Defendant Thomas Brady, NFL quarterback currently playing for the Tampa Bay Buccaneers, is a brand ambassador of FTX, and is a citizen and resident of Miami-Dade County, Florida.

34.     Defendant Kevin O'Leary, "Mr. Wonderful," a businessman, television personality appearing regularly on *Shark Tank*, and brand ambassador for FTX, is a citizen and resident of Miami Beach, Florida.

35.     Defendant David Ortiz, former designated hitter and first baseman in the MLB and a brand ambassador for FTX, is a citizen and resident of the State of Florida.

## JURISDICTION AND VENUE

36.     This action seeks, among other things, an expedited declaratory ruling for deciding the legal question of whether the YBA offered and sold to Plaintiffs—the same, exact one offered and sold to millions of other Americans for collectively billions of dollars—constituted an unregistered security. Accordingly, this action is well within the exclusive plenary jurisdiction of the Circuit Court as the amount in controversy far exceeds $30,000.00, exclusive of interest, costs and attorney's fees. Moreover, assignment to the Complex Business Litigation Division is proper because the amount in controversy far exceeds $1 million and involves complex issues.

37.     This Court has personal jurisdiction against Defendants because they are all admittedly Florida residents, who also conduct business in Florida, and/or have otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of FTX's YBAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of FTX's unregistered securities to consumers in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

38.     Venue is proper in this District pursuant to sections 47.011 and 47.051 because Defendants reside in this District; Defendants engaged in business in this District; and a substantial part of the events or omissions giving rise to the claims at issue occurred in this District.

39.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

### A.     Background on FTX.

40.     Until seeking the protection of the Bankruptcy Court, the FTX Entities operated a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive FTX Platform") that placed cryptocurrency trade orders on behalf of users like Plaintiffs and offered interest bearing cryptocurrency accounts.

41.     The FTX group of companies (FTX Group or FTX) was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established in order to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

42.     Prior to that, The Silicon Valley-born, MIT-educated Bankman-Fried, also known as SBF, launched his crypto trading firm, Alameda Research, in 2017,[13] after stints in the charity world and at trading firm Jane Street.[14]

43.     The FTX.com exchange was extremely successful since its launch. This year around $15 billion of assets are traded daily on the platform, which now represents approximately 10% of global volume for crypto trading. The FTX team has grew to over 300 globally. Although the FTX Entities' primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[15]

44.     FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 *billion dollars*.

45.     Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

46.     At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[16]

---

[13]     https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed December 5, 2022).

[14]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 5, 2022).

[15]     https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed December 5, 2022).

[16]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 5, 2022).

47.     In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[17]

48.     Bankman-Fried's cryptocurrency empire was officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[18]

49.     After obtaining this information, Changpeng "CZ" Zhao, the CEO of Binance, decided to liquidate roughly $530 million-worth of FTT. Customers also raced to pull out, and FTX saw an estimated $6 billion in withdrawals over the course of 72 hours, which it struggled to fulfill.[19] The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8th, that Binance would buy FTX, effectively bailing it out.[20]

50.     The next day, Binance announced that it was withdrawing from the deal, citing findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[21] The news sent FTT plunging even further — Bankman-Fried saw 94% of his net

---

[17]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 5, 2022).

[18]     https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed December 5, 2022).

[19]     https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed December 5, 2022).

[20]     https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed December 5, 2022).

[21]     https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed December 5, 2022).

worth wiped out in a single day.[22] On November 11th, unable to obtain a bailout, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[23]

     51.    Following his resignation, Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Entities went wrong:[24]



---

[22]  https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed December 5, 2022).

[23]  https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed December 5, 2022).

[24]  https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed December 5, 2022).

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*







*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*



*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*



SBF ✔ @SBF_FTX · Nov 10

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

87    234    2,625



SBF ✔ @SBF_FTX · Nov 10

12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

102    274    3,007



SBF ✔ @SBF_FTX · Nov 10

13) Because at the end of the day, I was CEO, which means that *I* was responsible for making sure that things went well.  *I*, ultimately, should have been on top of everything.

I clearly failed in that.  I'm sorry.

180    423    4,122



SBF ✔ @SBF_FTX · Nov 10

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

129    235    2,502







*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*



**SBF** ✔ @SBF_FTX · Nov 10

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers.  That's it.

💬 144        🔁 158        ♡ 1,970        ⬆️



**SBF** ✔ @SBF_FTX · Nov 10

19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406        🔁 760        ♡ 2,776        ⬆️



**SBF** ✔ @SBF_FTX · Nov 10

20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses.  So for now, all I'll say is:

well played; you won.

💬 1,532        🔁 3,303        ♡ 8,047        ⬆️



**SBF** ✔ @SBF_FTX · Nov 10

21) NOT ADVICE, OF ANY KIND, IN ANY WAY

I WAS NOT VERY CAREFUL WITH MY WORDS HERE, AND DO NOT MEAN ANY OF THEM IN A TECHNICAL OR LEGAL SENSE; I MAY WELL HAVE NOT DESCRIBED THINGS RIGHT though I'm trying to be transparent.  I'M NOT A GOOD DEV AND PROBABLY MISDESCRIBED SOMETHING.

💬 908        🔁 1,055        ♡ 3,463        ⬆️

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*



52.     According to a recent Reuters report, however, another explanation contributing to the precarious house of cards that was the Deceptive FTX Platform is that earlier this year, Bankman-Fried secretly transferred ***at least $4 billion*** in customer funds from FTX to Alameda without telling anyone, after Alameda was hit with a series of losses, and that the FTX entities lent more than ***half*** of its ***$16 billion*** in ***customer funds*** to Alameda in total, with more than ***$10 billion in loans outstanding***.[25]

**B.      FTX's offer and sale of YBAs, which are unregistered securities.**

53.     Beginning in 2019, the FTX Entities began offering interest-bearing cryptocurrency accounts to public investors. Plaintiffs and other similarly situated individuals invested in FTX's YBAs.

54.     FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

55.     The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Entities offered variable interest rewards on crypto assets held in the YBAs on the Deceptive FTX Platform, which rates were determined by the FTX Entities in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Entities pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

---

[25]     https://markets.businessinsider.com/news/currencies/ftx-crash-client-funds-alameda-binance-sbf-sec-cftc-probe-2022-11?utm_medium=ingest&utm_source=markets (accessed December 5, 2022).

56.     On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

> I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

> I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

>> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.

>> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

> FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

> FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[26] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY? Does my balance compound daily?* that read, in part, as follows:

---

[26] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application with developed by Blockfolio.

FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

**FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.

**FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.

FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not

been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

## C.  The Defendants Aggressively Marketed the FTX Platform

57.     In addition to the conduct of Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have been Brand Ambassadors for the company. A number of them hyped FTX directly to their social media fans, driving retail consumer adoption of the Deceptive FTX Platform.

58.     In April 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the Deceptive FTX Platform.

59.     FTX's explanation for using stars like Brady, O'Leary, and others was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[27]

60.     In other words, the FTX Entities needed celebrities like Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of the YBAs, which are unregistered securities. Below are representative statements and advertisements Defendants made to drive the offers and/or sales of the YBAs, which Plaintiffs will supplement as the case progresses and discovery unfolds.

---

[27]     https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed December 5, 2022).

## Defendant Tom Brady



61.     The star quarterback became an FTX ambassador last year. He also took an equity stake in FTX Trading Ltd.

62.     Mr. Brady also joined the company's $20-million ad campaign in 2021. They filmed a commercial called "FTX. You In?" showing him telling acquaintances to join the FTX platform. The ad can be viewed here: https://www.youtube.com/watch?v=uymLJoKFlW8

## Defendant Kevin O'Leary



63.     "Mr. Wonderful," both a brand ambassador and an FTX shareholder, made several public statements designed to induce consumers to invest in the YBAs.

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*

64.     "To find crypto investments opportunities that met my own rigorous standards of compliance, I entered into this relationship with @FTX_Official," Mr. O'Leary said on Twitter last year. Mr. O'Leary *recently deleted the tweet*.

65.     He also served as a judge for the FTX Charity Hackathon in Miami in March of 2022.[28]

66.     And *very* recently, on October 12, 2022, O'Leary stated confidently that FTX was totally compliant and a safe place to hold assets. O'Leary stated that: "I have to disclose I'm a paid spokesperson to a FTX and shareholder there, too, cause we mentioned him and I'm a big advocate for Sam because he has two parents who are compliance lawyers. If there's ever a place I could be that I'm not gonna get in trouble it's going to be in FTX so you know that's there they're great people but he gets the job in compliance which is why he's working so hard to get regulation."[29]



67.     He went on to state that "[t]here are a lot of signs right now that point to things looking bad. Crypto has taken a big hit and investors are wondering if things will turn around. If you follow history and the pattern of things, you know that this is RIGHT ON TRACK and we'll soon see a resurgence with crypto. Do you think we're entering a Bullish period? Let me know in the comments!"[30]

---

[28] https://ftxcharityhackathon.com/ (accessed December 5, 2022).

[29] *See* https://www.youtube.com/watch?v=iwD_zWgyUz8 beginning at 17:32 (accessed December 5, 2022)

[30] *Id.*

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*

## Defendant David Ortiz



68.     Defendant David Ortiz, who became an FTX brand ambassador and hyped the YBAs in exchange for cryptocurrency and multiple collections of NFTs, also ran his own FTX "You In?" ad, which began running nationwide during the first game of the 2021 World Series.

69.     In the ad, which can be found here: https://www.ispot.tv/ad/qSlm/ftx-big-papi-is-in, Ortiz is watching a game on the television when he receives a phone call from The Moon. Inspired by the "moonblast" home run scored on the field, The Moon frantically tells David about opportunities to get into cryptocurrency with FTX. David decides it's an offer he can't refuse and joins fellow sports stars Stephen Curry and Tom Brady on the platform. FTX announces it is the official crypto exchange of MLB.

## <u>COUNT ONE</u>

### Violations of the Florida Statute Section 517.07,

### The Florida Securities and Investor Protection Act

70.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–69 above, as if fully set forth herein.

71.     Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

72.     Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

73.     The YBA is a security pursuant to Fla. Stat. § 517.021(22)(a).

74.     The YBAs sold and offered for sale to Plaintiffs was not:

    a.   exempt from registration under Fla. Stat. § 517.051;

    b.   a federal covered security;

    c.   registered with the Office of Financial Regulations (OFR); or

    d.   sold in a transaction exempt under Fla. Stat. § 517.061.

75.     The FTX Entities sold and offered to sell the unregistered YBAs to Plainitff.

76.     Defendants are directors, officers, partners and/or agents of the FTX Entities pursuant to Fla. Stat. § 517.211.

77.     The FTX Entities, with Defendants' material assistance, offered and sold the unregistered YBAs to Plaintiffs. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiffs sustained damages as herein described.

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*

## <u>COUNT TWO</u>

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**

**§ 501.201, Florida Statutes, *et seq.***

78.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–69 above, as if fully set forth herein.

79.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

80.     Plaintiffs are each a consumer as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

81.     Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

82.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

83.     Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

84.     Plaintiffs have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the Deceptive FTX Platform and in the amount of his lost investment.

85.     The harm suffered by Plaintiffs was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

86.     Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs make claims for actual damages, attorneys' fees and costs.

87.     Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*

## COUNT THREE

### Civil Conspiracy

88.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–69 above, as if fully set forth herein.

89.     The FTX Entities and Defendants made numerous misrepresentations and omissions to Plaintiffs about the Deceptive FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive FTX Platform were safe and were not being invested in unregistered securities.

90.     The FTX Entities entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs to invest in the YBAs and/or use the Deceptive FTX Platform.

91.     Defendants engaged in unlawful acts with the FTX Entities, namely, the misrepresentations and omissions made to Plaintiffs and the sale of unregistered securities.

92.     Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Entities; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Entities, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

93.     Defendants' conspiracy with the FTX Entities to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT FOUR

### Declaratory Judgment

### (Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq.*)

94.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–69 as if fully set forth herein.

95.     This Count is asserted against Defendants under Florida Statutes §§ 86.011, *et seq.*

96.     There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*

97.     Plaintiffs have an obvious and significant interest in this lawsuit.

98.     Plaintiffs each purchased a YBA, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as further described hereinabove.

99.     If the true facts had been known, including but not limited to that the YBAs are unregistered securities, the Deceptive FTX Platform does not work as represented, and Defendants were paid exorbitant sums of money to peddle Voyager to the nation, Plaintiffs would not have purchased a YBA in the first place.

100.     Thus, there is a justiciable controversy over whether the YBA was sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiff.

101.     Plaintiffs seek an order declaring that the YBAs are securities required to be registered with the SEC and state regulatory authorities, that the Deceptive FTX Platform did not work as represented, and Defendants were paid exorbitant sums of money to peddle FTX to the nation.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for a judgment:

a.     Awarding actual, direct and compensatory damages;

b.     Awarding restitution and disgorgement of revenues if warranted;

c.     Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful, and that the YBA offered and sold to Plaintiffs—the same one offered and sold to millions of other Americans for collectively billions of dollars—constituted an unregistered security;

d.     Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

e.     Awarding statutory and multiple damages, as appropriate;

f.     Awarding attorneys' fees and costs; and

g.     Providing such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial as to all claims so triable.

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*

Dated: December 5, 2022

Respectfully submitted,

**By: */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

**By: */s/David Boies*
David Boies
(*Pro Hac Vice* Application Forthcoming)
Alex Boies
(*Pro Hac Vice* Application Forthcoming)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Phone: (914) 749–8200
dboies@bsfllp.com

**By: */s/Stephen Neal Zack*
Stephen Neal Zack
Florida Bar No. 145215
Hon. Ursula Ungaro (Ret.)
Florida Bar No. 200883
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., Suite 2800
Miami, FL 33131
Office: 305-539-8400
szack@bsfllp.com
uungaro@bsfllp.com

**By: */s/Jose M. Ferrer*
Jose M. Ferrer
Florida Bar No. 173746
**MARK MIGDAL & HAYDEN**
80 S.W. 8th Street, Suite 1999
Miami, Florida 33130
Telephone: (305) 374-0440
jose@markmigdal.com
eservice@markmigdal.com

*Michael Norris, et al. v. Thomas Brady, et al.*
*Amended Complaint and Demand for Jury Trial*

**By: */s/Ricardo M. Martinez-Cid***

Ricardo M. Martinez-Cid
Florida Bar No. 383988
Lea P. Bucciero
Florida Bar No. 84763
Zachary S. Gorwitz
Florida Bar No. 1025415
**PODHURST ORSECK, P.A.**
One S.E. Third Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 358-2800
Fax: (305) 358-2382
Email: rmcid@podhurst.com
Email: lbucciero@podhurst.com
Email: zgorwitz@podhurst.com
Email: rmcteam@podhurst.com

*Co-Counsel for Plaintiffs*